GARY M. RESTAINO
United States Attorney
District of Arizona
SARAH S. LETZKUS
Assistant U.S. Attorney
Arizona State Bar No. 027314
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: sarah.letzkus@usdoj.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Department of Economic Security, an Arizona State agency,<br><br>Plaintiff,<br><br>vs.<br><br>Christine Wormuth, Secretary of the Army, in her official capacity,<br><br>Defendant. | 4:23-CV-00250-LCK<br><br>**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Doc. 22)** |

Defendant United States of America, by and through, Christine Wormuth, Secretary of the Army, in her official capacity ("Defendant" or the "Army") respectfully submits the following opposition to Plaintiff's Motion for Preliminary Injunction ("Motion") (Doc. 22).

## I.   INTRODUCTION

### A.   Statutory Background

The Randolph-Sheppard Act ("RSA"), first enacted in 1936, and amended in 1954 and 1974, is intended to provide blind persons with "remunerative employment" and "economic opportunities" through the operation of vending facilities on federal property. 20 U.S.C. § 107(a). The RSA provides that "[i]n authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency." 20 U.S.C. § 107(b).

The RSA charges the Secretary of the Department of Education ("Secretary") with responsibility for interpreting and enforcing its provisions. 20 U.S.C. § 107a. The Rehabilitation Services Administration within the United States Department of Education ("USDOE") is responsible for overseeing the detailed operation of the program. 20 U.S.C. § 107a(a)(1).

Under the RSA federal agencies do not make vending agreements directly with blind vendors. Rather, the RSA provides that the Secretary shall designate an agency in each state as the State licensing agency ("SLA") for blind vendors. 20 U.S.C. § 107a(a)(5). As part of the designation process, the state agrees to cooperate with the Secretary in carrying out the RSA to provide training, and, if necessary, to provide each blind person with an initial stock of articles for his vending facility. *Id.* § 107b; 34 C.F.R. § 395.6. An SLA designated by the Secretary is authorized, with the approval of the head of the federal agency in control of the property on which the vending facility is to be located, to select the location for the vending facility and the type of facility to be provided.[1] 20 U.S.C. § 107a(c); 34 C.F.R. § 395.7. Blind vendors remain licensees of the state and are not paid salaries by the state; rather, they earn income derived from the profits of the vending facilities operated by them, and may receive payments from funds set aside from the program.[2] 20 U.S.C. § 107b(3)(D); 34 C.F.R. § 395.9. The RSA therefore creates two relationships — one between the federal entity and the SLA, and another between the SLA and the blind vendor.

---

[1] Licensed blind persons may vend newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services approved by the state agency, including the vending of or exchange of chances for any lottery authorized by state law. 20 U.S.C. § 107a(a)(5).

[2] The RSA also provides that some or all of the income from vending machines not operated by a blind vendor accrue to the blind vendor operating a RSA facility on the federal property, or to the appropriate SLA. 20 U.S.C. § 107d-3(b).

1     **B.     Procedural Background of This Case**

2          Plaintiff, Arizona Department of Economic Security ("ADES"), an agency of the

3     State of Arizona and the designated SLA under the RSA, brought this action alleging a

4     violation of the RSA, 20 U.S.C. §§ 107, et seq. Plaintiff contends that Defendant violated

5     the RSA when Plaintiff's bid was removed from consideration to be selected to operate

6     dining facilities located on the Ft. Huachuca Army installation after its bid was found to

7     be technically deficient and not in the competitive range. (Doc. 1.) Specifically,

8     Plaintiff's bid failed to satisfy the Solicitation's requirements because its technical

9     capability subfactor 2 (staffing) was unacceptable. **Exhibit A**, Declaration of Michael

10    Vicory, at ¶ 12.)

11         Pursuant to the requirements of the RSA, 20 U.S.C. § 107d-1(b), on May 30,

12    2023, ADES filed a request for arbitration with the United States Department of

13    Education ("USDOE") challenging the Army's exclusion of ADES from consideration

14    for the award of the contract to provide dining services at Ft. Huachuca. *See* Ex. A, at ¶

15    18 & Att. 1.) The arbitration request raised five issues; namely:

16         (1) Did the Army violate the RSA by improperly judging ADES's bid to be

17    technically unacceptable.

18         (2) Did the Army violate the RSA by excluding ADES's bid from the competitive

19    range even though the deficiencies with the bid could allegedly have been remedied by

20    meaningful discussions;

21         (3) Did the Army violate the RSA implementing regulations by failing to consult

22    with the Secretary so that he could determine whether Plaintiff was able to provide the

23    dining services at a reasonable cost;

24         (4) Did the Army violate the RSA by failing to apply the stated bid evaluation

25    criteria equally to Plaintiff's bid as it did to other bids; and

26         (5) Did the Army violate the RSA by relying on factors other than the criteria

27    stated in the Solicitation when evaluating bids and setting the competitive range.,

28

(6) What steps should the Army take to carry out the eventual decision of the arbitration panel.

*See* Plaintiff's Ex. 17. Plaintiff's current motion for injunctive relief addresses only issues one through three.[3]

It is important to note that RSA arbitrations often drag on for years. *See* Ex. A, at ¶ 19. It is up to the USDOE to decide when the arbitration occurs—not the contracting agency—and the USDOE often delays the arbitration. Vendors have used the preliminary injunction process to force the government to contract with them for years after their proposals were deemed technically unacceptable. *Id.* For example, in another RSA dispute regarding the provision of food services at Ft. Moore (fka Ft. Benning) in Georgia, the vendor ***obtained an injunction in 2018*** ordering the government to keep the contract in place until the arbitration was decided. ***The arbitration has not yet occurred as of July 2023***. In January 2023, the court ultimately modified the injunction to allow the Army to go ahead and issue another solicitation recognizing that "[t]he Court never intended the preliminary injunction to guarantee an indefinite period of arbitration" and "the potential arbitration delayed these proceedings through the term of the contract [in dispute]. Accordingly, it would be inefficient and antithetical to the purpose of a preliminary injunction to allow the injunction to live past the term of the 2018 Solicitation in the hopes of an arbitration hearing in the indefinite future." *See Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, No. 4:18-CV-148, 2023 WL 1110298, at *3 (E.D. Va. Jan. 30, 2023).

On July 10, 2023, the Secretary authorized the convening of an arbitration panel to hear and render a decision on the issues raised in the request. Ex. A, at ¶ 18 & Att. 2. The central issues to be determined in the arbitration are whether the Army violated the RSA

---

[3] Plaintiff's Motion states that "[f]or purposes of this Motion, ADES focuses on first two issues" submitted for arbitration (Doc. 22, at 20), but Plaintiff goes on to argue the third issue—failure to consult with the Secretary (*id.* at 23-24); as such this Response addresses the first three issues.

by finding Plaintiff's bid technically unacceptable, by applying solicitation criteria unfairly, and by ultimately excluding Plaintiff from the competitive range. *Id.* at Att. 2, at 1. The USDOE determined that issue three—consultation with the Secretary—will not be before the arbitration panel because the facts Plaintiff alleges regarding that issue would not constitute a violation of the RSA or its regulations as such consultation was required only if Plaintiff's bid was included in the competitive range and ranked among those proposals which had a reasonable chance of being selected for a final award.[4] *Id.* at 2. Plaintiff's bid was excluded from the competitive range because it was unacceptable for the technical capability factor. Ex. A, at ¶ 14.

Plaintiff filed the present motion for injunctive relief requesting that until the arbitration panel convenes to render a decision under the RSA the Army should have ADES as the contractor to provide food services to Ft. Huachuca's soldiers. (Doc. 22.) While Plaintiff purports that it merely seeks to preserve the *status quo* pending a decision by the arbitration panel, in reality, Plaintiff attempts to force Defendant to enter into a new contract with ADES (known as a "bridge contract") for an indeterminate period of time. Plaintiff's attempt to remain as the operator of dining facilities at Ft. Huachuca must be denied.

Plaintiff will not be able to prove that it is likely to prevail on the merits of the arbitration because the RSA is not triggered when a vendor's bid is found to be outside the competitive range due to technical issues with its bid. Second, Plaintiff will not be able to prove irreparable harm because its contract was scheduled to expire on August 31, 2023 (*see* Doc. 1 at ¶ 16), and it had no basis to have a reasonable expectation that its contract would be further extended or renewed. Third, the balance of the equities and the public interest weigh against Plaintiff being granted injunctive relief because Plaintiff's

---

[4] The Secretary also rejected issue six because the arbitration panel only has the ability to determine whether a violation of the RSA occurred and does not have authority to order an agency to undertake any particular remedy. *See* Ex. A, at Att. 2, at 3.

operating plan does not provide sufficient staffing to properly service the Ft. Huachuca dining facilities. Finally, the relief sought by Plaintiff is a mandatory injunction, triggering a higher burden, because it would force the Army to continue a contractual relationship that is due to expire on August 31, 2023.

## C.   Factual Background of This Case

On March 25, 2022, the Army's Mission and Installation Contracting Command (MICC) issued Solicitation No. W9124J21R0027 (the "Solicitation") to provide full food service to Fort Huachuca's dining facilities. Ex. A, at Att. 1. The purpose of the contract was to ensure seamless provision of quality food and services to Fort Huachuca's soldiers. Ex. A, at ¶ 4. In accordance with Title 34 of the Code of Federal Regulations (C.F.R), Section 395.33, Operation of Cafeterias by Blind Vendors, the Army had the right to choose one of two methods of selecting contracts to operate the dining facilities to establish priority in selection under the RSA: direct negotiations or competitive selection processes. 34 C.F.R., § 395.33. The Army was not required to use the direct negotiations method. *See* 34 C.F.R., § 395.33(b). In this instance, the Army chose to use competitive selection processes. Ex. A, at ¶ 5.

The Solicitation informed the offerors, including Plaintiff, that proposals would be evaluated under three factors: (1) technical capability, (2) past performance, and (3) price. *Id.* ¶ 7. The evaluation criteria were put in place to meet the Army's minimum requirements. *Id*. The Solicitation outlined all steps in the evaluation process. *Id.* ¶ 8.

The Solicitation was based on the current demands of the requiring authority, activity, Army Sustainment Command ("ASC"), in support of its critical mission of feeding soldiers at Ft. Huachuca. The Solicitation's technical capability factor had two subfactors that the offerors, including Plaintiff, were required to include—an organizational structure and a staffing plan. *Id.* ¶ 7. The Army evaluated proposals' technical capability on an "acceptable and unacceptable basis." *Id.* ¶ 7. An "unacceptable" rating in any sub-category (like staffing, for example) rendered the proposal technically unacceptable because it did not meet the requirements of the

Solicitation." *Id.* ¶ 7 and Att. 1, at 106. All those seeking to bid on the contract, including Plaintiff, had an opportunity to submit "any and all technical questions or clarifications" to the Contracting Officer and Contract Specialist. Ex. A, at ¶ 9.

On April 21, 2022, the MICC amended the Solicitation providing additional information, including technical questions and answers which assisted potential offerors in forming their proposals. *Id.* ¶ 10. The Army further modified the Solicitation on May 6, 2022, assisting the offerors in meeting the Agency's minimum requirements even further. *Id.* The Army's attempt to assist the offerors within the limits of the Federal Acquisition Regulation ("FAR") resulted in a final, May 9, 2022, amendment that once more included technical questions and answers. *Id.*

The Army complied with RSA's priority requirement by allowing Plaintiff to submit a bid despite the Solicitation being exclusively set-aside 100% for small businesses even though Plaintiff is not a small business. *Id.* ¶ 11. Plaintiff submitted its bid in May 2002. *Id.* Prior to that date, Plaintiff did not raise any questions or concerns about the evaluation process or the requirements of the Solicitation. *Id.*

The Source Selection Evaluation Board ("SSEB") conducted a technical evaluation of all bids, including Plaintiff's bid. *Id.* ¶ 12. The SSEB found Plaintiff's bid to be technically acceptable with respect to past performance. *Id.* However, the SSEB ultimately concluded that ADES's proposal failed to comply with the Solicitation's minimum requirements because its technical capability subfactor 2 (staffing) was unacceptable, specifically with respect to Cashiers. *Id.* ¶ 13. The Contracting Officer notified the Plaintiff of the bid's unacceptability on January 20, 2023. *Id.* ¶ 14. Plaintiff's technically unacceptable bid precluded Defendant from including Plaintiff in the competitive range. *Id.*

Plaintiff was offered an opportunity to have a debriefing. *Id.* ¶ 15. In the debriefing, the Contracting Officer provided the required information delineated in FAR 15.505(e). *Id.* Plaintiff complains that Defendant did not engage in discussions with Plaintiff regarding the deficiencies with its bid prior to its exclusion from the competitive

range. However, the Contracting Officer could not engage in discussions with Plaintiff regarding the technical deficiencies in its bid prior to the establishment of the competitive range without violating FAR 15.306, Exchanges with offerors after receipt of proposals. *Id.* ¶ 23.

Contracting Officers are not required to engage in the re-evaluation of a bid after it has been eliminated from the competitive range; the debrief provides the government's rationale, and no further information is required. *Id.* ¶ 21. However, in response to Plaintiff's concerns regarding the technical evaluation and the decision to exclude ADES's proposal from the competitive range, the Contracting Officer requested that the requiring activity, Army Sustainment Command ("ASC"), provide an independent review of Plaintiff's proposal. *Id.* ¶ 17.

ASC provided two subject matter experts ("SMEs") who were not members of the original SSEB and who know what an Army dining facility needs to feed soldiers. *Id.* The SME's independent review validated the findings of the SSEB that Plaintiff's bid did not satisfy the technical capability factor because of an unacceptable staffing plan, and that it was correctly removed from the competitive range as a result. *Id.*

All Plaintiff had to do to be included in the competitive range was to submit a bid that met the minimum requirements of the Solicitation. It failed to do so. Plaintiff's claims are simply without merit.

## II.   ARGUMENT

### A.   Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To receive preliminary injunctive relief, the moving party must show (1) a likelihood of success on the merits; (2) that the plaintiff will likely suffer irreparable harm in the absence of the preliminary relief sought; (3) that the balance of the equities tip in its favor; and (4) that the injunction would be in the public interest. *Id.* at 20. As the party moving for injunctive relief,

Plaintiff bears the burden of persuasion with respect to each of the required elements. *Id.* at 22.

A mandatory injunction seeks relief beyond maintaining the status quo and is particularly disfavored. *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (*citing Martinez v. Mathews*, 544 F.2d 1233, 1234 (5th Cir. 1976)). A heightened standard is applied when a party seeks mandatory injunctive relief: the Court must find a strong likelihood that the plaintiff would succeed on the merits of its claims and that the law and facts clearly favor the plaintiff. *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1156-1157 (9th Cir. 2007).

This Motion seeks a mandatory injunction that forces the parties to continue in a contractual relationship beyond its scheduled expiration, which is more than merely preserving the status quo. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (Equal Pay Act plaintiff's request for temporary restraining order reinstating to her former position after her contract had expired sought a mandatory injunction in that it did not maintain the status quo but created a new and onerous obligation for employer). RSA arbitrations last multiple years. Ex. A, at ¶ 19. In the interim, the government must continuously negotiate short term sole source contracts with the incumbent contractor (here, ADES). *Id.*  As such, the Court should treat the Motion as seeking relief beyond maintaining the status quo. *See Oklahoma by & through Oklahoma Dep't of Rehab. Servs. v. United States by & through Mattis*, No. CIV-18-1197-SLP, 2018 WL 10373342, at *2 (W.D. Okla. Dec. 17, 2018) ("Rather than seeking to maintain the status quo through a TRO or injunction until the Court can reach the merits of the parties' [RSA] dispute, the [SLA] would accomplish its ultimate litigation objective if the Court ruled for it on its motion. This would not be a proper use of the Court's equitable powers as it would be allowing a suit for a traditional injunction in the abstract.")

1

**B.     Plaintiff Will Not Succeed on the Merits**

2       Here, an arbitration panel will decide the merits of Plaintiff's claims. Judicial

3  review of Plaintiff's claim may occur after the arbitration panel issues its decision. 20

4  U.S.C. § 107d-2(a). As such, the focus of the Court's decision on the Motion here should

5  be whether Plaintiff is likely to succeed in the arbitration and in any future judicial

6  review of the arbitration panel's decision.

7       In evaluating whether Plaintiff is likely to succeed on the merits here, the Court

8  must keep in mind the deference afforded to contracting officers' decisions. Regardless

9  of what any arbitration panel has said about whether this deference is applicable with

10  respect to the panel's review, the United States Court of Federal Claims has confirmed

11  that the traditional deference does apply in judicial review of RSA disputes *See N.*

12  *Carolina Div. of Servs. For Blind v. United States*, 53 Fed. Cl. 147, 159 (2002), *aff'd sub*

13  *nom. N. Carolina Div. of Servs. for the Blind v. United States*, 60 F. App'x 826 (Fed. Cir.

14  2003). By virtue of this deference, a court may overturn the government's procurement

15  decision only if "(1) the procurement official's decision lacked a rational basis; or (2) the

16  procurement procedure involved a violation of regulation or procedure." *Impresa*

17  *Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir.

18  2001). In conducting the rational-basis analysis, the court looks to "whether the

19  contracting agency provided a coherent and reasonable explanation of its exercise of

20  discretion." *Id.* at 1333 (internal quotation marks omitted). And the court affords

21  "contracting officers ... discretion upon a broad range of issues." *Id.* at 1332-33 (internal

22  quotation marks omitted). Accordingly, "the disappointed bidder bears a heavy burden of

23  showing that the award decision had no rational basis." *Id.* (internal quotation marks

24  omitted). Protests alleging a violation of regulation or procedure "must show a clear and

25  prejudicial violation." *Id.* at 1333 (internal quotation marks omitted).

26

27

28

1

2

### 1.     RSA priority does not require inclusion of technically unacceptable bids in the competitive range

3  The RSA provides for a priority to blind vendors to operate cafeterias under some

4  circumstances, but that priority is not an absolute, unqualified right to a contract. *See*

5  *Randolph-Sheppard Vendors of Am., Inc. v. Harris*, 628 F.2d 1364, 1367 (D.C. Cir.

6  1980) ("It would be unreasonable to require agency heads to grant *unqualified* priorities

7  to blind vendors to operate cafeterias …. In fact, such a scheme, unlike the present one,

8  would actually exceed the authority delegated to the Secretary by the Amendments").

9  The RSA provides that "[b]lind persons licensed under the provisions of this Act shall be

10  authorized to operate vending facilities on *any* Federal property." 20 U.S.C. § 107(a)

11  (emphasis added). The RSA, pursuant to 20 U.S.C. § 107d- 3(e), directs the Secretary,

12  through the Commissioner of the Rehabilitation Services Administration

13  ("Commissioner"), to

14

15

16

> prescribe regulations to establish a priority for the operation of cafeterias on
> Federal property by blind licensees when he determines, on an individual
> basis and after consultation with the head of the appropriate installation, that
> such operation can be provided at a reasonable cost with food of a high
> quality comparable to that currently provided….

17  The implementing regulations promulgated by the Secretary are set forth at 34

18  C.F.R. §§ 395.1- 395.38 (2017). Section 395.33(a) provides that: "Priority in the

19  operation of cafeterias by blind vendors on Federal property shall be afforded when the

20  Secretary determines, on an individual basis, and after consultation with the appropriate

21  property managing department, agency, or instrumentality, that such operation can be

22  provided at a reasonable cost, with food of a high quality..." 34 C.F.R. § 395.33(a)

23  (emphasis added). Section 395.33(b) then provides:

24

25

26

27

28

> [T]he appropriate State licensing agency shall be invited to respond to
> solicitations for offers when a cafeteria contract is contemplated by the
> appropriate property managing department, agency, or instrumentality. Such
> solicitations for offers shall establish criteria under which all responses will
> be judged. Such criteria may include sanitation practices, personnel,
> staffing, menu pricing and portion sizes, menu variety, budget and
> accounting practices. **If the proposal received from the State licensing
> agency is judged to be within a competitive range and has been ranked**

**among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section.** (Emphasis added).

The U.S. Court of Appeals for the Fourth and Tenth Circuits, the U.S. Court of Appeals for the Federal Circuit, and the U.S. Court of Federal Claims, have explicitly interpreted the RSA to require a vendor's proposal for a competed cafeteria operations contract to first be placed in the competitive range and have been ranked among those proposals which have a reasonable chance of being selected for the final award by the procuring agency before it may be eligible for application of the "priority" set out in the RSA *See Kansas v. SourceAmerica*, 874 F.3d 1226, 1231-32 (10th Cir. 2017), *Nish v. Cohen*, 247 F.3d 197, 203 (4th Cir. 2001), *Kentucky v. United States*, 424 F.3d 1222, 1224 (Fed. Cir. 2005), *Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States*, 62 Fed. Cl. 445, 455 (2004), *Miss. Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20, 22 (2004).

Plaintiff's apparent belief that the language of the RSA is so broad as to automatically grant an incumbent blind vendor RSA priority even if its proposal is unacceptable is misplaced and contrary to law. Nothing in Title 20 or the USDOE's RSA regulations supports such a contention. Federal agencies are entitled to determine their requirements and to evaluate proposals received against those requirements. Priority afforded to an SLA solely because it is an incumbent vendor fails to acknowledge the possibility of an SLA fundamentally misconstruing a federal agency's stated requirements set out in a solicitation or, as is the case here, an SLA not submitting a proposal that meets the federal agency's stated minimum requirements.

> **2.**     **Plaintiff will not succeed on its claim that Defendant violated the RSA by finding its proposal technically unacceptable.**

Defendant did not violate RSA's priority provision by correctly determining that Plaintiff's bid was unacceptable as to the technical capability subfactor 2 (staffing). As set forth above, the evaluation of the technical capability factor was an assessment of

offerors' capability to satisfy the Army's **minimum** requirements. Ex. A, Att. 1, at 106. As explicitly stated in the Solicitation, in order to satisfy the staffing plan subfactor of the technical capability factor, it was Plaintiff's burden to "clearly demonstrate" in the proposal as submitted that its "staffing is appropriate to successfully perform the PWS [Performance Work Statement] requirements", including "the number and personnel and the labor mix [necessary] to successfully perform the PWS requirements." *See id.* It was Plaintiff's burden to provide sufficient information in the proposal as submitted to clearly show "(1) that the number of staff and the associated labor type outside of serving times is appropriate to clearly demonstrate successful completion of the PWS requirements and (2) the staffing will ensure successful continuous operations of all PWS tasks during the feeding times…." *Id.* The SSEB determined that the staffing plan with respect to Cashiers was unacceptable because it did not clearly meet these requirements. Contrary to Plaintiff's contention, the Army did not misunderstand the proposal, nor did it ever say or imply any such thing.

One reason why the staffing plan is unacceptable is because it fails to adequately explain how Plaintiff would ensure safety and accountability regarding a cash fund maintained to give change to individuals who paid with cash. *See* Ex. A, at ¶ 21. This deficiency was noted from the beginning. The PWS provides that one of the responsibilities of the vendor is to "[o]perate point of sales system (POS), record headcount, cash collection, cash turn-ins, and **safeguard and maintain accurate accountability of funds**" in the cash fund (the cash fund maintained to give change to individuals who paid in cash.). *See* Ex. A, at Att. 1, at 78 (emphasis added).

The independent review performed by the SMEs confirmed that Plaintiff's staffing proposal did not clearly demonstrate it could safeguard and maintain accountability of the cash fund at two separate dining facilities. The cash fund issue was explained in more detail in the Contracting Officer's April 3, 2023 letter to ADES:

> As it relates to the Thunderbird DFAC, the … SME's noted that normally, the Admin issues the change fund to the headcount and receives the funds back to account on a form DA 3546. Based on your proposal, the Admin

1

2

3

4

5

6

would be issuing the change fund to him or herself and receiving the funds back. ***This is not an appropriate means to safeguard the change fund***. It was not explained how this process would be performed correctly. As it relates to the Weinstein DFAC [dining facility], the SMEs noted that during breakfast and lunch, the ADES Proposal was not clear enough for the evaluators to see how the change fund would be managed with controls for cash. Dinner was unclear on how the cash would be safeguarded from theft for both bands. While hours are ample for managing the headcount and admin functions for the total hours for the day, ***it would not work for accountability at dinner without rearranging hours and providing an explanation in the proposal***. The SME's concluded that the SSEB correctly evaluated ADES's approach as unacceptable.

7    *See* Ex. A, at ¶ 21; Plaintiff's Ex. 14, at 1 (emphasis added). This is not, as Plaintiff

8    contends, a post-hoc excuse for finding the proposal deficient. The SSEB found that

9    Plaintiff's staffing plan was inadequate to satisfy the PWS requirements regarding flow

10    rate. When Plaintiff contended this was based on a misunderstanding and provided

11    clarification, the SMEs found that even with the clarification, the proposal still did not

12    satisfy the PWS because it failed to satisfy the requirements regarding cash fund

13    accountability. It was a legitimate basis to find Plaintiff's proposal deficient.

14         The proposed staffing plan is also unacceptable because Plaintiff did not

15    demonstrate that it can ensure smooth and prompt service or ensure food safety and

16    cleanliness. As the Contracting Officer explained:

17

18

19

20

21

22

23

24

25

The Offeror's staffing does not clearly demonstrate that they can accommodate fluctuating workloads within a band of meals. ***The aforementioned understaffed areas make the offeror's staffing too lean and too risky. In the event of a fluctuating workload, the offeror would not have any leeway to compensate for these understaffed areas within their staffing plan.*** The understaffed periods … regarding Food Sanitation Specialists/Servers, Cooks, and Dining Facility Managers, will not meet PWS requirements for sanitation, food preparation, and cleanliness. ***All understaffed positions would hinder all requirements and standards stated within paragraph 3 of the PWS regarding sanitation.*** Inadequate managing staffing would not satisfy PWS requirements and would cause too much risk of negative performance issues with food products not being cooked and served on time. Too few food sanitation specialists would not satisfy PWS requirements. ***This would cause too much risk of negative performance issues regarding inefficient flow rate, excessive patron times, and not enough staff to satisfactorily clean all food equipment, areas, and meals.***

26    *See* Plaintiff's Ex. 12, at 8 (emphasis added).

27         Plaintiff's contention that Defendant erred in not considering Plaintiff's past

28    performance is both incorrect and a red herring. Defendant ***did*** take past performance into

account. The SSEB specifically evaluated the past performance factor and found that factor was acceptable. Ex. A, at ¶ 12. However, as clearly explained in the Solicitation, Plaintiff could not be included in the competitive range unless all three factors—technical capability, past performance, and price—were acceptable. *Id.* ¶ 7. As Plaintiff's proposal was unacceptable as to the technical capability factor, Plaintiff could not be included in the competitive range despite its acceptable past performance. Plaintiff's contention that its proposal was sufficient because it provided for staffing that had previously been acceptable is irrelevant. The RFP provided that the proposals would be evaluated according to the Army's ***current*** minimum requirements. The Solicitation at issue here is not the same as the solicitation that resulted in Plaintiff being awarded the previous contract. With any procurement, the government evaluates each offeror impartially based on the content of its proposal; it does not make assumptions based on its knowledge of the incumbent's current performance to determine technical acceptability. Ex. A, at ¶ 13. For the RFP being challenged, ADES' proposed technical approach was evaluated as unacceptable, based on its staffing plan. The Army is entitled to determine what its current needs are and, the SSEB and Contracting Officer appropriately evaluated the proposals accordingly. Vendors are not entitled to dictate the staffing requirements of an agency.

### 3.    Defendant was not required to engage in negotiations/discussions regarding Plaintiff's technically unacceptable bid

Plaintiff's contention that RSA required Defendant to negotiate the staffing issue and/or clarify the staffing issue either before or after Plaintiff's submission lacks merit. Plaintiff essentially conflates two separate contracting methods, (1) direct negotiation with the SLA; and (2) the competitive range process. The Army had the right to decide which of the two methods it would utilize in this case and was not required to use the direct negotiations method. *See* 34 C.F.R. § 395.33(b) & (d). In this instance, the Army chose to use the competitive range processes. Ex. A, at ¶ 5. The Solicitation clearly

1   informed offerors, including Plaintiff, that Defendant would apply the FAR in

2   determining who was awarded the contract. *See* Ex. A, at Att. 1, at p. 36.

3          To support his contention that "meaningful discussions" were required, Plaintiff

4   relies on "the meaning of the phrase 'competitive range' as of 1977, when the Act's

5   regulations were adopted." (Doc. 22, at 25.) Plaintiff contends that "competitive range"

6   was understood at that time to require "that any proposal must be considered to be within

7   a competitive range so as to require negotiations unless it is so technically inferior or out

8   of line with regard to price that meaningful discussions are precluded." (*Id.*, internal

9   quotation marks omitted). But as the Court of Federal Claims put it, "[t]here is no

10  precedent to support plaintiff's argument that the Randolph-Sheppard Act regulations

11  require the application of a competitive range definition that is different from that

12  typically used in federal procurement law [the FAR] today." *N. Carolina Div. of Servs.*

13  *For Blind v. United States*, 53 Fed. Cl. 147, 167 (2002), *aff'd sub nom. N. Carolina Div.*

14  *of Servs. for the Blind v. United States,* 60 F. App'x 826 (Fed. Cir. 2003). There is no

15  "meaningful discussion" requirement in the FAR.

16         Plaintiff's complaint that the Army did not discuss the deficiencies with its

17  proposal with Plaintiff prior to excluding it from the competitive range ignores the clear

18  terms of the Solicitation. The Solicitation notified offerors, including Plaintiff, that

19  Defendant would follow a clear, five step process in determining which proposals would

20  be considered as part of the competitive range. Ex. A, at ¶ 8. Relevant here, Step One

21  provides that "[a]fter an initial evaluation of timely received proposals …a Competitive

22  Range (CR) will be established from proposals evaluated as "Acceptable." *Id.* at ¶ 8 &

23  Att. 1, at 104. Per Step Two, "[i]n accordance with Army Directive 2020-05 (Vending

24  Facility Program for the Blind on Federal Property), the Government shall enter into

25  discussions/negotiations ***with all offerors whose proposals have been determined to be***

26  ***in the [Competitive Range]*** established in Step One…." *Id.* (emphasis added). Therefore,

27  Plaintiff was on notice that for discussion/negotiation to occur, its proposal must first be

28  included in the competitive range. Plaintiff never communicated any objections or sought

any clarifications of the five-step process prior to summitting its proposal. (Ex. A, at ¶ 11.) Plaintiff's proposal was not acceptable; therefore, it was never part of the competitive range. (*Id.* ¶ 14.) As such, Plaintiff had no reasonable expectation that the Army would enter into discussions/negotiations with it contrary to the clear terms of the Solicitation and the requirements of FAR.

Plaintiff's insistence that the Army was required to conduct discussions with it prior to the establishment of the competitive range is not only contrary to the terms of the Solicitation, but it also ignores black letter law. Per FAR 15.306, the government "***may***" engage in only limited discussion with vendors after receiving their bids and prior to the establishment of the competitive range. (Emphasis added). "Such communications ***shall not*** be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal." FAR 15.306(b)(2) (emphasis added). FAR 15.306 goes on to provide: "[s]uch communications ***shall not*** provide an opportunity for the offeror to revise its proposal…." *Id.* at 15.306(b)(3) (emphasis added). And once the competitive range is established, the government is only permitted to engage in discussions/negotiations with offerors that are in the competitive range. *See id.* at 15.306(d). As such, courts have rejected Plaintiff's "meaningful discussions" argument. *See Oklahoma by & through Oklahoma Dep't of Rehab. Servs.*, 2018 WL 10373342, at *4 (noting Plaintiff's meaningful discussion argument "***makes no sense***" given the clear language of subsection b of the regulation) (emphasis added).

The law allows for offerors excluded from the competitive range to request a debriefing (*see* FAR 15.505), and Plaintiff did so here. *See* Plaintiff's Ex. 11. The Army's debriefing includes all that is required by FAR. *See* FAR 15.505(b). It provides the agency's evaluation of the significant elements in Plaintiff's proposal and a summary of the agency's rationale for excluding Plaintiff from the competitive range. *See* Plaintiff's Ex. 12. The Contracting Officer was not required to do anything else after submitting the debriefing. But the Contracting Officer went out of his way to get an independent review

of Plaintiff's proposal from two SMEs that were not members of the original SSEB. *Id.* ¶ 17.  The SMEs's independent review validated the findings of the SSEB that Plaintiff's bid did not satisfy the technical capability factor because of an unacceptable staffing plan, and that it was correctly removed from the competitive range as a result. *Id.*

To the extent Plaintiff contends that a statement in the 1998 USDOE handbook *Administration of the Randolph-Sheppard Vending Program by Federal Property Managing Agencies* that proposals should be included in the competitive range "if the offer can be made acceptable by conducting meaningful discussions", this reference cannot and does not trump the communication restrictions set out in the FAR. *See, e.g.*, *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam) (holding that failure of government employee to follow 13 volume internal agency manual did not provide a basis of estoppel against the government*)*. Moreover, Defendant went out of its way to secure multiple evaluations of Plaintiff's proposal and allowed Plaintiff to explain in response to the debriefing why it thinks Defendant got it wrong (*see* Plaintiff's Ex. 13), but ultimately decided that Plaintiff's staffing proposal even with its clarifications was simply unacceptable (*see* Plaintiff's Ex. 14). As such, Plaintiff could not be included in the competitive range. It is unclear what additional discussion Plaintiff believes would change the SSEB's and Contracting Officer's determination, which was affirmed by the independent SMEs.

### 4.    Defendant was not required to consult with the Secretary before excluding Plaintiff from the competitive range

Plaintiff's contention that Defendant violated the RSA by failing to consult with the Secretary before excluding Plaintiff from the competitive range is based on a misleading description of the applicable regulations. 34 C.F.R. § 395.33(a) provides that priority to blind vendors shall be applied if the Secretary in consultation with the appropriate agency determines that the vendor can provide the services at a reasonable cost and with food of comparable high quality. But subsection (b) of the regulation makes

it clear that this consultation shall occur only if the SLA's proposal is included in the

competitive range:

> If the proposal received from the State licensing agency ***is judged to be within a competitive range*** and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section.

34 C.F.R. § 395.33(b) (emphasis added). The consultation requirement is not relevant

here because Plaintiff's proposal was determined to be unacceptable and, therefore, was

not included in the competitive range. Plaintiff's interpretation of the regulation is

illogical and unworkable. It would require consultation before any blind vendor's

proposal was found unacceptable for any reason. As one Oklahoma Court explained:

> [A]s the Army persuasively argued at the recent TRO hearing, under the [plaintiff's] preferred order of consultation with the DOE—i.e., that consultation with the DOE is required before any state-licensing-agency applicant can be excluded from the competitive range—the [SLA] could bid any amount (e.g., $10 trillion on a contract estimated to include services totaling no more than $10,000) and the Army would be unable to exclude the uber-high bid without engaging in the consultation process. In addition to this being an untenable result, the [plaintiff] provides no authority that this process was intended by the Randolph-Sheppard Vending Facility Act of 1936, 20 U.S.C. §§ 107-107f ("RSA").

*Oklahoma by & through Oklahoma Dep't of Rehab. Servs. v. United States by & through*

*Shanahan*, No. CIV-18-1197-SLP, 2019 WL 7758681, at *5 (W.D. Okla. Apr. 16, 2019)

(*citing Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States*, No.

4:18cv148, 2018 WL 6503512, at *6 (E.D. Va. Dec. 11, 2018) ("[T]he Government was

only required to consult with the [Secretary] after a determination that the bid was judged

to be within a competitive range") (internal quotation marks omitted).

Plaintiff cites several RSA arbitration decisions for the proposition that Defendant

was required to consult with the Secretary about Plaintiff's proposal. All of the cited

arbitration decisions are distinguishable because the vendors in those cases were not

taken out of competitive range because of technical issues but because their respective

proposal bids were too high and/or 34 C.F.R. § 395.33(b) was ignored by the respective

arbitration panels. As Plaintiff concedes, these arbitration decisions are not precedential,

and the Court is not bound by them. (*See* Doc. 13, at 20) Nor are they persuasive given the different facts at issue and the clear and plain language of 34 C.F.R. § 395.33(b).

### C.   Plaintiff Will Not Suffer Irreparable Harm

Plaintiff has not established the second required element, that it is likely to suffer irreparable harm in the absence of preliminary relief, making a preliminary injunction inappropriate in this case. An "irreparable harm" is defined as the type of "harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Plaintiff's current contract with the Army is set to expire on August 31, 2013. Plaintiff has no automatic right to renewal of further extension of this contract. The loss of this revenue may be disappointing to the SLA and/or the blind vendor but does not constitute irreparable harm because they had no absolute right to this income. Further, harm that is merely monetary "will not usually support injunctive relief." *American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009).

### D.   The Balance of Equities Does Not Favor Plaintiff

The balance of equities factor requires the Court to weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. To succeed in getting an injunction, Plaintiff must demonstrate that the balance of equities tips in its favor. *Id.* at 20. Plaintiff is unable to do so here. First, if this Motion were granted and Plaintiff allowed to extend contracted services under the terms of its soon to expire contract, the Army would not obtain the minimum staffing levels it sought through its Solicitation and that it determined were necessary achieve the mission of feeding America's soldiers. At the end of the day, what Plaintiff is trying to do here is circumvent the competitive selection process and force Defendant to enter bridge contracts with it for an indeterminate length of time. RSA arbitrations often take years Ex. A, at ¶ 19. If Plaintiff were to obtain the preliminary injunction it seeks, it would have little incentive to achieve a quick resolution of the

dispute because it will continue to be paid despite not being the selected bidder. An injunction here would reward Plaintiff for sidestepping the competitive selection process.

### E.     Preliminary Relief Is Not in the Public Interest

While the balance of equities focuses on the parties, "the public interest inquiry primarily addresses impact on non-parties rather than parties," and addresses "the public consequences in employing the extraordinary remedy of injunction." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022) (internal quotation marks omitted). The public consequences of tolerating Plaintiff's attempt to circumvent the competitive selection process here are immense because it would render the FAR procedures obsolete in practice and ensure that nobody would ever be able to get a contract to provide dining services on Ft. Huachuca for the foreseeable future except Plaintiff. Eliminating the efficiencies generated by a truly competitive contracting process is not in the public interest. And as set forth above, if this Motion is granted, the Army would not obtain the minimum staffing levels it requires. This would affect the level of food service given to the troops. Even if Plaintiff were amenable to entering into a bilateral modification to increase staffing levels to the Army's required minimum staffing levels, this modification may result in increased cost. As such, granting injunctive relief here would not serve the public interest.

### III.    CONCLUSION

Plaintiff's request for a preliminary injunction here is an attempt to nullify the competitive bidding process required by the government to obtain an indefinite extension of its contract despite the fact that it does not meet the Army's current needs. Defendant followed the FAR and the terms of the Solicitation. It correctly determined that Plaintiff's proposal was not acceptable. Plaintiff will not succeed on the merits and the injunctive relief requested does not serve the public interest. For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

//

Respectfully submitted this 27th day of July, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/Sarah S. Letzkus*
SARAH S. LETZKUS
Assistant U. S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 27th, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Randy J. Aoyama
Megha Singh
Hinshaw & Culbertson, LLP
2375 E. Camelback Road, Suite 410
Phoenix, AZ 85016

Andrew D. Freeman (*Admitted Pro Hac Vice*)
Neel K. Lalchandani (*Admitted Pro Hac Vice*)
Brown, Goldstein, & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
*Attorneys for Plaintiff*

*s/Lisa Startup*