Law Offices
HINSHAW & CULBERTSON LLP
2375 E. Camelback Rd., Suite 410
Phoenix, AZ 85016
602-631-4400
602-631-4404
raoyama@hinshawlaw.com
meghasingh@hinshawlaw.com

Randy J. Aoyama (020096)
Megha Singh (036306)

BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
410-962-1030
410-385-0869
adf@browngold.com
nkl@browngold.com

Andrew D. Freeman, *Pro Hac Vice*
Neel K. Lalchandani, *Pro Hac Vice*
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Department of Economic Security, an Arizona State agency,<br><br>    Plaintiff,<br><br>v.<br><br>Christine Wormuth; Secretary of the Army, in her official capacity,<br><br>    Defendant. | No. CV-23-250-TUC-LCK<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT ................................................................................................................. 1

    A. ADES seeks a prohibitory, not a mandatory, injunction. ............................. 1

    B. ADES is likely to prevail on the merits of its Randolph-Sheppard claims. 3

        1. ADES is likely to succeed on its claim that the Army violated the Act by finding ADES's proposal technically unacceptable. .............. 4

        2. The Army separately violated the Act because any "deficiencies" could have been remedied through meaningful discussions. ............. 8

    C. The remaining factors support issuance of a preliminary injunction. ....... 11

CERTIFICATE OF SERVICE ................................................................................................ 12

## I. INTRODUCTION

Congress "passed the RSA [Randolph-Sheppard Act] to change the normal government contracting procedures for the benefit of the blind[.]" *Georgia v. United States*, 398 F. Supp. 3d 1330, 1351 n.7 (S.D. Ga. 2019). The Army's Response loses sight of this principle. It ignores *all eight* of the Randolph-Sheppard arbitration decisions cited in the Motion (ECF 22); it requests special deference for its exclusion of ADES's proposal where none is due; and it asks the Court to ignore the Department of Education's interpretation of its own regulation in favor of the Army's interpretation. The Army seeks to arrogate to itself the power to declare a State Licensing Agency's proposal outside of its competitive range. But Congress empowered the Department of Education to establish Randolph-Sheppard regulations and empowered Randolph-Sheppard arbitration panels to review federal agencies' decisions denying the application of the priority.

The already-convened arbitration panel is likely to find that the Army violated the Randolph-Sheppard Act by unreasonably excluding ADES's proposal from the competitive range based on technical "deficiencies" that could have been remedied through meaningful discussions. The Army's Response fails to engage with the extensive evidence and authorities presented in ADES's Motion. Instead, it offers conclusory statements contradicted by that evidence and cites inapplicable law that does not account for the requirements of the Act. An injunction will preserve the status quo until the panel renders a decision on the merits.

## II. ARGUMENT

### A. ADES seeks a prohibitory, not a mandatory, injunction.

As a threshold matter, the Army's assertion that ADES seeks a mandatory injunction, thus triggering a higher burden, is incorrect. ADES seeks an injunction that preserves the status quo pending resolution of the arbitration—i.e., a prohibitory, rather than a mandatory, injunction.

A prohibitory injunction preserves the status quo. *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988). In contrast, a mandatory injunction "goes well beyond

simply maintaining the status quo[.]" *Anderson v. United States*, 612 F.3d 1112, 1114 (9th Cir. 1980). The Army's brief neglects to include the definition of "status quo," which in the Ninth Circuit (and elsewhere) means "the last uncontested status which preceded the pending controversy." *GoTo.com v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quotation omitted).

Here, the parties' dispute centers on the Army's exclusion of ADES's proposal from consideration for award of the contract. The "last uncontested status" (i.e., the status immediately prior to the filing of the motion) has ADES providing full food services at Fort Huachuca. The majority of courts to consider this issue in similar circumstances have determined that a preliminary injunction would preserve the status quo. *See, e.g., Hawaii, Dep't of Hum. Servs. v. United States Marine Corps*, No. 18-00128 LEK-KUM, 2018 WL 2187977, at *9 (D. Haw. May 11, 2018); *Johnson v. United States*, No. EP-14-CV-00317-DCG, 2014 WL 12540469, at *10 (W.D. Tex. Sept. 12, 2014). As a Kansas federal court explained, the last uncontested "status existed when Kansas provided [dining facility attendant] services to the Army under the [Randolph-Sheppard Act] contract, regardless of whether it is legally entitled to priority for a new contract." *Kansas v. United States*, 192 F. Supp. 3d 1184, 1209 (D. Kan. 2016); *id.* (collecting cases).

The two cases cited by the Army are unpersuasive. *Stanley* does not involve the Randolph-Sheppard Act and neither cites nor applies the "last uncontested status" standard. Rather, it involves an employee seeking a TRO to compel her former employer to hire her over a month after her contract expired, at a higher salary than before. *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). The *Oklahoma* case also does not use "last uncontested status" standard and is poorly reasoned. That court believed that granting an injunction to the State Licensing Agency would provide it with "its ultimate litigation objective." *Oklahoma v. United States*, Case No. CIV-18-1197-SLP, 2018 WL 10373342, at *2 (W.D. Okla. Dec. 17, 2018). But ADES's ultimate objective is not temporary relief; it is a new five-year contract to operate the cafeterias at Fort Huachuca.

The *Oklahoma* decision is an outlier, with which courts have explicitly disagreed. *See, e.g., Georgia Vocational Rehab. Agency v. United States*, Civ. Action No. 4:18cv148, 2019 WL 279992, at *3–4 (E.D. Va. Jan. 22, 2019).

The Army further complains that an injunction cannot issue here because "RSA arbitrations last multiple years." (ECF 30 at 9). If that were true, a long delay would underscore the need for an injunction, given that absent such relief, ADES would suffer irreparable harm for a significant period of time.

But the Army's statement is hyperbolic. The arbitration in this matter is proceeding apace and will likely be completed in the next six months (i.e., early in 2024). ADES filed its arbitration complaint on May 30, 2023, and the Secretary of Education authorized the convening of an arbitration panel on July 10, 2023. ADES and the Army have selected their respective panel members. The next step is to select the chairperson, after which the parties will appear for a scheduling call, take some discovery, and prepare for and present their respective cases at the arbitration hearing.

The timeline of a recent arbitration is instructive. In a case between the Virginia SLA and the Army, R/S 22-04, the Secretary of Education convened the arbitration on June 6, 2022. The panel and the parties then set the arbitration hearing for January 18–19, 2023, a little over six months from the convening letter. The matter settled in January, on the eve of the arbitration, when the Army entered into direct negotiations with the SLA. A similar, if not more expedited, timeline should govern this case, with the arbitration taking place by February 2024.[1]

  B. <u>ADES is likely to prevail on the merits of its Randolph-Sheppard claims.</u>

As outlined in ADES's Motion, the arbitration panel is likely to find that the Army violated the Randolph-Sheppard Act (1) by rating ADES's proposal to be technically unacceptable and excluding it from the competitive range on that basis; and (2) *even if*

---

[1] The Army points to delays in an arbitration regarding Fort Benning, but that case was an extreme outlier. The delays there (including to replace the panel chair) were largely due to the pandemic and an agreed-upon lengthy stay for settlement negotiations.

82872\314391283.v1

ADES's proposal had deficiencies, by not including it in the competitive range when the proposal could have been made acceptable through meaningful discussions.

> 1. *ADES is likely to succeed on its claim that the Army violated the Act by finding ADES's proposal technically unacceptable.*

The Army violated the Act by unreasonably finding ADES's proposal to be technically unacceptable. Attempting to justify its decision, the Army focuses on a $25 cash fund—a trivial non-issue that it raised belatedly—and a generalized allegation of understaffing ("specifically with respect to Cashiers," (ECF 30 at 7)) that is not only unsupported but is contradicted by the record, including the Army's prior determinations and ADES's decades-long history of performance.

In seeking acceptance of its factually unsupported statements, the Army contends that its Contracting Officer's decision is entitled to deference. (ECF 30 at 10). But Randolph-Sheppard panels have refused such deference given the remedial purposes of the Act and that the Department of Education—not the Army—is tasked with interpreting and enforcing the provisions of the Act. *See, e.g., In re Texas*, R-S16-09 (Feb. 28, 2017) (ECF 22-18, at 22) (explaining that panel "is free to set aside the Contracting Officer's conclusion if it finds he failed to apply the criteria properly" or is "not supported by the evidence"); *NISH v. Cohen*, 247 F.3d 197, 202 (4th Cir. 2001). The question here is whether ADES is likely to succeed before the arbitration panel, but the Army disregards the standard such panels apply (and the resulting decisions). (ECF 30 at 10).[2]

Under *any* standard of review, the Army's exclusion of ADES's bid was unreasonable. The decision was inadequately explained, factually unsupported, and contradicted by the evidence in the record—all in violation of the Randolph-Sheppard Act's mandate to provide a priority to blind vendors.

---

[2] The Army's citation to *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147, 159 (2002), is inapposite for several reasons, including that the SLA withdrew its request for arbitration; the court ruled on standing grounds and deemed that the Randolph-Sheppard Act "need not be reached in order to resolve this action"; and the plaintiff did not challenge "the contracting officer's competitive range determination" but rather argued that it did not have enough time to prepare its proposal. *Id.* at 156, 164.

**$25 Cash Fund:** In its Response, the Army highlights an alleged inadequate control of the "cash fund" (also referred to as "change fund") in ADES's proposal. (ECF 30 at 13–14) The Army's reliance on this issue is unconvincing given (a) it did not raise it initially, (b) the evidence reflects ADES's adequate safeguarding of that cash fund, and (c) the immateriality of a $25 fund to a multi-million-dollar contract.

The Army erroneously claims that this supposed "deficiency was noted from the beginning" (ECF 30 at 13) without citing any evidence. The Army excluded ADES's proposal in January 2023. According to the Army, the debriefing "provides the government's rationale" for excluding a proposal from the competitive range. (ECF 30 at 8). Yet, there was *no mention* of the cash fund in the 11-page debriefing letter sent by the Army's Contracting Officer, Michael Vicory. (ECF 22–12.) The Army first referenced the cash fund in its April 3rd letter, months after it excluded ADES's proposal from consideration. (ECF 22–14 at 1.) As reflected there, Army Sustainment Command ("ASC")—not the Source Selection Evaluation Board or Contracting Officer Vicory—noted the issue *after* ADES's proposal had been excluded. *See id.* (ASC's Subject Matter Experts "noted that . . . ADES proposal was not clear enough for the evaluators to see how the change fund would be managed with controls for cash").[3]

*Even if* the Army had raised the cash fund issue from the start, that would not have justified the exclusion of ADES's proposal. Soldiers and other personnel who regularly eat at the Fort Huachuca cafeterias use a common access card. The change fund is used only for the rare instances when members of the public visit, pay cash, and require change.

The Army does not explain (let alone prove) how ADES's proposal violated the general statement in the Performance Work Statement that the vendor must "safeguard and maintain accurate accountability of funds collected," (ECF 30–3, at 78), or justify how such a "violation" would warrant exclusion from the competitive range. The Army appears

---

[3] While the Army repeatedly refers to ASC's review as an "independent review," there is nothing "independent" about it. ASC is a part of the Army, one with a long history of hostility towards the Randolph-Sheppard Act.

to take issue with the fact that, at certain times, ADES's proposal had only one Admin/Cashier assigned. From that premise, the Army *assumed* that a single person would handle the cash fund both before and after mealtime. *See* (ECF No. 22–14 at 1). But both the Army's premise and assumption are wrong. As to the former, the Army ignores that ADES's technical proposal reflects that individuals *other* than those categorized as Admin/Cashier can handle cash and the cash fund.[4] *See* (ECF 22–9 at 8) (reflecting that the Food Sanitation Specialists (FSS) employees "are cross trained to be Admin."). In addition, ADES's technical proposal included ample managerial staff, not included in the staffing matrix, who are onsite at the cafeterias and also assist with the cash fund.

The Army's speculation that a single person would handle the cash is erroneous. ADES has securely handled the change fund at Fort Huachuca for decades. The cash boxes are kept in a government-provided safe and taken to the headcount station at the beginning of the meal; at the end of the meal, the amount of cash recorded in the digital system is verified against the cash in the cash boxes. The verification process is always completed by two people: one individual signs the required form when receiving the cash fund before mealtime and a different individual (either another Admin or a manager) signs it when returning the cash at the end of the shift. *See* **Ex. 28**. Moreover, the Army has consistently evaluated ADES's practice as meeting the *same contractual requirements* that the Army now claims ADES's proposal failed to meet.[5] *See* **Ex. 29** (reflecting that ADES received the highest mark, satisfactory, for all standards related to headcount and cashier service, including "[c]ash deposits are made IAW [in accordance with] the contract").

**Alleged Understaffing:** The Army also broadly asserts that ADES's "[p]roposed

---

[4] This is authorized by the Army's regulations. *See* Army Reg. 30–22, § 3.27, Change Fund Authorization ("[T]he headcounter (*or other person designated to take cash collections* for meals) may be provided with a change fund[.]" (emphasis added). And it is mandated by the Solicitation. ECF No. 30–3 at 106 (bidder's staffing "shall . . . allow for cross-training and cross-utilizing of personnel to perform the requirements of the PWS.").

[5] The prior PWS (i.e., the one for the contract ADES currently operates) provides that "[t]he contractor shall provide a Change Fund to support Cash Collection procedures. The Change Fund should be twenty-five dollars per headcount station, or such amount as is appropriate for the meal, and entered accordingly on DA FORM 3456[.]"

staffing plan is [] unacceptable because Plaintiff did not demonstrate that it can ensure smooth and prompt service or ensure food safety and cleanliness." (ECF 30 at 14). But the Army's assertions regarding staffing levels do not withstand scrutiny.

As explained in ADES's Motion, the Army mistakenly believed that ADES's proposal included zero Cashiers. *See* (ECF 22 at 11, 18). The Army responds with a general denial: "the Army did not misunderstand the proposal, nor did it ever say or imply any such thing." (ECF 30 at 13). But it does not dispute that ADES included the Cashier position in its Staffing Matrix under the title "Office Clerk." Nor can the Army dispute that, in its April 3rd letter, it abandoned its original position—conceding that "hours are ample for managing the headcount and admin functions"— before pivoting to saying they were insufficient for the "cash fund." (ECF 22–14 at 1).

The Army's only other staffing complaint is that the Food Sanitation Specialist (FSS) and Dining Facility Attendant (DFA) positions at certain times were "somewhat understaffed, by "1-21%." (ECF 22–12 at 7–8). But the Army does not specify when or where ADES's proposal fell short by any particular amount. Nor does the Army explain what it believes are the proper staffing levels or how it developed its estimates, including whether it considered ADES's historical staffing levels in developing those estimates.

Again, the Army does not substantively respond to the points in ADES's Motion. It does not dispute that a bidder cannot be expected to predict the exact level of staffing (ECF 22 at 18); ADES cross-trained FSSs and DFAs to assist each other in serving food and cleaning the facilities (*id.* at 18–19); and the Army repeatedly deemed ADES's staffing to meet contractual requirements and provide quality service (*id.* at 8–9, 16). All these arguments and their supporting evidence are unrebutted.

The Army's claim of understaffing suffers from a fundamental flaw. The Army found ADES's staffing to meet the PWS requirements when evaluating ADES's performance under the existing contract but a month later found that ADES's proposal— based on that same staffing—does not meet the same requirements. *Compare* ECF 22–6 at

2–3 *with* ECF 22–12. The Army has not explained those diametrically opposed findings.[6] Even assuming that the Army was unaware of ADES's incumbent status, something went awry. As demonstrated in practice, ADES's staffing levels are sufficient; for the Army to find otherwise, its evaluation is demonstrably inaccurate.

That decision is even *more* unreasonable given the Army's knowledge of ADES's history of successful performance at Fort Huachuca. The Army's claim that it could not use this "knowledge . . . to determine technical acceptability" (ECF 30 at 15) is wrong. On-point (and unrebutted) authority confirms that the Army cannot put its head in the sand. (ECF 22 at 17–18) (citing *Mo. Dep't of Soc. Servs. v. U.S. Dep't of the Army*, R-S/16-13 (May 1, 2019) (finding Army's technical acceptability rating unreasonable where Army was "well-aware of" SLA's staffing because it had been incumbent "for more than fifteen years"); *see also Crowley Gov't Servs., Inc. v. United States*, 158 Fed. Cl. 358, 368 (2022) (recognizing that performance at same location as relevant to technical assessment). In the typical case, where a bidder's "past performance" concerns other locations, it may not shed much light on technical capability. Here, however, ADES's past performance *at the same location* validated its appropriate staffing.

In sum, the Army erred in finding ADES's bid technically unacceptable. Both the post-hoc cash fund issue and the alleged understaffing are contradicted by the evidence.

> *2. The Army separately violated the Act because any "deficiencies" could have been remedied through meaningful discussions.*

The Army further violated the Act by excluding ADES's proposal even though any "deficiencies" could have been remedied through meaningful discussions. This presents an independent and straightforward basis for relief. Because ADES need prove only a single violation of the Act to prevail at the arbitration, (ECF 22 at 15), the Court could withhold judgment on the first issue and enter an injunction based solely on a finding that

---

[6] The findings cannot be explained by a change in the contract, as the scope of work is the same. The Army states that the "[s]olicitation [] here is not the same as the [prior] solicitation," ECF 30 at 15, but does not identify any material change in staffing levels.

8

the Army likely violated the Act on this second issue.

In the fact section of its brief, the Army correctly states that the "RSA [Randolph-Sheppard Act] charges the Secretary of the Department of Education [] with responsibility for *interpreting and enforcing* its provisions." (ECF 30 at 2) (emphasis added) (citing 20 U.S.C. § 107a). Yet, in its argument section, the Army rejects the Department of Education's interpretation of its *own* Cafeteria Regulation. *See id.* at 18.

The DOE explained that based on the "clear intent of the Act," a "proposal should be within the competitive range [] if the offer *can be made acceptable by conducting meaningful discussions* . . . A proposal *must* be considered within the competitive range unless it is technically inferior . . . that the possibility of being made acceptable through meaningful negotiations is precluded." (ECF No. 22–21 at 36) (emphasis added). This interpretation is authoritative. (ECF 22 at 21) n.5; *NISH*, 247 F.3d at 202.

The Army responds that DOE's interpretation "cannot and does not trump the communication restrictions set out in the FAR." (ECF 30 at 18). The caselaw, however, holds otherwise: it is well-established that, to the extent there is a conflict between the specific Randolph-Sheppard Act and the general FAR regulations, the Act supersedes any contrary regulations. *See Georgia*, 398 F. Supp. 3d at 1351 n.7 (recognizing that Act "might require a different result than the general FAR regulations would otherwise with certain government contracts"); *Oklahoma Dep't of Rehab. Servs. v. United States Dep't of the Army, Fort Sill*, R-S/15-10, at 18 (finding that "neither the CICA nor the Federal Acquisition Regulation (FAR) apply when the RSA's priority applies").

The Army's defense hinges on the flawed premise that FAR 15.306 governs here.[7]

---

[7] Even if the above precedent did not exist, the Army's claim fails for four reasons. First, the Court should adopt the meaning of "competitive range" in 1977, when the Act's regulations were adopted ECF 22 at 20; *Georgia*, 398 F. Supp. 3d at 1349. Second, the Act authorizes direct negotiations with SLAs. *See* 34 C.F.R. § 395.33(d). Third, the DOE's interpretation and FAR 15.306 can be reconciled. The DOE states that a proposal should be placed in the competitive range if meaningful discussions could make it acceptable. Thus, the Army was required to place ADES's bid in the competitive range, after which the Army could have engaged in discussions. And fourth, FAR 15.306 permits discussions to "enhance Government understanding of proposals; allow reasonable interpretation of

Given that the Randolph-Sheppard Act governs over any conflicting general procurement regulations, it also governs over the Army's internal directives and solicitation procedures because, again, DOE, not the Army, is responsible for interpreting and enforcing the Act. Further, the language from *Oklahoma* that the Army emphasizes in bold and italics does *not* concern the "meaningful discussion argument," as the Army misrepresents. (ECF 30 at 17). It concerns the distinct issue of the Army's obligation to consult with the Secretary of Education.

Multiple Randolph-Sheppard panels have applied the DOE's interpretation of the Cafeteria Regulation, including the meaning of competitive range. (ECF 22 at 21–22) (discussing cases). Under this appropriate "meaningful discussions" standard, the Army's violation of the Act is plain. Even assuming the validity of the "deficiencies" discussed above, they would have easily been remedied.

Monitoring the cash fund and the "somewhat understaffed" FSS and DFAs roles are minor issues. If the Army had come to ADES and said it wanted more staffing to address those concerns, ADES would have promptly consented. This is true for a simple reason: additional staffing results in additional compensation for ADES and its vendor. In addition, ADES and the Army have a long history of collaborative negotiations on staffing levels. *See* (ECF No. 22–2), Weber Decl. ¶ 27.[8]

The Army's Response states that "[i]t is unclear what additional discussion Plaintiff believes would change the SSEB's and Contracting Officer's determination." (ECF 30 at 18). The Army misunderstands. The question is not whether ADES would have been able to change the Army's determination about the deficiencies. The question is, *accepting* those deficiencies, whether ADES's proposal had the "possibility of being made acceptable

---

the proposal; or facilitate the [] evaluation." FAR 15.306(b)(2). If the Army had engaged in discussions, this entire dispute could have been avoided.

[8] The Army states, "[e]ven if Plaintiff were amenable to entering into bilateral modification to increase staffing levels to the Army's required minimum staffing levels, this modification may result in increased cost." ECF 30 at 21. Apparently, the Army wants more employees but does not woant to pay for them, although employees' hourly pay is set by a collective bargaining agreement. That said, ADES is always open to direct negotiations and to providing whatever staffing the Army desires.

through meaningful negotiations." The Army's failure to include ADES's proposal in the competitive range despite that possibility is an independent violation of the Act that ADES is likely to prove at the arbitration.

      C.    <u>The remaining factors support issuance of a preliminary injunction.</u>

The Army argues that monetary harm is not usually sufficient for an injunction (ECF 30 at 20), but in the usual case, damages are available. Indeed, the case it cites for this general principle reversed the denial of an injunction, recognizing that even monetary damages (available there but not here) might not suffice. *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1057–59 (9th Cir. 2009). Because sovereign immunity bars damages here, the harm is irreparable. (ECF 22 at 24–25) (citing three cases).

ADES will be harmed much more if an injunction is not issued than the Army would be if one is. The stakes for ADES, Mr. Weber, and the 20 blind vendors who support themselves and their families through its program are significant. The Fort Huachuca contract is the lifeblood of Arizona's Randolph-Sheppard program. *Id*; (ECF No. 22–1), Mackey Decl. ¶¶ 6–10. Further, the public interest will be promoted by respecting the Act, its remedial purposes, and its arbitration process. By contrast, the Army has identified no real harm. It claims that the "food service given to the troops" will be affected. (ECF 30 at 21). But the Army and its soldiers have continued to favorably review ADES's performance with its current staffing, which an injunction will keep in place.

Contrary to the Army's assertion, ADES is not seeking to "circumvent the competitive selection process." *Id.* at 20. Rather, ADES seeks to preserve the status quo until the arbitration panel can confirm, by early next year, that the Army violated the Randolph-Sheppard Act.

///

///

///

///

DATED this 7th day of August, 2023.

           HINSHAW & CULBERTSON LLP

           */s/ Randy J. Aoyama*
           Randy J. Aoyama
           Megha Singh

           *and*

           BROWN, GOLDSTEIN & LEVY, LLP
           Andrew D. Freeman (Admitted PHV)
           Neel K. Lalchandani (Admitted PHV)
           *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

      I certify that on the 7th day of August, 2023, I electronically transmitted the attached document to the Clerk's Office and all counsel using the CM/ECF System for filing, with a courtesy copy sent by email to:

Sarah S. Letzkus, Esq.
Assistant U.S. Attorney
United States Attorney's Office – District of Arizona
405 West Congress Street, Suite 4800
Tucson, AZ 85701
Sarah.Letzkus@usdoj.gov

By /s/ Tammy Kassen

12