1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF ARIZONA

3

4    Arizona Department of Economic              4:23-CV-00250-LCK
     Security, an Arizona State agency,
5
          Plaintiff,                              August 15, 2023
6                                                      1:37 p.m.
                                                 Tucson, Arizona
7    vs.

8    Christine Wormuth, Secretary of the
     Army, in her official capacity,
9

10        Defendant.
     _____
11

12

13

14

15           OFFICIAL TRANSCRIPT OF PROCEEDINGS

16             EVIDENTIARY HEARING (DAY ONE)

17        BEFORE THE HONORABLE LYNNETTE C. KIMMINS
                UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23        PROCEEDINGS WERE DIGITALLY RECORDED

24        TRANSCRIBED BY:  ERICA R. McQUILLEN
              405 West Congress, Suite 1500
25                Tucson, Arizona 85701
                   (520) 205-4267

```
1                         A P P E A R A N C E S

2    For the Plaintiff:

3         Andrew D. Freeman
          Neel K. Lalchandani
4         Brown Goldstein & Levy LLP
          120 East Baltimore Street
5         Suite 2500
          Baltimore, Maryland 21202
6

7    For the Defendant:

8         J. Cole Hernandez
          Sarah Suzanne Letzkus
9         United States Attorney's Office
          405 West Congress Street
10        Tucson, Arizona 85701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          EXAMINATION INDEX

 2

 3   SCOTT WEBER
             DIRECT BY MR. FREEMAN . . . . . . . . . . . . . . . 39
 4           CROSS BY MS. LETZKUS . . . . . . . . . . . . . . . 89
             EXAM BY THE COURT  . . . . . . . . . . . . . . . .101
 5           REDIRECT BY MR. FREEMAN . . . . . . . . . . . . . .105
             RECROSS BY MS. LETZKUS . . . . . . . . . . . . . . 108
 6

 7   KRISTEN MACKEY
             DIRECT BY MR. LALCHANDANI  . . . . . . . . . . . .109
 8           CROSS BY MS. LETZKUS  . . . . . . . . . . . . . . .116
             EXAM BY THE COURT  . . . . . . . . . . . . . . . . 116
 9

10   MICHAEL VICORY
             DIRECT BY MS. LETZKUS . . . . . . . . . . . . . . .118
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2              THE CLERK:  In Civil Matter 23-250, Arizona

3    Department of Economic Security vs. Christine Wormuth, on for

4    an evidentiary hearing.

5              Would counsel please state your appearances for the

6    record.

7              MR. FREEMAN:  Good afternoon, Your Honor.  Andrew

8    Freeman for the Plaintiff Arizona Department of Economic

9    Security.  With me is my co-counsel Neel Lalchandani and the

10   administrator of the Rehabilitation Services Administration

11   for DES, Kristen Mackey.

12             THE COURT:  Thank you.  Good afternoon.

13             MR. FREEMAN:  And I would just -- so Your Honor

14   knows, we have both the operator of the facility, Mr. Weber,

15   will be our first witness, and then a fairly large number of

16   Arizona blind vendors have also come for the hearing.

17             THE COURT:  All right.  Thank you very much.

18             MS. LETZKUS:  Good morning, Your Honor.  Sarah

19   Letzkus for the defendant, and along with me is my colleague

20   Cole Hernandez, and this is Major Roan, who represents the

21   Army in this matter.

22             THE COURT:  Thank you.  Good afternoon.

23             This is the time set for the plaintiff's motion for

24   preliminary injunction.  I have had an opportunity to review

25   the plaintiff's motion with exhibits, along with the

1    defendant's response and the plaintiff's reply.  We had set

2    this for an evidentiary hearing today, and I've also slated

3    tomorrow afternoon if need be.

4            Before we get started, though, I do have one

5    question for the plaintiffs, just to make sure that I

6    understand before we get started with testimony.  Based on all

7    of the pleadings and the information that the Court has

8    reviewed, it would be my intention to address only Issues 1

9    and 2 that are, the way I read this, pending before the

10   arbitration panel.

11           Issue Number 3, whether the Army had to consult with

12   the Secretary despite finding plaintiff was not in the

13   competitive range, it was indicated by the Department of

14   Education that that was not alleged to be a violation of the

15   RSA and excluded it from the arbitration, and I know the

16   plaintiffs did speak of that issue briefly in their motions,

17   but I wanted to give you an opportunity.  Do you anticipate

18   discussing Issue 3, or do you agree with the Court that we

19   should only be looking at Issue 1 and 2?

20           MR. FREEMAN:  We agree with the Court, Your Honor.

21   Very briefly, the Department of Education did invite us to

22   submit additional rationales with respect to Issue 3.  We have

23   done that.  We have not yet heard back from them, but we think

24   that we only need to prevail on either on Issue 1 or Issue 2,

25   and that will be the thrust of our argument with respect to

 1   likelihood of success today.

 2              THE COURT:  Okay.  So then for the purposes of

 3   today's hearing, the Court will only ask the parties to

 4   address Issues 1 and 2.

 5              MR. FREEMAN:  Thank you.

 6              THE COURT:  Okay.  Thank you, Mr. Freeman.

 7              And are the parties ready to proceed with testimony

 8   at this time?

 9              MR. FREEMAN:  If I might?

10              THE COURT:  Sure.

11              MR. FREEMAN:  Just a moment, Your Honor.  Just a

12   couple of housekeeping things.

13              THE COURT:  Sure.

14              MR. FREEMAN:  First, I believe the Court has the

15   copies of the exhibits.  The parties have stipulated to the

16   authenticity and admissibility of all of them other than the

17   three declarations, two for plaintiffs and one for defendant,

18   which are still part of the record from the briefing, but

19   since each of those folks will be here to testify, the

20   Government didn't want to stipulate to those three, and that's

21   fine with us.

22              THE COURT:  Okay.  So then that would be -- and

23   Ms. Letzkus, is the Government agreeing to the admission of

24   all of the exhibits with the exception of Plaintiff's Exhibit

25   1 and 2 and Defense Exhibit 33?

1          MS. LETZKUS:  Yes, Your Honor.  We stipulated to the

2    admissibility of everything else.

3          THE COURT:  Okay.

4          MS. LETZKUS:  And Your Honor, I think that -- sorry

5    about this, but --

6          MR. FREEMAN:  That's okay.

7          MS. LETZKUS:  I didn't mean to interrupt, but I

8    think there is a lot of legal issues that the judge is going

9    to -- that you are going to have to consider and decide here,

10   and the factual issue is not that broad, so I think it would

11   make sense for the parties to give opening and closing

12   statements, and if Your Honor would consider it, perhaps even

13   a brief post-trial or posthearing memo.

14         THE COURT:  And I will allow the opening and closing

15   statements.  The post-trial memo I think we can discuss after

16   closing arguments to see whether or not the Court will find it

17   useful, and the issue becomes deadlines for that post-trial

18   memo based on the requirement of the Court making a ruling in

19   an expeditious manner.  We'll discuss it after closing for a

20   post-trial memo, but I am willing to give the parties an

21   opportunity to do openings and closing statements as well.

22         MR. FREEMAN:  Thank you, Your Honor.  Just two more

23   housekeeping matters.

24         THE COURT:  Sure.

25         MR. FREEMAN:  One, just to flag for the Court,

1   Plaintiffs Exhibits 4, 5, 6, and 9 were submitted under seal.

2   They have some confidential or proprietary information from

3   ADES in Number 9, and 4, 5 and 6 are what the Army refers to

4   as CPARs, Contractor Performance Assessment Reports, that the

5   Army has requested to keep confidential.  None of it's state

6   secrets.  I think we can handle it as we go along, but I just

7   wanted to flag that for the Court.

8          THE COURT:  Okay.  Thank you.  I appreciate that.

9          So what the Court will find, based on stipulation of

10  the parties, that all of the exhibits, with the exception of

11  Plaintiff's Exhibit 1, Plaintiff's Exhibit 2, and Defense

12  Exhibit 33, will be admitted based on stipulation.  Exhibits

13  4, 5, 6, and 9 --

14         MR. FREEMAN:  Yes, Your Honor.

15         THE COURT:  -- will be admitted as under seal.

16         Anything further, Mr. Freeman?

17         MR. FREEMAN:  Last thing, Your Honor.

18         THE COURT:  Sure.

19         MR. FREEMAN:  Yes, the plaintiff would seek to

20  invoke Rule 615, the rule on witnesses such that witnesses --

21  future witnesses would not hear the other witnesses's

22  testimony.  We have no objection to them staying for the

23  opening statements.

24         THE COURT:  Okay.  And Ms. Letzkus, anything on

25  behalf of the Government?

1          MS. LETZKUS:  I don't have a problem with that, Your

2     Honor, except, you know, I think that the same should be true

3     for plaintiff's witnesses then.

4          THE COURT:  Correct.

5          MR. FREEMAN:  Well, let me just say, the same is

6     true except that we don't have -- our first witness will be

7     the first witness, so obviously he doesn't skip his own

8     testimony, and then --

9          THE COURT:  Right, and then what about -- what about

10    Ms. Mackey?

11         MR. FREEMAN:  Ms. Mackey is the representative of

12    the Department and, therefore, is entitled under the Rule to

13    be here.

14         THE COURT:  Okay.  So then what we would do -- well,

15    why don't we go ahead and go through opening arguments or

16    opening statements, and then what we'll do is then we'll bring

17    the witnesses, all four witnesses, forward.  We'll allow them

18    to be sworn in, and then we'll dismiss it looks like

19    Mr. Vicory and Mr. Froehlich based on the Rule, because

20    Mr. Weber's going to be your first witness; correct?

21         MR. FREEMAN:  Yes, Your Honor.

22         THE COURT:  Okay.  All right.  Any other

23    housekeeping matters?

24         MR. FREEMAN:  No, Your Honor.

25         THE COURT:  Okay.  Ms. Letzkus?

UNITED STATES DISTRICT COURT

```
 1              MS. LETZKUS:  Nothing for us.
 2              THE COURT:  Okay.  And Ms. Letzkus, I'm going to ask
 3    you just to maybe put the microphone a little bit closer to
 4    you.  The courtroom deputy's indicated it's hard to pick up on
 5    the tape, so -- thank you.
 6              So Mr. Freeman, if you'd like to go forward with
 7    your opening statement.
 8              MR. FREEMAN:  Mr. Lalchandani will give the opening
 9    statement for the Government, Your Honor.
10              THE COURT:  Okay.
11              MR. LALCHANDANI:  And if it's okay with Your Honor,
12    I'd like to give it from the podium.
13              THE COURT:  Yes, please --
14              MR. LALCHANDANI:  Thank you.
15              THE COURT:  -- I would prefer that.
16              MR. LALCHANDANI:  And Your Honor, I have a very rare
17    voice disorder that kicks up from time to time.
18              THE COURT:  Okay.
19              MR. LALCHANDANI:  So if I choke on my words, just
20    let me know, and I can repeat myself.
21              THE COURT:  All right.  Thank you.
22              MR. LALCHANDANI:  Good afternoon, Your Honor.  Neel
23    Lalchandani on behalf of the Arizona Department of Economic
24    Security.  I appreciate the opportunity to highlight just a
25    few points briefly.
```

 1          Just last year in the Hawaii Department of Human

 2   Services decision, the Ninth Circuit, in a unanimous decision,

 3   described the Randolph-Sheppard Act as sweeping and inclusive.

 4   The Court stated that the statutory structure of the Act

 5   invites us to interpret it broadly in favor of increased blind

 6   vendors, and the Court continued, the Act's implementing

 7   regulations sweep even more broadly.

 8          The Court there was addressing the very same

 9   regulation at issue in this case, 34 CFR 395.33, which

10   mandates that the operations of cafeterias by blind vendors,

11   quote, "shall be expected to provide maximum employment

12   opportunities to blind vendors to the great extent possible."

13   That is the legal lens to which to view this case.

14          The Act is expansive and remedial, and the priority

15   in the Act must mean something.  The Army's exclusion of DES's

16   proposal was the opposite.  It was restrictive and

17   exclusionary.  The Army evaluated the proposal in a

18   hypertechnical manner with an eye towards eliminating the

19   proposal from the competitive range.

20          Now, with that framing in mind, DES seeks a

21   preliminary injunction to preserve the status quo until such

22   time as the arbitration panel can render a decision on the

23   merits.  Numerous courts have entered injunctions under

24   similar circumstances, as we cited at pages 13 and 14 of our

25   opening motion, and DES has met each of the four preliminary

1    injunction factors, which I'll briefly address in turn.

2          Now, for the first factor of likelihood of success

3    on the merits, there are two main violations here, as the

4    Court just alluded to.  The first is that the Army

5    unreasonably found that DES's proposal was technically

6    unacceptable, and the second is, even assuming those

7    deficiencies, the Army should have placed the proposal in the

8    competitive range given that any such deficiencies could have

9    been remedied through meaningful discussions.

10         Now, there is a slight variation in this case from

11   the typical analysis.  The analysis is not whether DES will

12   ultimately prevail in federal court but whether it will

13   prevail before an arbitration panel that's already been

14   convened, and for that reason the eight decisions that we've

15   cited in our brief are important.  The Army has ignored each

16   of those decisions outright.  And of course those decisions

17   are not binding on the Court, and we don't mean to suggest

18   that, but as other courts have acknowledged, those panel

19   decisions provide the best indicator of what a similar panel

20   will do.

21         So very briefly on the first violation, the first

22   violation is that DES's proposed staffing in its proposal was

23   sufficient, and the Army's finding otherwise was unreasonable.

24   DES's proposed staffing was based on actual staffing, and the

25   proposal explained that the knowledge of operating the

 1   cafeteria for close to 20 years and the cross-training of

 2   employees created efficiencies in the staffing.  It's unclear

 3   how the Army reached its conclusion of understaffing.  The

 4   decision was neither sufficiently explained nor based in

 5   actual evidence.

 6          Now, briefly on the specific deficiencies that the

 7   Army has highlighted, and there are four of them.  The first

 8   is the cashier position, and as we've cited in our brief, that

 9   deficiency is just wrong.  The proposal included sufficient

10   staffing for the cashier position under the term

11   "admin/cashier" in the technical proposal and under the phrase

12   "office clerk" in the staffing matrix.

13          The second issue relates to dining facility

14   attendants, or DFAs, and food sanitation specialists, FSSs,

15   and the Army said those were slightly understaffed by one to

16   21 months percent.  There's no proposal that's going to be an

17   exact perfect match for the Government's estimate.  The

18   proposal is always going to be one to 21 percent off.  So

19   that's not a sufficient basis to exclude a proposal, and the

20   Army has not responded to that argument in our briefing.  And

21   also, the Army's exclusion has not accounted for the cross-

22   training, which the technical proposal explains.

23          The third issue is about the two staffing scenarios

24   in the staffing matrix that were left blank.  Those two

25   staffing scenarios do not occur.  DES also provided the

pricing for those scenarios in the pricing matrix.  The Army
never asked for the follow-up.  And there's actually an
on-point Randolph-Sheppard panel decision, the South Carolina
decision, at ECF 22-20, at page 4, that rejected a similar
argument on allegedly missing information from the proposal.

          And the fourth issue, which the Court read about, is
the cash fund issue, and this is the issue that the Army
pivoted to and raised belatedly.  This is a $25 cash fund for
a multimillion dollar contract, and it's noteworthy that the
$25 is supplied by Mr. Scott Weber himself.  It's not the
Army's money.

          In any event, the proposed staffing in the proposal
was adequate to safeguard those funds.  There hadn't been any
problems in 20 years with either the cash fund or for that
matter the staffing levels in general, and the Army's
evaluations, their regular inspections, confirmed the same.

          Now, the second violation of the Randolph-Sheppard
Act, with the first being that the Army should not have rated
it technically deficient, the second is, even assuming some or
even all of the deficiencies the Army has pointed to, it was
still required to place DES's proposal in the competitive
range because those deficiencies could have been remedied.

          This is an independent ground for entering an
injunction, and the standard that I've cited is the Department
of Education's own interpretation of its own regulation, as

1  found in the handbook that is Plaintiff's Exhibit 18, for

2  purposes of this hearing, at ECF 22-21.

3         Now, the Department of Education's guidance in this

4  handbook has repeatedly been relied upon by Randolph-Sheppard

5  panels.  It was relied upon by the Colorado panel at 22-22, by

6  the Utah panel, 22-24, and by the Oklahoma panel, 22-25.  And

7  under the standard, it's apparent that any deficiencies were

8  fixable, easily so.  The main and sole concern the Army has

9  raised is that there was understaffing.  The fix for that is

10 easy.  DES provides more staffing.

11        And this is not the typical cases where the federal

12 agency complains that the bidder has provided too much

13 staffing and there's a difficult decision as to whether to

14 reduce staffing and whether the contract can be operated in

15 that manner, but here the fix was simple.

16        The Army has not meaningfully engaged with this

17 violation.  It has simply offered a generic argument that its

18 interpretation of a nonRandolph-Sheppard regulation governs

19 over the Department of Education's interpretation of the

20 specific Randolph-Sheppard regulation, and for reasons that

21 I'm happy to expand on, that is incorrect.

22        After establishing likelihood of success on the

23 merits, the second factor, of course, is irreparable harm, and

24 here there will be significant irreparable harm to DES, to

25 Mr. Weber, and to the blind vendors who are part of Arizona's

1    Randolph-Sheppard program.

2            There are no monetary damages available due to

3    sovereign immunity.  That's well-established in the case law.

4    Mr. Weber will be harmed personally.  He will lose his

5    employment.  And as Ms. Mackey will testify to, DES, as an

6    agency of the State of Arizona, will be harmed immensely.  Its

7    budget and its programming will be decimated, and there will

8    be real consequences for the roughly 20 blind vendors who

9    operate across the state and who rely on the funds and the

10   support that DES provides to them, many of whom are here today

11   in the courtroom.

12           Now, on the other side of the ledger, the Army has

13   not established any harm in its briefing.  It referenced

14   supposed harm to the quality of service at Fort Huachuca, but

15   as we provided in the documents and the evidence, the Army has

16   continued to and will continue to receive the same exemplary

17   service that it's received for close to two decades and that

18   it continues to rate positively in its own evaluations.

19           And the fourth and finally is the public interest

20   factor, and the public interest will be served by enforcing

21   the Randolph-Sheppard Act, by promoting opportunities for

22   blind vendors, and allowing the statutorily mandated

23   arbitration process to play out, which will not take five

24   years, as we've addressed in the briefing and was an essential

25   theme in the Army's response.

1          And I think it's worth, just closing, considering

2    the alternative, what the Army asked for.  The Army asked for

3    a situation where another contractor would come in, and then

4    if DES prevails in the arbitration, it would come back and

5    replace the new contractor who's just come in.  That would be

6    far more disruptive.

7          And it's worth noting, the one case the Army relies

8    on in its response brief, Randolph-Sheppard case, is this

9    Oklahoma decision where an injunction was denied, and the

10   Court said there was no likelihood of success.  Well, we've

11   provided the panel decision from that same exact case, and the

12   Oklahoma State licensing agency prevailed in the arbitration,

13   and that's ECF 22-25.

14         It's highly disruptive, as I've mentioned, and to

15   avoid that result, we ask that the Court enter an injunction

16   to preserve the status quo and effectuate the Randolph-

17   Sheppard Act until the already-convened panel has time to

18   decide on the merits early next year.

19         Thank you.

20         THE COURT:  Thank you.

21         Ms. Letzkus, when you're ready.

22         MS. LETZKUS:  Thank you, Your Honor.  Good

23   afternoon.

24         As an initial matter, when I first received

25   plaintiff's lengthy motion for an injunction and the hundreds

1    of pages of exhibits, I thought, oh, no, this must be really

2    complicated, this Randolph-Sheppard Act.  There must be so

3    many facts in dispute here.  But then I took a look at the

4    plain language of the statute and the regulations, and I

5    found, you know, it's not that difficult.  It's actually

6    pretty simple to understand.

7           We agree, the Randolph-Sheppard Act does afford a

8    priority to blind vendors in certain circumstances, but those

9    circumstances aren't applicable here.  Why?  Because

10   plaintiff's proposal was simply unacceptable to meet the

11   minimum requirements of the Army.

12          Now, the Randolph-Sheppard Act, which is 20 USC

13   Section 107, says that, where feasible, blind vendors should

14   operate food services on federal property and are entitled to

15   a priority in contracting for such services.  The statute then

16   directs the Secretary of Education to promulgate regulations

17   to achieve that goal.  The Secretary did promulgate

18   regulations.  The regulations expressly give the Government

19   the right, the chance, but not the requirement, to engage in

20   direct negotiations with the State licensing agency and/or the

21   blind vendor.  That's just a choice.  The Government has the

22   right to choose a different contracting method, the

23   competitive selection process, which is what it chose to do

24   here.

25          If you look at the plain language of the regulation,

1    Your Honor, which is 34 CFR Section 395.33, it's very clear

2    that the RSA priority is not relevant to setting the

3    competitive range.  Per the regulations, the first step is you

4    establish the competitive range.  Only proposals that are

5    acceptable and clearly demonstrate that the offeror can meet

6    the minimum requirements of the solicitation may be included

7    in the competitive range.  The priority, the Randolph-Sheppard

8    Act priority, comes into play only if the State licensing

9    agency's proposal has been found to be acceptable and thus is

10   included in the competitive range.

11        The priority language does not mean that the

12   Government must include an unacceptable proposal in the

13   competitive range in the first place.  To argue otherwise,

14   plaintiff relies solely on subsection A of the regulation.

15   Subsection A says, "The priority shall be afforded when the

16   Secretary determines that the blind vendor can provide the

17   required services at a reasonable cost with food of comparably

18   high quality to the other offers," but plaintiff ignores

19   subsection B of the regulation.

20        Subsection B talks about how the Secretary makes

21   that determination.  It says, "If the proposal received from

22   the State licensing agency is judged to be within the

23   competitive range and has been ranked among those proposals

24   that have a reasonable chance of being selected for a final

25   award, then the agency shall consult with the Secretary so

1    that the Secretary can make the determination that is
2    contemplated in subsection A.

3             So essentially there are two triggering events
4    before the priority applies.  First, the proposal must be
5    judged to be included in the competitive range because it is
6    acceptable and meets the minimum requirements of the
7    solicitation.  Second, the Secretary must determine that the
8    blind vendor can provide the required services at a reasonable
9    cost with food of comparably high quality to the other vendors
10   in the competitive range.

11            So if the answer to that second question -- if the
12   Secretary determines the answer to the second question is yes,
13   then and only then does the blind vendor get a priority over
14   the other vendors who are also included in the competitive
15   range.

16            Here, again, plaintiff's proposal was not
17   acceptable.  It did not meet the minimum requirements of the
18   solicitation, did not clearly demonstrate that it could
19   provide the minimum requirements of the Army, so it was not
20   included in the competitive range appropriately, and
21   therefore, the priority doesn't come into play.

22            Now, by law, Your Honor, the contracting officer
23   must follow the terms of the solicitation in awarding a
24   contract.  The solicitation set out a five-step process that's
25   very clear for how the award would happen in this case.  Only

1    the first two are really relevant here.

2          So per the solicitation, Step 1:  Establish the

3    competitive range from proposals that are evaluated

4    acceptable.  Step 2:  Enter into discussions, which means

5    negotiations, with those offerors who were included in the

6    competitive range.  Plaintiff's proposal was not included in

7    the competitive range because it was not acceptable;

8    therefore, per the solicitation, no discussions or

9    negotiations were contemplated.

10          Now, a solicitation also clearly put plaintiff on

11   notice that the Government was going to apply the Federal

12   Acquisition Regulations or what's commonly called the FAR in

13   determining how to make the award here.  The solicitation says

14   that the Government's selection of a vendor will be conducted

15   using FAR Parts 12 and 15.  It's plain to see and the

16   solicitation is ripe with references to the FAR.  So there

17   could be no argument that plaintiff did not understand that

18   the FAR would be applied here.

19          Plaintiff did not object to or even raise a question

20   about either the five-step process in the solicitation or the

21   application of FAR prior to submitting its proposal.  As such,

22   the plaintiff has waived any argument that the five-step

23   process and/or the FAR don't apply here, and several of the

24   arbitration panel decisions that plaintiff attached to its

25   motion say exactly that:  If you didn't object before

submitting your proposal, you can't now argue that the FAR
doesn't apply.

So plaintiff's main contention here is that we
should have forgiven them for not complying with the
solicitation, for not providing sufficient information so that
the Government could determine that plaintiff could meet the
anticipated needs of the Army over the next five years.  And
they say, well, we could have just remedied it with meaningful
discussions before we -- before the Government set the
competitive range.

But the Federal Acquisition Regulation imposes
strict limits on communications with offerors after a proposal
is received but before a competitive range is set, and the FAR
expressly says that a contracting officer cannot allow an
offeror to submit a revised proposal or to alter their
proposal in any way after they have submitted a proposal and
before the competitive range is set, and that is FAR 15.306,
Your Honor.

There is no reference in the regulation, in the
statute, in the solicitation, or in the FAR, to quote/unquote,
"meaningful discussions."  Plaintiff has created this theory
based on outdated guidance in a handbook that has been
essentially rescinded, and even if there is such guidance
about meaningful discussions, guidance in a handbook cannot
trump federal law.  Federal law here, the FAR, says that

1   plaintiff -- the contracting officer could not allow plaintiff

2   to submit a revised proposal with more staffing or anything

3   like that before setting the competitive range.

4        Plaintiff here contends that you can't apply FAR to

5   this contract because FAR somehow conflicts with the Randolph-

6   Sheppard Act.  That's not correct.  The Randolph-Sheppard Act

7   says the Department of Education shall issue regulations

8   implementing the Randolph-Sheppard Act.  It's done so here.

9   All the regulations say is the blind vendor must be allowed to

10  submit a proposal in response to the solicitation, and if that

11  proposal is technically acceptable and thus included in the

12  competitive range, then the agency must consult with the

13  Secretary of Education about the proposal.

14       The regulations, again, are completely silent as to

15  evaluation of offers, as to the competitive range, as to award

16  without discussions, rejection of offers, and other

17  contracting matters that are expressly addressed by FAR.  So

18  there's no conflict here, and in fact the only guidance we

19  have is the FAR.  The Government has to follow the FAR in

20  making an award on this contract.

21       The contracting officer here correctly determined

22  that plaintiff could not be included in the competitive range

23  because the proposal was just unacceptable.  Mainly, the

24  staffing proposal was too lean and not sufficient to meet the

25  projected needs of the Army over the next five years.  They

1    were understaffed as to cashiers.  That creates too much risk

2    of long lines at dining facilities.

3              Service members have a very limited time to eat, and

4    if they are late returning to duty from lunch, they can be

5    subject to criminal penalties.  Plaintiff admits that its

6    proposal did not provide for any staff at all with respect to

7    two bands of meals that the solicitation provides a vendor

8    must ultimately provide, and those are at Thunderbird.

9    However, plaintiff's proposed pricing did provide for those

10   nonexistent staffing of those bands.

11             And plaintiff says, well, that doesn't matter.  We

12   didn't have to propose anything because those meals we haven't

13   been required to serve in the past.  That's not good enough.

14   The solicitation required that they proposed staffing for

15   those two bands.  They did not do so.  The Army is entitled to

16   decide what its projected needs are over the next five years,

17   and the Army has projected that it needs proposed staffing for

18   those two bands.  Plaintiff admits: proposal, absolutely

19   silent as to those two bands, as to staffing.

20             Plaintiff was also -- plaintiff's proposal was also

21   understaffed as to food sanitation workers, and I think it's

22   apparent to everyone how important it is that you have enough

23   sanitation and cleaning support so that food can be prepared

24   in a safe fashion and the soldiers fed in a safe fashion.

25             The staffing plan also created an issue with

accountability with respect to -- and potential effect
regarding the collection and safeguarding of cash that is used
to pay for meals.  Plaintiff says this is just a minor thing,
it's just $25, that most service members use a meal card, not
cash.  This is not accurate.  A lot of service members use
cash, as do all visitors to the base.  That's why there is an
ATM outside of all of the dining facilities.

And even if it was just a small amount of money
involved, that's still the Government's money.  If any money
goes missing, the Army would still have to launch an
investigation.  That would take time away from the Army's
important mission of training its soldiers at Fort Huachuca
and could also cause further delay in the service of food to
service workers or to service members.

So plaintiff's other main contention here is that
the Government didn't take into account its past performance
under its prior contract in deciding whether to include
plaintiff in the competitive range, but the Army expressly did
evaluate past performance as a factor in deciding whether to
include plaintiff in the competitive range, and it judged that
plaintiff's past performance was acceptable.  However, the
proposal was unacceptable as to staffing.  That is a separate
requirement from past performance.  Therefore, the proposal
was unacceptable.

The Army is in the best position to determine what

its current projected needs are over the next five years for
dining services at Fort Huachuca.  It's not the State
licensing agency and not the vendor but the Army that is in
the best position to assess its own needs.  The Army is
entitled to decide that its current needs or its projected
needs over the next five years are different than what was
acceptable in the past.

The Court should also keep in mind that the
contracting officer's decision that plaintiff's proposal was
unacceptable and therefore not included in the competitive
range is entitled to deference under the law.  Whatever
arbitration panels may have said in the past, the federal
courts have clearly stated that the deference applies even in
the face of the Randolph-Sheppard Act.

With respect to those arbitration panel decisions,
as plaintiff has acknowledged, they are not binding on this
Court.  They are also not persuasive, Your Honor, because they
are distinguishable.  Plaintiff contends that the defendant
didn't address these arbitration decisions in its response.
That's not accurate.  The response explicitly says that the
decisions are not binding, and they are also factually
distinct from the facts in this case, and I'll go through some
of those distinctions for you, Your Honor.

So case R-S/16-3, which is Missouri Department of
Social Service v. Army, in that case, it was determined that

 1   the State licensing agency's proposed staffing did meet

 2   technical requirements in terms of being adequate to serve the

 3   minimum requirements of the Army, but it was excluded from the

 4   competitive range because of too much staffing, which is a

 5   completely different situation than we have here.

 6         Next case, R-S/19-01, which is the South Carolina

 7   Commission For the Blind v. Marine Corps, which plaintiff's

 8   counsel just cited again to this Court.  In that case, the

 9   contracting officer did not even establish a competitive range

10   and did not hold direct negotiations or discussions either.

11   That's not what happened here.  The Government set the

12   competitive range here appropriately.

13         Another case, R-S/20-09, which is Colorado Business

14   Enterprise v. the Air Force.  Again, in that case, the

15   contracting officer did not set a competitive range and

16   decided not to contract with the State licensing agency

17   because the pricing was too high.  That's not the situation we

18   have here.

19         Another case, which is R-S/18-09, which is Southern

20   Oklahoma Department of Rehabilitative Services v. the Army,

21   that's the only case, Your Honor, that -- the only arbitration

22   panel decision that plaintiff has cited that actually had the

23   proposal be excluded because it was found technically

24   unacceptable, but in that case, one of the evaluators had a

25   bias and a conflict of interest.  The Army did not allow the

1    State licensing agency to even participate in the bidding

2    process in that case, so that is certainly not the situation

3    we have here.

4            Finally, in case R-S/16-08, which is Opportunities

5    for Ohioans v. the Air Force, again, in that case, the

6    proposal was included in the competitive range.  It just was

7    excluded later because the pricing was too high.  So these

8    arbitration panel decisions, in addition to not being binding

9    on this Court, are not persuasive because they are factually

10   distinct.

11           The Army subject matter experts here who know what

12   the Army's projected needs are for dining services over the

13   next five years have determined that plaintiff's proposal does

14   not meet the Army's minimum requirements.  The Army should not

15   be forced to continue to use plaintiff's services indefinitely

16   when it has expressly determined that plaintiff's proposal

17   does not meet its minimum requirements.

18           Again, it's undisputed that plaintiff proposed no

19   staffing at all for two bands of meals that the Army has

20   determined it is likely to need over the next five years and

21   that were expressly required to be addressed per the

22   solicitation, and plaintiff's proposed staffing for the other

23   bands of meals, especially for cashiers and food sanitation

24   workers, was simply too lean.

25           The solicitation was perfectly clear, Your Honor,

1   that offerors' proposals must clearly establish that they can

2   meet the Army's minimum requirements and contain all of the

3   information required for the Army to make that assessment and

4   all of the information required by the solicitation.  By

5   plaintiff's own admission, its proposal did not do so.

6           And entering an injunction here under the

7   circumstances would essentially reward plaintiff's attempt to

8   do an end run around the competitive contracting requirements.

9   That is not in the public's interest.

10          The equities tilt in defendant's favor here as well.

11  Plaintiff claims that it would suffer financial harm if the

12  injunction isn't issued.  I'm certainly sympathetic to that,

13  Your Honor.  However, you can't ignore the harm that will come

14  to soldiers and to the Army's mission of training soldiers at

15  Fort Huachuca if soldiers are not fed in a timely and safe

16  fashion.

17          Now, Your Honor, you will see a lot of references in

18  the paperwork and perhaps even in testimony today to the term

19  "the headcount."  That's a very clinical and detached term.

20  It's important to remember that these are people.  These are

21  soldiers serving their country, not simply numbers on a page.

22          You will hear from one of the subject matter experts

23  that it is imperative that soldiers are fed in a timely and

24  safe fashion and that there are no backups or risks of

25  backups.  Soldiers, again, have very strictly limited time to

1   eat their meals.  If the line is too long, they go hungry or

2   they risk serious disciplinary action for being late.

3              Soldiers are being trained at Fort Huachuca so that

4   they can move on to their active duty assignments.  It's

5   critical that everything runs smoothly and efficiently in Fort

6   Huachuca, including the dining services, so that the Army can

7   focus on its core mission of training these soldiers.

8              Finally, Your Honor, plaintiff does not merely seek

9   to preserve the status quo here.  It's trying to use this

10  Court to do an end run around the competitive selection

11  process.  Randolph-Sheppard arbitrations are currently taking

12  at least two years.  That doesn't even include any subsequent

13  judicial review.  Plaintiff wants the injunction to last

14  throughout all appeals here.  Realistically, this means that

15  the five-year term of the new contract that would have been

16  awarded to a different vendor but for the injunction will have

17  expired by the time it's determined whether plaintiff should

18  have been included in the competitive range to begin with.

19             That's exactly what happened in the Eastern District

20  of Virginia case regarding dining services at Fort Benning

21  that we cited in -- that defendant cited in its response, and

22  that was Case Number 4:18-CV-148.  So in 2018, the Court

23  issued a preliminary injunction in that case pending the

24  results of an arbitration.  It's 2023 now.  Arbitration has

25  yet to happen.  In January of this year, the Court actually

1    had to modify the injunction, noting that it was never

2    intended to guarantee an indefinite period of continued

3    services.

4           Now, plaintiff will contend Fort Benning was an

5    isolated, unusual case, any delays were caused by COVID,

6    COVID's not a problem now, everything will be decided quickly.

7    But Your Honor, realistically, once there is a backlog, the

8    backlog continues to snowball even after whatever caused the

9    backlog in the first place goes away.  It's kind of like the

10   backlog that's created when there's an attorney vacancy at the

11   United States Attorney's Office.  The backlog continues beyond

12   the point where those positions are actually filled.

13          So there's no reason to think that this arbitration

14   will proceed any faster than the arbitrations have over the

15   past several years, and in the meantime, the Army will be

16   forced to enter into temporary bridge contracts for the

17   foreseeable future, which are inefficient, cause a lot of

18   other uncertainty, and you will learn that they're just not

19   favored for many reasons.

20          To sum it up, Your Honor, plaintiff will not succeed

21   on the merits here because the Army did not violate the

22   Randolph-Sheppard Act.  The public interest and the equities

23   and the needs of soldiers at Fort Huachuca would be better

24   served by denying the injunctive relief requested.

25          The soldiers deserve to be fed in a safe and timely

 1   manner, and the Army has determined that plaintiff did not

 2   clearly demonstrate that it will be able to do that.  As such,

 3   defendant requests that the Court deny the injunction.

 4              THE COURT:  Thank you.

 5              MS. LETZKUS:  Thank you.

 6              MR. FREEMAN:  Your Honor?

 7              THE COURT:  Mr. Freeman, yes.

 8              MR. FREEMAN:  This is somewhat unusual, but given

 9   that we're going to be spending the rest of today and possibly

10   into tomorrow on the facts, I was hoping that I might spend

11   five minutes now responding to some misstatements of law that

12   the Government just made.

13              THE COURT:  Just five minutes.  You need --

14              MR. FREEMAN:  Thank you.

15              THE COURT:  I need all the parties to be aware, we

16   have basically crammed this hearing into the next two days.  I

17   am also the criminal duty magistrate judge, and I have very

18   limited time.  The parties have indicated to me a decision

19   needs to be made quickly, it needs to be made before the end

20   of this month based on the contract that's being done, so I

21   need to make sure this gets done no later than tomorrow at

22   five o'clock.

23              So I will give you five minutes and that's it.

24              MR. FREEMAN:  Thank you, Your Honor.

25              I'd like to address three points.  The first is a

1  misstatement with respect to the meaning of competitive range.

2  It's a basic principle of statutory interpretation that one

3  looks --

4          THE COURT:  Well, I think there is competitive range

5  defined by the RSA, competitive range defined by the FAR.

6          MR. FREEMAN:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. FREEMAN:  But so -- but the issue here is

9  competitive range under the Randolph-Sheppard Act and the

10  Act's cafeteria regulations, which were enacted in 1977.  It's

11  an important point that competitive range meant something

12  different in 1977 when the Department of Education adopted

13  those regulations than it did now.  In 1977, competitive range

14  included -- one was included in the competitive range if a

15  submission -- if a proposal could be made competitive by

16  meaningful discussions.

17          We have a fairly extensive discussion of both that

18  point and the law supporting it at pages 19 to 23 of

19  plaintiff's initial brief that the Army has not responded to.

20  Again, that also goes to what's now Exhibit 18, the Department

21  of Education handbook where the Department of Education set

22  out exactly that, that the meaningful discussions, again, it's

23  the Department of Education that Congress tasked with --

24  implementing -- with promulgating, implementing, and

25  interpreting the Randolph-Sheppard regulations.  To the extent

1  that the specific Randolph-Sheppard regulations conflict with

2  the FAR, it is the Randolph-Sheppard regulations that govern

3  here.

4        The second point I wanted to make, briefly, is to

5  point out a mistake in the framing that the Government

6  advanced with respect to the effect of a preliminary

7  injunction.  Counsel spoke to the harm if the soldiers are not

8  fed in a timely fashion that they allege.  We'll show that the

9  facts are quite different.  But that's not actually the

10  question here.  The question here is, if Your Honor grants a

11  preliminary injunction, will there be any harm to the Army?

12        If Your Honor grants a preliminary injunction, we

13  will continue under the current staffing, and there is no

14  dispute that, under the current staffing, the soldiers are fed

15  in a timely manner, and DES and its operator have consistently

16  gotten good evaluations, including evaluations for timeliness.

17  There simply is no delay under the current staffing, which is

18  all that would happen if Your Honor -- all that would be

19  continued under a preliminary injunction.

20        THE COURT:  Let me ask you this though.  What if the

21  -- if arbitration does not go forward within the next two to

22  three years -- let me just finish -- does not go forward

23  within the next two to three years, and the Army has indicated

24  they need increased staffing, what's the resolution to that?

25        MR. FREEMAN:  Well, two things, Your Honor.

1          THE COURT:  If they need increased staffing before

2    arbitration takes place.

3          MR. FREEMAN:  So there's two things.  So first of

4    all, there are procedures where the Army can always ask for

5    task orders and modifications if that were to occur.  The fact

6    of the matter is that it hasn't occurred under the current

7    staffing.  Even when there have been far more soldiers at Fort

8    Huachuca, they have always been timely fed.  You'll hear from

9    the contractor that he's quite proud of that.

10          The "if" was the third point I wanted to get to.

11    Actually, before I turn to the -- the last thing in terms of

12    the framing, the Government pointed to the two bands that it

13    alleges weren't properly addressed in the proposal.  It said,

14    well, maybe those two bands might be needed in the next five

15    years.

16          Again, that's not the right question.  The question

17    is, and I don't think the Government will dispute, unless you

18    have a pandemic in the next six months or so, the arbitration

19    panel will have a chance to decide that question, and the only

20    -- one of those two quote/unquote not-sufficiently-addressed

21    bands had to do with going to only takeout meals.  The only

22    circumstances in which that's ever occurred or is ever likely

23    to occur is if we shut down in-person dining entirely for

24    another pandemic.

25          Again, they handle -- even under the current

1   staffing, they -- there's no dispute that they, the

2   contractor, adequately handled that situation, the sole

3   takeout under the pandemic.

4       The last point I wanted to address, Your Honor, was

5   the premise of your hypothetical and the last point or the

6   next-to-last point that the Government made, which is simply

7   untrue with respect to the idea that the Randolph-Sheppard

8   arbitrations are taking two years.  The most recent

9   arbitration that I'm aware of, Your Honor, I was actually a

10  participant in, as was one of the Government's witnesses, was

11  for what was then Fort Lee, Virginia.  It's now Fort Gregg-

12  Adams.

13      The Department of Education convened that

14  arbitration in June of 2022, and an arbitration hearing was

15  scheduled for January of 2023, almost exactly six months

16  later.  Even that would have gone faster if the Army hadn't

17  fought discovery in the case, requiring rulings from the panel

18  compelling -- compelling discovery.

19      But it was a six-month period, Your Honor, and

20  again, that's postCOVID, postpandemic.  The Fort -- I can go

21  into, we did discuss it briefly in our hearing, the Fort

22  Benning delays were just extraordinary, partly due to the

23  pandemic, partly there was a whole year of settlement

24  negotiations when the parties agreed to withdraw the

25  arbitration from the panel and we tried to go through.

1          Sounds like it was -- it's just not -- it's apples

2    and oranges, Your Honor.  As I said, Fort Lee is the closest.

3    Even that, I submit, was longer than this one will be, that

4    RSA has cleared up whatever backlog it had.  It is moving

5    faster.  And Fort Lee, as I said, went to the panel within six

6    months.  There is a requirement that the panel issue its

7    decision within 30 days.  That bogeyman of two years is just

8    simply not true.  To the extent it was ever true, it was in

9    the past, before RSA -- and when I say RSA, it's the

10   Rehabilitation Services Administration, which is part of the

11   Department of Education -- has cleared up that backlog.

12          Thank you.

13          THE COURT:  Okay.  Thank you.

14          And I'm going to ask that -- I know Mr. Weber's

15   going to be your first witness, so we -- before we have

16   Mr. Weber come to the stand, if I can have Mr. Vicory and

17   Mr. Froehlich come forward to be sworn in.

18          MR. FREEMAN:  Do you want our other witnesses as

19   well, or will you wait, Your Honor?

20          THE COURT:  No, we can wait.

21          THE CLERK:  Please raise your right hand.

22          (Michael Vicory and Wade Froehlich were duly sworn

23          by the clerk.)

24          THE COURT:  And for purposes of the record, can you

25   each state your name and spell it, please.

1          Mr. Vicory, if you want to start.

2          MR. VICORY:  Sure.  My name is Mike Vicory, last

3    name spelled V-i-c-o-r-y.

4          THE COURT:  Mr. Froehlich?

5          MR. FROEHLICH:  Your Honor, my name is Wade

6    Froehlich, last name spelled F-r-o-e-h-l-i-c-h.

7          THE COURT:  Thank you.

8          Gentlemen, my understanding is that you both will be

9    witnesses in this matter.  The plaintiffs have invoked Rule

10   615 of the Rules of Evidence requesting that any witnesses be

11   excluded until their testimony actually takes place, so I

12   would ask, at this time you will be excluded.  You'll not be

13   back into the courtroom until you actually give testimony.

14         I'm also going to ask that you not discuss with each

15   other or anybody else the nature of your testimony.  Obviously

16   you can speak to the Government, but for purposes of while

17   you're in the room separate from here, please make sure that

18   you don't talk to each other about the case or anybody else

19   who may be involved in the case.  All right?

20         (Witnesses respond simultaneously in the

21          affirmative.)

22         THE COURT:  Okay.  Thank you.

23         And there's two rooms outside if you want to --

24   right outside these doors.  If you want to sit in those rooms,

25   you're more than welcome to.

1          And then, Mr. Freeman, my understanding is that

2   Mr. Weber will be the first witness?

3          MR. FREEMAN:  That's correct.

4          THE COURT:  Okay.  If you'd like to bring him

5   forward, and we'll have him sworn in.

6          THE CLERK:  Sir, if you can just raise your right

7   hand, please.

8                  SCOTT WEBER, WITNESS, SWORN

9          THE CLERK:  Thank you, sir.

10          And if you could please speak directly into the

11   microphone, which is right in front of you, and if you could

12   state your full name for the record, please, spelling your

13   last name.

14          THE WITNESS:  There it is.  My name is Scott Weber,

15   W-e-b-e-r.

16          THE COURT:  And Mr. Weber, if at any time you need a

17   glass of water or anything, just let us know, and we'll have

18   Mr. Freeman get that for you.  Okay?

19          THE WITNESS:  Thank you, Judge.

20          THE COURT:  Okay.  Mr. Freeman, whenever you're

21   ready.

22          MR. FREEMAN:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. FREEMAN:

25   Q.   Good afternoon, Mr. Weber.  Would you please just briefly

 1  introduce yourself to Judge Kimmins.

 2  A.   Yeah, my name is Scott Weber.  I'm an Arizona native,

 3  grew up in Phoenix.  I was 19 years old.  I was a victim of

 4  road rage, and I lost my sight.  I was going to ASU at the

 5  time, sorry for you guys in Tucson, and after a year, I came

 6  back to ASU and was going to school there with a four legged

 7  friend, my guide dog.  And in 1985, I became a Randolph-

 8  Sheppard vendor with the Arizona State licensing agency for

 9  Arizona.

10  Q.   How old are you, Mr. Weber?

11  A.   I am 63.

12  Q.   Where do you work now?

13  A.   I work at the Fort Huachuca dining facilities in Sierra

14  Vista.

15  Q.   And what's your position there?

16  A.   I am the president of TME, Thunder Mountain Enterprises,

17  which is my company.

18  Q.   Just taking a short step back, Mr. Weber, could you

19  describe your career in the food service industry and in

20  particular in the Arizona blind vending program.

21  A.   Okay.  Yeah, I started out in 1985 at the Commerce

22  building in downtown Phoenix.  It was a cafeteria.  I moved

23  from there to the DES building, the old one, which was a

24  cafeteria.  Then I moved to Occupational Licensing, which was

25  a cafeteria.  Then I moved to Department of Education, which

1   was a cafeteria.  And then I moved to the general mail

2   facility, which is a 24 hour/seven-day-a week cafeteria that

3   feeds 2,600 people, has 48 vending machines, and I was there

4   for 20 years.

5   Q.   And at each of those locations, what was your job?

6   A.   I was the owner of the business and a blind vendor,

7   obviously.

8   Q.   Then picking up after the postal facility.

9   A.   Pardon me?

10  Q.   Could you pick up from there, please?

11  A.   Okay.  So after the postal facility, actually, what

12  happened was, and many of you experienced this, the mail

13  changed from paying bills by mail to paying them online, and

14  the post office started decreasing their staffing, so the

15  opportunity came up to be the first blind vendor that ran a

16  roadside rest stop and filled the vending machines at it, and

17  I decided I wanted to go do that, so I did that at the Sacaton

18  rest stop.  Very rewarding.  A little different when it's 115

19  outside and you're trying to load vending machines.

20       So then I went up the hill to Sunset Point, much nicer

21  weather and nicer to fill vending machines.  While I was at

22  Sunset Point, I was asked to run three other facilities on an

23  emergency, one of them being the old post office, one of them

24  being Desert Schools, and the other one being the Capital

25  downtown, and those were all food service locations, so I ran

1   all four at one time.

2        And then the time came up when my friend who was working

3   at Fort Huachuca running the dining facility contract was

4   going to retire, and my kids had grown up, so I decided I

5   would like to go down to Fort Huachuca because I thought it

6   was the next level for me to be able to meet my goals.

7   Q.   I'm going to ask you some questions about Fort Huachuca

8   in just a moment, but could you tell Judge Kimmins, please,

9   have you received any recognition or honors as a vendor over

10  your career?

11  A.   Yes, I have numerous rewards prior to coming down to Fort

12  Huachuca, but in the nine years I've been down here, six of

13  the years I've been the Operator of the Year for the program

14  in the state of Arizona.  Plus I am the chairman of the

15  Elected Committee of Blind Vendors that represents all of the

16  operators all over the state of Arizona.

17  Q.   And before you started -- I'm sorry.  What year did you

18  start at Fort Huachuca?

19  A.   I started in December of '13.

20  Q.   December 2013.  In your -- see if I can do the math -- 28

21  years as a vendor before that, did you receive any recognition

22  or awards?

23  A.   Yes, there were numerous awards.  I probably have forgot

24  some, and I'm not prepared to answer all those right now, but

25  I was received very well by our program and received numerous

1    awards, as well as my locations.  I can think of the

2    Scrambler, Weekend Scrambler award I won from the post office

3    for supporting their golf tournaments and Black History Month

4    for supporting Black History Month every year and getting very

5    involved with it.

6    Q.   Were you -- I'm sorry.

7    A.   Go ahead.  I'm sorry.

8    Q.   Were you ever recognized as the Operator of the Year

9    before you were at Fort Huachuca?

10   A.   Yes, I have.  I just can't cite which years, and it was

11   numerous times.

12   Q.   Thank you.  So let's turn to Fort Huachuca, Mr. Weber.

13   You said you've been the operator of the food service contract

14   there since December 2013?

15   A.   Yes.

16   Q.   And could you briefly describe your role as the operator

17   of that contract.

18   A.   So I'm a very hands-on manager, and so I developed an

19   LLC, and I'm the president.  My wife's the vice president.

20   She works with me.  She is also the payroll manager and she's

21   my assistant.  I am there Monday through Friday for regular

22   business hours where I meet with my project manager and other

23   managers and discuss happenings and give input and decisions.

24   I'm very involved with that.

25        During meal service, I go out and I observe the soldiers

1   coming through the dining facility as far as, you know, the

2   lines and everything of that nature to make sure the flow is

3   happening properly and to ensure that every one of our

4   customers gets through quickly and out and be able to sit

5   down, have a good meal, and move on, move on timely.

6   Q.   We'll get to that in a little bit, Mr. Weber.  Could you

7   just briefly -- who holds the contract with the Army for the

8   food service operations at Fort Huachuca?

9   A.   Arizona DES, the State licensing agency.

10  Q.   And what's your relationship with Arizona DES?

11  A.   I have what's called an operator's agreement with DES,

12  with Randolph-Sheppard, with the Arizona Business Enterprise

13  Program in the DES role.

14  Q.   And did DES select you to be the operator at Fort

15  Huachuca?

16  A.   Yes.  When a location becomes available, they're

17  announced, we submit our interest, and then they set up a

18  selection.  We sit down amongst a couple of our peers and

19  office staff for BEP, and I do a presentation, I answer some

20  questions, I do a business plan, and they look at my history,

21  and then they make a decision to select an operator or not to

22  select an operator, and I was selected to be the operator at

23  Fort Huachuca.

24  Q.   You mentioned that you do business through a corporation.

25  You might have mentioned this, but what's the name of that

DIRECT EXAMINATION OF SCOTT WEBER

1  corporation?

2  A.   Thunder Mountain Enterprises.

3  Q.   How many cafeterias do you and Thunder Mountain

4  Enterprises operate at Fort Huachuca?

5  A.   We operate three: the Weinstein Dining Facility, the

6  Thunderbird Dining Facility, and remote site feeding at Black

7  Tower.

8  Q.   And could you just briefly describe each of those three

9  facilities, please.

10  A.   Sure.  Thunderbird Dining Facility we mostly feed

11  officers.  It's a smaller, older facility, and we feed less

12  officers there, but it's been remodeled.  It's very nice.  And

13  we've taken that over, full service, over from the Army.  We

14  only had DFA services and cook support up until '19, and then

15  we took over the Thunderbird facility full cafeteria without

16  the Army after that.

17  Q.   And can I just interrupt you for a second.  There is lots

18  of acronyms, and I want to make sure it's clear.

19  A.   I'm sorry.  There are many acronyms.

20  Q.   You mentioned DFA services.  What does that stand for?

21  A.   Dining facility attendants.  They're basically

22  cleanup-type folks.

23  Q.   Okay.  So you and your team did the DFA work until 2019

24  at Thunderbird and then since then have been doing all of the

25  food-service-related work at Thunderbird; is that correct?

1    A.   Yes.

2    Q.   And how about at Weinstein?

3    A.   Weinstein we've always had.  It's the AIT.  IMT, basic

4    and manualized.  AIT, advanced individual training.  I'm

5    sorry.  Initial military training.  I'm going to have a hard

6    time getting over the acronyms.

7          So we feed the soldiers at Weinstein.  At 2:00 in the

8    morning we have a meal service that we feed the 213th, which

9    comes down from Black Tower because there's nowhere to eat,

10   and they have to work at night, so they come down there, so we

11   open down there for them.

12         And then we do a breakfast, lunch, and dinner meal, each

13   of them open pretty much an hour and a half, and we feed the

14   soldiers that come in and -- quickly, efficiently, with good

15   quality food, and get them on their way.

16   Q.   Approximately how many meals do you serve per day or per

17   month?

18   A.   At one time, in the dining facility, Weinstein, we

19   exceeded 100,000 a month.  We're below 70,000 right now.

20   Q.   And is that for all three facilities combined?

21   A.   Yes.

22   Q.   I want to ask you a few questions, Mr. Weber, about the

23   staffing of those dining facilities.  In total, approximately

24   how many employees do you have?

25   A.   Approximately 110.

1   Q.    How are their pay rates set?

2   A.    So there's two types of employees that work for me,

3   managerial and collective bargaining agreement union

4   employees.  And so we negotiate the pay rates with the union

5   ever year, and our president also gives input and mandates a

6   minimum wage, and it's been helpful for the employees, and we

7   were able to move by percentage everybody's wage up by the

8   same percentage, and so that's how they're established.  As

9   far as the managerial part of it, that's up to me.

10  Q.    And approximately how many managerial employees do you

11  have and how many union collective bargaining employees do you

12  have?

13  A.    I have eight managers that work for me, and the remainder

14  of them, so the 102, would be union employees.

15  Q.    Okay.  What are the largest categories of employees that

16  you have?

17  A.    Mainly DFAs and FSSs.  They're all paid the same rate,

18  and they all work closely together.  As a matter of fact, the

19  union has recommended that they become one category.

20  Q.    And again, could you just briefly describe what a DFA is

21  and what an FSS is.

22  A.    I'm sorry.  Food sanitation specialists are servers and

23  prep folks.  They don't cook but they do do a lot of prep

24  work.  And dining facility attendants, they keep the place

25  clean and squared away, and they also are cross-trained with

 1    the FSSs to be able to assist wherever they're needed there.

 2    Q.    Are there other categories of employees in the food

 3    service operation at Fort Huachuca?

 4    A.    Yes, there are.  There's cook IIs, which are basically

 5    kitchen managers, but they oversee the entire facility and all

 6    the employees.  There's cook I's that are cooks.  They make

 7    the food for the day, and they also can assist with serving

 8    the food and wherever else they're needed because they're very

 9    well-trained folks.

10         We have admin, which also can be considered office clerk.

11    We call them admin.  They're the folks that work on the AFMIS

12    system, which is the Army Food Management Information System,

13    and they're the ones who control the cash flow out to the

14    headcount stations.  That is a term we use there.  It's also a

15    term that's used in Army inspections for us.

16         And then they --

17    Q.    I'm sorry.  What?  What is the term that's used?

18    A.    Headcount.

19    Q.    Okay.  And so the folks who are sometimes called admin or

20    office clerks are the folks who do the headcount; is that

21    correct?

22    A.    Yes.  They are the primary folks that handle from the

23    office end of it out to the register end of it, and then we

24    have additional people that work as office clerks in the

25    proposal or could be considered cashiers.  We also call them

 1  headcount.  I don't think it's impersonal but we do.  And they

 2  also will work additional stations when it's necessary.

 3  Q.   So let's see.  I'm going to come back to how the

 4  headcount is done, but are there -- so you've mentioned the

 5  dining facility attendants, the --

 6  A.   Yeah.

 7  Q.   -- food service, FSS, food service -- food sanitation

 8  service workers, the cook IIs, the admin/office

 9  clerk/headcount folks.  Are there other significant categories

10  of employees?

11  A.   Yes.  We have rations folks, which are -- they basically

12  accept the products in, and they put the products away, and

13  they issue them out.  Okay?  And we have leads.  So we have

14  DFA leads, we have FSS leads, which help out the cook IIs with

15  organization and structure.  There was not FSS leads before I

16  became there, but I saw the need for it to help make the flow

17  seem good and everything like that because we're out front

18  dealing with it, so.

19  Q.   And for each of these categories, are they restricted to

20  doing just the specific tasks that fall under their category

21  of employee?

22  A.   Absolutely not.  So what happens is, if we ask an FSS to

23  be a cook, they need to be paid cook wages.  If an FSS was to

24  volunteer to be a cook, then they could pay their own -- you

25  know, get their own pay rate.  This is all union stuff.

 1    But for the most part everybody in my place is

 2 cross-trained.  The DFAs can do FSS and do on a regular basis.

 3 The FSSs can do the cashier positions for the clerks.  The

 4 FSSs also have the ability to step in and do cook positions

 5 occasionally.  The cooks also have the ability to step in

 6 anywhere, and the cook IIs have the ability to step in

 7 everywhere.  They're all cross-trained.

 8 Q.   Thank you.  And does the Army specifically encourage

 9 cross-training?

10 A.   Yes, it does.

11 Q.   And why is that?

12 A.   For more efficient flow, to get the soldiers in and out,

13 fed well, and on their way.

14 Q.   I want to ask you a few questions, Mr. Weber, about the

15 evaluations that you and your team have received in the almost

16 10 years that you've been operating the food services at Fort

17 Huachuca.

18    First, what types of evaluations do you receive and who

19 performs them?

20 A.   So we get evaluated by a lot of folks.  The Army does

21 that very well.  And so first of all, we have our food program

22 manager that comes in on a regular basis.  We talk about the

23 quality of the food, the dietary part of the food, adding

24 things to the catalog where we purchase our food, all those

25 kind of things, menu changes, just everything affiliated with

1    food service, and we have a great relationship.  They do do

2    their own inspections.

3        The COR, who's the contract officer representative, is

4    probably our biggest individual that we have the most contact

5    with, and they do a regular inspection.  They have rotating

6    inspections they do.  They're at the facility just about

7    daily, and it's a very close relationship.

8        I also requested that we start -- we have monthly

9    meetings with the COR to discuss issues where actually the

10   COR, the KO, the food program manager, everybody comes to, and

11   we discuss all the issues to make the situation better for the

12   soldiers.  And then we --

13   Q.   Let me just interrupt there for a second.

14   A.   Yes, sir.

15   Q.   Again, slowing you down on these acronyms.

16   A.   Sorry.

17   Q.   KO is?

18   A.   Contract offer.

19   Q.   And I think you did define COR, but could you do that

20   again for us?

21   A.   Contract officer representative.

22   Q.   And is the contract -- I think you mentioned the COR, the

23   contract officer representative, is the person who you most

24   regularly interact with; is that correct?

25   A.   Yes, definitely.

1  Q.   And --

2  A.   And then we are also inspected by the vets, the

3  preventive maintenance.  We have what's called FMAT

4  inspections.  That's the Food Management Assessment Team, I

5  believe.  They come every two years, and they do a full

6  evaluation of everything, from the LRC folks, which is

7  Logistic Readiness Command, that's who the COR and the food

8  program manager work for, all the way down to the dining

9  facilities to make sure we're doing the proper service for the

10 Army.

11 Q.   And are you familiar with the term CPAR or Contractor

12 Performance Assessment Report?

13 A.   Very much so.

14 Q.   And could you explain please what that is.

15 A.   So CPARs are done each year by the KO.  They consult with

16 the COR.  The KO is the contract officer.  The COR is the

17 contact officer representative.  And they determine the level

18 of service we've done for the year and whether they would

19 recommend that we, you know, do that same service the next

20 year, and at that point they would list out any kind of

21 deficiencies we have, but we have not had deficiencies.  And

22 it's just been a -- somewhat of an evaluation yearly that says

23 you're doing a great job and we recommend you moving forward.

24 Q.   And I don't want to spend too much time on them, but I

25 will, just for the judge's benefit, three of the recent CPARs

1   are Exhibits 4, 5 and 6, Plaintiff's Exhibits 4, 5, and 6.

2   They were also ECF Numbers 22-4, 22-5 and 22-6.  And those are

3   under seal but do reflect always exceptional, very good, or

4   satisfactory ratings for all of the -- all of the areas rated.

5        I'm going to just turn briefly, Your Honor, to Exhibit 6.

6   22-4, which is the CPAR for December 2021 to November 30th,

7   2022.

8        Mr. Weber, was that the most recent Contractor

9   Performance Assessment Report --

10  A.   Yes.

11  Q.   -- that the Army has conducted?

12  A.   Yes.

13  Q.   And it's signed at the end, I'll just represent to you.

14  It says, "Name" -- on the last page, the third page, the last

15  page of that exhibit, it says, "Name and title of assessing

16  official:  Karen Billick, Contracting Officer."

17       Is she the contracting officer with whom you deal at Fort

18  Huachuca?

19  A.   Yes.

20  Q.   And just above where she signs her name, it says,

21  "Recommendation:  Given what I know today about the

22  contractor's ability to perform in accordance with this

23  contract or order's most significant requirements, I would

24  recommend them for similar requirements in the future."

25       Is that what -- is that the contracting officer's

1   assessment of your team's performance as of December, as of

2   November 30th, 2022?

3   A.   Yes.

4   Q.   And turning to the page before that, on quality, the CPAR

5   rated you and your team very good; is that correct?

6   A.   Yes.

7   Q.   And on management they rated you satisfactory; correct?

8   A.   Yes.

9   Q.   And in fact, in all categories that they rated, they

10  rated you either very good or satisfactory; correct?

11  A.   Yes.

12  Q.   And in some previous years, as reflected in Exhibits 4

13  and 5, they sometimes rated you either very good or

14  exceptional in some of those categories; correct?

15  A.   Yes.

16  Q.   I do want -- going down on that most recent CPAR on page

17  2, under "Assessing Official Comments," under "Quality," the

18  contracting officer wrote that the salad bar exceeds the

19  requirements with respect to the choices that are offered.

20  She wrote, and I'm quoting, "Quality rating has improved on

21  Quality-of-Life Report to 96 percent in October '22."

22       Could you tell Judge Kimmins, please, what the Quality-

23  of-Life Report is?

24  A.   Yes.  The Quality-of-Life Report is an evaluation of

25  basic -- well, it's more of a survey that all the soldiers get

 1  when they leave Fort Huachuca, and it's about all the

 2  services, not just the dining facilities, but we weren't

 3  getting those on a regular basis.  I found out about them, and

 4  I asked if I could see them because we could take comments in

 5  there and improve the service for the soldiers.  So the Army

 6  was willing to start giving those Quality-of-Life Reports to

 7  us, and we use them somewhat in our own evaluation.

 8      We shoot for over 90 percent, basically the satisfactory

 9  and exceeds being two columns that are middle and above, and

10  we've been able to accomplish that.  97 was one of the very

11  highest scores we've gotten.

12  Q.   Going down to the next category of the "Assessing

13  Official Comments" from the end of last year, there's a

14  category called "Schedule," and she wrote, "Performance meets

15  contractual requirements.  There are no schedule issues with

16  serving breakfast, lunch, dinner, and the fourth meal

17  requirements at the applicable DFACs."  That's dining

18  facilities.  DFAC is dining facilities; is that correct?

19  A.   Yes.

20  Q.   And is that your understanding, that the Army had no

21  concerns with respect to your scheduling of your workers

22  throughout last year; correct?

23  A.   The Army has never had an issue with our scheduling or

24  staffing levels.

25  Q.   And actually, I'll ask you that right now.  Since

1   December of 2022, has the Army had any issues with your

2   staffing or staffing levels or the flow levels at which you

3   serve soldiers?

4   A.   No.

5   Q.   The last couple of categories she goes through, "Cost

6   Control," she said, "Contractor stays within the estimated

7   costs.  All billing turned in in" -- "IAW" is "in accordance

8   with;" correct?

9   A.   Yes.

10  Q.   "...in accordance with contractual requirements."

11       "Management," she wrote, "Management handles unexpected

12  situations and issues daily to keep the DFAC facilities

13  operational and serving the soldiers nutritional meals.

14  Management team is qualified to manage both DFAC facilities

15  and handling short suspenses."  She means when serving a

16  suspended for a short period of time; correct?

17  A.   Yes.

18  Q.   And is that your understanding, that those were her

19  ratings of your performance, your team's performance, for

20  2022?

21  A.   Most definitely.  We've always wanted not to be the

22  problem.  We've always wanted to be the answer to the problem,

23  and we want to exceed expectations.  We have a great

24  relationship with Fort Huachuca.

25  Q.   And then turning the page to the last page of the

1   contracting officer's assessment report for 2022, there's a

2   category, "Regulatory Compliance," where she writes, "The

3   contractor complied with all reporting requirements, quality

4   assurance, surveillance plan, contractual requirements, safety

5   requirements, environmental reporting and standards."

6       Is it your understanding that you and your team met all

7   regulatory requirements in 2022?

8   A.   (No response.)

9   Q.   Mr. Weber, is that your understanding?

10  A.   Yes.

11  Q.   And has that been true since December 2022?

12  A.   Yes.

13  Q.   Finally, there is a category of "Additional/Other," and

14  she wrote, quote, "Over the span of nine months, the

15  contractor has and continues to improve, modify, and work

16  towards meeting guidelines and regulations.  Contractor is

17  made aware of any discrepancies and resolves them in a timely

18  manner or asks for qualifications on them."

19      Let me ask first, were there any discrepancies or

20  significant problems in 2022 or since then?

21  A.   No.

22  Q.   Is the rest of that true, that you have and continue to

23  improve, modify, and work towards meeting guidelines and

24  resolving any problems that the Army brings to your attention?

25  A.   It's a great thing what we do, feeding soldiers, and

1    we're out there to watch and try to make improvements and do

2    the best we can do.  We try to constantly give variety in the

3    menus.  We also try to provide more nutritious items, a lot of

4    the Beyond stuff and things that are out there.

5         We're constantly listening to our customers.  Soldiers

6    give us ideas, and we do them after consulting -- consulting

7    with the food program manager and the dietitian, and it's just

8    a great relationship.

9    Q.   Thank you.  I want to change the topic for a little

10   while, Mr. Weber, and ask you some questions about the 2022

11   proposal that Arizona DES submitted to the Army.

12        First, when did the Army resolicit the contract at Fort

13   Huachuca?

14   A.   March of '22.

15   Q.   And how does the -- that 2022 solicitation compare to the

16   current contract you'd been operating?

17   A.   There are band levels back in the contract.  Those were

18   gone for a while.  We operated on them before.  And also we

19   picked up the management of supplies, and now it's built into

20   the contract, so the -- we pay for them.  The Army won't pay

21   for them.  They'll be paid -- well, they will.  It's part of

22   the contract.

23   Q.   And were there any changes that would significantly

24   impact the staffing levels of the new contract compared to the

25   current contract?

1  A.   So the bands, quickly, the bands are different levels of

2  number of customers coming through the food service locations.

3  So in Thunderbird, you know, you would have zero to 750.  At

4  Weinstein you would have zero to 2,251.  Those would be band

5  1.  And then over that 2,251 to 4,500 at Weinstein would be

6  band 2.

7       So they're there to basically save the Government some

8  money when it's slow, and so we also can adjust our levels of

9  employees for those.  But right now, we're at band 1, but

10 we're still operating with band-2-type employees.

11 Q.   And so do you have -- I just want to make sure that we're

12 clear on what bands mean.  So the Army is saying it's slightly

13 different staffing depending on how many meals are being

14 served per day; is that correct?

15 A.   How many soldiers are being served, yes.

16 Q.   And those numbers, the zero to 2,250 and above, are meals

17 per day being served at Weinstein; is that correct?

18 A.   Yeah, yeah, the 2,251, zero to, would be band 1.

19 Q.   And I'm just trying to be clear, Mr. Weber.  Those

20 numbers, are those the number of meals that are served each

21 day?

22 A.   That's for the total number of meals for that day.

23 Q.   Okay.  At that facility?

24 A.   Yes.

25 Q.   And the zero to 750 is the total number of meals under

 1   band 1 at Thunderbird; is that correct?

 2   A.   Yes.

 3   Q.   And in the -- in prior contracts, has the Army used that

 4   sort of band system?

 5   A.   Yeah.

 6   Q.   And then --

 7   A.   We used to do bands, yes.

 8   Q.   Okay.  So under the new contract, Mr. Weber, are the --

 9   is the number of cafeterias any different under the new

10   solicitation compared to the current contract?

11   A.   No.  There has been no changes at all three of them.

12   Q.   Okay.  So same three contracts, same range of number of

13   meals being served, same mission, same scope of service; is

14   that correct?

15   A.   Everything's the same.

16   Q.   And did DES prepare a proposal in response to the 2022

17   solicitation?

18   A.   Yes, it did.

19   Q.   What was your role in preparing that proposal?

20   A.   So we as the elected committee, DES decided that they

21   needed to have a partner work with them doing the proposal

22   because it hadn't been done the way it's being done, was done.

23   In other words, it hadn't been announced for competitive

24   range.  And so we agreed it was very important to the program,

25   so DES was willing to hire Sodexo to work with them in putting

 1  a proposal together, and Sodexo, two folks from Sodexo, met

 2  with me twice at Fort Huachuca, and we went over all sorts of

 3  things such as staffing and -- just everything.

 4      We went over the process of running it, they observed the

 5  job we're doing, and they were able to put a proposal together

 6  from that.

 7  Q.   Based on your experience operating food services at Fort

 8  Huachuca for the last almost 10 years, Mr. Weber, are the

 9  staffing levels in DES's proposal sufficient to meet the

10  contract's requirements?

11  A.   Yes.

12  Q.   What's the basis for that belief?

13  A.   The staffing levels are almost the same as what I'm

14  operating now, and I'm operating at band level 2, and so

15  there's very -- there's enough.  Some of the names they're

16  just called different.  They recommend -- they call it

17  cashiers.  We call it -- you know, they're called office

18  clerks.  We call people admin.

19      So there's probably a misunderstanding there somewhere,

20  but for the most part, the proposal was the same as what we

21  do, and we've given exceptional service right now, and we have

22  fed at times well over the max amount of soldiers you can

23  feed.  Mainly at the Weinstein Dining Facility, we've exceeded

24  the capabilities of the facility, and so we were able to do

25  that efficiently with the staffing we have.

1    Q.   In January of this year, 2023, Mr. Weber, did you learn

2    of the Army's evaluation of DES's proposal?

3    A.   Yes, I did.

4    Q.   And are you aware that the Army found that proposal to be

5    deficient with respect to staffing, and specifically they

6    found that the proposal was technically unacceptable due to

7    the insufficient staffing?

8    A.   Yes, I did, and I was very shocked about it too.  I

9    thought, you know, hey, it was right on, so --

10   Q.   What was right on, Mr. Weber?

11   A.   The proposal was right on.  With the quality of service

12   that we are used to providing, with my experience, we could --

13   we could meet the needs of the Army with those, that proposal.

14   Q.   Let me drill down on that a little bit, Mr. Weber, and

15   ask you specifically about some of the staffing levels that

16   the Army raised concerns about.

17        I'm going to turn, Your Honor, to Plaintiff's Exhibit 12,

18   which is the Army's debriefing letter dated January 26th,

19   2023.

20        Are you aware, Mr. Weber, that Arizona DES requested a

21   debriefing, asking the Army to give its reasons for excluding

22   the proposal from the competitive range, and in response to

23   that, on January 26th, the Army responded with what's referred

24   to as the debriefing letter, which is Exhibit 12?

25        Were you aware of that?

1    A.   Yes.

2    Q.   And I'm turning, Your Honor, to -- the paging's a little

3    bit wonky -- at the top of the page, it's page 7, for the --

4    because there was a cover page on each of the exhibits, they

5    all start with page 2, so the ECF number, it says page 8 of

6    12.  And -- sorry.  I'm looking at the wrong copy, Your Honor.

7    With your indulgence.

8         So at the top of page 7 of that letter, Mr. Weber,

9    Mr. Vicory of the Army wrote, "Subfactor 2:  Staffing plan was

10   unacceptable."  He then writes, "Below is listed the specific

11   areas of concern for each building or task," and he starts

12   with Thunder -- he starts, he says, "Building 52107."  Which

13   building is that?

14   A.   That's the Thunderbird Dining Facility.

15   Q.   And he writes with respect to Thunderbird in that

16   paragraph and also with respect to building 85202, three

17   paragraphs below that -- what is 85202?

18   A.   That's the Weinstein Dining Facility.

19   Q.   Okay.  For Thunderbird, the specific failure that the

20   Army alleges is that, for building 52107, Thunderbird, cashier

21   for three meals a day, one to 750 meals.

22        So that's band 1; is that correct, Mr. Weber?

23   A.   Yes.

24   Q.   He writes, "Cashiers are significantly understaffed by 21

25   to 100 percent," and then he gives the times for breakfast,

 1  lunch, and dinner.  He writes that, "Understaffed cashiers

 2  would hinder requirements regarding headcount procedures.  Too

 3  few cashiers would not satisfy PWS," performance work

 4  statement, "requirements and would cause too much risk of

 5  performance issues negatively impacting flow rate and cause

 6  patrons to wait excessively at the headcount stations."

 7       What is your response, Mr. Weber, as to whether the

 8  proposal included sufficient cashiers?

 9  A.   The proposal did include sufficient cashiers.  They're

10  very similar to what we do now, and we move the soldiers

11  through very quickly, and we have a great flow, and they get

12  in quickly, they get their food quickly, and then they can go

13  sit down and eat, and the flow is consistent where we don't

14  have backups of lines or we don't have backups because there's

15  no seating.  We handle it the most efficient it could be

16  handled, and we have been complimented on it.

17  Q.   I'm going to skip down to the paragraph that addresses

18  cashiers at building 85202.  Again, is that Weinstein,

19  Mr. Weber?

20  A.   Yes, that's Weinstein.  I'm sorry.

21  Q.   And the specific criticism at the Army levels is that,

22  for three meals a day, breakfast, lunch, and dinner, from one

23  to 2,250 meals -- that's band 1; is that correct?

24  A.   Yes.

25  Q.   He writes that, "Cashiers are grossly understaffed by

 1    more than 101 percent for breakfast, lunch, and dinner," and

 2    then gives the same criticism word-for-word, that too few

 3    cashiers would negatively impact flow rate and cause patrons

 4    to wait excessively at the headcount stations.

 5         What is your response to that criticism?

 6    A.   Outside of being a little bothered and wishing Mr. Vicory

 7    would come see our operation, how we operate, we move the

 8    soldiers through at a very strong flow, getting them through

 9    as quick as we possibly can.

10         Part of our problem is usually when they all show up at

11    once, they're not spread out through the hour and a half.  We

12    flood the lines with them.  We flood the dining facility where

13    they have no room to sit.  So we have to meter them somewhat

14    to get them in and out efficiently, but we do that, and we do

15    it well.

16    Q.   And what's your understanding -- was there a possible

17    source of confusion between the proposal that DES submitted

18    and what it called the people who are doing the headcount and

19    the Army's use of the word cashier?

20    A.   Yeah, we call them admin, it's the admin person, which is

21    the office clerk, and then we call them headcount, and that's

22    the folks that also run the other headcount stations.  The

23    confusion is we didn't list anybody out as cashiers because we

24    do not call them that, and we would not have just a cashier

25    because there wouldn't be enough work.  They wouldn't get

1  enough hours.

2      And so the admin and the headcount and FSSs can fill in

3  in headcount because they're trained to do so.  We meet the

4  flow and the demand, and we move them through quickly, and

5  that would have been seen if there was a visit.

6  Q.   So are you confident, Mr. Weber, that there are an

7  adequate number of employees in the proposal that ADES

8  submitted in 2022 to perform all of the headcount functions

9  and to make sure that there will be no negative impact on the

10  flow rate of soldiers coming through that line?

11  A.   Without exception, it would exceed their expectations,

12  just like we do every day.

13  Q.   If there were any problems, are there any other employees

14  who are cross-trained to handle the headcount

15  responsibilities?

16  A.   Yes.  We have numerous FSSs that can do headcount.  Our

17  managers have even done it at times.  My managers are working

18  managers, and they're not sitting in offices.  They're out

19  there working with the employees, and they step in wherever

20  they're needed.  They handle customer issues or complaints or

21  complements, and they also can jump in at headcount.  If

22  they're seeing there's a little buildup or if the flow looks

23  like we can increase it significantly, they'll jump on another

24  station, and we'll move even more of them through faster.

25  Q.   At the bottom of page 7, Mr. Weber, for building 85202,

1   again, Weinstein, this is another criticism the Army levels in

2   the debriefing.  It says, for three meals a day, breakfast

3   lunch, and dinner, 2,251 to 4,500 meals.  Is that band 2?

4   A.    That is band 2.

5   Q.    And let me -- if I just might finish, Mr. Weber.

6   A.    Sorry.

7   Q.    What he writes is that food sanitation specialists and

8   DFAs, dining facility attendants, are somewhat understaffed by

9   one to 21 percent for breakfast, lunch, and dinner, which he

10  says would hinder requirements for serving operations, and

11  regarding sanitation, too few food sanitation specialists

12  would not satisfy performance work requirements -- performance

13  work statement requirements, which would cause risk of

14  negative performance regarding inefficient flow rate,

15  excessive patron wait times, not enough staff to

16  satisfactorily clean all food equipment areas and utensils.

17        What is your response to that criticism?

18  A.    That is just not true.  We take care of that, and the

19  levels that we do now would be the levels that would be at

20  band 2 at that point, so I would invite him to come visit.

21  Q.    Have there been periods when you and your team have

22  served between 2,250 and 4,500 meals per day at Weinstein

23  using your current staffing?

24  A.    That was the majority of the time I've had the contract,

25  was always at band 2.  I think we rarely are -- I think we may

 1   have hit band 1 once.  We actually may have gone to a higher

 2   band at three at one point too, and we were exceeding the

 3   dining facility's capacity at that point.

 4   Q.   And in the staffing of DFAs and FSSs at Weinstein, in

 5   this case for band 2 for three meals a day, is that comparable

 6   to the staffing levels that you currently -- is the staffing

 7   level in the proposal comparable to the staffing level that

 8   you currently provide?

 9   A.   Yes, it is.

10   Q.   Again, if there were any problems, is there any cross-

11   training that you provide that would allow any of your other

12   employees to help out either with FSS tasks or DFA tasks?

13   A.   So my goal is, basically, when the soldiers are in,

14   that's why we're there, is to feed the soldiers, so everybody

15   becomes service to the soldiers at that point.  So cooks will

16   be up assisting on lines, making sure the food's replenished

17   and of quality and garnished correctly and the proper portions

18   are going out.

19        All of us are focused, including myself and my wife are

20   focused at those times.  We're all cross-trained.

21   Q.   And so if at any point there was -- you were a couple of

22   DFAs short or a couple of FSSs short, how would you cover

23   that?

24   A.   Yeah, that happens.  So at that point some cooks may end

25   up being servers and some DFAs can end up being servers.

1  They're trained to do that likewise, and so everybody pitches

2  in.  So if a couple DFAs, say, were helping out the FSSs at

3  the end of the meal service, the FSSs and the DFAs would help

4  out the DFAs clean up the place.

5      So everything was ran efficiently.  There wasn't anything

6  that wasn't done or left unturned, and no customer suffered

7  any kind of shortage of labor for us.

8  Q.   Has the Army ever criticized your staffing of FSSs or

9  DFAs at Weinstein at any point in the almost 10 years that

10 you've operated the contract?

11 A.   Not in my nine years and nine months at the end of this

12 month.

13 Q.   Turning, Mr. Weber, to one other criticism the Army

14 leveled.  It's sort of in the middle of page 7.  They assert

15 that the ADES proposal failed to include staffing levels for

16 two scenarios, one for two meals a day, brunch and supper, for

17 band 1, I think there were one to 250 meals at Thunderbird,

18 and a second scenario, if there were a hundred percent takeout

19 for three meals a day, again, band 1, one to 750 meals at

20 Thunderbird.

21     What is your response to that criticism?

22 A.   So --

23 Q.   Actually, first, do those scenarios occur currently?

24 A.   We are not open on weekends at Thunderbird, and brunch

25 and supper is on the weekend at Weinstein on Sundays.  We do

 1  not do brunch and supper at Thunderbird.

 2  Q.   That's the two -- that's the two-meals-a-day scenario; is

 3  that correct?

 4  A.   Yes, that's the two meals a day.  So that doesn't happen

 5  Monday through Friday, and that's when we're open at

 6  Thunderbird.

 7       With the other one, the to-go meals --

 8  Q.   Yes, sir?

 9  A.   -- we did that during COVID, and we did not change

10  staffing levels because we still have to make the food, we

11  still have to serve the food, we still have to clean up after

12  serving the food, and we have to do headcount.  Headcount

13  cashiers, office clerk, whatever you wish to call them, we

14  have to do that when they come into the facility to pick up

15  the food.

16       So the level of service needs to stay high, and we did

17  not decrease our staff during COVID.  We actually exceeded the

18  expectations by meeting quarantines and all sorts of other

19  things too.

20  Q.   And when's the last time that the Army had a hundred

21  percent takeout at Fort Huachuca?

22  A.   That was during COVID.  I don't have a date, but it

23  was --

24  Q.   So when you say during COVID, was it -- so February,

25  March 2020 through -- officially the President didn't declare

1  the pandemic over until May of 2023.  Did the Army switch back

2  to in-person dining before 2023?

3  A.   Yes.  It was sort of a switch back from going from full

4  takeout to going to not being able to serve themselves in

5  salad bars, we'd have everything packaged for them, to them

6  eventually going back into the dining rooms.  So it just moved

7  in that direction, yes.

8  Q.   Would it be accurate to say that the last time that the

9  Army did a hundred percent takeout was in 2020 or early 2021?

10  A.   The only time I did it in my 9.9 months (sic).

11  Q.   Was when?

12  A.   During COVID, during that time.  I can't cite you

13  specific dates because I don't remember --

14  Q.   Okay.

15  A.   -- what the dates were.

16  Q.   Has it been in the past year that they did a hundred

17  percent takeout?

18  A.   No.

19  Q.   Those were, I believe, Mr. Weber, all of the criticisms

20  leveled in the debriefing letter.  Ms. Mackey of the

21  Department of Economic Security then wrote an explanation to

22  Mr. Vicory, the contracting officer, on March 6th, 2023, which

23  is Exhibit 13, Plaintiff's Exhibit 13, and I won't spend too

24  much time on that, Ms. Mackey will be testifying, but did that

25  letter explain the confusion about cashier, the headcount

1   function being performed by the admins or admin/cashier in the

2   written technical proposal and by office clerks in the

3   staffing matrix at the bottom of the first page of Exhibit 13?

4   Do you recall that?

5        I'll represent to you, Mr. Weber, that that's what the

6   letter says.

7   A.   Okay.  I'm having a rough time referring the actual --

8   I'm sure I've read it, but a lot of things have happened since

9   then.

10  Q.   And then at the top of page 2, she talked about the

11  adequate staffing of FSSs and DFAs and the cross-training.

12  Second paragraph of page 2 she explained that the two

13  scenarios do not actually occur -- the two scenarios for which

14  there was no staffing matrix do not actually occur but that

15  ADES did include pricing for those two scenarios.

16       Is that accurate?

17  A.   Yes.

18  Q.   And she offered, and I'm quoting, "If the Army requests

19  that" -- "If the Army requests that ADES provide the staffing

20  matrix on which that pricing is based, we will immediately

21  provide it."

22       Did the Army ever request the staffing matrix on which

23  DES's pricing for those two scenarios that don't currently

24  occur, did they ever ask for that?

25  A.   I don't believe they allowed us to do any further

1   submissions.

2   Q.   Turning, then, Mr. Weber, to Exhibit 14, the Army's

3   response to Ms. Mackey's letter, and in that response, they --

4   he writes, "As it relates to the Thunderbird Dining Facility,

5   the ASC," Army Sustainment Command, "SMEs," subject matter

6   experts, "noted that normally the admin issues the change fund

7   to the headcount and receives the funds back on a form DA

8   3546.  Based on your proposal, the admin would be issuing the

9   change fund to him or herself and receiving the funds back."

10       And then it goes on.  It's a fairly lengthy paragraph.  I

11   won't read all of it.  But that's with respect to Thunderbird.

12   It says the same, essentially the same, with respect to

13   Weinstein, that the proposal was not clear enough for the

14   evaluators to see how the change fund would be managed with

15   controls for cash.  Dinner was unclear on how the cash would

16   be safeguarded from theft from both bands.

17       It acknowledges, I'm quoting, "Hours are ample for

18   managing the headcount and admin functions for the total hours

19   for the day, but it would not work for accountability at

20   dinner."  This is Weinstein.  Does accountability refer to the

21   change fund, the cash fund?  Is that correct, Mr. Weber?

22   A.   Ask the question again, if you don't mind.

23   Q.   It says that, while there are ample hours for managing

24   the headcount and admin functions for the total hours for the

25   day, it would not work for accountability at dinner.  Is it

1    your understanding that that's referring, again, to the

2    safeguarding of the change fund?

3    A.   Yeah, I think he's making an assumption that, if he

4    thinks we're understaffed without ever seeing the facility,

5    that you can't perform the regulations that the Army requires

6    us to do, that we've never had a deficiency in and is

7    regularly inspected.

8    Q.   So let me ask you, Mr. Weber, just a few questions about

9    how the cash fund is handled at Fort Huachuca.  Did the

10   proposal include adequate staffing to safeguard the cash fund?

11   A.   Yes, it did.

12   Q.   And how much -- could you explain to Judge Kimmins,

13   please, what the cash fund is?

14   A.   Yes.  We have $25 cash banks which are provided by me.

15   The admin person will count -- that bank is kept in a

16   Government-provided safe, so when it's time to serve the

17   customers, the admin will count that $25 cash bank.  They will

18   fill out -- they will sign on the form that Mr. Freeman's

19   referring to, and then they go out front and perform the

20   headcount duties by letting the soldiers in.

21       So if the soldiers have a CAC card, which is a common

22   access card, they are in the system, and so when they swipe

23   their card, it's very quick, and they go into the system, so

24   they pass through quickly.

25       If they do not have a CAC card, then there is a button

1    called no-CAC, and they hit the button, and then it becomes a

2    cash sale, and so at that point you can make change for them

3    or you can charge them what is the food requirement at that

4    point, the cash requirement, and that goes into the cash

5    drawer.

6         So at the end of the service, there's a printout that

7    comes out of the headcount station that lists out how many of

8    everything that, you know, different categories that everybody

9    went through, and it tells you how many cash customers you

10   have and how much cash should be in there above your $25

11   amount.  And then they would take the box -- the admin would

12   take the box back to the office.  They would verify it, and

13   then it would be checked by a manager or a different admin

14   person to ensure that it is accurate.

15        And then at that point, it's put into the AFMIS system,

16   which is, again, the Army Food Management Information System.

17   The information is already in there because it came from the

18   headcount, so it's verified, and then there is a printout

19   that's called like a 1544 that the admin would check and sign,

20   and then my project manager reviews all of them and signs them

21   likewise.  And then the cash from -- that's over the $25 is

22   put with a slip in a separate box inside the

23   Government-provided safe, and the $25 box goes back in the

24   safe.

25        At the end of the month, the COR or the food program

1    manager a lot of the time will come in and verify all the

2    cash, put together a deposit, and deposit it in the bank.

3    They do that.  We don't do that.  So that --

4    Q.   Mr. Weber, I want to ask you just very briefly and direct

5    Judge Kimmins' attention to Plaintiff's Exhibit 20.  You just

6    referred to Form 1544.  I'll represent to you, Mr. Weber, that

7    Exhibit 20 at the top says it's the control record for dining

8    facility, DD Form 1544, and then at the bottom, it also is

9    numbered DA Form 3546.

10        Are you familiar with that form?

11   A.   Yes, they're somewhat connected.

12   Q.   And I'll just describe for you, Mr. Weber, Plaintiff's

13   Exhibit 20 is the control record for one of your facilities,

14   it says at the top "Weinstein DFAC," for the month of May, and

15   for each day in May, there are three lines, so the first three

16   lines that are filled out, there's a signature.  There is a

17   heading that says "Issued to," and on the right there is a

18   heading that says "Received By," and under "Issued to,"

19   there's a signature.  I'll represent to you that it's Erin

20   R.V.  Do you know who Erin is?

21   A.   That's an admin person for us.

22   Q.   Then it says that "Organization TME."  What's TME?

23   A.   Thunder Mountain Enterprises, my company.

24   Q.   "Change fund $25."  So is that the $25 that's going out?

25   A.   Yes.

1  Q.   And again, there's three lines.  Is that breakfast,

2  lunch, and dinner on that date?

3  A.   Yes.

4  Q.   At Weinstein; correct?

5  A.   Yeah, there's lines for each meal service, yes.

6  Q.   And so the first line reflects the $25 went out in the

7  morning for breakfast in the cash fund at Weinstein, and

8  Ms. Velasquez signed for it, correct, on May the 1st, 2023?

9  A.   Yes.

10  Q.   And then, if we move over to the right, it says,

11  "Received by," same date, 5/1/2023, "Turned in cash $25," and

12  it's signed, and I'll represent to you that it's a different

13  signature than Ms. Velasquez's that I've been informed is the

14  signature of Daniel Sands.  Who's Mr. Sands?

15  A.   Daniel is also an admin person that works for me.

16  Q.   And then if one goes down to the next line, on May 1st,

17  would that be the cash fund for lunch?

18  A.   Yes.

19  Q.   And there the "Issued to," the $25 going out, is the same

20  signature as when it came back.  So that's Mr. Sands signs for

21  the money going out at lunch, $25, and then moving to the

22  right, the same $25 came back, and this time Ms. Velasquez

23  signs for it coming back; correct?

24  A.   Yes.

25  Q.   And finally, there's a third line for dinner.  Again, $25

1  goes out, signed for by Mr. Sands, and $25 comes back signed

2  for the next morning by Ms. Velasquez; correct?

3  A.    Yes.

4  Q.    And so am I right in understanding, Mr. Weber, that what

5  that reflects is that there were no cash payments at Weinstein

6  on May 1st, 2023?

7  A.    We don't receive very many cash payments at Weinstein, so

8  that's correct.

9  Q.    And I don't want to spend too much time on this, but

10 going down to May the 2nd, $25 goes out signed for by

11 Ms. Velasquez.  $37.90 comes back signed for by Mr. Sands.  So

12 that reflects that $12.90 in cash came in for breakfast on May

13 the 2nd, 2023.  Is that correct?

14 A.    Yes.

15 Q.    And then for lunch and dinner that day, again, one of

16 them signs, the other one of them signs for coming back, and

17 it's the same $25 that goes in and out.  Is that -- and again,

18 I don't want to belabor this too much, but would it be

19 accurate to say that, throughout the month of May, if one

20 looks through this form, and in fact for every single month

21 for both Weinstein and Thunderbird, one person signs for the

22 money going out, and a different person signs for the money

23 coming back at each meal?  Is that correct?

24 A.    That's the regulation and we follow it.

25 Q.    And did you inform the Army that you were going to follow

1    the regulations with the new proposal?

2    A.   We've informed the Army that we were going to follow all

3    the regulations, and so it's part of that, again, the

4    assumption was made based on them thinking we didn't have

5    enough staffing, so they assumed we couldn't follow the cash

6    process correctly, and that's just not true.

7    Q.   In addition to two different people, one person signing

8    the cash out and a different person signing the cash in, you

9    mentioned the AFMIS system.  Just briefly, again, what does

10   that stand for?

11   A.   Army Food Management Information System.

12   Q.   If a soldier or a visitor pays in cash, is that reflected

13   in the AFMIS system?

14   A.   It will show up on the AFMIS system.  The admin person

15   will go in the AFMIS system, verify that the money that was in

16   the cash bank, that was over like what you represented, it

17   would list the number of patrons, and it would list the dollar

18   amounts, what classification they are, and then at that point

19   they can verify that and verify the funds, and then it's put

20   into the safe.

21   Q.   So that's a double-check on the amount of cash that comes

22   in; is that correct?

23   A.   Yes, it is.

24   Q.   How do most of the customers at all three of your

25   facilities pay for their food?

 1   A.    Almost a hundred percent at Weinstein are CAC cards.

 2   Q.    What's a CAC card?

 3   A.    Common access card, meal card.  I've heard it referred to

 4   as other things, but not too many cash customers over there.

 5   Over at Thunderbird we have a lot more cash customers on a

 6   regular basis, and so they do pay cash.  And we just got

 7   credit card acceptors finally in the dining facility, so now

 8   they don't have to carry cash and they can pay.

 9         And by the way, we don't have 24-hour tellers at all our

10   dining facilities.  One of them got eaten up by mice and they

11   had to remove it.

12         Yeah, so we do a lot of cash over at Thunderbird.  At

13   Black Tower we have some.  That's been controversial.  They

14   don't know whether they're supposed to be doing it or not

15   doing it, but right now the directive is that we accept cash

16   out there as well as CAC.

17               THE COURT:  And Mr. Freeman, how much more do you

18   have?  I just want to give our staff a break at some point.

19               MR. FREEMAN:  I appreciate it.  15 minutes, Your

20   Honor.

21               THE COURT:  Okay.  Why don't we go ahead and take a

22   break now.  We'll do a brief 10-minute break, just to give

23   staff an opportunity, and Mr. Weber, if he needs time as well.

24               MR. FREEMAN:  Thank you.

25               THE WITNESS:  Thank you, ma'am.

DIRECT EXAMINATION OF SCOTT WEBER

1          (Off the record from 3:33 p.m. to 3:50 p.m.)

2          THE COURT:  And Mr. Freeman, before we get started,

3    I want to talk to all the parties.

4          I have significant concerns as to whether or not we

5    are going to get this done tomorrow.  I also need to make sure

6    the parties are aware, as I indicated before, based on the

7    nature of this case and the fact that a decision needs to be

8    made quickly, we've scheduled this in the middle of my current

9    criminal duty schedule, so I am very limited with what I can

10   do.

11         I can start tomorrow at 1:45.  That leaves us from

12   1:45 until either 5:00 or 5:30.  We can go -- my staff's

13   indicate they're willing to go until 5:30 this evening.

14         MR. FREEMAN:  Thank you, Your Honor.

15         THE COURT:  After that, my next available is next

16   Monday, on August 21st, or Friday, on August 25th.  And I

17   recognize that you all and your witnesses are coming here from

18   out of state.  If we can get all of the witnesses done

19   tomorrow, we could do telephonic arguments on that Monday or

20   Friday, but I am very concerned as to whether or not we're

21   going to get done.  So --

22         MR. FREEMAN:  I appreciate that, Your Honor.  We

23   will do our best.  I will wrap up with Mr. Weber, and

24   Ms. Mackey will be much briefer than Mr. Weber.  Obviously the

25   Government gets to cross-examine.

1          THE COURT:  Right, right.  Okay.  All right.  So I

2   will --

3          MR. FREEMAN:  And so today we are -- we need to be

4   -- we can go until 5:30?

5          THE COURT:  We can go until 5:30 if that works for

6   all the other parties.

7          And I recognize -- Ms. Letzkus and Mr. Hernandez,

8   are there any issues or concerns with going until 5:30 today?

9          MS. LETZKUS:  I don't have a concern with going

10  until 5:30 today, but I am concerned that I have two witnesses

11  to put on and --

12          THE COURT:  Right.

13          MS. LETZKUS:  -- I haven't even cross-examined their

14  first witness.

15          THE COURT:  They're going to be tomorrow.  I can

16  guarantee you they're going to be tomorrow.

17          MS. LETZKUS:  I understand, Your Honor.  It's just

18  I'm -- I just want to make sure that we have enough time to

19  put on our case.

20          THE COURT:  Right.  And let me let the parties know,

21  I am well-versed with all of the pleadings, all of the

22  exhibits.  I spent an incredible amount of time going through

23  all of the pleadings, the exhibits, the arbitration decisions,

24  so I'm well-versed in that.  I have specific questions that I

25  want to ask during closing arguments and/or specific questions

DIRECT EXAMINATION OF SCOTT WEBER

1    to the witnesses, so I don't need to be educated on

2    information that's already in the pleadings.

3              So hopefully that will kind of help things moving

4    along as well.

5              MR. FREEMAN:  Thank you, Your Honor.

6              THE COURT:  Okay.  Mr. Freeman, with that, go ahead.

7              MS. LETZKUS:  Your Honor, just one more

8    administrative thing.

9              THE COURT:  Sure.

10             MS. LETZKUS:  I just want to let the Court know that

11   the Army has gone ahead and awarded a bridge contract to

12   plaintiff through the end of September, just to accommodate

13   this hearing and to give Your Honor a little bit of breathing

14   room.

15             THE COURT:  That -- I appreciate that.  That helps

16   tremendously.

17             Okay.  And Mr. Freeman, go ahead.

18             MR. FREEMAN:  Thank you, Your Honor, and I'll try to

19   expedite things.

20   BY MR. FREEMAN:

21   Q.   Mr. Weber, we were finishing up with respect to the

22   controls for the cash fund, and you had walked us through

23   Exhibit 20 or the first couple -- with money coming in and

24   coming out.  I was going to show you the same form for

25   Thunderbird, but let me just ask you the question.

1      At Thunderbird, do you -- do your employees make use of

2   the same form for cash going in and coming out -- going out

3   and coming in at Thunderbird?

4   A.   Yes.

5   Q.   And is it tracked and separately signed, one person for

6   each meal signs for the cash going out and a different person

7   signs coming back?

8   A.   Yes.

9   Q.   In your 10 years at Fort Huachuca, has there ever been

10  any issue with missing cash at any of your dining facilities?

11  A.   Never.

12  Q.   Has the Army ever had any complaints or voiced any

13  complaints about -- regarding the safeguarding of cash by the

14  -- at the dining facilities at Fort Huachuca?

15  A.   No.

16  Q.   Very briefly, I know you spoke some earlier about your

17  relationship with the Army, which I won't go back over.  I do

18  want to ask you, Mr. Weber, if the Army had asked DES and your

19  operation for -- to add cashiers to its proposal, what would

20  the response have been?

21  A.   We will do what you ask.

22  Q.   And if the Army had asked for more FSSs and/or DFAs, what

23  would your response have been?

24  A.   We would do what they asked.  It's their facility and

25  their soldiers.  We take care of them.

 1   Q.   Sitting here today, are you open to discussions with the

 2   Army about staffing levels?

 3   A.   Ask me the question again, please.

 4   Q.   Sitting here today, do you continue to be open to

 5   discussions with the Army regarding staffing levels at Fort

 6   Huachuca?

 7   A.   Yes.

 8   Q.   Finally, Mr. Weber, I want to turn and ask you a few

 9   questions about the effect on you and your family and ADES and

10   its vendors if this contract is taken away and given to

11   someone, a different contractor.

12        How would losing the service contract at Fort Huachuca

13   affect you personally?

14   A.   I would be out of a job and out of income.  My wife would

15   be out of a job and income.  I would lose my insurance.  I

16   wouldn't be able to be the chairman that represents all the

17   elected operators in the State of Arizona.  It would be tough.

18   Q.   And if the Army awards the contract to someone else, how

19   would that affect ADES and the other blind vendors in Arizona?

20   A.   We have what's -- and Kristen will probably explain it,

21   but we have what's called set aside, which is roughly 20

22   percent of what I make, and I pay that to the SLA, State

23   licensing agency, so that goes towards matched money with the

24   Federal Government to be able to operate the program.

25        So new equipment, things like that, they may have to

1  suffer.  The program itself, based on how COVID hit it, is

2  already suffering.  So we've -- we're trying to build the

3  program back up.  This would damage it significantly.

4  Q.   I want to ask you two more questions about that, but I'm

5  sorry, I just came across a note about one thing I forgot to

6  ask you about earlier.  I apologize, Your Honor, but if I

7  could direct the Court's attention to Plaintiff's Exhibit 9,

8  the next-to-last page, which is numbered Volume II Technical,

9  page 8.

10      And Mr. Weber, I'll describe for you the first page of

11  Exhibit 9 at the top says, "Volume II Technical."  There's a

12  cover letter from Nathan Pullen.  Who is Mr. Pullen?

13  A.   He was the former program manager.

14  Q.   And there is a table of contents that this technical

15  proposal includes the staffing plan, and the one thing I

16  wanted to ask you about on this next-to-last page, numbered

17  page 8, there is a section describing cross-utilization, and

18  did that section describe the plan and what you've described

19  earlier with respect to Thunder Mountain Enterprises

20  cross-utilizing its employees to fill in to make sure that all

21  of the tasks are done and that all of your employees help one

22  another out?  Is that --

23  A.   Yes.

24  Q.   And specifically, in the second paragraph, second line of

25  that section, you wrote, or the proposal wrote, "We have FSS

 1  personnel that are cross-trained to be admin."  Is that

 2  accurate?

 3  A.   Very accurate.

 4  Q.   And that would be accurate, will be accurate, if the Army

 5  accepts this new proposal?

 6  A.   Yeah, it's accurate daily, and it would be accurate with

 7  the new proposal.

 8  Q.   And so again, to the extent that there is any shortage of

 9  admin personnel, the FSS personnel could fill in; is that

10  correct?

11  A.   Yes, as well as managers and other folks too.

12  Q.   And in fact, at times, do FSS personnel fill in and sign

13  for cash if an admin isn't available?

14  A.   Yes.

15  Q.   And again, that's to make sure that different people are

16  signing, one person signing the cash out and a different

17  person counting it and signing it in; is that correct?

18  A.   Yeah, and as well as if we need to move the flow even

19  faster, we can do that by adding more headcount.

20  Q.   And then going down four lines below that, the proposal

21  says that all managers are considered working managers and can

22  be cross-utilized or assigned to step in and help with

23  management tasks when necessary, especially during absences,

24  vacancies, and contingency situations.

25        Are your managers also trained to step in for all the

 1  personnel and for one another, whether serving as cashiers or

 2  headcount or securing the cash or other -- or DFAs or FSSs if

 3  necessary?  Is that correct?

 4  A.   My managers can do everything in the facility, and

 5  they're very well trained.

 6  Q.   Okay.  And that's what you were describing in the

 7  technical proposal or what DES was describing in the technical

 8  proposal regarding cross-utilization; is that correct?

 9  A.   Yes.

10  Q.   Finally, going back to where I was asking you, Mr. Weber,

11  about the harm to yourself and to ADES and the vendors, I

12  wanted to also ask you the flip side about whether there would

13  be any harm to the Army.  If the Court grants the motion for

14  preliminary injunction, what service will the soldiers at Fort

15  Huachuca receive while we're waiting for the Randolph-Sheppard

16  arbitration panel to rule?

17  A.   I love the soldiers.  I love feeding the soldiers.  They

18  would not see any decrease in service or any problems.  I'm

19  there every day, I focus on it, and I love doing what I do.

20  And so there would be nothing -- there would be continued and

21  even better service than they're going to get anywhere else.

22  Q.   And if the Court denies the preliminary injunction so

23  that you and DES are replaced as the contractor at Fort

24  Huachuca, and then early next year, if DES prevails in the

25  arbitration, how would you and DES be affected by having to

 1  leave and then come back?

 2  A.   Again, it's the loss of income and maybe not being able

 3  to keep a house down here or down in Sierra Vista, I should

 4  say, so there might be some changes that need to be made on

 5  how long it goes out, but the income from myself and the set

 6  aside pay would be a devastating impact to the program.

 7          MR. FREEMAN:  Thank you.

 8          THE WITNESS:  Thank you.

 9          MR. FREEMAN:  Ms. Letzkus has a chance to ask you

10  some questions now.

11          THE COURT:  Thank you, Mr. Freeman.

12          MR. FREEMAN:  Thank you, Your Honor.

13          THE COURT:  Ms. Letzkus?

14                     CROSS-EXAMINATION

15  BY MS. LETZKUS:

16  Q.   Thank you for being here, Mr. Weber, this afternoon.  I

17  appreciate it.  I just have a few follow-up questions for you.

18      At the beginning of your testimony today, you went

19  through your long history of providing food services at

20  Government facilities; right?

21  A.   Yes, ma'am.

22  Q.   So it's safe to say you're familiar with the process of

23  contracting with the Government to provide dining services?

24  A.   Yes, ma'am.

25  Q.   You've been contracting with the Government to provide

1   dining services for many years?

2   A.   Nine years, nine months, and maybe 10, yes, ma'am.

3   Q.   And you helped to -- or you played a significant role in

4   crafting the actual proposal that was submitted in response to

5   the solicitation?

6   A.   I gave a lot of input, spent a lot of time with Sodexo

7   and the program, yes.

8   Q.   Have you prepared or at least assisted in the preparation

9   of a lot of proposals over the years?

10  A.   Yes, I have.  Recently we just put together the WAATS

11  proposal for Marana, and that opened today, and it's a

12  Randolph-Sheppard facility.  I was very involved with that.

13       I also was involved with sole source proposals from 16 at

14  Fort Huachuca, from 21 at Fort Huachuca.  We did those

15  ourselves.

16  Q.   Mr. Weber, I appreciate your answers, and they're very

17  helpful, but we are running out of time, as we, you know,

18  discussed, so --

19  A.   I'm a little wordy.  I apologize.

20  Q.   I would appreciate it if you would answer the question as

21  I ask it.  Okay?

22  A.   Yes, ma'am.

23  Q.   So when you submit a proposal in response to a

24  solicitation, do you first read or have the solicitation read

25  to you?

 1   A.   Yes.

 2   Q.   In your experience, is it important that your proposal

 3   satisfy all the requirements of the solicitation?

 4   A.   Yes.

 5   Q.   Would you agree it's important that your proposal clearly

 6   demonstrates how you'll meet the Government's needs in every

 7   way?

 8   A.   Yes.

 9   Q.   And would you agree that, if the solicitation says they

10   want your proposal to include information about a particular

11   task or a service or meal, your proposal should include that?

12   A.   Yes.

13   Q.   Did you read or have read to you the solicitation that's

14   at issue in this case before you submitted your proposal, or

15   before ADES submitted its proposal?

16   A.   Yes, I read it, but I did not present it, you're right.

17   Q.   Do you believe you understood the terms of the

18   solicitation?

19   A.   Yes.

20   Q.   You did not submit any questions or objections to the

21   contracting officer either yourself or through ADES about the

22   terms of the solicitation prior to submitting your proposal;

23   correct?

24   A.   I did submit some questions to DES.  I would not have

25   dealt with the contracting officer on the proposal.  It's not

1  my position.

2  Q.   Now, I just want to read for you a little part of the

3  solicitation.  It's on page 109 of the solicitation, which is

4  Defendant's Exhibit 30, and I'll just read it to you so that

5  we understand what we're talking about here.

6      It says, quote, "Selection of a source for award purposes

7  will be conducted using FAR part 12, acquisition of commercial

8  items in conjunction with FAR part 14, contracting by

9  negotiation."

10     Do you know what the acronym FAR is?

11 A.   Yeah, Federal Acquisition Regulation.

12 Q.   So the solicitation says the Government will apply the

13 Federal Acquisition Regulation in evaluating proposals; right?

14 A.   Yes.

15 Q.   Now, the solicitation at issue outlined a five−step

16 process for evaluating proposals.  Do you understand that?

17 A.   Can you be more clear?

18 Q.   Sure.  So I'll read again from the solicitation.  This is

19 on page 104 of the solicitation.  It says −− it's under the

20 heading, "Evaluation Factors for Award."  It says, "Step 1:

21 After initial evaluation of timely received proposals, in

22 accordance with (IAW) the evaluation criteria specified in the

23 solicitation and based on those initial evaluations, to

24 include total evaluated price, a competitive range will be

25 established from proposals evaluated acceptable."

CROSS-EXAMINATION OF SCOTT WEBER

1      So just from what I read there, from the terms of the

2   solicitation, it says that your proposal would be included in

3   the competitive range only if it was evaluated as acceptable;

4   right?

5   A.   Yes.

6            MR. FREEMAN:  Objection.

7            THE COURT:  What's your objection?

8            MR. FREEMAN:  Your Honor, in the -- immediately

9   above, there is a reference to conducting pursuant to the

10  Randolph-Sheppard Act, which as we've discussed previously,

11  has a different meaning with respect to competitive range for

12  SLA proposals as opposed to other proposals, so there's,

13  therefore, an ambiguity with respect to competitive range.

14           THE COURT:  Well, I'm going to sustain the objection

15  because it's a speaking objection.  You can certainly redirect

16  on that.  I think Ms. Letzkus is just asking him if he's aware

17  of the specific information with the FAR if that was listed in

18  the solicitation.

19           MR. FREEMAN:  Thank you.

20           THE COURT:  Okay.  Go ahead, Ms. Letzkus.

21  BY MS. LETZKUS:

22  Q.   Okay.  I'm going to go on to read what the solicitation

23  said Step 2 was.  It says, "In accordance with Army Directive

24  2020-05, Vending Facility Program For the Blind on Federal

25  Property, the Government shall enter into

1   discussions/negotiations with all offerors whose proposals

2   have been determined to be in the competitive range per Step

3   1."

4        So you were on notice based on the express language of

5   the solicitation that discussions or negotiations regarding

6   your proposal would happen only if you were determined to be

7   in the competitive range; correct?

8   A.   My belief is, as Randolph-Sheppard, we should be talking

9   back and forth, giving Randolph-Sheppard the priority.  I

10  don't think the priority's been observed.

11  Q.   So per the terms of the solicitation, did you understand

12  that the solicitation said that discussions would happen only

13  if your proposal was included in the competitive range?

14       I'm not asking about what your opinion is.  I'm asking

15  about what the terms of the solicitation said.

16  A.   Yes.

17  Q.   Okay.  I want to read some more from the solicitation.

18  This is also on page 109.  It's under "General Instructions."

19            THE COURT:  And Ms. Letzkus, just for my purposes,

20  are you -- when you're saying 109, are you talking about the

21  page number at the top of the document or at the bottom of the

22  document?

23            MS. LETZKUS:  Thank you, Your Honor.  I'm sorry.

24            THE COURT:  That's okay.

25            MS. LETZKUS:  It's the bolded page number at the

1    bottom.

2              THE COURT:  Thank you.

3    BY MS. LETZKUS:

4    Q.   So I'll read from the general instructions here.  It

5    says, "If an offeror believes that the requirements of these

6    instructions contain an error, an ambiguity, omission, or are

7    otherwise deemed unsound, the offerer shall immediately notify

8    the contracting officer in writing with supporting rationale.

9    The offeror is reminded that the Government reserves the right

10   to award this contract based on the initial proposal as

11   received without discussions."

12        So based on that express language in the solicitation,

13   the Government reserved the right to award this contract

14   without; any discussion at all; correct?

15   A.   Ma'am, in due respect, I was not involved with all this

16   part of the proposal that was submitted.  I was asked for

17   information so that they could put it together.  I was not

18   involved with the submission of it and every -- all the stuff

19   you're reading me, so I --

20   Q.   Okay.  So per the language that I read, the solicitation

21   expressly stated that the Government reserved the right to

22   award the contract without any discussion at all correct?

23              MR. FREEMAN:  Objection.

24              THE COURT:  I think, Ms. Letzkus, you can ask him if

25   he recalls reading that or being aware.  He's just said that

 1  he wasn't involved in the submission and that he only provided

 2  information.

 3          Mr. Weber, for my benefit, did you actually read the

 4  solicitation in its entirety before providing information to

 5  ADES?

 6          THE WITNESS:  No, I did not.

 7  BY MS. LETZKUS:

 8  Q.   I'm a little confused because I thought I asked you that

 9  question a little while ago, and I asked you if you had read

10  it or had it read to you, and I believe your answer was yes,

11  so are you changing your answer?

12  A.   I have read what was presented to me.

13          THE COURT:  Why don't you ask him what was presented

14  to him and who presented it.

15  BY MS. LETZKUS:

16  Q.   Yeah, exactly, what was presented to you, who presented

17  it?

18  A.   DES presented me with what the -- basically the staffing

19  levels were and a few other concerns and to get my input

20  because they were work related, and plus I shared a lot of

21  information with Sodexo.  But the specifics of some of the

22  submission I did not see, and if I don't see them, I don't

23  know what they are.

24          THE COURT:  Mr. Weber, let me just ask a clarifying

25  question with respect to you said you reviewed the

 1   submissions.  Right now Ms. Letzkus is talking about the

 2   solicitation that was done by the Army, which is approximately

 3   119 pages long.

 4          Did you read the solicitation prior to providing

 5   information on the proposal?

 6          THE WITNESS:  Yes, I did.

 7          THE COURT:  And the entire solicitation?

 8          THE WITNESS:  Yes, I did.

 9          Thank you.

10   BY MS. LETZKUS:

11   Q.   So we spent a lot of time discussing your past

12   performance and various performance reviews in which your

13   services have been satisfactory and recommended for similar

14   contracts, so are you aware that past performance was just one

15   of the factors that was to be evaluated in deciding whether a

16   proposal was acceptable?

17   A.   I don't believe you're evaluating past -- no, that's not

18   the only one.

19          THE COURT:  And she's asking with respect to the

20   solicitation.

21          Correct?

22          MS. LETZKUS:  Yes.

23          THE WITNESS:  Okay.  Ask the question again, if you

24   would.

25   BY MS. LETZKUS:

CROSS-EXAMINATION OF SCOTT WEBER

1    Q.    So per the terms of the solicitation, are you aware that

2    the proposals would be evaluated under three evaluation

3    factors: technical capability, past performance, and price?

4    A.    Thank you, yes.

5    Q.    So past performance, per the solicitation, was just one

6    of the considerations in evaluating proposals; right?

7    A.    Yes.

8    Q.    Do you understand that your proposal was deemed

9    acceptable for past performance?

10   A.    Yes.

11   Q.    So at any rate, the Army did consider your past

12   performance in evaluating your proposal; correct?

13   A.    Yes.

14   Q.    Were you provided with the staffing matrix that was

15   attached to the solicitation or made aware of that staffing

16   matrix?

17   A.    Yes.

18   Q.    So we've heard -- you're not disputing that your proposal

19   did not include staffing for two different bands for

20   Thunderbird; correct?

21   A.    It did not include them, yes.

22   Q.    So your proposal did not include staffing for meals that

23   were specifically required by the solicitation?

24   A.    It did not include them in the matrix.  It included them

25   in the price.

CROSS-EXAMINATION OF SCOTT WEBER

1  Q.   Are you talking about that you included it in the

2  proposed price?

3  A.   That's my understanding.  You know, I'm listening to what

4  the response was, that they weren't in there, so sure enough,

5  they were blank, so they were from what I understand in the

6  pricing but not in the matrix or the question about the meals

7  to go and the two meals on the weekend.

8  Q.   So Mr. Weber, you said that in the past you haven't had

9  to provide those meals, correct, or at least not always?

10  A.   So I do provide brunch and supper at Weinstein, and we

11  did do to-go meals during COVID.

12  Q.   Okay.  Would you agree with me that, even if the

13  Government hasn't needed those meals in the past, that doesn't

14  mean it may not need them sometime in the next five years?

15  A.   I would agree with you.

16  Q.   Do you understand that soldiers at Fort Huachuca have a

17  limited amount of time to eat?

18  A.   Yes.

19  Q.   Do you agree it's important that a vendor staff

20  operations in such a fashion that will ensure that the

21  soldiers get fed in a timely fashion?

22  A.   Yes.

23  Q.   So in your declaration, you said you emphasized food

24  safety and sanitation in your operations; is that correct?

25  A.   Yes.

CROSS-EXAMINATION OF SCOTT WEBER

```
 1   Q.   Do you agree it's important that whoever operates dining
 2   services at Fort Huachuca provide sufficient staffing to
 3   ensure food safety and adequate sanitization and cleaning?
 4   A.   Yes.
 5   Q.   Mr. Weber, is it your position that you know better than
 6   the Army what its requirements are going to be for dining
 7   facilities at Fort Huachuca to feed soldiers in a timely and
 8   safe fashion over the next five years?
 9              MR. FREEMAN:  Objection.
10              THE COURT:  Basis for the objection?
11              MR. FREEMAN:  Argumentative.
12              THE COURT:  Overruled.  He can answer.
13              THE WITNESS:  Ask me the question again, please.
14   BY MS. LETZKUS:
15   Q.   Is it your position that you know better than the Army
16   what its requirements will be for feeding soldiers in a timely
17   and safe fashion at Fort Huachuca over the next five years?
18   A.   No.
19              MS. LETZKUS:  Just one second, Your Honor.
20              Okay.  Just one last question.
21   BY MS. LETZKUS:
22   Q.   Would you agree with me that nobody really expected that
23   the COVID outbreak would happen and that dining services would
24   be radically affected by COVID?
25   A.   I would totally agree with you because I lived through
```

```
 1    it, and we were essential, and we worked through all the COVID

 2    and all the different changes, including getting COVID and

 3    being hospitalized.

 4              MS. LETZKUS:  Okay.  That's all I have, Your Honor.

 5    Thank you.

 6              THE COURT:  Thank you.

 7              Redirect?

 8              MR. FREEMAN:  No, Your Honor.

 9                              EXAMINATION

10    BY THE COURT:

11    Q.   Mr. Weber, I have some questions for you, and if you

12    can't answer them -- because I'm still a little confused as

13    far as how much involvement you had in bringing the

14    solicitation and also the proposal.

15         So one of the questions, let me ask you, is if you can

16    explain to me first what your involvement was with respect to

17    the solicitation and whether -- let's just start with that.

18         So when did you receive the solicitation for the new

19    contract?

20    A.   I received it at the same time DES did.

21    Q.   And did you read the solicitation, the entire

22    solicitation?

23    A.   Yes, I did.

24    Q.   You talked about how you had involvement with ADES in the

25    proposal.  Can you explain to me what involvement you had?
```

COURT EXAMINATION OF SCOTT WEBER

1   A.   Yes, I was involved with the selection of Sodexo to

2   assist DES.

3   Q.   The selection -- say that again.  The selection of what?

4   A.   So I was -- the Arizona Participating Operators Committee

5   Elected Committee of Blind Vendors was involved through

6   looking at four different companies that could possibly work

7   with DES on the proposal, and so we were giving input through

8   active participation to the SLA about who we thought might be

9   good, and we all agreed that Sodexo would be a good choice, so

10  that's where my involvement came from.

11  Q.   Okay.  And then did you provide information to ADES and

12  Sodexo for the proposal?

13  A.   Yes, I did.  They visited the facilities, and I gave them

14  a lot of information.

15  Q.   And what type of information did you give them?

16  A.   Staffing schedules, processes for handling cash, the Army

17  regulations.  They also were there to observe the flow and see

18  how we operated, and they said it was one of the nicest dining

19  facilities they've ever been to.

20  Q.   Once the written proposal was being finalized, did you

21  have an opportunity to actually read and review the proposal?

22  A.   So I did review it, and I did send back some questions to

23  DES, and time became very close, and the program manager who

24  was dealing with it is -- one of his grandparents passed away,

25  and he had to leave the state, and so we weren't able to meet

1    as a group and go over it line by line, and that's nobody's

2    fault but ours, but it would have been nice to have a little

3    more time, but we realized we didn't have that.

4    Q.    You had mentioned to Ms. Letzkus that you also -- I think

5    she asked you whether or not you had any questions regarding

6    the solicitation prior to submitting your proposal, and you

7    said that you did have questions that you gave to ADES, to

8    DES; is that correct?

9    A.    Yes.

10   Q.    And do you know if DES sent those questions to the Army

11   prior to the proposal being written?

12   A.    They had told me they addressed part of the questions.

13   Q.    Okay.

14   A.    I don't know if they went to the Army with them.  I

15   wouldn't have that idea.

16   Q.    And were you involved in the actual writing of the

17   proposal or just giving information to the parties for the

18   proposal?

19   A.    Just giving the information to the parties for the

20   proposal.

21   Q.    And if you can't answer this, that's okay, this may be

22   questions for Ms. Mackey, but in the staffing, do you know

23   where in the staffing proposal it would direct the Army to

24   consider your past performance when evaluating the technical

25   capacity?

1  A.   So if I -- if I can answer this with what you're asking,

2  I could look at that staffing, and I matched it up as soon as

3  this morning, actually, I matched it up with what I currently

4  do.  I looked at a few position differences and things of that

5  nature, but we had the same quantities, and actually they had

6  a little -- maybe a little more higher-end staffing, more cook

7  IIs, and so I felt with the staffing that was being presented

8  I could easily do at band 2 what I can do with the crews I

9  have now.

10  Q.   So did you recognize in the solicitation that they were

11  asking for increased staffing to include the 100 percent

12  takeout and the brunch/dinner that you did not already handle?

13  A.   I did not see -- I did not catch that in the proposal.

14  Q.   In the proposal or the solicitation or both?

15  A.   I would say on the proposal.  The proposal that was

16  submitted, I did not see all of it.

17  Q.   Okay.  Did you recognize the solicitation to be requiring

18  additional staffing for the 100 percent takeout and the

19  additional lunch and dinners?

20  A.   I don't think it required additional staffing myself.  I

21  think it was just the way we do business.  I think the boxes

22  weren't filled.  The price was there, and we're used to doing

23  it.  I remember the conversation with Sodexo where we talked

24  about to-go.  I told them that there's no staffing changes.

25  It's just like any other day because we still gotta perform

the majority of the services.  We may not have to light some

dining tables and we may not have to throw some trash, but we

still had to do everything else to make sure they had a safe,

secure meal and a good meal.

Q.   Give me just a minute.

     I know Mr. Freeman talked to you and you explained to the

Court regarding how you safeguard the cash fund.  Do you know

if that explanation was provided in the proposal that was

submitted?

A.   I believe it was provided in the proposal as a

regulation.  It's something that we're regulated on that we

have to follow and that we're inspected for, so it wouldn't

necessarily have been a line item in the proposal or in the

announcement of the, you know, the solicitation.  It would

have been assumed that you do this because you have the

contract and it's a regulation and you're inspected on it.

          THE COURT:  And Mr. Freeman, any questions based on

the Court's questions?

          MR. FREEMAN:  Yeah, just very briefly, Your Honor.

          THE COURT:  Sure.

                         REDIRECT EXAMINATION

BY MR. FREEMAN:

Q.   Directing the Court's attention, and I'll read to

Mr. Weber, Plaintiff's Exhibit 9, at the bottom, it says

"Volume II Technical, page 7."  The easiest way to find it,

1    Your Honor, is actually counting back from the page 9, of

2    Exhibit 9.  It's three pages in.

3         There's a paragraph of the proposal, Mr. Weber, in bold,

4    that says, "Staffing by DFAC," and the Court asked you about

5    where the proposal directed the Army's attention to the

6    reliance on past needs to be as correlating with the needs

7    under the new solicitation, and the second sentence of the

8    "Staffing by DFAC," I'll read it to you, Mr. Weber, says, "We

9    were able to determine the staffing needs of each DFAC,"

10   that's dining facility, "based on our ongoing knowledge of the

11   facility layout and size, meal requirements, and anticipated

12   headcount."

13        Then you go through what your knowledge of each DFAC is,

14   but is that at least one of the sections where you called the

15   Army's attention to the fact that, based on your current

16   operation of the facilities, you were able to determine the

17   staffing needs for the new proposal?

18   A.   Yes.

19   Q.   If I could also direct you, Your Honor, if you turn back

20   four pages before that to page 3 of the technical proposal,

21   and it's Section 1.2, "Decision-Making/Problem Resolution

22   Authority," and at the end of the third paragraph of that

23   portion of DES's proposal, the proposal -- the last sentence

24   of that third paragraph, and I'll read the sentence entirely,

25   "Furthermore, DES/BEP will conduct regular onsite inspections

REDIRECT EXAMINATION OF SCOTT WEBER

1    of the Fort Huachuca food service operation to ensure

2    compliance with the requirements outlined in the RFP and any

3    applicable DoD regulations and laws."

4         Would it be accurate to say that that was at least one of

5    the sections where DES informed the Army that it would comply

6    with any and all applicable DoD regulations and laws?

7    A.   Yes.

8    Q.   And the solicitation references, would it be fair to say,

9    hundreds of regulations that are -- that are required to be

10   complied with?

11        Let me ask it different.  Are there hundreds of Army

12   regulations that apply to food service operations?

13   A.   Yes, very many.

14   Q.   And was it your understanding that you needed to refer to

15   each and every one of those regulations to inform the Army

16   that you would comply, as you have always complied, with all

17   of its regulations?

18   A.   Yes, and they inspect them too, so it's -- they make sure

19   we're following all those.

20   Q.   And you informed the Army that you would continue to

21   comply with all of those by telling it in the sentence I just

22   read that you would ensure compliance with the requirements in

23   the RFP and any applicable DoD regulations and laws; correct?

24   A.   Yes.

25             MR. FREEMAN:  Thank you.

 1            THE COURT:  And Ms. Letzkus, any questions based on

 2    the Court's questions and Mr. Freeman's?

 3            MS. LETZKUS:  I just one have follow-up question,

 4    Your Honor.

 5                         RECROSS-EXAMINATION

 6    BY MS. LETZKUS:

 7    Q.   Again, reading from the solicitation, page 105 at the

 8    bottom there, under "Evaluation Factors Criteria," subsection

 9    3 (sic), it says, quote, "The proposals will be evaluated

10    under three evaluation factors: technical capability, past

11    performance, and price."

12         So based on that language, past performance is just one

13    of the considerations in evaluating proposals; right?

14    A.   That's true.

15            MS. LETZKUS:  That's the only question I have.

16    Thank you, Your Honor.

17            THE COURT:  Okay.  Thank you.

18            And Mr. Weber, you may step down.  Thank you.

19            THE WITNESS:  Thank you, ma'am.

20            MR. FREEMAN:  Your Honor, just so the record's

21    clear, if I might, the spelling of Sodexo is S-o-d-e-x-o.

22            THE COURT:  Can you say that one more time?

23            MR. FREEMAN:  Yes, Your Honor.  S-o-d-e-x-o.  It's a

24    large multinational food service company.

25            THE COURT:  Okay.  Thank you very much.  I

                    UNITED STATES DISTRICT COURT

1   appreciate that.

2           And then, Mr. Freeman, if you'd like to call your

3   next witness.

4           MR. FREEMAN:  Actually, Mr. Lalchandani will be

5   calling Ms. Mackey.

6           MR. LALCHANDANI:  Ms. Mackey.

7           THE COURT:  Oh, okay.

8               KRISTEN MACKEY, WITNESS, SWORN

9           THE CLERK:  Thank you, ma'am.

10          You may be seated, and as you are, please speak

11  directly into the microphone, and state your name for the

12  record, please spelling your last name.

13          THE WITNESS:  Sure.  Kristen Mackey, M-a-c-k-e-y.

14          THE COURT:  Thank you.  And then, Ms. Mackey,

15  there's water and cups there if you need it.

16          THE WITNESS:  Thank you.

17          THE COURT:  Wherever you're ready.

18          MR. LALCHANDANI:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20  BY MR. LALCHANDANI:

21  Q.   Good afternoon, Ms. Mackey.

22  A.   Hi.

23  Q.   Can you please introduce yourself to Judge Kimmins.

24  A.   Sure.  My name's Kristen Mackey.  I am the administrator

25  for Arizona Rehabilitation Services Administration.

 1   Q.   And Ms. Mackey, how long have you worked with the

 2   Rehabilitation Services Administration?

 3   A.   I have worked for AZRSA for 15 years.

 4   Q.   And what is your current role?

 5   A.   My current role is the administrator over three programs,

 6   the vocational rehabilitation program, older individuals that

 7   are blind, and the BEP Randolph-Sheppard program.

 8   Q.   And how long have you served in that role as

 9   administrator?

10   A.   As administrator, I've been in the role for six to seven

11   years.

12   Q.   So Ms. Mackey, you mentioned the Business Enterprise

13   Program.  Can you please describe what that program is.

14   A.   The Business Enterprise Program is the State of Arizona

15   Randolph-Sheppard program.  There is a federal law.  There is

16   also a state law that guides the opportunities for individuals

17   who are blind to become blind vendors and increase their

18   employment opportunities.

19        So as the Arizona State Rehabilitation Administration, we

20   are the State licensing agency under DES.  So DES is the large

21   umbrella agency.  Then there is the division and then the

22   administration, and in my administration I oversee the BEP

23   program.

24   Q.   Thank you for that explanation, Ms. Mackey.

25        How many blind vendors are currently part of Arizona's

DIRECT EXAMINATION OF KRISTEN MACKEY                111

1   Randolph-Sheppard program?

2   A.   Currently we have approximately 20 blind vendors.

3   Q.   And what types of business do they operate?

4   A.   They operate vending facilities and vending lines and

5   dining facilities, so food service facilities.

6   Q.   And across the state of Arizona, how many sites are --

7   the blind vendors who are part of the program, how many sites

8   are they operating?

9   A.   We operate approximately 31 sites at the moment.

10  Q.   And what support does DES or through its Randolph-

11  Sheppard program provide to its blind vendors?

12  A.   We provide a substantial amount of administrative

13  support.  We are the, again, the licensing agency, so we enter

14  into contracts on behalf of the operators.  We provide

15  equipment.  We repair equipment.  We provide support through

16  consultants to each of the operators to ensure that there is a

17  successful business.

18  Q.   And how does Arizona's Randolph-Sheppard program go about

19  recruiting or attracting members to the program?

20  A.   We, you know, quite honestly, we use examples like Scott,

21  came into the program, was able to grow his business and

22  obtain, you know, increasing complexity and larger operations.

23  And so we point to the success of our current operators.  We

24  also point to success of our current contracts to share the

25  good news about the work that's being done.

1    Q.   What are the requirements for someone to be accepted as a

2    blind vendor in the program?

3    A.   You must demonstrate that you've had the training, you

4    completed the training, you have the skills and ability and

5    knowledge in order to be able to run a site successfully.

6    Q.   Ms. Mackey, how many staff members currently support

7    Arizona's Randolph-Sheppard program?

8    A.   We currently have eight staff members.

9    Q.   Ms. Mackey, I want to now ask you a few questions about

10   the budget for the Randolph-Sheppard program.  Approximately

11   what is the annual budget to support the Randolph-Sheppard

12   program in Arizona?

13   A.   Approximately $5.4 million.

14   Q.   And what are the sources of funding that comprise that

15   5.4 roughly million dollars?

16   A.   The funding is provided by income, that is, a portion of

17   the income that is accrued from the blind vendors.  So the

18   blind vendors earn wages, and then a portion of those wages

19   are set aside to the program.

20   Q.   And that's what the term "set aside funds" means, that

21   portion that you're referring to?

22   A.   That's correct.

23   Q.   And what about any other sources of funding?

24   A.   There are no other sources of funding for the program.

25   Q.   Are there any match funding that is applied to those set

1  aside funds you were describing?

2  A.   Yes, we can -- we can match the nonfederal dollars with a

3  federal grant, and we -- that match portion is approximately a

4  four-to-one match, so if we were to, say, you know, show that

5  we have $1 to spend, the Federal Government would give us $4,

6  and then we would be able to turn that around and provide $5

7  worth of service.

8  Q.   Ms. Mackey, how would you describe the importance of the

9  Fort Huachuca contract to Arizona's Randolph-Sheppard program?

10 A.   It's extremely important.  It is 75 to 85 percent of the

11 total budget for the program.

12 Q.   So even though it's only one site out of the 30 or so you

13 mentioned, it supplies 75 to 85 percent of the budget?

14 A.   That's correct.

15 Q.   How much would Arizona's Randolph-Sheppard program lose

16 financially if the Fort Huachuca contract is lost?

17 A.   Gosh, about $4 million would be lost just from this one

18 contract.

19 Q.   And 4 million out of the total of?

20 A.   5.4.

21 Q.   What would be the impact first on the staff that you help

22 to oversee?

23 A.   Quite honestly, I can't imagine running a program on 20

24 percent of the total budget that we're used to.  We would have

25 to make some significant changes to staffing, addressing the

 1    availability of staff, how staff can assist, to run the

 2    program.  It would be -- quite frankly, it would probably

 3    devastate the program.

 4    Q.   And what would be the impact on the blind vendors that

 5    the program supports?

 6    A.   We provide supports to the blind vendors to help them

 7    continue and be able to engage in additional contracting,

 8    continue with the successful running of their business, their

 9    equipment, their machines, manage the repair and operations.

10    We provide health insurance benefits, retirement benefits, so

11    the operators would be significantly negatively impacted by

12    the loss of this contract.

13    Q.   Does the Randolph-Sheppard program provide any other

14    financial support to its blind vendors?

15    A.   We have in the past provided and we can provide wage to

16    up to a fair minimum wage.  During COVID, when a lot of the

17    federal court buildings and state municipality buildings

18    closed, many of the operators sustained significant loss in

19    their funding and their income, and so we did provide a series

20    of rebate checks to the operators to help them continue to

21    just basically, you know, keep the lights on and keep food on

22    their table.

23    Q.   And Ms. Mackey, I believe you mentioned previously that

24    it would impact the ability to apply for future contracts.  Is

25    that correct?

 1  A.   Correct.  You know, we utilize -- you know, we point to

 2  the successful operations' long-term success at large

 3  operations such as Fort Huachuca when establishing our

 4  credibility and knowledge and expertise in being able to run a

 5  program of that scope and size.

 6  Q.   So it's accurate to say that there's a range of

 7  operations within the program?

 8  A.   Very, yes.

 9  Q.   And loss of Fort Huachuca would be loss of a significant

10  program --

11  A.   That is correct.

12  Q.   -- or operation?

13       Ms. Mackey, is there any other way that the loss of the

14  contract would impact the Randolph-Sheppard program in Arizona

15  and its blind vendors?

16  A.   I believe we would not be able to recruit and retain

17  additional individuals who are blind to come into the program

18  without, you know, some significant successes to show.  You

19  know, our program is to offer opportunities to individual

20  blind vendors to be able to have gainful employment, and I

21  think we would be at a loss for being able to show the success

22  of the program.

23            MR. LALCHANDANI:  Thank you, Ms. Mackey.

24            Your Honor, with just a brief indulgence to confer

25  with co-counsel.

 1          THE COURT:  Sure.

 2          MR. LALCHANDANI:  We have nothing further for

 3 Ms. Mackey.

 4          THE COURT:  Okay.  Thank you.  And Ms. Letzkus?

 5                      CROSS-EXAMINATION

 6 BY MS. LETZKUS:

 7 Q.   Thank you, Ms. Mackey.  I appreciate you being here

 8 today.

 9      Did you have any involvement in crafting the proposal

10 that was submitted by ADS -- ADES in response to the

11 solicitation at issue?

12 A.   I did not.

13          MS. LETZKUS:  Okay.  That's the only question I

14 have.

15          THE COURT:  So Ms. Mackey, let me ask you -- any

16 redirect?

17          MR. LALCHANDANI:  No, Your Honor.

18                        EXAMINATION

19 BY THE COURT:

20 Q.   Okay.  So if Mr. Weber, as you heard testify, said that

21 he had given questions to DES regarding the solicitation, do

22 you know who he would have given them to?

23 A.   He would have given them to the program manager at the

24 time.

25 Q.   And who was the program manager?

1   A.    Nathan Pullen.

2   Q.    And then do you know who actually were the people

3   involved in putting the proposal together based on the Army's

4   solicitation?

5   A.    Individuals from Sodexo, staff, and subject matter

6   experts such as Scott and other operators.

7              THE COURT:  Any other questions?

8              MR. LALCHANDANI:  No, Your Honor.

9              THE COURT:  You may step down.  Thank you.

10             Any other further witnesses from the plaintiff?

11             MR. FREEMAN:  No, Your Honor.

12             THE COURT:  Ms. Letzkus, would you like to at least

13  get started in the next half-hour, 45 minutes?

14             MS. LETZKUS:  Yeah, Your Honor, because the time is

15  so short, I think it would be a good idea to at least get

16  started.

17             THE COURT:  Okay.  So who are you planning to call

18  first?

19             MS. LETZKUS:  I'm planning to call Mr. Vicory first.

20             THE COURT:  Okay.

21             MR. FREEMAN:  Just as a housekeeping matter, Your

22  Honor.

23             THE COURT:  Yes.

24             MR. FREEMAN:  The exhibits have been -- we

25  stipulated to their admissibility.  They have been admitted;

1   is that correct?

2             THE COURT:  Yes, they all have, with the exception

3   of the declarations.

4             MR. FREEMAN:  Thank you, Your Honor.

5             THE COURT:  Sure.  And Mr. Vicory, if you'd like to

6   come forward, you can have a seat.  You've already been sworn

7   in, so we'll just get started.

8             THE WITNESS:  Okay.

9          MICHAEL VICORY, WITNESS, PREVIOUSLY SWORN

10                      DIRECT EXAMINATION

11  BY MS. LETZKUS:

12  Q.   Thank you, Mr. Vicory.  Good afternoon.  Thank you for

13  being here.  I know you flew in, and it's been a long day for

14  you, so I appreciate your patience.

15  A.   No problem.

16  Q.   Mr. Vicory, can you tell us what your current role is

17  with the Federal Government?

18  A.   Yes, I'm currently the director of the Installation

19  Readiness Center at the Mission Installation Contracting

20  Command.  I'm also a warranted contracting officer.

21  Q.   How long have you been a contracting officer for the

22  Federal Government?

23  A.   So I've been in the contracting career series for 23

24  years.  I've been a warranted contracting officer for about 15

25  years.  12 of those years I've held an unlimited warrant,

1    which means I can obligate the Government to an unlimited

2    amount.

3    Q.   It's my understanding that the contractor's warrant has

4    something I think you just said to do with binding the

5    Government.  Can you explain that a little more?

6    A.   Yeah, so when I award a -- so as the contracting officer,

7    when we -- when the Government awards a contract, I can sign

8    that contract, which binds the Government to the contract.

9    Q.   What are your duties as contracting officer?

10   A.   So I act as a business advisor.  So I provide -- I accept

11   requirements from the requiring activity.  In this case it's

12   Army Sustainment Command.  We will issue solicitations, we

13   review proposals, and we award contracts.

14   Q.   How many contracts do you think you've been involved with

15   as a contracting officer over the years?

16   A.   Oh, gosh, probably hundreds.

17   Q.   So is it safe to say you're pretty familiar with the

18   Federal Government contracting process?

19   A.   Yes, it is.

20   Q.   I want to turn now just to talk about the solicitation at

21   issue here, which is for a five-year contract to operate

22   services at Fort Huachuca.  Do you understand that to be the

23   solicitation we're talking about here today?

24   A.   Yes, ma'am.

25   Q.   Are you the current contracting officer for the

1    solicitation?

2    A.    Yes, I am.

3    Q.    What does that mean?

4    A.    That means I'm responsible to ensure that we have met the

5    obligations under the Federal Acquisition Regulations in

6    awarding the contract.

7    Q.    I saw some reference in the solicitation to the term

8    lowest priced technically acceptable contract or LPTA.  Can

9    you explain what that is?

10   A.    Yeah, so when we do a low price technically acceptable,

11   we're evaluating to ensure that the contractor that we award

12   to has met the Government's minimum requirements as stated in

13   the solicitation.

14   Q.    In your experience, is there typically much negotiation

15   back and forth with potential vendors for an LPTA contract?

16   A.    It depends.  There can be.  In the food service realm, we

17   have had significant negotiations.

18   Q.    So in your role as a contracting officer, have you

19   encountered contracts involving the Randolph-Sheppard Act?

20   A.    I have.

21   Q.    Do you know -- do you have basic familiarity with the

22   Randolph-Sheppard Act then?

23   A.    Yes, I do.

24   Q.    Does the Randolph-Sheppard Act mandate a particular

25   contracting method?

1   A.   No, it does not.  It allows for two different methods of

2   procurement.  What you can do is a competitive process or you

3   can go into direct negotiations with the State licensing

4   agency.

5   Q.   And can you just explain quickly the difference between

6   those two contracting processes?

7   A.   Yes.  So if I do the competitive, I would issue a

8   solicitation, accept proposals from multiple vendors from

9   industry.  We would publicize it, so allowing, you know, to

10  allow, you know, maximum competition, and we go through the

11  selection process.

12       It it's direct negotiations, you're going directly to the

13  State licensing agency.  So it's equivalent to, like, sole

14  sourcing.  I'm selecting to go directly and I'm going to

15  negotiate just with the State licensing agency.

16  Q.   But in this case, is it accurate that the Government

17  decided to go the competitive selection route?

18  A.   Yes, ma'am.

19  Q.   Not direct negotiations?

20  A.   Correct.

21  Q.   So is it your understanding that the solicitation at

22  issue is subject to the Randolph-Sheppard Act in this case?

23  A.   Yes, it is.

24  Q.   Does Randolph-Sheppard Act have any impact on which

25  vendors are permitted to submit proposals and be considered

1   for a contract?

2   A.   I'm not sure I understand.

3   Q.   Sure, I'll rephrase.

4        I saw some language in the solicitation that this is a

5   100 percent small business contract.  Do you remember that

6   language?  Are you familiar with that language?

7   A.   Yes, ma'am.

8   Q.   So what happens if a State licensing agency or blind

9   vendor that's not a -- does not meet the qualifications to be

10  considered a small business?  Are they still allowed to submit

11  a proposal?

12  A.   Yes, ma'am.  So when we issue a solicitation for food

13  service, we normally do a 100 percent small business set

14  aside, which means it's set aside for small businesses.  Large

15  businesses are not allowed to bid.

16       The State licensing agencies don't qualify as a small

17  business, but because of the Randolph-Sheppard Act, we allow

18  them to submit bids just like the small businesses.

19  Q.   And plaintiff was permitted to -- ADES was permitted to

20  submit a proposal here; correct?

21  A.   Yes, ma'am.

22  Q.   Are you pretty familiar with the terms of the

23  solicitation at issue?

24  A.   Yes, ma'am.

25  Q.   Did the solicitation set out the steps of the process for

DIRECT EXAMINATION OF MICHAEL VICORY

 1   which the contract would be awarded?

 2   A.   Yes.   The solicitation set out five steps for the process

 3   of setting the competitive range up to award.

 4   Q.   And can you briefly explain the first couple steps?

 5   A.   Yeah, so under Step 1, we would look at the proposals and

 6   would determine acceptability, and for those proposals that

 7   have been determined acceptable, it says we will set the

 8   competitive range.   If a proposal is unacceptable, it

 9   specifically states they would be outside the competitive

10   range.

11   Q.   Okay.   And do you know what -- was that Step 1?

12   A.   I --

13   Q.   Yeah, if you want to turn to -- I think you have the

14   exhibits up there.   It should be in the binder that says

15   Plaintiff's Exhibits.   So it's the --

16          THE COURT:  Defendant's Exhibits.

17          MS. LETZKUS:  Yeah, it's Defendant's Exhibits.

18   Sorry.

19          THE WITNESS:  No, no problem.

20          MS. LETZKUS:  Yeah, it's the blue.

21          THE WITNESS:  Okay.

22   BY MS. LETZKUS:

23   Q.   So if you look at the solicitation there, which --

24          THE COURT:  Exhibit 30.

25   BY MS. LETZKUS:

DIRECT EXAMINATION OF MICHAEL VICORY                    124

1    Q.    -- which is Exhibit 30, so if you can turn to where it's

2    bold at the bottom, where it says page 104.

3    A.    Page 104.

4    Q.    Are you there?

5    A.    I am, yes.

6    Q.    So do you see where it says, "Evaluation Factors for

7    Award?"

8    A.    Yes.

9    Q.    And then it looks like there's five steps outlined?

10   A.    Yes.  And so Step 1 is, "After the initial evaluation of

11   timely received proposals, in accordance with the evaluation

12   and criteria specified in the solicitation and based on the

13   initial evaluations, to include the total evaluated price, a

14   competitive range will be established for proposals evaluated

15   as acceptable.  If the contracting officer determines a

16   proposal should be excluded from the CR," the competitive

17   range, "the contracting officer will provide a written notice

18   of exclusion to that offeror.

19   Q.    Okay.  And can you read to us what the first sentence

20   under Step 2 says?

21   A.    Yes.  "In accordance with Army Regulation 210-25, Vending

22   Facility Program For the Blind on Federal Property, the

23   Government shall enter into discussions/negotiations with all

24   offerors whose proposals have been determined to be in the

25   competitive range established in Step 1 above.  If after

1  discussions have begun the Government determines that an

2  offerer's proposal should no longer be included in the

3  competitive range, the proposal will be eliminated from

4  consideration for award."

5  Q.   So to sum up Step 2, what you've just read, is it fair to

6  say that it provides that discussions will be held with those

7  offerors whose proposals were included in the competitive

8  range?

9  A.   Yes, ma'am.

10  Q.   Was this five-step process that you've -- that's laid out

11  in this solicitation, was that standard process at the time of

12  the issuance of this solicitation?

13  A.   Yes, it was.

14  Q.   So by "standard," I mean was this the standard practice

15  for award -- evaluating and awarding the contract?

16  A.   Yes, this was standard language.  We inserted it in all

17  our solicitations at that time.

18  Q.   Okay.  So if you could turn to the solicitation, page 105

19  at the bottom, where it says, "C.  Evaluation Criteria?"

20  A.   Yes.

21  Q.   You see that?  So there's, like, three factors and a

22  couple subfactors.  You see that?

23  A.   Yes.

24  Q.   So can you tell us what subsection G, or excuse me,

25  subsection C generally explains?

DIRECT EXAMINATION OF MICHAEL VICORY

1  A.   So subsection C talks about what the Government's going

2  to look at when we evaluate.  So in this case, we had three

3  factors.  One was technical, one was past performance, and one

4  was price.

5       Under the technical capability factor, we have two

6  subfactors.  One was the organizational structure, and one was

7  the staffing plan.

8  Q.   Okay.  On that same page, I think same page, 106.

9  A.   Okay.

10 Q.   So if you look at kind of the middle of the page, there's

11 kind of -- there's like a heading that says, "Adjectival

12 Ratings," I believe?

13 A.   Yes.

14 Q.   Can you explain to us what -- generally what that

15 paragraph describes?

16 A.   So essentially it says how we're going to assign the

17 rating.  So these ratings, we have the ratings of acceptable

18 or unacceptable.  So a proposal that meets the requirements of

19 the solicitation would be rated as acceptable, and a proposal

20 that does not meet the requirements of the solicitation would

21 be rated as unacceptable, and these definitions come out of

22 the Department of Defense Source Selection Procedures.

23 Q.   Okay.  So if a proposal was acceptable, say, as to past

24 performance but unacceptable as to technical capability,

25 whether it be subfactor A, which talks about operation

 1  structure, or subfactor B, which deals with the staffing plan,

 2  if the proposal was acceptable as to past performance but it

 3  was not acceptable as to technical capability, then is the

 4  entire proposal unacceptable?

 5  A.   Correct, and I believe that is stated in the

 6  solicitation.

 7  Q.   Are you aware of anywhere in the solicitation where it

 8  says that the Government will or must look at the vendor's

 9  prior performance over the years in evaluating the technical

10  capability factor?

11  A.   That is not part of the solicitation.

12  Q.   Okay.  So did -- did offerors for the solicitation have a

13  chance to submit questions to get clarity on the terms of the

14  solicitation or how the award would be made, what they would

15  be evaluated on, stuff like that?

16  A.   Yes, ma'am, they did.

17  Q.   And did you get any questions from offerors?

18  A.   We did.  We got questions -- we got some questions, and

19  we provided answers to those questions over the course of the

20  time the solicitation was on the street.

21  Q.   What does that mean, "on the street?"

22  A.   Sorry.  So we issue the solicitation for I believe

23  normally around 30 days, so during that 30-day period, vendors

24  have a period of time that they can submit questions and then

25  we provide answers.

DIRECT EXAMINATION OF MICHAEL VICORY

1    In this case's solicitation, I believe one of the things

2 we did was we actually extended it for an additional period of

3 time based on some of the questions we got and some of the

4 changes we made.

5 Q.    So the plaintiff here, Arizona Department of Economic

6 Security, they were one of the offerors who submitted a

7 proposal for the solicitation; right?

8 A.    Yes, ma'am.

9 Q.    Did the Government receive any questions from ADES before

10 it submitted its proposal in response to the solicitation?

11 A.    No.  No, ma'am.

12 Q.    Did the Government receive any questions directly from

13 Mr. Weber prior to the submission of the proposal?

14 A.    No, ma'am.

15 Q.    So as a contracting officer, did you establish a

16 competitive range here?

17 A.    Yes, we did.

18 Q.    Okay.  So can you walk me through the process of setting

19 the competitive range, starting from the issuance of a

20 solicitation through the establishment of the competitive

21 range?

22 A.    Yes, so we -- yeah, we start with issuing a solicitation,

23 and then, as we talked about, we'll go through a question and

24 answer period.  Proposals are received upon the due date of

25 the solicitation.  Once we receive proposals, we distribute

 1    them to what we call a Source Selection Evaluation Board, the

 2    SSEB, so the SSEB contains a technical evaluation team, a past

 3    performance evaluation team, and a price evaluation team.

 4        So the different parts of the proposals, for example,

 5    Volume I is the technical proposal, that will go to the

 6    technical evaluation team.  The past performance proposal will

 7    go to the past performance evaluation team, and the price

 8    proposal will go to the price evaluation team.

 9        So they all do their independent evaluations.  Each team

10    has multiple people that are on the team.  And it goes through

11    the process where it goes to a chairperson, the SSEB chair,

12    who then -- let me take a step back.

13        During the process that they're doing the SSEB, they

14    actually do independent evaluations, and then they do a

15    consensus review.  So by the time the SSEB chairman gets all

16    the documentation, everything's been evaluated independently,

17    and then there's been a consensus done, so we get a complete

18    consensus document.

19        The SSEB chair then submits the SSEB report through the

20    contracting chain, which eventually comes to the contracting

21    officer.  The contracting officer reviews the report, makes

22    sure it is accurate and complete, and then we prepare the

23    competitive range determination.

24    Q.   Okay.  And I think you said that's generally what the

25    steps are in evaluating and setting the competitive range.

1  Did you follow that -- did the Government follow that process

2  with respect to the solicitation at issue here?

3  A.   Yes, ma'am.

4  Q.   Was plaintiff's -- was ADES's proposal included in the

5  competitive range?

6  A.   It was not.

7  Q.   Do you remember why it was not included?

8  A.   Yes.  So as we discussed earlier, part of the evaluation

9  criteria includes a technical capability factor, two

10  subfactors, organizational structure and staffing plan.  So

11  they were acceptable under the organizational structure

12  subfactor.  They were unacceptable under the staffing plan

13  subfactor, and as a result they were overall unacceptable.

14  Q.   Do you remember why ADES's proposal was deemed

15  technically unacceptable --

16  A.   Because --

17  Q.   -- under the staffing subfactor that you just talked

18  about?

19  A.   So their staffing plan did not meet the minimum

20  requirements that the Government projected for Fort Huachuca,

21  specifically as it relates to staffing the Weinstein and

22  Thunderbird DFACs.

23  Q.   Okay.  I want you to go ahead and take a look at the

24  Government's Exhibit which is 32.

25  A.   I'm there.

131

 1   Q.   Okay.  So are you familiar with what Exhibit 32 is?

 2   A.   Yes.  This is the staffing matrix that each vendor had to

 3   fill out when they submitted their proposals.

 4   Q.   Okay.  And this one looks like it's filled out, and I can

 5   just represent it was filled out per ADES and included in

 6   their proposal.

 7   A.   Yes.

 8   Q.   Okay.  See at the top there, it's kind of hard to read,

 9   it's very little to fit on one page, but it says, "Building

10   52107 Thunderbird."  Do you see that?

11   A.   Unfortunately, my eyes are not --

12            THE COURT:  You're not alone.

13   BY MS. LETZKUS:

14   Q.   We'll, I'll represent to you that's what it says.  So is

15   Thunderbird one of the dining facilities at Fort Huachuca?

16   A.   Yes, it is.

17            THE COURT:  And Ms. Letzkus, are you talking about

18   the very top, the top one with the first green kind of --

19            MS. LETZKUS:  So above the first green, it says --

20   the very first thing it says on the page, it says "Building."

21            THE COURT:  Okay.

22            MS. LETZKUS:  And then if you tab over a few spaces

23   it says the number and then "Thunderbird."

24            THE COURT:  Okay.  I see.  Okay.

25            THE WITNESS:  Yeah, I see that.

DIRECT EXAMINATION OF MICHAEL VICORY

1  BY MS. LETZKUS:

2  Q.   Okay.  So does this appear to be a proposal for staffing

3  the Thunderbird Dining Facility?

4  A.   Yes, it does.

5  Q.   And if I look at -- there's kind of four boxes here;

6  right?  And the first one in green, at kind of the second line

7  from the very top of the page, says, "Three meals per day,

8  breakfast, lunch, dinner, one to 750 meals?"

9  A.   Yes.

10  Q.   Do you see that?

11  A.   Yes.

12  Q.   And it looks like in the first column there it describes

13  various positions, like cook I, cook II, food sanitation

14  specialist; is that right?

15  A.   That's correct.

16  Q.   Okay.  And then, if you look at the other columns, it

17  looks like there's some numbers there?

18  A.   Correct.

19  Q.   So do the numbers represent the number of proposed staff

20  for that position during that particular time?

21  A.   That is correct, yes.

22  Q.   Okay.  And it looks like the same thing under the second

23  box?

24  A.   That is correct.

25  Q.   And that's for three meals per day, breakfast, lunch,

1    dinner, 751 to 1,500 meals?

2    A.   That is correct.

3    Q.   If you look at the next two boxes, which are two more

4    bands, including a 100 percent takeout and also a brunch and

5    supper band, was there any staff here proposed to staff those

6    meals?

7    A.   There is no staffing here, no.

8    Q.   Is the Government able to evaluate whether a vendor is

9    capable of meeting its minimum requirements for staffing if

10   entire bands in the staffing matrix are left blank?

11   A.   No, we cannot.

12   Q.   There has also been some talk here about staffing the

13   cashier's position.  Do you recall that?  Do you recall seeing

14   anything about staffing the cashier's position?

15   A.   Yes, ma'am.

16   Q.   Was that a factor in the decision that the technical

17   proposal was unacceptable?

18   A.   Yes, it was.

19   Q.   Can you explain why the technical proposal is

20   unacceptable based on the cashier proposal?

21   A.   Yes.  So the way the -- well, the way it was evaluated

22   was that the Government found it to be understaffed, like,

23   from a range, so like I believe it was 21 percent to 101

24   percent.  So what that means was that there were not enough

25   people, enough cashiers, available to protect the change fund.

DIRECT EXAMINATION OF MICHAEL VICORY                    134

1   Q.   Okay.  Can you explain to me what you mean by "protect

2   the change fund?"

3   A.   So basically there was no separation of function, so the

4   person who was managing the change fund would be changing it

5   out to himself or herself.

6   Q.   Okay.  So if you can go ahead and look at Plaintiff's

7   Exhibit 12.

8   A.   Yes, ma'am.

9   Q.   So does this appear to be a letter from you to Joyceline

10  Elliot at the Arizona Department of Economic Security on or

11  about January 26, 2023?

12  A.   Yes, it is.

13  Q.   And the first sentence in the first paragraph says,

14  "Please accept this letter as a preaward debriefing in

15  accordance with (IAW) Federal Acquisition (FAR) 15.505."

16       What is a debriefing?

17  A.   So when a vendor is either not selected for competitive

18  range or not selected for award, under FAR they have the right

19  to request a debriefing, and in that debriefing there's

20  specific information that the Government is obligated to give,

21  and so they did request this debriefing in accordance with the

22  FAR timely, and so we provided this debriefing to them.

23  Q.   So does this debriefing set out the reasons why ADES's

24  proposal was deemed unacceptable?

25  A.   Yes, ma'am.

DIRECT EXAMINATION OF MICHAEL VICORY

1  Q.  So if you turn to -- if you look at the blue heading at

2  the top of that document, you'll see "Case" and then some

3  numbers.  Then at the very right it says page whatever out of

4  12.  If you turn to where it says page 8.

5  A.  Yes, ma'am.  I'm there.

6  Q.  So the -- I'd say halfway down that page, do you see

7  where it says, "For Building 52107.  Three meals per day

8  (breakfast, lunch, dinner)."

9      Do you see that paragraph?

10 A.  Yes, ma'am.

11 Q.  And then it says, "Meals cashiers are significantly

12 understaffed by 21 to 100 percent."

13     Is that what you were just explaining about the range?

14 A.  Yes, ma'am.

15 Q.  So is it your understanding that, when it says up to a

16 hundred percent understaffed, that means that the Government

17 thought that plaintiff had proposed no staffing at all?

18 A.  No, not necessarily.

19 Q.  Okay.  What could it mean?

20 A.  Well, it could mean, for example, that they've -- they

21 proposed two and the Government thought that there needed to

22 be four.

23 Q.  Okay.  So that would be a 100 percent increase?

24 A.  Correct.

25 Q.  And then, if you look at the next two paragraphs, it

 1    talks about Building 52107 still, talks about brunch and

 2    supper, and then it talks about a hundred percent takeout.

 3         Do you see that?

 4    A.   Yes, ma'am.

 5    Q.   And it says, for both, staffing was not included in for

 6    this band?

 7    A.   Yes, ma'am.

 8    Q.   So is that what we just went over on the staffing matrix?

 9    A.   That's correct, yes, ma'am.

10    Q.   Are you aware of some of the potential consequences for

11    services at Fort Huachuca if there are -- if the vendor is

12    understaffed as to cashiers?

13    A.   Yes, ma'am.

14    Q.   Could you explain some of those.

15    A.   Yeah, so if a vendor is understaffed at the cashier, what

16    can happen is, because they don't have the team to do both

17    looking at the headcount and the admin functions and then do

18    the cashier work, you can see, number one, there's the

19    potential for fraud, waste, and abuse because the person -- if

20    the person who is managing the cash fund was changing it out

21    to themselves, there's nobody to oversee that or to enforce

22    that separation of function.

23         The other thing is, too, if they are focused on that,

24    then that could potentially lead to headcount issues as it

25    relates to the soldiers who are trying to get fed being

1   delayed because of a longer line.

2   Q.   Okay.  So a potential consequence of understaffed

3   cashiers could mean longer lines and longer waits for the

4   soldiers to get fed?

5   A.   That's correct.

6   Q.   Okay.  Back to page 8 of your letter there, so if you

7   look at the bottom paragraph, it says, "For building 85202.

8   Three meals per day (breakfast, lunch, dinner), 2,251 to 4,500

9   meals," do you see that?

10  A.   Yes, ma'am.

11  Q.   It says, "Food sanitation specialists/DFA are somewhat

12  understaffed, one to 21 percent," for certain times.  Do you

13  see that?

14  A.   Yes, ma'am.

15  Q.   What is the consequence of -- what is a potential

16  consequence of having too few staff doing food sanitation

17  specialist or DFA tasks?

18  A.   Well, it's safety and sanitation, right, so if you have

19  too few people who are doing the cleaning, you can have bugs,

20  cockroaches, you can have the food pile up in the garbage

21  cans, things that basically create an unhealthy environment

22  for soldiers as they're trying to feed themselves.

23  Q.   Could it also have an impact on the timeliness of

24  soldiers being fed?

25  A.   I believe so, yes.

DIRECT EXAMINATION OF MICHAEL VICORY

1   Q.   If you look at page 9 of 12, I will tell you that, on

2   page 7, it talks about understaffing the food sanitation

3   position.   On page 8 it says it could cause negative

4   performance issues regarding inefficient flow rate, excessive

5   patron wait times, and not enough staff to satisfactorily

6   clean all food equipment, areas, and utensils.

7        Is that your understanding of the consequences of being

8   understaffed for food sanitation personnel?

9   A.   Yes, ma'am.

10  Q.   There has been a lot of discussion here today that ADES

11  and Mr. Weber have been satisfactorily performing under

12  contracts to provide dining services to Fort Huachuca, you

13  know, for years now.

14       When the Government is and specifically when you were

15  evaluating proposals to see if they satisfy the minimum

16  requirements for staffing, does the Government, do you, take

17  into account past performance for that particular evaluation?

18  A.   For the -- for the technical evaluation, no, we don't,

19  because that would require the technical team to make

20  assumptions.

21  Q.   Okay.   So is it safe to say that the Government is

22  looking just at the proposal and not making any assumptions

23  about past performance or whether that past performance will

24  continue to be good in the future when making decisions about

25  the technical element of the proposal?

 1  A.   Correct.  We are bound only to look at what they propose

 2  as it relates to the solicitation requirements.

 3  Q.   And do you recall if the solicitation explicitly says

 4  that the offeror is to assume that the Government has

 5  absolutely no information or any knowledge about the

 6  experience of the vendor or the offeror or past performance of

 7  the offeror when making its evaluation?

 8  A.   I'm sorry.  Can you ask that question again?

 9  Q.   Sure.  So let me -- let me go directly to the exhibits.

10  I think that will help.

11  A.   Okay.

12  Q.   So if you go to the solicitation, which was Defendant's

13  Exhibit 30.

14  A.   Okay.

15  Q.   Are you there?

16  A.   I'm there, yes.

17  Q.   Okay.  So if you turn to --

18          MR. LALCHANDANI:  Ms. Letzkus, which page?

19          MS. LETZKUS:  I was about to say.

20          MR. LALCHANDANI:  Okay.

21  BY MS. LETZKUS:

22  Q.   So if you turn to page 112 in bold at the bottom.

23  A.   I'm there, yes.

24  Q.   Okay.  Looking under Subsection B, "Volume II, Technical

25  Volume," do you see that?

1    A.   Yes, ma'am.

2    Q.   I'm just going to read from a few lines from the bottom

3    of the paragraph that is under subsection 1 there.

4    A.   Okay.

5    Q.   It says -- I'll read from the middle, actually.  It says,

6    "Statements that the offerer understands, can, or will comply

7    with the PWS, including referenced publications or technical

8    data, or phrases such as 'standard procedures will be

9    employed' or 'well-known techniques will be used,' et cetera,

10   will be considered unacceptable."

11        Is that your understanding?

12   A.   Yes, ma'am.

13   Q.   Then it goes on to say, "Offerers are responsible for

14   including sufficient details to permit a complete and accurate

15   evaluation of each proposal.  Offerors shall assume that the

16   Government has no prior knowledge of their technical

17   capabilities and past experience and will base its evaluation

18   on the information presented in the offerer's proposal."

19        Do you see that?

20   A.   Yes, ma'am.

21   Q.   Can you explain to us in plain English what that means?

22   A.   Essentially, as it states, we're not going to make

23   assumptions based on any performance that's been done.  We are

24   going to look at -- we are going to base it based on the

25   proposal that is received in accordance with the solicitation

DIRECT EXAMINATION OF MICHAEL VICORY

1    terms.

2    Q.    And that's for the technical part of the proposal?

3    A.    For the technical part, yes.

4    Q.    So were any other offerors who submitted proposals, were

5    they -- were any others deemed unacceptable for their

6    technical proposal?

7    A.    Yes, we had multiple offers deemed unacceptable.

8    Q.    Were any of those other offerers who submitted

9    unacceptable proposals included in the competitive range?

10   A.    No, they were not.

11   Q.    Why not?

12   A.    Because they did not meet the minimum technical work

13   requirements, and in accordance with our solicitation terms

14   and conditions, I could not include them in the competitive

15   range.

16   Q.    And is the same true for ADES?

17   A.    That is correct, yes.

18   Q.    Okay.  So after you got -- you said you would get the

19   proposal from the SSEB that would be their evaluation of all

20   the factors and subfactors that the award would be based on.

21   After you got the SSEB's evaluation, before you set the

22   competitive range, did you go back to ADES or any of the other

23   offerors who were deemed to have unacceptable proposals and

24   give them the ability to revise their proposals to make them

25   acceptable?

 1  A.   No, I did not, because I'm expressly prohibited from

 2  doing such.

 3  Q.   And why are you expressly prohibited from doing such?

 4  A.   Based on the FAR, because when you evaluate proposals,

 5  you -- in order to allow someone to revise a proposal, you

 6  need to go into discussions, and in order to go into

 7  discussions, you need to establish the competitive range.

 8  Q.   So after you got the SSEB's analysis, did you do --

 9  analysis specifically of ADES's proposal, did you evaluate the

10  SSEB's analysis yourself?

11  A.   Yes.  We look at it for completeness and accuracy.

12  Q.   Did you agree that ADES's proposal was unacceptable?

13  A.   Yes, we did.

14  Q.   And why?

15  A.   Because based on the data provided, they specifically, as

16  you mentioned earlier, just looking at the missing information

17  in the staffing matrix and based on the description of the

18  staffing deficiencies, it was clear to us that the technical

19  team had made the correct assessment, and therefore, they were

20  unacceptable.

21  Q.   So we looked at the debriefing letter that you sent to

22  ADES; right?  Did ADES respond to that debriefing letter, do

23  you remember?

24  A.   Yes, they did, ma'am.

25  Q.   Okay.  If you'd take a look at Plaintiff's Exhibit 13.

 1  A.    I'm there.

 2  Q.    Okay.  This is a letter from you, Michael Vicory, to

 3  Kristen Mackey with ADES.  Does this letter appear to be your

 4  response to -- does this letter appear to be ADES's response

 5  to your debriefing letter?

 6  A.    Yes.  This is ADES's response to my debriefing letter.

 7  Q.    If you turn to page 2 of that letter, second full

 8  paragraph, it says, "The other two issue noted" -- "The other

 9  two issue," should say "issues," "noted in the debriefing

10  letter, i.e. the Army's claim that ADES did not include

11  staffing for two scenarios at the Thunderbird criteria, they

12  seem to be based on a misunderstanding.  On this issue the

13  Army ignores that those two scenarios did not actually occur

14  at Fort Huachuca and further ignores that ADES did include

15  pricing for those two scenarios in the pricing matrix."

16        Do you see that?

17  A.    Yes, ma'am.

18  Q.    So that would be basically what we talked about, the

19  staffing matrix didn't propose any staffing at all for two

20  bands of meals?

21  A.    That's correct.

22  Q.    And what's your response to the idea that this is based

23  on a misunderstanding or doesn't really matter because they

24  haven't had to -- these scenarios haven't occurred before at

25  Fort Huachuca?

DIRECT EXAMINATION OF MICHAEL VICORY

1    A.   My response is that's simply inaccurate because, again,

2    we're talking about -- they're talking here about what's

3    happened.  Our solicitation is about what the Government's

4    projected future requirement is, and we expressly stated that

5    they needed to complete -- they needed to submit a completed

6    pricing -- excuse me -- a completed staffing matrix and they

7    did not.

8              THE COURT:  And Ms. Letzkus, I think I'm going to

9    stop you now, just to give everyone a chance to get out by

10   5:30.

11             Can the parties be back at 1:45 tomorrow?

12             MR. LALCHANDANI:  Yes, Your Honor.

13             MS. LETZKUS:  Yes, Your Honor.

14             THE COURT:  Okay.  All right.  You too.

15             THE WITNESS:  Will do.

16             THE COURT:  All right.  We'll see you at 1:45.

17             THE WITNESS:  Thank you.

18             MS. LETZKUS:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             And the same admonition that we talked about

21   earlier, don't discuss the case with anyone.  All right?

22             THE WITNESS:  Yes, ma'am.

23             THE COURT:  Okay.  Thank you.

24             (Proceedings concluded in this matter at 5:24 p.m.)

25

1                         C E R T I F I C A T E

2

3          I, Erica R. McQuillen, do hereby certify that the

4   preceding pages of typewritten matter are a true, correct, and

5   complete transcription of the digital recording of proceedings

6   in the above-entitled matter.

7              Dated this 24th day of August, 2023.

8

9                          s/Erica R. McQuillen
                     Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25