1            IN THE UNITED STATES DISTRICT COURT

2                     DISTRICT OF ARIZONA

3

4   Arizona Department of Economic          4:23-CV-00250-LCK
    Security, an Arizona State agency,

5
         Plaintiff,                              August 16, 2023
6                                                    2:15 p.m.
                                                 Tucson, Arizona
7   vs.

8   Christine Wormuth, Secretary of the
    Army, in her official capacity,

9

10       Defendant.
    _____

11

12

13

14

15           OFFICIAL TRANSCRIPT OF PROCEEDINGS

16            EVIDENTIARY HEARING (DAY TWO)

17       BEFORE THE HONORABLE LYNNETTE C. KIMMINS
              UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23           PROCEEDINGS WERE DIGITALLY RECORDED

24       TRANSCRIBED BY:  ERICA R. McQUILLEN
              405 West Congress, Suite 1500
25                Tucson, Arizona 85701
                    (520) 205-4267

1                      A P P E A R A N C E S

2    For the Plaintiff:

3          Andrew D. Freeman
           Neel K. Lalchandani
4          Brown Goldstein & Levy LLP
           120 East Baltimore Street
5          Suite 2500
           Baltimore, Maryland 21202

6

7    For the Defendant:

8          J. Cole Hernandez
           Sarah Suzanne Letzkus
9          United States Attorney's Office
           405 West Congress Street
10         Tucson, Arizona 85701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

```
 1                          EXAMINATION INDEX

 2

 3   MICHAEL VICORY
             DIRECT BY MS. LETZKUS . . . . . . . . . . . . . . .  5
 4           CROSS BY MR. FREEMAN   . . . . . . . . . . . . . . 18
             REDIRECT BY MS. LETZKUS . . . . . . . . . . . . . 63
 5           EXAM BY THE COURT  . . . . . . . . . . . . . . . . 67
             FURTHER CROSS BY MR. FREEMAN . . . . . . . . . . . 73
 6

 7   WADE FROEHLICH
             DIRECT BY MS. LETZKUS . . . . . . . . . . . . . . 79
 8           CROSS BY MR. LALCHANDANI . . . . . . . . . . . . . 99

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                        P R O C E E D I N G S

1          THE CLERK:  Calling Civil Matter 23-250, Arizona

2   Department of Economic Security vs. Christine Wormuth, on for

3   a motion hearing, day two.

4          Would counsel please state your appearances for the

5   record.

6          MR. FREEMAN:  Good afternoon, Your Honor.  Andrew

7   Freeman for the plaintiff, Arizona Department of Economic

8   Security, with my co-counsel Neel Lalchandani and our client

9   Ms. Mackey.

10          THE COURT:  Thank you.  Good afternoon.

11          MR. LALCHANDANI:  Good afternoon.

12          MS. LETZKUS:  Good afternoon, Your Honor.  Sarah

13   Letzkus with the United States Attorney's Office for the

14   defendant, and with me is my co-counsel, Cole Hernandez, and

15   our Army Representative Major Roan.

16          THE COURT:  Thank you.  Good afternoon.

17          And this is continuing the evidentiary hearing on

18   the motion.  We do have -- Mr. Vicory is currently on the

19   stand.

20          Ms. Letzkus, are you ready to proceed with your

21   direct?

22          MS. LETZKUS:  Yes, Your Honor.

23          THE COURT:  Okay.  Go ahead.

24           MICHAEL VICORY, WITNESS, PREVIOUSLY SWORN

1                        DIRECT EXAMINATION

2   BY MS. LETZKUS:

3   Q.   Good afternoon, Mr. Vicory.  Thank you for being here

4   today again.  I appreciate it.

5   A.   Thank you.

6   Q.   I think where we left off yesterday, we had just

7   established that you had notified ADES that they would not be

8   included in the competitive range, and they had requested a

9   debriefing, and you provided that debriefing.

10       Do you remember that?

11  A.   Yes, ma'am.

12  Q.   Did ADES respond to your debriefing letter?

13  A.   Yes, they did.

14  Q.   And what did they say?

15  A.   They submitted a follow-up letter.  I believe -- I have

16  to look.  I believe it was January 20th.

17  Q.   If you want to look at Exhibit 12.

18  A.   Exhibit 12, yes.  So sorry, on January 26, essentially

19  saying that the information we provided in the debrief was

20  incorrect and based on some misunderstandings.

21           MR. FREEMAN:  So excuse me, Ms. Letzkus.  Just so

22  the record is clear, the January 26 letter, Exhibit 12, is

23  from Mr. Vicory.  The response is March -- is the Exhibit

24  13 --

25           MS. LETZKUS:  I apologize.  It is Exhibit 13.

1              THE WITNESS:  My apologies, yes.

2              THE COURT:  Thank you, Mr. Freeman, I appreciate

3    that.

4    BY MS. LETZKUS:

5    Q.   Are you looking at the right letter then?

6    A.   I am.

7    Q.   Okay.  I apologize for that.

8         Okay.  So just to -- could you go ahead and recap what

9    you said the letter basically says?

10   A.   Yeah, so in the letter they submitted on March 6, which

11   was really a response to the debrief letter we had sent, they

12   were essentially saying that the information we provided in

13   the debrief didn't accurately reflect the facts and it was

14   based on a misunderstanding from the Army.

15   Q.   Okay.  Did you do anything, take any action in response

16   after receiving ADES's letter?

17   A.   Yes, ma'am.  After reading the letter, I decided it would

18   be smart to go ahead and reach out to some subject matter

19   experts at Army Sustainment Command, which was the requiring

20   activity that owned the food service requirement from Fort

21   Huachuca, and have them do basically a secondary review to

22   review what ADES was alleging in the letter and also review

23   what the Source Selection Evaluation Board had found.

24   Q.   Did you give the subject matter experts any documents?

25   A.   Yes, I did.  I provided them the letter from ADES, I

 1  provided them the SSEB report, and I provided them the ADES
 2  proposal.
 3  Q.   Is there anything in the solicitation that required you
 4  to go back to the subject matter experts and ask them to take
 5  a look after the SSEB had already judged the proposal
 6  unacceptable?
 7  A.   No, there's not.  When I got the letter, from my
 8  perspective, I take it seriously because there's instances
 9  where the Government makes mistakes, and so I wanted -- and I
10  didn't want to have to go through this.  First of all, if we
11  made a mistake, I wanted to put him back in the competitive
12  range, but also I just wanted to make sure that we covered
13  down and that we were clear that what the SSEB found was
14  accurate.  So I went above and beyond and reached out to them
15  to do this.
16  Q.   Okay.  If the SMEs had come back to you and said, you
17  know, no, we actually -- or if the SMEs, sorry, subject matter
18  experts, had come back to you and said, actually, we disagree
19  with the SSEB's findings and we think the proposal is
20  acceptable, would that have changed your decision here?
21  A.   Potentially what I would have done is get the whole team
22  together.  I would have the Source Selection Evaluation Board
23  come and -- come together with the subject matter experts and
24  rereview, and if they had decided as a team from a consensus
25  that a mistake was made, we would have taken corrective

 1  action, and I would have put ADES in the competitive range.

 2  Q.   So do you remember what the subject matter experts'

 3  evaluation of plaintiff's proposal was?

 4  A.   Yes.

 5  Q.   Can you go ahead and explain what the subject matter

 6  experts -- what you understand they determined?

 7  A.   So based on the letter from ADES and based on the SSEB

 8  report, the subject matter experts determined that the Source

 9  Selection Evaluation Board was correct in their evaluation

10  that the staffing for the cashiers, the food sanitation

11  specialists, and then the staffing assessment based on the

12  lack of information in the staffing matrix was accurate, and

13  therefore, they were unacceptable.

14  Q.   Okay.  If you can take a look at Exhibit 14.

15  A.   Yes, ma'am.

16  Q.   And just to speed this up, it looks like Exhibit 14 is a

17  letter from you to Ms. Mackey at ADES.  Is that right?

18  A.   Yes, ma'am.

19  Q.   So does this letter summarize what the subject matter

20  experts told you?

21  A.   Yes.  This letter reflects the findings of the subject

22  matter experts.

23  Q.   So ultimately, you concluded that plaintiff -- that ADES

24  could not be included in the competitive range; correct?

25  A.   That's correct.

 1   Q.   Was that decision based on the SSEB's initial evaluation

 2   of the proposal or the subject matter experts' second look or

 3   both?

 4   A.   Both.

 5   Q.   So after you got the subject matter experts' analysis of

 6   the proposal, what did you do?

 7   A.   I responded to Ms. Mackey with a letter essentially

 8   stating, this letter that I'm looking at right now issued on 3

 9   April, I'm providing the basis for what the subject matter

10   experts found and reasserting the Government's position that

11   we did evaluate their proposal correctly and therefore it

12   could not be included in the competitive range in accordance

13   with the solicitation.

14   Q.   Did you give ADES the opportunity to revise its proposal

15   to address the deficiencies that the SSEB and the subject

16   matter experts found with the proposal?

17   A.   No, I did not.  I cannot in accordance with the

18   solicitation nor the FAR.  If I were to do something like

19   that, I would actually be opening myself up to litigation or

20   protest, a General Accountability Office protest, from other

21   vendors that had submitted bids and also been excluded from

22   the competitive range.

23   Q.   Okay.  So do you remember we went through the five-step

24   process for evaluating proposals that was set out in the

25   solicitation?

1  A.   Yes, ma'am.

2  Q.   Okay.  Do you remember what Step -- do you remember what

3  Step 1 and Step 2 were?

4  A.   Step 1 and Step 2 essentially described how we were going

5  to establish a competitive range based on the technical

6  acceptability of the proposal.

7  Q.   Okay.  And just going ahead and taking a look at Exhibit

8  30, which is the solicitation, if you can turn to -- on the

9  page number in bold at the bottom, where it says 104.

10  A.   Yes, ma'am.

11  Q.   And do you see towards the bottom there subsection

12  3?

13  A.   Yes.  Yes, ma'am.

14  Q.   And it says, "The source selection will be conducted in

15  the following steps," and then it lays out the steps?

16  A.   Yes, ma'am.

17  Q.   Okay.  Looking at Step 2, it says, "In accordance with

18  the Army Regulation 210-25, Vending Facility Program for the

19  Blind on Federal Property, the Government shall enter into

20  discussions/negotiations with all offerors whose proposals

21  have been determined to be in the competitive range," CR,

22  "established in Step 1 above."

23       Did I read that generally accurately?

24  A.   You did, yes, ma'am.

25  Q.   So does Step 2, the solicitation, directly provide that

1  the Government would only enter into discussions with those

2  offerors who were found to be within the competitive range?

3  A.    That is correct.

4  Q.    So if you had entered into discussions with any offeror

5  after they submitted their proposal and before there was a

6  competitive range determination, would that violate the terms

7  of the solicitation?

8  A.    Yes, it would violate the terms of the solicitation and

9  the Federal Acquisition Regulation.

10 Q.    What would be some consequences for the Government if you

11 violated the terms of the solicitation and entered into

12 discussions with somebody who was not in the competitive

13 range?

14 A.    So essentially, if I do that, I'm violating the terms of

15 the solicitation and I'm not treating all of the proposals

16 fairly, and so the remedy for other proposers who felt like

17 they had been harmed, they have two remedies or multiple

18 remedies.  They could submit an agency protest, they could

19 submit a protest with the General Accountability Office, or

20 they could go straight to the Court of Federal Claims.

21       Most vendors choose to submit a protest to the General

22 Accountability Office, and based on my experience, if I had

23 violated the terms of the competitive range and how it was

24 established in a solicitation, I would have -- that protest

25 would have absolutely been sustained, and I would have been

1    forced to take corrective action.

2    Q.    Okay.  Switching gears here a little, are you aware that

3    ADES has initiated arbitration of essentially whether the

4    decision not to include them in the competitive range violated

5    the Randolph-Sheppard Act?

6    A.    Yes, they have, ma'am.

7    Q.    If you can take a look at Exhibit 17 for me.

8    A.    I'm there.

9    Q.    Okay.  Does this appear to be a complaint for Randolph-

10   Sheppard Act arbitration against the Army by ADES?

11   A.    Yes, it does.

12   Q.    Okay.  If you turn to page 3 of that exhibit, which on

13   the very top, in blue, it would say page 4 out of 10.

14   A.    I'm there.

15   Q.    Okay.  I'm just going to read from the last paragraph on

16   that page, second sentence.  It says, "The Army suggested that

17   ADES's proposal for food sanitation specialist (FSS) and

18   dining facility attendant (DFA) positions were somewhat

19   understaffed, but that ignores that, one, ADES cross-trained

20   FSSs and DFAs to perform each other's responsibilities as a

21   measure to operate more efficiently and save costs; two, ADES

22   based its staffing proposals in its experience running these

23   cafeterias; and three, the Army's evaluations of ADES's

24   performance over the years consistently found the ADES's

25   staffing to be adequate and in full compliance with the

1   requirements of the contract."

2        Did I generally get that right?

3   A.   Yes, ma'am.

4   Q.   So it looks like ADES is complaining here that it thinks

5   the Army ignored its history of past performance on its

6   contract for services at Fort Huachuca.  Is that right?

7   A.   I mean, that's what they allege, but that's not accurate.

8   Q.   Okay.

9             MR. FREEMAN:  Objection.

10            THE COURT:  The basis for the objection?

11            MR. FREEMAN:  Counsel is mischaracterizing the

12   objection.

13            THE COURT:  I'll sustain it.  I think he's

14   indicating that you've mischaracterized by your summation of

15   what ADES may have been thinking when they wrote the letter,

16   so I'll go ahead and sustain it based on that.

17            MR. FREEMAN:  Thank you, Your Honor.

18   BY MS. LETZKUS:

19   Q.   So Mr. Vicory, to get to the point, did the Army consider

20   ADES's past performance in determining whether the proposal as

21   a whole was acceptable and could be included in the

22   competitive range?

23   A.   So the answer is yes.  As we discussed yesterday, we

24   evaluated three elements.  We evaluated technical -- the

25   technical factor, the past performance factor, and the price

 1   factor.

 2        For the past performance factor, ADES was evaluated as

 3   satisfactory or acceptable.  For the technical factor, we did

 4   not evaluate the technical factor from a place of past

 5   performance.  As we also noted yesterday, the RFP specifically

 6   stated that we were not going to use our knowledge of their

 7   experience in order to make the decision.  We were going to

 8   evaluate each proposal independently.  So when you're

 9   evaluating the technical proposal, you do not look at past

10   performance to come up with a final evaluation of acceptable

11   or unacceptable.

12   Q.   Okay.  So are you pretty familiar with Randolph-Sheppard

13   Act arbitrations?

14   A.   I am.

15   Q.   And are you aware about how long it's been taking to get

16   a decision in an RSA arbitration over the past three to five

17   years?

18   A.   It's been taking two years.

19        MR. FREEMAN:  Objection.  Relevance, Your Honor.

20   Over the last three to five years, as we already discussed, in

21   the relevant period in the last year, they've been much, much

22   faster.  I object to going back five years when RSA was

23   backlogged or even two or three years during the pandemic.

24        MS. LETZKUS:  Your Honor, could I respond to that?

25        THE COURT:  Sure.  Well, let me sustain the

DIRECT EXAMINATION OF MICHAEL VICORY                    15

1    objection.  If you can lay some foundation with respect to

2    Mr. Vicory's experience with arbitrations from a period of the

3    last five years and have him explain that based on his

4    foundation of arbitrations he's been involved with.

5              MS. LETZKUS:  Okay.  Thank you, Your Honor.

6    BY MS. LETZKUS:

7    Q.   Mr. Vicory, have you been involved in RSA arbitrations

8    over the past five years?

9    A.   So I've been involved over the last two years.  That's

10   when I started working for the Army working food service

11   contracts.

12   Q.   Okay.  And are you aware, do you have some impression as

13   to how long it's been taking to get a final decision from the

14   arbitration panel in the Randolph-Sheppard Act arbitrations

15   that you're familiar with over the past two years?

16   A.   Yes.  The most recent experience I have is working the

17   Fort Moore, formerly Fort Benning, service procurement, and

18   that took -- I think we were up to three years.  So when I

19   came in, that was under litigation, and the Court, essentially

20   we came to an agreement, and they modified the order so we

21   could issue a solicitation.

22         So in a sense that still hasn't been settled.  The order

23   was modified so we could at least issue the solicitation

24   because it had been so long.

25   Q.   Okay.  By the way, do you know Mr. Weber, who's the blind

1  vendor involved here?

2  A.   I do not.

3  Q.   Have you ever spoken to him?  Have you ever met with him?

4  A.   I have not, no.

5  Q.   Do you know when the current contract under which ADES is

6  performing -- providing dining services at Fort Huachuca, do

7  you know when that's due to expire?

8  A.   At the end of September, 30 September.

9  Q.   And I understand that the proposal originally was due to

10 expire at the end of August.  Is that correct?

11 A.   Correct.  The contract was set to expire August 31st.

12 Q.   So how -- how did the -- did the Army issue a bridge

13 contract for basically a month then?

14 A.   The Army exercised an option under the existing contract

15 for an additional month.

16 Q.   Do you know why the Army issued -- exercised that option

17 and then had -- and, well -- yeah.  Do you know why the Army

18 exercised that option?

19 A.   Yes, well, it's important that we maintain continuity of

20 support during this time, and we understood that, given that

21 the hearing was established for yesterday and today, we knew

22 that the judge would need the time necessary to make the

23 decision, and so from that perspective, given that we need a

24 30-day transition anyway, we decided to go ahead and exercise

25 that option to 30 September.

1    Q.   So if the Government was precluded from issuing award on

2    this five-year contract that's at issue here until a decision

3    was reached by the arbitration panel and all of the appeals

4    were resolved, what would the consequences be for the

5    Government?

6    A.   Well, so given that, you know, usually we try to look --

7    we usually issue a contract for five years.  In rare

8    circumstances where events overcome, we'll do what we call a

9    bridge contract, and the whole point of that is to bridge

10   between the current and when we get the future contact in

11   place.

12        The issue with the bridge contract is it creates a lot of

13   uncertainty.  Just for example, we don't know when this will

14   be resolved, i.e. the arbitration, and so the bridge contract

15   may be -- we have to essentially issue a bridge contract for

16   anywhere from six months, one year.  So we try to estimate

17   what time is necessary to do the bridge contract, but during

18   that time, we are in essentially a sole source negotiation

19   with a vendor, and so that limits our leverage, it limits our

20   ability to make changes, especially if we can't come to a

21   mutually agreeable decision, and it creates uncertainty.

22        So if an employee of a company isn't sure what's going to

23   happen over the next few months, six months, they may decide

24   to leave.  We actually recently had that happen when we were

25   trying to transition Fort Lee.  We received a protest from the

 1  incumbent vendor, and during that time, performance was

 2  actually degraded because employees weren't sure what was

 3  happening, so they started essentially jumping ship.

 4          MS. LETZKUS:  Can I just take five seconds, Your

 5  Honor?

 6          THE COURT:  Sure.

 7  BY MS. LETZKUS:

 8  Q.   Mr. Vicory, what role if any did the needs of the

 9  requiring authority play in creating a solicitation?

10  A.   I mean, I consider them -- their needs are the ultimate

11  authority.  The reason we're issuing a solicitation is

12  essentially meet the stated need of the requiring activity.

13  So if I don't have a need from the requiring activity, I don't

14  have a job, essentially.

15      So when the requiring activity comes to us with their

16  performance work statement, which outlines what they need

17  done, that is ultimately what we're trying to accomplish for

18  them.

19          MS. LETZKUS:  Okay.  I have no further questions,

20  Your Honor.

21          THE COURT:  Thank you.  Cross-examination?

22          MR. FREEMAN:  Yes, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. FREEMAN:

25  Q.   Good afternoon, Mr. Vicory.

1   A.   Good afternoon, sir.

2   Q.   Mr. Vicory, under the current contract, Arizona DES and

3   its blind vendor operate all three dining facilities at Fort

4   Huachuca, correct, Weinstein, Thunderbird, and Black Tower;

5   correct?

6   A.   That is correct.

7   Q.   And sometimes they serve less than 750 meals a day at

8   Thunderbird and sometimes they serve more; correct?

9   A.   That is my understanding, yes.

10  Q.   Sometimes they serve less than 2,250 meals per day at

11  Weinstein; sometimes they serve more; correct?

12  A.   That's my understanding, yes.

13  Q.   Sometimes they serve less than 1,500 meals a day when

14  they're serving just lunch and supper at Weinstein and

15  sometimes more; correct?

16  A.   That's my understanding.

17  Q.   And each of those cutoff points corresponds to the bands

18  that the Army has included in the new solicitation, the 2022

19  solicitation; correct?

20  A.   I'm sorry.  So --

21  Q.   DES has -- in past contracts, there have been, you know,

22  band 1 and band 2.  The current contract doesn't have a band 1

23  and band 2.  The new contract goes back to having bands.  And

24  again, for Thunderbird, band 1 is below 750, and band 2 is

25  above.  For Weinstein the band is below 2,250, band 1; band 2

1    is above; correct?

2    A.    So I can't actually compare because I did not award or

3    administer the current contract, so I can only speak to what's

4    in the current solicitation.

5    Q.    Okay.

6    A.    And the current solicitation does have the bands as you

7    discussed.

8    Q.    Okay.  And you are aware, however, that DES has served

9    meals that correspond to each of those bands; correct?

10   A.    Again, I would assume, yes.

11   Q.    Okay.  And at the beginning of the pandemic, DES served a

12   hundred percent takeout for all meals using it its current

13   staffing; correct?

14   A.    That's my understanding, yes.

15   Q.    So those are the same scenarios for which the 2022

16   solicitation requests staffing and pricing; correct?

17   A.    Again, I can't -- unfortunately, I can't do a comparison

18   between what was in the previous contract and what's in the

19   current solicitation, but yes, the current solicitation has

20   bands for the different utilization numbers for the brunch,

21   Sunday lunch, and then for the 100 percent takeout.

22   Q.    All right.  So actually, I apologize if my question was a

23   little bit confusing.  I'm not asking about the previous

24   solicitation.  I'm asking about the service that DES has

25   provided over the past five years, and over the past five

1    years, DES has provided service that corresponds to each of

2    the bands in the new solicitation; correct?

3              MS. LETZKUS:  Objection, Your Honor.  Foundation.

4    He's repeatedly testified that he was not involved and only

5    can testify as to the solicitation.

6              THE COURT:  And I'll allow Mr. Vicory to answer it

7    if he can and has knowledge to answer it.  I think he -- well,

8    if you can answer it based on your knowledge and experience,

9    you can do that.

10   A.   Yes, and so just to repeat, based on my experience, I did

11   not -- so the current contract that ADES has he been operating

12   under was awarded by the Army Contracting Command Office at

13   Fort Huachuca and administered.  The new solicitation, based

14   on the Army's category management initiatives, all food

15   service is now being executed by my organization, so we issued

16   in our working the new solicitation.

17        So I can't speak to what they've been operating under,

18   under the current contract.  I can only speak to what's in the

19   new solicitation.

20   Q.   Okay.  Let me ask it a couple different ways, Mr. Vicory.

21        So you became the procuring contract officer on January

22   1st of this year; correct?

23   A.   That is correct.

24   Q.   Did you have any involvement with the Fort Huachuca

25   contract prior to January 1, 2023?

1   A.   So I had -- I had involvement with the Fort Huachuca

2   solicitation prior to January, not the current contract.

3   Q.   Okay.  With the solicitation, were you involved in the

4   evaluation of the proposals prior to 1 January?

5   A.   No, I was not.

6   Q.   What was your involvement prior to 1 January?

7   A.   So I was involved -- so as the director, I review all

8   documentation that goes through the higher-level review, so I

9   reviewed the evaluations that were conducted by the Source

10  Selection Evaluation Board, including the technical, past

11  performance, and price.  And I also evaluate -- I also

12  reviewed the competitive range documentation that came

13  through, so I was intimately aware of what happened with that

14  solicitation even before January 1st.

15  Q.   Okay.  So I know you weren't here yesterday, but

16  yesterday Mr. Weber, the blind vendor who's been there for the

17  past almost 10 years, testified that at times he and his team

18  have served the full range of meals at both low levels and

19  high levels of soldiers coming through to be fed at

20  Thunderbird and Weinstein, that they've also served 100

21  percent takeout meals at the beginning of the pandemic.

22       Do you have any basis to dispute that testimony?

23  A.   I don't have any basis to dispute that.  I just wasn't

24  involved.

25  Q.   Okay.  If the services in -- so do you have any reason to

1  dispute that the services requested in the 2022 solicitation

2  are substantially the same as the services that DES has

3  provided over the past five years?

4  A.   I can't confirm.  I do know that the current solicitation

5  was issued under what ASC or Army Sustainment Command

6  considers an enterprise PWS.  I don't believe the Fort

7  Huachuca original contract was under that enterprise PWS.

8           THE COURT:  What's a PWS?

9           THE WITNESS:  Oh, I'm sorry.  Your Honor.

10           THE COURT:  That's okay.

11           THE WITNESS:  The performance work statement.

12           THE COURT:  Okay.  Thank you.

13  BY MR. FREEMAN:

14  Q.   Are you familiar, Mr. Vicory, with the staffing levels

15  that DES proposed in response to the solicitation?

16  A.   I am familiar, yes.

17  Q.   Okay.  In any way, do they differ from the current

18  staffing that DES provides?

19  A.   So I can't speak to that because I'm not familiar with

20  the current staffing.  My office is not administering the

21  current contract.

22  Q.   Okay.  So I thought you just said that your office had

23  extended an extension of the current contract at Fort

24  Huachuca?

25  A.   No, I was speaking to the Army.  So the Army had -- the

1  current contract is being administered by the ACC office at

2  Fort Huachuca, so they are the ones that issued the extension.

3  Q.   Okay.  So the Army as a whole has been satisfied with the

4  performance of ADES under the current contract; correct?

5  A.   Based on the Contractor Performance Assessment Reports

6  that have been -- that I've seen, I have no reason to dispute

7  that.

8  Q.   Okay.  If the Army had succeeded in completing the

9  issuance of a new contract, then the use of the 2022

10  solicitation would be governing the current performance;

11  correct?

12  A.   Correct, yes.

13  Q.   But instead, actually, not because -- initially not

14  because of this matter but because a different contractor

15  protest -- filed a protest, the Army has issued several

16  extensions of the previous contract; correct?

17  A.   So yes.  The Army did exercise eight dash.  So when we

18  issue a contract, we generally issue a contract for five

19  years, and then we include a clause called the 52.217-8

20  clause.  It's a FAR clause which allows for an additional

21  six-month extension of services.

22       So based on delays in the procurement process, Fort

23  Huachuca did exercise that additional option, and so that was

24  -- that was -- that was contemplated under the current

25  contract.  What happened, though, in June, they ended up

1    having to do an additional task order on top of that to cover

2    until we could get through this process, which we were

3    expecting to do with -- we were expected to make an award by

4    end of July.

5    Q.   Well, initially, your office wrote a letter saying that

6    you were going to -- you anticipated extending the contract

7    through December; correct?

8           MS. LETZKUS:  Objection, Your Honor.  Misstates the

9    evidence.

10   BY MR. FREEMAN:

11   Q.   Was there a letter sent to DES contemplating an extension

12   through November or December?

13   A.   Is that letter in the file, sir?

14   Q.   I've seen it.  We'll keep going and we'll find it.

15          THE COURT:  Okay.  If you can direct him to a

16   specific exhibit.

17          MR. FREEMAN:  Sure.  Let's keep going and --

18          THE COURT:  Otherwise the objection is sustained at

19   this point.

20          MR. FREEMAN:  Thank you, Your Honor.

21   BY MR. FREEMAN:

22   Q.   Are you aware, Mr. Vicory, of any problems from June

23   until now with the service that DES is providing at Fort

24   Huachuca?

25   A.   I am not aware, but I am also not administering the

1    contract, so I'm not seeing the day-to-day operations.

2    Q.   So if there were an additional contract extended from now

3    until early next year, do you have any reason to believe that

4    there would be any new problems or any problems with the

5    service provided at Fort Huachuca?

6            MS. LETZKUS:  Objection, Your Honor.  Foundation.

7    He's -- and asked and answered.  He's repeatedly said that he

8    does not have knowledge about the current performance --

9            THE COURT:  And --

10           MS. LETZKUS:  -- so asking to speculate about what

11   their future performance would be when he has no knowledge

12   about what their current performance is, I don't think that's

13   appropriate.

14           THE COURT:  And I will sustain as to speculation.

15   BY MR. FREEMAN:

16   Q.   You are aware -- you've reviewed the CPARs, which are the

17   performance assessment reports; correct?

18   A.   Yes.

19   Q.   And you're aware that all the CPARs are satisfactory or

20   very good or sometimes excellent; correct?

21   A.   That is correct.

22   Q.   So as far as you know, the Army has always been satisfied

23   with the performance that DES has provided at Fort Huachuca;

24   correct?

25   A.   Based on the CPARs reports that I've seen, yes, the Army

1    has been, at Fort Huachuca, has been satisfied with the

2    service provided by ADES.

3    Q.   And can you identify, Mr. Vicory, any anticipated

4    differences in the service that the Army anticipates needing

5    at Fort Huachuca from last year to this year to next year?

6    A.   I don't know if I can speculate on that because I don't

7    set the -- I don't know the training schedules or what the

8    future looks like for Fort Huachuca.  For example, at Fort

9    Knox, we had a situation where we were looking to extend --

10   Q.   I'm not asking Fort Knox.  I'm asking about Fort

11   Huachuca.

12   A.   Okay.

13   Q.   And my question is, so you are the procuring contract

14   officer for a contract for the next five years; correct?

15   A.   I am the procuring contracting officer.  Once we award

16   the contract, we'll be transitioning the contract back to ACC

17   Fort Huachuca.  They will be the administering contracting

18   office.

19   Q.   Okay.  But you're familiar with the services that are

20   being solicited under the 2022 solicitation; correct?

21   A.   That is correct, yes.

22   Q.   And can you, being familiar with that and being familiar

23   with the past performance, can you identify any significant

24   changes from the current performance to the future -- to

25   what's being solicited under the 2022 solicitation?

1  A.   So as I was saying, it's difficult for me to speculate

2  because the reason why we have banding is because the flow

3  rate into the cafeterias depends on what exercises and what

4  units are currently at Fort Huachuca.  So it could go up or

5  down over the next six months, one year.

6          MR. FREEMAN:  Okay.  Let me -- we're going to offer

7  a new exhibit, Your Honor.  I direct counsel and the Court

8  to -- it's Document 25-1 in the record, and unfortunately,

9  Your Honor, I didn't anticipate any dispute about this.

10 BY MR. FREEMAN:

11 Q.   Who's Karen Billick, Mr. Vicory?

12          MS. LETZKUS:  Your Honor, I just want to object.

13          THE COURT:  I'm confused.  Are you talking about an

14 actual document that we all have?

15          MR. FREEMAN:  Well, so here's -- yes and no is the

16 answer, Your Honor.

17          THE COURT:  Okay.

18          MR. FREEMAN:  There is a letter dated, I will

19 represent, in the record as Exhibit 25-1, which was part of --

20          THE COURT:  Okay.  Hold on.  25-1.  Part of your

21 motion?

22          MR. FREEMAN:  Yes, Your Honor.

23          MR. LALCHANDANI:  It's not part of the paper copies.

24          MR. FREEMAN:  It's on the ECF.

25          MR. LALCHANDANI:  It was part of the motion to

1    expedite the hearing.

2           MS. LETZKUS:  Your Honor, if it's not on the exhibit

3    list, it wasn't produced.  There's no copies of it for

4    opposing counsel or for the judge.

5           THE COURT:  So it's not in --

6           MR. FREEMAN:  I'd like -- if I could, just very

7    briefly, Your Honor --

8           THE COURT:  Well, I need a copy of the document so

9    that I have a copy of it, the witness has a copy of it.  I

10   don't want you just saying what this document says without

11   anybody being able to look at it.

12          So you said on the docket it's -- what is the

13   document number?

14          MR. FREEMAN:  25-1.

15          THE COURT:  Okay.  Hold on.

16          Can you find that, Cindy, and can you make about

17   five copies of it?

18          MR. FREEMAN:  Thank you.  We'll come back to it.

19          THE COURT:  And I want everyone to look at it before

20   you start asking any questions.  I want Ms. Letzkus to have an

21   opportunity to look at it to see if it's even relevant to

22   where we're at right now with respect to the preliminary

23   injunction, and then, Ms. Letzkus, I'll give you an

24   opportunity to talk once we all have a copy of this document.

25          MR. FREEMAN:  So Your Honor, if I could just confer

1   with Ms. Letzkus for a moment.

2            THE COURT:  Sure.

3            (A discussion was had off the record between

4            counsel.)

5            MR. FREEMAN:  Your Honor, in the interest of time,

6   we'll move on.

7            THE COURT:  Okay.  We'll give everyone a copy of it

8   so they have it in case you want to go back to it.

9            MR. FREEMAN:  Thank you.  I appreciate it, Your

10  Honor.

11           THE COURT:  Okay.  Yeah, go ahead and give them.

12           Okay.  Go ahead, Mr. Freeman.

13           MR. FREEMAN:  Thank you, Your Honor.  Thank you.

14           THE COURT:  And whenever you're ready.

15           MR. FREEMAN:  Thank you, Your Honor.  I'm just

16  trying to shorten this a little bit.

17           THE COURT:  Okay.

18  BY MR. FREEMAN:

19  Q.   Mr. Vicory, yesterday Mr. Weber testified that the

20  staffing levels in DES's proposal are comparable to its

21  staffing levels, its current staffing levels, DES's current

22  staffing levels.  Do you have any reason to disagree with

23  that?

24  A.   I mean, I don't have a reason to disagree with it, but I

25  can't confirm or deny.

 1            MR. FREEMAN:  Your Honor, if I might approach with

 2    tentative Exhibit 22, which I have previously shown the

 3    Government's counsel, and they've agreed to stipulate to the

 4    authenticity and admissibility.

 5            THE COURT:  Is that the letter that we were talking

 6    about?

 7            MR. FREEMAN:  No, it's a new exhibit, Your Honor.

 8            THE COURT:  Okay.  So --

 9            MR. FREEMAN:  22 is the staffing levels for the

10    Weinstein --

11            THE CLERK:  Can you get in front of a microphone?

12            MR. FREEMAN:  I'm sorry.  Plaintiff's Exhibit 22,

13    Your Honor, is the staffing levels that DES submitted for the

14    Weinstein Dining Facility as part of its submission.

15            THE COURT:  Okay.  Go ahead, if you want to show

16    Mr. Vicory that.

17            MR. FREEMAN:  If I hand out one copy for the Court,

18    and I also have one --

19            THE COURT:  Sure.  That would be great.

20    BY MR. FREEMAN:

21    Q.   Actually, before we go through this document, Mr. Vicory,

22    I do want to be sure that I know what we're fighting over.

23    There are three -- there were three letters back and

24    forth: your debriefing letter of January 26, which is

25    Plaintiff's Exhibit 12; Ms. Mackey's request for

 1  reconsideration on March 6th, which is Exhibit 13; and your

 2  response to Ms. Mackey's request for reconsideration, which is

 3  Exhibit 14.

 4       And would you agree, Mr. Vicory, that the alleged

 5  deficiencies that your subject matter expert came back with

 6  that are summarized in your letter of April 3rd are slightly

 7  different than the deficiencies, different -- overlapping but

 8  not a hundred percent the same as the deficiencies in the

 9  original debriefing letter?

10       MS. LETZKUS:  Your Honor, I object to the question.

11  It's vague and speculative, and I couldn't even understand it.

12       THE COURT:  Overruled, if he can answer it.  I mean,

13  I understood it to mean, are there any, and correct me if I'm

14  wrong, are there any overlapping discrepancies found by the

15  SSEB and the SMEs or either -- or additional information from

16  the SMEs that wasn't in the original.

17       Is that correct?

18       MR. FREEMAN:  Let me rephrase it.

19       THE COURT:  All right.

20  BY MR. FREEMAN:

21  Q.  Basically, so, for example, Mr. Vicory, the debriefing

22  letter addresses alleged deficiencies at the Weinstein DFAC

23  for the number of cashiers for three meals a day in band 1 and

24  for three meals a day in band 2 and for two meals a day band 1

25  only and then for a hundred percents takeout; correct?

 1   A.    I believe so, yes.

 2   Q.    Page 7 of your debriefing letter.  Exhibit --

 3             THE COURT:  Exhibit 12?

 4             MR. FREEMAN:  Exhibit 12, yes, Your Honor.  It says

 5   page 7 at the top.  It's also page 8 of 12 and carries on to

 6   the next page.

 7   A.    Yes, sir.

 8   Q.    So your letter of April 3rd says that hours are ample for

 9   managing the headcount and admin functions for the total hours

10   of the day as it relates to the Weinstein DFAC; correct?

11   A.    Let me look at that letter, please.

12   Q.    Sure.  It's at the bottom of the first page of Exhibit

13   14.

14   A.    Yes, I see where it says that.

15   Q.    So would you agree -- or actually, again, I'm just trying

16   to understand the Army's position now, because the Army's

17   current position is that the hours are ample for managing the

18   headcount and admin functions for the total hours of the day

19   at the Weinstein Dining Facility.

20   A.    So I think the Army's position is that ADES was

21   understaffed for the cashiers.  The letter that I sent on

22   April 3rd provided clarification.

23   Q.    Okay.  Let me be sure that I understand the

24   clarification.  So at this point, sitting here today, the Army

25   is alleging that there were not sufficient cashiers at the

 1    Weinstein DFAC for accountability at dinner, so that's getting

 2    the cash fund out and in securely; is that correct?

 3    A.    I'm sorry, sir.  Could you repeat the question?

 4    Q.    Sure.  I'm just trying to understand your letter of April

 5    3rd.  At the very bottom of the first page, it says, "The

 6    hours are ample for managing the headcount and admin functions

 7    for the total hours for the day.  It would not work for

 8    accountability at dinner without rearranging hours and

 9    providing an explanation."

10         Did I read that correctly?

11    A.    You did.

12    Q.    Okay.  And the sentence before that states, as it relates

13    to the Weinstein DFAC, the SMEs note that during breakfast and

14    lunch, the ADES proposal was not clear enough for the

15    evaluators to see how the change fund would be managed with

16    controls for cash; correct?

17    A.    Correct.

18    Q.    So do I understand correctly that, with the clarification

19    of your April 3rd letter, the Army's complaint about the

20    staffing of cashiers at the Weinstein DFAC is simply that they

21    would -- there are not -- it's not properly staffed for

22    accountability at dinner?

23    A.    I believe that is correct.

24         MR. FREEMAN:  The Court's indulgence.

25    BY MR. FREEMAN:

1  Q.   What is it the Army's alleging that is inadequate in

2  DES's proposal with respect to cashiers at dinner at the

3  Weinstein DFAC?

4  A.   So to my understanding, at dinner, you require more

5  personnel because it gets busier during the dinnertime.

6  Q.   Compared to what, Mr. Vicory?

7  A.   Compared to the breakfast and lunch.

8  Q.   If I suggested to you that lunch is the busiest meal at

9  Fort Huachuca, would you have reason to disagree with that?

10         MS. LETZKUS:  Objection, Your Honor.  He's

11  testifying.  Facts not in evidence.

12         THE COURT:  Do you have anything to show that lunch

13  is busier than dinner --

14         MR. FREEMAN:  I believe --

15         THE COURT:  -- that you can point Mr. Vicory to?

16         MR. FREEMAN:  So, yes.  Yesterday in his

17  testimony --

18         THE COURT:  Whose testimony?

19         MR. FREEMAN:  Mr. --

20         THE COURT:  Well, you didn't allow him to be here.

21         MR. FREEMAN:  No, I'm going to represent to him --

22         THE COURT:  Okay.

23         MR. FREEMAN:  -- that in his testimony yesterday,

24  the blind vendor testified that lunch was the busiest meal

25  throughout the week at Fort Huachuca, do you have any reason

1  to disagree with that?

2          MS. LETZKUS:  Your Honor, we object.  It calls for

3  speculation.  He has repeatedly -- and there's no foundation.

4  He's repeatedly testified that he is not aware of the current

5  operations at the dining facilities at Fort Huachuca.

6          THE COURT:  Sustained.

7          MR. FREEMAN:  Okay.

8          THE COURT:  I don't think he has the information.

9  He's indicated to you that he's basing it on the CPARs and the

10 other information that he has, so --

11         MR. FREEMAN:  Okay.

12 BY MR. FREEMAN:

13 Q.  So is that correct, Mr. Vicory, that you have no

14 knowledge with respect to which meals are busier than others?

15 A.  Yeah, I am not a technical subject matter expert, so I do

16 not have knowledge of what -- and like I stated, I'm not

17 administering the current contract, so I don't have any

18 knowledge of what's currently happening at Fort Huachuca.

19 Q.  So I'm sorry.  Could you explain to us one more time,

20 Mr. Vicory, what the Army's alleging with respect to

21 deficiencies with respect to cashiers at Fort Huachuca?

22         MS. LETZKUS:  Objection, Your Honor.  Asked and

23 answered.

24         THE COURT:  I'll allow it.  Overruled.

25 A.  So, sir, as it relates to the letter, it says that,

1  during breakfast and lunch, the ADES proposal is not clear

2  enough for evaluators to see how the change out would be

3  managed with controls for cash, and then it says it would not

4  -- so while the hours are ample for managing the headcount and

5  admin functions -- I believe that's different than the cash --

6  than the cash fund piece -- for the total hours of day, it

7  would not work for accountability at dinner.

8        So I see an issue for the breakfast and lunch and then

9  with the dinner.  I think what they're saying is you can get

10 the admin functions and the headcount functions done, but you

11 can't do that with the cashier, so the cashier is left

12 basically with no separation of function changing out the cash

13 fund to himself or herself, and I believe that is the root of

14 the issue of why you were determined unacceptable.

15 Q.   Was there any other current alleged deficiency with

16 respect to the DES proposal regarding cashiers?

17 A.   I mean, I'd have to defer to the subject matter expert,

18 but based on the -- when I review the information I provided,

19 this is where the meat of it is.

20 Q.   Okay.  Are you aware, Mr. Vicory, that the Army allows

21 the cash fund to be signed in and out by cashiers, by

22 administrators, by managers, by FSSs?

23 A.   I am not aware.  I'm not a food service specialist, and I

24 don't -- I've never viewed that at Fort Huachuca since I've

25 never been there, sir.

 1  Q.   You're aware that, in the solicitation, the Army actually

 2  encourages cross-training of different positions so that they

 3  can fill in or assist one another; correct?

 4  A.   In the solicitation, we wanted them just to make sure

 5  that they describe how they're going to cross-functionally use

 6  personnel.

 7  Q.   But you also -- the Army affirmatively encourages cross-

 8  training to promote efficiencies; correct?

 9  A.   I don't think we said it in the solicitation that we

10  affirmatively encourage, but we do, under the evaluation

11  criteria section, say that, if you are going to, you need to

12  explain it to us so we can understand what you're doing.

13  Q.   If I could direct your attention, Mr. Vicory, to the

14  Army's Exhibit 30, the solicitation, page 106.

15  A.   Yes, sir.

16  Q.   The paragraph that begins subfactor 2, going down to the

17  last sentence, which begins at the third from the last line.

18  "The offerer's staffing shall clearly demonstrate that they

19  can accommodate fluctuating workloads," I'm skipping forward a

20  couple words, "and allow for cross-training and

21  cross-utilizing of personnel to perform the requirements of

22  the PWS;" correct?

23  A.   Correct.

24  Q.   So the Army wants cross-training so that personnel can be

25  cross-utilized to perform the requirements of the performance

1  work statement; correct?

2  A.   So to repeat what I said, this is actually how we were

3  going to evaluate, so it's not that we're encouraging it.

4  We're saying, if you're going to offer cross-utilization, you

5  need to explain it to us so we can understand that you can do

6  it adequately and meet the minimum requirements of the

7  solicitation.

8  Q.   Do you have any reason to believe that the -- so we saw

9  yesterday, Mr. Vicory, I know you weren't here, that at each

10  of the locations, one person signs for the cash fund to go out

11  and a different person signs for it to come back at each of

12  the three meals, breakfast, lunch, and dinner.

13       Do you have any reason to doubt that?

14       MS. LETZKUS:  Objection, Your Honor.  Again, he's

15  asking the witness to speculate.  He was not here and did not

16  hear any of that testimony.

17       THE COURT:  Sustained.

18  BY MR. FREEMAN:

19  Q.   If the -- if an office clerk signed for the cash to go

20  out and a shift leader signed for it to come back, would that

21  meet the Army's concerns with respect to safeguarding the cash

22  fund?

23  A.   So I can repeat and understand what the technical subject

24  matter expert stated.  I think you're asking me to be a

25  technical subject matter expert, which I cannot do.  I

1    apologize.

2    Q.   Mr. Vicory, did the -- did the Army's evaluation of

3    ADES's proposal account for ADES's cross-training of its

4    employees?

5    A.   Yes, it did.

6    Q.   And are you aware that ADES's proposal said that it would

7    cross-train its FSSs as admins?

8    A.   From my understanding, having talked to the technical

9    subject matter experts when they did the reevaluation, is that

10   ADES did not properly describe how they were going to cross-

11   utilize so that they could understand how you'd be able to do

12   it and meet the minimal technical requirements.

13   Q.   And so your concern is that -- in what way did they fail

14   to properly describe the cross-utilization?

15   A.   Again, I cannot speculate on how they came across it.  I

16   can just tell you that, when I did my review for accuracy and

17   completeness, that I discussed this with them, and they told

18   me that ADES did not adequately explain how they're going to

19   cross-train and cross-utilize to support the minimum technical

20   requirements.

21   Q.   Okay.  If I could direct your attention, Mr. Vicory, to

22   Plaintiff's Exhibit 9.

23   A.   Yes, sir, I'm here.

24   Q.   Next to last page.  At the bottom it says page 8.  Last

25   paragraph, second sentence.  "We have FSS personnel," that's

1    food service sanitation -- food sanitation specialists, "that

2    are cross-trained to be admin;" correct?

3    A.   Yes, I see that, where it says that, yes.

4    Q.   And if you go up above, there is a grid that describes

5    what each task does, so the FSS's ordinary -- their top

6    priority is described as serving and stocking the lines, and

7    the admin and cashiers' top priority is described as recording

8    headcount; right?

9    A.   I do see that, yes.

10   Q.   So this technical proposal informed the Army that the

11   food sanitation specialists would be cross-trained to be

12   admins, i.e. to record the headcount and perform the other

13   functions of admins; correct?

14   A.   I thought the question was regarding the cashiers and the

15   change fund.

16   Q.   Well, the -- if you look at what the -- what this

17   proposal describes, it says that the admin/cashiers record

18   headcount; correct?

19   A.   Yes, but it doesn't discuss the change fund.

20   Q.   Well, the change fund is part of -- that's -- the

21   recording the headcount is the top priority; correct?

22   A.   I guess what I would say is that requires the technical

23   subject matter experts to assume things, which we are not

24   allowed to do per the solicitation requirements.

25   Q.   Did all the proposals -- Mr. Vicory, did all the

1  proposals that were found technically acceptable explicitly

2  mention the change fund?

3  A.   I can't speak to that because I didn't review those

4  proposals in depth.  I reviewed this proposal in depth because

5  of the request submitted by ADES in March of 2023.

6  Q.   How much is the change fund, Mr. Vicory?

7  A.   Sir, I'm not an expert on the change fund.

8  Q.   Have you ever been to Fort Huachuca, Mr. Vicory?

9  A.   I have not, no.

10  Q.   Did your initial debriefing letter, Mr. Vicory, Exhibit

11  12, anywhere mention the change fund?

12  A.   It did not.  Oh, actually, hold on.  I'm sorry.  Let me

13  look and confirm.

14       No, it stated that too few cashiers would not satisfy the

15  PWS requirements and would cause too much risk of performance

16  issues negatively impacting the flow rate and cause patrons to

17  wait excessively at the headcount stations.

18  Q.   Does that mention --

19            THE COURT:  What page are you on?

20            THE WITNESS:  I'm sorry.

21            THE COURT:  That's okay.

22            THE WITNESS:  That was on page 8 of 12, at the

23  bottom.

24            THE COURT:  Thank you.

25            THE WITNESS:  No problem.  For building 85202, Your

1  Honor.

2  BY MR. FREEMAN:

3  Q.   85202 is Weinstein, correct, Mr. Vicory?

4  A.   I believe so, yes, sir.

5  Q.   And that allegation is that too few cashiers would

6  negatively impact the flow rate and cause patrons to wait

7  excessively but does not mention the cash fund, correct, or

8  the change fund?

9  A.   It does not specifically say the change fund here, no.

10  Q.   Okay.  So the first time that the change fund or the cash

11  fund was raised as an issue was by your subject matter expert

12  on the second go round of evaluation; correct?

13  A.   That's correct, yes.

14  Q.   And the debriefing letter set out all the reasons that

15  ADES's proposal was excluded from the competitive range;

16  correct?

17  A.   Yes, it did.

18  Q.   Okay.  Let me turn, Mr. Vicory, to page 2 of your letter

19  of April 3rd, Document 14.

20  A.   Yes, sir.

21  Q.   In the second paragraph, you respond to Ms. Mackey's

22  assertion that small differences between ADES's staffing and

23  the Army's estimates regarding food sanitation specialists is

24  not a sufficient basis to exclude ADES's proposal altogether;

25  correct?

 1   A.   Yes, that's what Ms. Mackey stated in her letter, yes.

 2   Q.   And Ms. Mackey also had explained and pointed to the fact

 3   that the proposal states, quote, "Currently DFAs and FSSs are

 4   cross-utilized to help each other with cleaning and serving

 5   tasks," and we also just read that they're also -- the FSSs

 6   are -- well, actually, let me just stop there.  That's

 7   correct; right?  That's the quote?

 8   A.   Yes, yes, sir.

 9   Q.   And what you wrote in your letter of April 3 was that the

10   SMEs affirmed the SSEB's conclusion that ADES was understaffed

11   in band 2 for the Weinstein Dining Facility; correct?

12   A.   Yes.

13   Q.   So now I would like to direct your attention, Mr. Vicory,

14   to Exhibit 22, which I passed up to you a little while ago.

15        You have that?

16   A.   Yes, sir.

17   Q.   And I'm sorry.  I stopped.  I guess I should have read

18   one more sentence.  It says, "In your letter, breakfast and

19   dinner as proposed were understaffed for the tasks required;"

20   correct?

21   A.   Yes, that's correct.

22   Q.   And the very first grid at the top of the first page of

23   Exhibit 22 is three meals per day, breakfast, lunch, and

24   dinner, one to 2,250 meals; correct?

25                THE COURT:  Can I ask a question?

1          MR. FREEMAN:  Yes.

2          THE COURT:  Is Exhibit 22, is that part of the

3    proposal that ADES provided?

4          MR. FREEMAN:  Yes.  Yes, Your Honor.

5          THE COURT:  This is a page in the proposal that was

6    provided by ADES?

7          MR. FREEMAN:  It is, Your Honor.

8          THE COURT:  Okay.

9          MR. FREEMAN:  Right.  So this is the staffing

10   proposal for the Weinstein Dining Facility.  We printed it.  I

11   apologize that it came out front and back.  That was the

12   limitation of where we were today.  But this was a spreadsheet

13   in the proposal.  But yes, this is a reproduction that the

14   parties have stipulated is an accurate reproduction of the

15   proposal.

16         THE COURT:  Okay.  Thank you.

17         MR. FREEMAN:  And actually, the -- right.  So the --

18   again, so that the Court is clear, yesterday the Army

19   introduced the staffing proposal for Thunderbird --

20         THE COURT:  Right.

21         MR. FREEMAN:  -- I think as Exhibit 32, if I'm

22   remembering correctly, with the sort of tiny type --

23         THE COURT:  Yes.

24         MR. FREEMAN:  -- and so we, instead of trying to put

25   it on one page, we put it on two, so it's still tiny, but not

1  quite as tiny.

2           THE COURT:  Okay.  Thank you.

3  BY MR. FREEMAN:

4  Q.   And Mr. Vicory, actually, I'm just -- I apologize for

5  jumping around just a little bit, but going back to Exhibit

6  12, the original debriefing letter, at the bottom of page 7,

7  the only criticism with respect to the staffing of food

8  sanitation specialists and DFAs in the debriefing letter was

9  for band 2?  2,251 meals to 4,500 meals; correct?  That's at

10  the bottom of page 7?

11  A.   That is correct.

12  Q.   So the Army did not offer any criticism of the proposed

13  staffing for three meals a day for the -- for band 1, one

14  through 2,250 meals; correct?

15  A.   That appears correct, yes.

16  Q.   Okay.  So then let me direct you to, essentially the

17  second grid on page 1 of Exhibit 22 is three meals a day,

18  breakfast, lunch, and dinner, 2,251 to 4,500 meals.  That's

19  DES's proposal for staffing the Weinstein Dining Facility for

20  band 2 for those three meals a day; correct?

21  A.   I'm sorry, sir.  Can you repeat the question?

22  Q.   Yes, sir.  If you look, if I could direct your

23  attention -- so this is Exhibit 22 that you have in your hand.

24  The first band across the top, the first set of grids with a

25  green heading is three meals a day for band 1, one to 2,250?

1   A.   Yes.

2   Q.   And then if one goes down to the second, the middle band

3   on the first page, it says, what's highlighted in green, three

4   meals per day, breakfast, lunch, and dinner, 2,251 to 4,500

5   meals; correct?

6   A.   Following, yeah.

7   Q.   So that's the only band for -- that's the only aspect of

8   the three meals a day proposal for which the Army claimed that

9   DES's proposal was insufficient with respect to the FSSs and

10  DFAs, correct, with respect to three meals a day?

11  A.   Oh, yes, that is correct.

12  Q.   And if one looks at the proposal -- so the letter, the 3

13  April letter, says that breakfast and dinner as proposed were

14  understaffed for the task required; correct?  That was Exhibit

15  14, the paragraph we were just looking at?

16  A.   So that's -- we're talking about Weinstein breakfast and

17  dinner as proposed were understaffed for the task required.

18  Q.   When you put the FSSs and DFAs together, that's what your

19  subject matter expert informs you; correct?

20  A.   (No audible response.)

21  Q.   So looking at breakfast and dinner on Exhibit 22 for band

22  2, there are at breakfast six FSSs and eight DFAs for a total

23  of 14 FSSs and DFAs combined; correct?

24  A.   And what time was that?

25  Q.   For breakfast, six o'clock, 6:30, 7:00.  Actually,

1  beginning at 5:30.

2  A.   So the food -- so the food sanitation specialists and the

3  DFAs, it is, yes, 14.  That was correct.

4  Q.   And do you have any basis to allege that 14 FSSs and DFAs

5  combined would be inadequate to perform the duties of those

6  two positions at breakfast when serving three meals a day at

7  lunchtime?

8        MS. LETZKUS:  We object again, Your Honor.  We've

9  been over this.  He doesn't have any knowledge about the

10  current operations at Fort Huachuca and --

11       MR. FREEMAN:  I'm not asking --

12       MS. LETZKUS:  -- he's not an expert in the -- he's

13  not a subject matter expert.  And also, Your Honor, I would

14  just ask for relevance here because -- to move this along.

15       THE COURT:  I am failing to see the relevance to

16  this, Mr. Freeman.

17       MR. FREEMAN:  So Your Honor, we have now that

18  cashiers Mr. Vicory has said is no longer an issue, only

19  whether the cash fund is properly signed in and out.  The only

20  other criticism with respect --

21       THE COURT:  And I think that misstates --

22       MS. LETZKUS:  Yes.

23       THE COURT:  -- some of the testimony, Mr. Freeman.

24       We're going to take a break.  I have a criminal

25  matter that I need to deal with before four o'clock.  I now

 1  have two criminal matters that I have to deal with before four

 2  o'clock.  So we're going to take probably about a 20-minute

 3  break.

 4          And again, I'm going to ask all the parties to take

 5  into consideration the time constraints and the -- even though

 6  the contract is extended until September, there's still time

 7  constraints with respect to what the Court needs to deal with,

 8  so the more concise everything can be the better.  We still

 9  have one more witness.

10          Who is Mr. Froehlich, Ms. Letzkus?  How does he

11  relate to the case?

12          MS. LETZKUS:  Mr. Froehlich is one of the subject

13  matter experts who reevaluated the proposal.

14          THE COURT:  So with that, Mr. Freeman, some of these

15  questions may be better directed to Mr. Froehlich than to

16  Mr. Vicory.  Just kind of think that through, and then we'll

17  come back at 10 to 4:00.

18          MR. FREEMAN:  Thank you, Your Honor.

19          THE WITNESS:  Thank you.

20          MR. HERNANDEZ:  Your Honor, do you want us to clear

21  our tables?

22          THE COURT:  No, no.  I can do it in chambers on the

23  criminal matter, so you guys are good.

24          Thank you.

25          MR. HERNANDEZ:  Okay.  Thank you.

1            (Off the record from 3:28 p.m. to 3:55 p.m.)

2            THE COURT:  Mr. Freeman, whenever you're ready, you

3    can continue.

4            MR. FREEMAN:  Thank you, Your Honor.

5    BY MR. FREEMAN:

6    Q.   Briefly, Mr. Vicory, I want to be sure that I understood

7    your previous testimony.  I want to very briefly summarize my

8    understanding.

9            So the debriefing letter, Exhibit 12, set out all the

10   grounds for the Army's disqualification of DES's proposal from

11   the competitive range; correct?

12   A.   That is correct.

13   Q.   And the debriefing letter does not mention the cash fund;

14   correct?

15   A.   The debriefing letter does not mention -- does not

16   mention the cash fund, no.

17   Q.   And the subject matter experts' evaluation determined

18   that DES's proposal included, quote, ample staffing for

19   managing the headcount and administrative functions; correct?

20   A.   It mentioned that, but I think there's context to that.

21   Q.   And the -- you don't have any personal knowledge with

22   respect to how many more of any particular position the Army

23   believes would be required to meet its requirements; correct?

24           MS. LETZKUS:  Your Honor, asked and answered

25   multiple times.

1          THE COURT:  Overruled.  He can answer it.

2          THE WITNESS:  I'm sorry.  Can you repeat the

3    question, sir?

4    BY MR. FREEMAN:

5    Q.   You do not have any knowledge yourself of how many more

6    of any particular position the Army believes would be required

7    to meet its requirements?

8    A.   Correct.  I am not a technical subject matter expert.

9    Q.   Okay.  Let me turn to something I think -- you did say

10   yesterday, Mr. Vicory, that you're familiar with the Randolph-

11   Sheppard Act; correct?

12   A.   That is correct.

13   Q.   And are you familiar with the handbook that the

14   Department of Education published to provide guidance to

15   federal property managers with respect to the Randolph-

16   Sheppard Act?

17   A.   I am familiar.  I've been made aware of it actually quite

18   recently.  I have tried to find it in the past, and it was not

19   readily available, but I have seen the handbook.

20   Q.   And you're aware that the Department of Education is the

21   agency charged by Congress with promulgating regulations with

22   respect to the operation of federal cafeterias, correct,

23   including dining facilities?

24   A.   That is correct.

25   Q.   So you follow the Department of Education's guidance in

1   its handbook?

2   A.   So like I had stated, I was not aware of the handbook

3   until actually recently because the handbook was not readily

4   available.  I had looked for it but I believe the handbook has

5   expired.

6   Q.   Are you aware that the Department of Education has stated

7   that chapter 7 regarding cafeterias should still be used to

8   provide guidance?

9               MS. LETZKUS:  Objection, Your Honor.  Foundation.

10              MR. FREEMAN:  I asked him if he's aware of that.

11              THE COURT:  Overruled.  He can answer.

12  A.   Can you repeat the question?

13  Q.   Are you aware, Mr. Vicory, that the Department of

14  Education in the past couple of years has in writing stated

15  that chapter 7 of that handbook with regard to cafeterias

16  should still be used for guidance?

17  A.   I am not aware of that.

18  Q.   Okay.  So there's an exhibit, if I could ask you,

19  Mr. Vicory, to turn to Plaintiff's Exhibit 19.

20  A.   I'm there, sir.

21  Q.   At the bottom of -- this is a letter on Department of --

22  U.S. Department of Education stationary from the Acting

23  Commissioner of the Rehabilitation Services Administration,

24  Ms. Dobak, and at the last sentence of the second paragraph,

25  "The department recognizes that, while portions of the

 1  handbook are outdated, other sections, including chapter 7, do

 2  provide valuable guidance to our stakeholders and may continue

 3  to be consulted."

 4        Were you aware of that?

 5              THE COURT:  Is this a letter that was sent to

 6  Mr. Vicory?

 7              MR. FREEMAN:  It's not.  It's a letter that's been

 8  used in previous arbitrations that he said he'd been involved

 9  in.

10              THE COURT:  Okay.

11  A.   So what I read is that they are calling it valuable

12  guidance that may continue to be consulted.

13  Q.   Okay.

14              MS. LETZKUS:  Your Honor, I would just like to

15  object because there's no foundation, nothing to establish

16  that this letter here from Ms. Dobak was ever -- ever came up

17  in any arbitration that Mr. Vicory was involved in.

18  BY MR. FREEMAN:

19  Q.   Have you been involved, Mr. Vicory, in the Army's

20  arbitrations over the past two years?

21  A.   Yes.  I've been involved in the one with Benning and to

22  some extent the one with Lee.

23  Q.   How about Fort Sill?

24  A.   I was not involved in Fort Sill.

25  Q.   Okay.  So you said you've recently become aware of

```
 1   Exhibit 18, the Randolph-Sheppard handbook from the Department

 2   of Education; correct?

 3   A.   That is correct.

 4   Q.   Okay.  And does the -- you and the Army, in implementing

 5   -- in administering cafeteria solicitations, follow the

 6   guidance of the Department of Education in this handbook,

 7   specifically chapter 7 of this handbook, which is titled, "The

 8   Operation of Cafeterias?"

 9   A.   So we follow the guidance as delineated in the U.S. Code

10   and the CFR, or statute, the statute and the CFR.

11   Q.   The statute being the Randolph-Sheppard Act?

12   A.   That's correct.

13   Q.   And the Randolph-Sheppard regulations?

14   A.   That's correct, the CFR, yes.

15   Q.   And you understand that the Department of Education

16   issued the Randolph-Sheppard regulations and is charged by

17   Congress with interpreting it; correct?

18   A.   That is correct.

19   Q.   And so you understand that this handbook represents the

20   Department of Education's interpretation of its own

21   regulations; correct?

22            MS. LETZKUS:  Objection, Your Honor.

23            THE COURT:  Sustained.  He doesn't have the --

24            MR. FREEMAN:  Okay.

25            THE COURT:  -- foundation nor the experience or
```

1   knowledge to answer that.

2   BY MR. FREEMAN:

3   Q.   Mr. Vicory, just as a hypothetical, if the Army had

4   placed DES's proposal in the competitive range, then in Step

5   2, it could have asked for clarifications or modifications,

6   correct, in Step 2 of your evaluation?

7   A.   That is correct.  If ADES was in the competitive range,

8   we would have entered discussions with them.

9   Q.   Okay.  And in those discussions, you would have allowed

10  DES to provide the staffing levels that underlay the pricing

11  for those two scenarios at Thunderbird; correct?

12          MS. LETZKUS:  Objection, Your Honor.  It's vague.  I

13  don't know -- he has two scenarios at Thunderbird.

14          MR. FREEMAN:  I'll lay some foundation, Your Honor.

15          THE COURT:  Yeah, please repeat the question.

16          MR. FREEMAN:  Thank you.  Actually -- sure.  Let me

17  go back and lay some foundation.  I appreciate counsel's

18  objection.

19  BY MR. FREEMAN:

20  Q.   So you're aware, Mr. Vicory, that in addition to the

21  alleged deficiencies with respect to cashiers and the alleged

22  deficiencies with respect to FSSs and DFAs, the Army also

23  pointed to the fact that DES's proposal failed to fill in the

24  staffing levels for two scenarios at the Thunderbird facility,

25  one for two meals a day, brunch and supper, and the second for

1  a hundred percent takeout; correct?

2  A.   That is correct.

3  Q.   Okay.  You're aware that those scenarios do not currently

4  occur at Thunderbird; correct?

5  A.   As stated previously, I really don't have awareness of

6  what currently is going on at Thunderbird or Huachuca in

7  general under the current contract.

8  Q.   You're aware that nowhere at any dining facility since

9  the first -- since 2020, at the beginning of the pandemic, has

10 the Army had a hundred percent takeout; correct?

11       MS. LETZKUS:  Objection, Your Honor.  Foundation.

12 He's repeatedly said he's not aware.

13       THE COURT:  Sustained.

14 BY MR. FREEMAN:

15 Q.   Are you aware, Mr. Vicory, that ADES provided pricing for

16 those two scenarios?

17 A.   That is correct.  ADES provided pricing for those two

18 scenarios.

19 Q.   And just so the record is complete, I'm not going to ask

20 you questions about it, but I'm introducing Plaintiff's

21 Exhibit 23, which is the pricing matrix from DES's proposal,

22 which includes pricing for those scenarios.

23       MR. FREEMAN:  I'll just hand one up to the Court, if

24 that's okay.

25       THE COURT:  And that's been marked as what?

1          MR. FREEMAN:  Plaintiff's Exhibit 23, Your Honor,

2  and the Government has stipulated that that's -- to the

3  microphone, sorry -- the Government has stipulated that this

4  is an accurate copy of the pricing matrix that DES submitted

5  as part of its proposal.

6          THE COURT:  And is the Government stipulating to the

7  admission of both Exhibit 23 and 22?

8          MS. LETZKUS:  Yes, to --

9          THE COURT:  22 is the staffing levels of Weinstein

10  from the ADES proposal?

11          MS. LETZKUS:  Yes, Your Honor, and we'll stipulate

12  to those.

13          THE COURT:  Okay.  Thank you.

14          MR. FREEMAN:  Thank you.

15  BY MR. FREEMAN:

16  Q.  So with that background, Mr. Vicory, again, if you'll

17  just allow me a hypothetical.  If DES's proposal had been put

18  in the competitive range at that point, would the Army have

19  discussed with DES the staffing levels that underlay the --

20  these two scenarios, the pricing for these two scenarios, i.e.

21  the two meals per day, brunch and supper, and 100 percent

22  takeout?

23  A.  So you're asking me to discuss a hypothetical that could

24  never happen per the solicitation requirements.  Because they

25  were technically unacceptable, they would never have been in

1   the competitive range.

2   Q.   Well, so if the Department of Education instructed you

3   that, if a proposal can be made to be acceptable, it should be

4   placed in the competitive range, and you followed that

5   guidance, at that point, you could have placed them in the

6   competitive range, moved on to Step 2, and discussed with them

7   and asked for clarifications or modifications; correct?

8            MS. LETZKUS:  Objection, Your Honor.  Asked and

9   answered, foundation, asks for speculation.

10           THE COURT:  Overruled.  He can answer.  If he can

11  answer, he can.

12  A.   Sir, can you repeat the question?

13  Q.   Sure.  If the United States Department of Education

14  instructed the Army that, if a proposal can be made to be

15  acceptable, it should be placed in the competitive range, and

16  the Army followed that guidance, the Army could then place

17  SLA's the proposal in the competitive range, move on to Step

18  2, discuss with DES any clarifications or modifications that

19  it wished, and then decide whether those clarifications or

20  modifications were sufficient to keep it in the competitive

21  range.  That's what Step 2 allows; correct?

22           MS. LETZKUS:  Your Honor, may we approach the bench?

23           THE COURT:  Yes.

24           (The following proceedings occurred at sidebar.)

25           MS. LETZKUS:  It is completely inappropriate for

 1    co-counsel to be coming up to the podium and providing

 2    material to be read and suggesting exhibits.  It's slowing

 3    things down.  They have selected their counsel to represent

 4    them during this hearing.  That's who should be doing this,

 5    not both of them.

 6            THE COURT:  Well, he's co-counsel to assist, so I'm

 7    going to allow him to do it.

 8            All the parties need to be aware, the longer this

 9    takes, the less time I'm allowing any argument or anything

10    else.  We're already at the point where I don't think we're

11    going to end today, so the parties are going to have to figure

12    out -- we'll talk after 5:30 as to how we're going to do this.

13            But I'll allow him to -- his co-counsel can bring

14    things up to him for questions.  Is that what your objection

15    is?

16            MS. LETZKUS:  Well, more that he's giving him

17    questions to ask.

18            THE COURT:  Well, that's part of co-counsel.

19    Co-counsel's allowed to do that.

20            MS. LETZKUS:  I mean, I would suggest that, to speed

21    things along, if we wait and take five seconds after --

22            MR. FREEMAN:  I'm almost finished, Your Honor.

23            THE COURT:  Like I said, I'm going to allow it.  It

24    is what it is.  It's not the most efficient way, I agree, but

25    it is what it is.

1            MS. LETZKUS:  Thank you, Your Honor.

2            THE COURT:  Okay.

3            (End of bench conference.)

4            THE COURT:  Mr. Vicory, go ahead.

5            So -- and I don't think -- you're going to have to

6    re-ask the question because I don't think Mr. Vicory -- I

7    don't remember the question, so --

8            THE WITNESS:  Thank you, Your Honor.  Yes.

9            THE COURT:  Sure.

10           THE WITNESS:  Sir, if you could repeat the question.

11           THE COURT:  Okay.

12           MR. FREEMAN:  Sure.

13   BY MR. FREEMAN:

14   Q.   So Mr. Vicory, at Step 2 of the Army's process, I think

15   you know it well enough that we don't have to turn back to

16   page 104, the Army can enter into discussions or negotiations

17   with all offerors; correct?

18   A.   Under Step 2 I can enter into -- under my solicitation, I

19   can enter into discussions with any offeror that's been

20   determined acceptable, and it's all offerors that were

21   determined acceptable I would enter discussions with.

22   Q.   And among the things that you can discuss with offerors

23   who are determined acceptable is staffing levels; correct?

24   A.   If I were to enter in discussions, I would address all

25   deficiencies that made them unacceptable.  Excuse me.  Because

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION OF MICHAEL VICORY

1  they were unacceptable, I would not be in discussions, but I

2  would discuss anything that the technical team brought up that

3  needed to be discussed.

4  Q.   So if the technical team brought up securing a cash fund,

5  you could discuss that with the offeror; correct?

6  A.   Well, based on the solicitation requirements, the

7  technical team decided to determine that they were technically

8  unacceptable, so I could not discuss that because they would

9  not be in the competitive range.

10 Q.   I understand.  If an offeror, including the DES, had been

11 determined to be in the competitive range but there were

12 questions about securing the cash fund, you could have

13 discussed that with them in Step 2; correct?

14 A.   Sir, I don't mean to be disagreeable, but they would have

15 never been in the competitive range based on the solicitation

16 requirements.

17 Q.   Well, I thought you told me that the debriefing letter,

18 your SSEB didn't even raise the cash fund as an issue, so that

19 wasn't a reason why they were disqualified; correct?

20 A.   They were disqualified because of their inadequate

21 staffing.

22 Q.   Allegedly, and that -- but that didn't -- the SSEB did

23 not mention the cash fund, you told me; correct?

24 A.   The cash fund wasn't mentioned in the debrief letter, but

25 the cash fund was part of the issue that made them

1  unacceptable on staffing.  As I stated, because they were

2  unacceptable, they could not be in the competitive range, and

3  therefore, I would not have discussions with them about it.

4  Q.  Okay.  But again, if -- hypothetically, if an offeror was

5  deemed to be acceptable but you wanted -- the Army wanted

6  clarification about how one -- how the offeror secures the

7  cash fund, you could have that discussion in Step 2; correct?

8  A.   If an offeror was determined acceptable, I would discuss

9  the issues that were brought forward, but because the staffing

10 and the cash fund made them unacceptable, I would not be able

11 to have that conversation with them.

12 Q.  You testified yesterday that at times you've had

13 extensive negotiations and discussions with offerors in Step

14 2; correct?

15 A.   Correct.

16          MR. FREEMAN:  If I can just have a moment, Your

17 Honor, I'm almost done.

18          THE COURT:  Okay.

19          MR. FREEMAN:  Nothing further, Your Honor.

20          THE COURT:  And redirect?

21          MS. LETZKUS:  Yes, Your Honor.

22          MR. FREEMAN:  And Exhibit 22 and 23 are in evidence;

23 is that correct?

24          THE COURT:  Yes, based on stipulation, right,

25 Ms. Letzkus?

1        MS. LETZKUS:  Yes, Your Honor.

2        THE COURT:  Okay.

3                    REDIRECT EXAMINATION

4   BY MS. LETZKUS:

5   Q.   Hi again, Mr. Vicory.  I'll try and be brief.

6   A.   Thank you, ma'am.

7   Q.   You were asked -- you were shown a staffing proposal for

8   the Weinstein Dining Facility; correct?

9   A.   Correct.

10  Q.   Was Weinstein the only dining facility for which the

11  solicitation required proposed staffing?

12  A.   No, it was not.  There were two other facilities, one

13  being Weinstein.

14  Q.   And did --

15  A.   Sorry.  Thunderbird.  Excuse me.

16  Q.   And did plaintiff's staffing -- did plaintiff's proposal

17  propose staffing for the Thunderbird facility?

18  A.   Partially.  So they provided staffing for two of the

19  bands.  As we stated earlier, the band for the brunch, the

20  Sunday brunch, and the band for a hundred percent takeout,

21  there was no staffing proposed.

22  Q.   If I could have you look at Exhibit 14.

23  A.   I'm there.

24  Q.   Okay.  So you were asked whether the subject matter

25  experts only had a problem with the change fund.  Do you

1  recall those questions?

2  A.   I do.

3  Q.   Can you turn to page --

4          MR. FREEMAN:  Objection, Your Honor.

5          THE COURT:  Basis?

6          MR. FREEMAN:  The question was whether they only had

7  objections with respect to the change fund with respect to the

8  cashier position, and he answered yes.

9          THE COURT:  So Ms. Letzkus, if you can ask the

10 question based on --

11         MS. LETZKUS:  Your Honor, I can move on.

12         THE COURT:  Go ahead.

13         MS. LETZKUS:  I can move on.

14         THE COURT:  Go ahead.  Overruled.  Go ahead.  You

15 can ask the question.

16 BY MS. LETZKUS:

17 Q.   Okay.  Mr. Vicory, if you'll turn to page 2 of that

18 letter, which up top in blue will be 3 of 4.

19 A.   Yes, ma'am.

20 Q.   Do you see that second paragraph there?

21 A.   Yes, I do.

22 Q.   Do you see where it says, "The ASC SMEs affirmed the

23 SSEB's conclusion that ADES was understaffed in band 2 for

24 Weinstein DFAC.  Breakfast and dinner as proposed were

25 understaffed for the tasks required.  The SMEs concluded the

 1   SSEB correctly evaluated ADES's approach as unacceptable."

 2        Did I read that right?

 3   A.   You did.

 4   Q.   So -- and I believe you testified before that the --

 5   well, I'll just ask you this.  Did the subject matter -- to

 6   your understanding, did the subject matter experts agree with

 7   all of the deficiencies outlined by the SSEB?

 8   A.   Yes, they did.

 9             MR. FREEMAN:  Objection, Your Honor.

10             THE COURT:  Overruled.  It's been answered.

11   BY MS. LETZKUS:

12   Q.   You were asked a series of questions about plaintiff's

13   proposal for cross-training/cross-staffing.  Do you remember

14   that?

15   A.   I do.

16   Q.   Did the proposal ADES submitted explain how the cross-

17   training would -- and cross-staffing would not impact the

18   service provided to the diners?

19   A.   It did not.

20   Q.   If you could turn to exhibit -- well, okay.  If you'd

21   turn to Exhibit 18, which is the selection from the handbook.

22   A.   Yep.

23   Q.   Can you turn to page 6 of 9 in blue at the top?

24   A.   I'm there.

25   Q.   Okay.  Under Section 2 there, "Evaluation of SLA

 1   Proposals," it says, "A proposal received from the SLA will be

 2   evaluated in the same manner as for other offerors."

 3        Did I read that right?

 4             MR. FREEMAN:  Objection.  Objection, Your Honor.

 5             THE COURT:  What's the basis of the objection?

 6             MR. FREEMAN:  Ms. Letzkus objected that he had no

 7   basis for this and didn't allow me to ask him questions about

 8   the very next section, and now she --

 9             THE COURT:  Ms. Letzkus, he's right.  You did object

10   that he didn't have a basis for the handbook, so --

11             MS. LETZKUS:  Okay.  I'll move on.

12             THE COURT:  Okay.  Sustained.

13   BY MS. LETZKUS:

14   Q.   Just to clarify Mr. Vicory, how many dining facilities

15   were covered by the solicitation?

16   A.   Three.

17   Q.   Not just Weinstein?

18   A.   Not just Weinstein.  There's Weinstein, Thunderbird, and

19   I honestly can't remember the name of the third one.

20   Q.   And did the solicitation require that there be acceptable

21   staffing proposed for all three of the dining facilities?

22   A.   The solicitation was extremely clear that they needed to

23   propose staffing for all three dining facilities.

24             MS. LETZKUS:  Just one second while I confer.

25   BY MS. LETZKUS:

1   Q.   Mr. Vicory, under the terms of the solicitation, were you

2   allowed to treat offerors differently in deciding whether to

3   apply the five-factor test?

4   A.   No.  The solicitation stated that every proposal be

5   evaluated the same.  In fact, the handbook, which I am aware

6   of, speaks specifically to evaluating the SLA just as you

7   evaluate everybody else.

8             MS. LETZKUS:  Okay.  That's all I have.

9             MR. FREEMAN:  Two very short follow-ups, Your Honor.

10            MS. LETZKUS:  Your Honor --

11            THE COURT:  I'm not going to allow it.  I'm going

12  ask some questions.  After I ask some questions, if either

13  party has questions based on that, you'll be allowed to do

14  that.

15                           EXAMINATION

16  BY THE COURT:

17  Q.   Mr. Vicory, with respect to the SSEBs and the SMEs, did

18  those individuals, the individuals that conduct the proposal

19  reviews, do they have familiarity with ADES's current staffing

20  and the adequate -- and the adequacy of the past staffing

21  levels as they dealt with Fort Huachuca?

22       Does that make sense?  So as far as --

23  A.   Yes.

24  Q.   -- the individuals that are evaluating the proposal,

25  whether it's the SSEB or the SME, do they have any type of

1   knowledge regarding the current staffing that ADES does?

2   A.   So I cannot say with a hundred percent assurity.  What I

3   can tell you is that when we -- when we constitute a Source

4   Selection Evaluation Board, it usually includes three members.

5   One of them is a member from ASC headquarters who's on every

6   SSEB to maintain continuity.  The other SSEB members usually

7   come from the Logistics Readiness Centers, the LRCs, that are

8   aware and are familiar with the -- what is happening at that

9   facility.  To be honest with you, I can't confirm that that

10  was the case here.  I believe it was but I cannot confirm.

11  Q.   Okay.  And what about with the SMEs?

12  A.   So the subject matter experts, they came from -- one of

13  them was Mr. Fullick.  The other was a gentleman named Craig

14  Schwartz.  They came from ASC headquarters.  So they don't --

15  they're not at Fort Huachuca, but they understand Army food

16  service across the entire enterprise, so they have an

17  understanding of the food service program at every

18  installation across the enterprise.

19  Q.   Okay.  And then if the Army would want additional staff

20  added right now to the current level of staffing that's been

21  -- being provided by ADES, how -- is there some sort of

22  mechanism for that to take place, in the basis of a continuing

23  contract or a bridge contract?

24  A.   There is.  So it's dependent on whether it's considered

25  in scope, so that would be an independent determination made

by the contracting officer at Fort Huachuca.  What I mean by
"in scope," sometimes if you're just adding people it might or
might not be in scope.  If it is -- so is it something that
the contract contemplated?  If the -- if it wasn't
contemplated, it's not in scope.  That will require what we
call a justification and approval which would then require us
to do the J&A and publicize it, and that gives industry the
opportunity to protest and say, well, because you're adding
additional work, you should put it back out for competitive
bid.

Q.   Would the understaffing of the DFA and the FSS positions
by the one to 21 percent alone, would that have been
sufficient to take the proposal out of -- or make the proposal
technically unacceptable?

A.   So from my perspective, the fact that they determined
that to be a deficiency, that makes them unacceptable.  So if
that had been the only deficiency and they were determined
unacceptable, they would have been removed from the
competitive range just for that.

Q.   Just for that.  Okay.

     And then there's been talks, talk about the DoE handbook
and also the FAR regulations.  Could the Army have complied
with the DoE handbook by including ADES in the competitive
range and still complied with the FAR regulation by conducting
the meaningful conversations once they're in the competitive

 1  range?

 2  A.   I'm sorry.  Your Honor, can you ask that question one

 3  more time?

 4  Q.   Yeah, well, what I'm wondering --

 5  A.   I think I know what you're getting at.

 6  Q.   -- is, if you can comply with the handbook and put them

 7  in the competitive range and then do the meaningful

 8  discussions, then would that still comply with the handbook

 9  and the FAR, or are the FAR and the handbook just separate

10  from each other?

11  A.   I'd prefer to look at it as what we delineated in our

12  solicitation as the five-step process requirement.  So had I

13  included them in the competitive range under any circumstance

14  if they were technically unacceptable, I would have violated

15  the terms of my solicitation and been subject to a General

16  Accountability Office protest, and I believe, had we done

17  that, we would have been forced to take corrective action,

18  meaning we would have -- the protest would have been

19  sustained, and we would not have moved forward, and we would

20  have lost 100 additional days, potentially, for GAO to make

21  that determination.

22       Quite frankly, the Army Lit Div folks would probably tell

23  me I have to take corrective action because they wouldn't take

24  that to GAO because it's such an obvious departure from the

25  solicitation requirements.

1  Q.   Okay.  And then with respect to looking at past
2  performance, was there anything in the solicitation that would
3  allow you to look at the past performance for the technical
4  aspects of the solicitation?
5  A.   No.
6  Q.   And I don't know if you can answer this, but -- so in the
7  pleadings, the Army argues that the injunction is not in the
8  public interest because it precludes a competitive contract
9  award.  If there's no injunction and then the Army awards the
10 contract to another vendor who has been found acceptable, will
11 it necessarily be getting a better level of service for the
12 same or lesser price?
13      And I don't know if you can answer that or not.  And part
14 of that is, you know, the Court doesn't get any of the other
15 contracts to compare, so based on your experience, would you
16 have an answer to that?
17 A.   I think I can speak generally.
18 Q.   Okay.
19      MS. LETZKUS:  Your Honor, I'm being told that that
20 is proprietary information that the Government is not
21 permitted to reveal.
22      THE WITNESS:  I believe I can speak --
23      THE COURT:  In general?
24      THE WITNESS:  -- generally.
25      THE COURT:  I mean, obviously I'm not -- I'm not

 1   asking him for specific contracts, but just in general.

 2            UNIDENTIFIED SPEAKER:  Your Honor, may I answer?

 3            THE COURT:  Well, why don't you talk to Ms. Letzkus.

 4            MS. LETZKUS:  Okay.  So if he can, he can address

 5   very generally, but if it does start to go too specific, I

 6   will have to stop it.

 7            THE COURT:  Sure.  Okay.

 8   BY THE COURT:

 9   Q.   In general terms, if you can.

10   A.   Yeah, and I'm sorry, Your Honor.  Can you repeat the

11   question?  I apologize.

12   Q.   So in the -- in the Government's response --

13   A.   Uh-huh.

14   Q.   -- part of what they talk about is an injunction is not

15   in the public interest because it precludes a competitive

16   contract award.

17   A.   Uh-huh.

18   Q.   So my question is, if there's no injunction and this

19   contract is awarded to a general -- another vendor --

20   A.   Yes.

21   Q.   -- is the Army necessarily getting kind of a better level

22   of service at a better price or -- I mean, I guess in general,

23   are all the contracts pretty similar?

24   A.   I can't speak to the better price piece, but as far as

25   level of service, I won't say a better level of service,

1  because this is about the minimum technical requirements, but

2  what we have right now is I have a vendor I'm ready to award

3  to who has met the minimum technical requirements based on the

4  projected need of the Army.  If I -- and I have a current

5  vendor, right, I have a proposal that was unacceptable for the

6  projected needs for the Army.

7       So from my perspective, I would rather award a contract

8  to a vendor that has been assessed by the technical subject

9  matter experts to meet those projected needs coming up.

10       Did I answer your question?

11  Q.   Yes, you did.

12  A.   Okay.  Thank you.

13            THE COURT:  So based on my questions, Ms. Letzkus,

14  do you have any questions of your witness?

15            MS. LETZKUS:  No, Your Honor.

16            THE COURT:  And Mr. Freeman, do you have any

17  questions based on my questions?

18            MR. FREEMAN:  Just briefly, Your Honor.

19                     FURTHER CROSS-EXAMINATION

20  BY MR. FREEMAN:

21  Q.   Mr. Vicory, the solicitation page 104 specifically says

22  the procurement will be conducted pursuant to the Randolph-

23  Sheppard Act; correct?

24            MS. LETZKUS:  Your Honor, this goes beyond your

25  questions.

1          THE COURT:  This does go -- it does go beyond my

2     questions, Mr. Freeman.

3     BY MR. FREEMAN:

4     Q.   Mr. Vicory, is it your testimony that even a one percent

5     difference in staffing is sufficient to eliminate a proposal

6     from the competitive range?

7     A.   I'm sorry.  You're asking me to speculate on something I

8     can't speculate on.

9     Q.   Well, the judge asked you whether understaffing of the

10    DFA and FSSs by one to 21 percent alone would be sufficient to

11    make DES's proposal unacceptable, and I'm just trying to

12    figure out, so if there are -- if the Army thought it needed

13    15 or 16 DFAs and an offeror offered 14, would that alone make

14    it -- make the proposal unacceptable?

15    A.    I still feel like you're asking me to speculate, but I

16    also --

17         THE COURT:  And Mr. Freeman, my question was

18    specifically one of the specific indications that were

19    technically unacceptable, which was the one to 21 percent --

20         MR. FREEMAN:  Right.

21         THE COURT:  -- along with the other deficiencies.

22    So my question was related to if it was only that deficiency

23    of the one to 21 percent.  So I do think, if you're going to

24    go one percent, two percent, three percent, all the way to a

25    21 percent, it's going to be speculative.

1          MR. FREEMAN:  Well, no, I'm sorry.  I'm trying to

2     follow up specifically on Her Honor's question.

3     BY MR. FREEMAN:

4     Q.   So if the -- if a hypothetical offeror, the only

5     deficiency that the SSEB found was that there should be a

6     total of 17 DFAs and FSSs combined, and the proposal proposed

7     14 DFAs and FSSs combined, that would be a 20 percent

8     difference between 17 and 14, would that alone be enough to

9     disqualify an offeror and refuse to place it in the

10    competitive range?

11         MS. LETZKUS:  Objection, Your Honor.  We just went

12    over this.

13         THE COURT:  I'm going to sustain it.

14         MR. FREEMAN:  So I thought --

15         THE COURT:  It is speculative.  I was asking about a

16    specific item that was found the deficiency along with other

17    items that were deficient.  My question was, if that was the

18    only item that was deficient, would that make the contract

19    still unacceptable.

20         MR. FREEMAN:  Your Honor, I'm --

21         THE COURT:  You're asking for things that --

22    speculative things that were not found to be deficient in the

23    proposal.

24         MR. FREEMAN:  I'm sorry.  I'm trying to -- I was

25    trying to put flesh on what I thought was Your Honor's

1    question, so let me ask it one more time.

2    BY MR. FREEMAN:

3    Q.    If the only deficiency that the SSEB found was that the

4    combined number of DFAs and FSSs was understaffed by between

5    one and 21 percent, is it your testimony that that deficiency

6    and that deficiency alone would be sufficient to exclude a

7    proposal from the competitive range at Step 1 rather than

8    putting them in the competitive range, allowing them to

9    clarify or modify or negotiate, and then figure out whether

10   that staffing is sufficient at Step 2?

11   A.    So I'm going to go ahead and use your words.  A

12   deficiency indicates a lack of acceptability, and so any one

13   deficiency means that they are unacceptable and so therefore

14   would not be pushed forward in the competitive range.

15   Q.    Okay.  So Mr. Vicory, you and I, we're both involved in

16   the solicitation at what was then Fort Lee and subsequently

17   became Fort Gregg-Adams; correct?

18            MS. LETZKUS:  Objection, Your Honor.  Beyond the

19   scope.

20            THE COURT:  Sustained.  I am not -- I do not want to

21   go into any other --

22            MR. FREEMAN:  Okay.

23            THE COURT:  -- situation regarding any other case.

24            MR. FREEMAN:  Let me ask the question -- okay.

25   BY MR. FREEMAN:

1  Q.   Mr. Vicory, you have -- you and the Army have placed

2  other offerors in the competitive range even when you found

3  deficiencies; correct?

4          MS. LETZKUS:  Your Honor --

5          MR. FREEMAN:  That's -

6          MS. LETZKUS:  Objection.  Beyond the scope of the

7  questions.  We need to move along.

8          THE COURT:  I'll allow him -- overruled.  I'll allow

9  him to answer it.  However, I'm going to let him explain how

10 it may have been a different situation than what we have here.

11 A.   So here's how I will answer that.  So the Fort Lee

12 solicitation was issued before I was the director of the

13 Installation Readiness Center.  I will absolutely emphatically

14 tell you right now that every solicitation I've worked on

15 since I've been the director of the IRC, if they were

16 deficient when we were using the five-step process, which was

17 common at the time, they were not part of the competitive

18 range.  They were excluded.

19     If at one time a contracting officer before my time made

20 that mistake, then shame on them, and if someone would have

21 protested, we would have been told to take corrective action,

22 because if our -- I will tell you that, if our solicitation

23 requirements, which I think are clear, state that, if you are

24 unacceptable, you will not be in the competitive range, as

25 long as I'm sitting in this seat, that's how we will handle it

1   and that's how we will manage it, and if we do it any other

2   way, we deserve for the GAO to sustain the protest and be

3   driven towards corrective action.

4               MR. FREEMAN:  Objection.

5               THE COURT:  I'll allow it.

6   BY MR. FREEMAN:

7   Q.   So you are aware that --

8               THE COURT:  Mr. Freeman --

9               MR. FREEMAN:  Thank you, Your Honor.

10              THE COURT:  -- done.  No more questions.

11              You may step down, Mr. Vicory.

12              THE WITNESS:  Thank you, Your Honor.

13              THE COURT:  And Ms. Letzkus, if you'd like to call

14   Mr. Froehlich.

15              MS. LETZKUS:  Yes, Your Honor.

16              MR. HERNANDEZ:  Your Honor, may he stay in the

17   courtroom now that he's --

18              THE COURT:  Yes.  Mr. Vicory, you're allowed to stay

19   in the courtroom.

20              And Mr. Froehlich, please come forward.  You were

21   previously sworn in yesterday, so if you'd like to please have

22   a seat at the witness stand.

23              And Ms. Letzkus, are you asking questions?

24              MS. LETZKUS:  Yes, Your Honor.

25              THE COURT:  Okay.

```
 1              MS. LETZKUS:  Your Honor, I just want to point out
 2    that we are not going to finish my direct today.
 3              THE COURT:  No, we're not.  At 5:30 we'll discuss
 4    when we're coming back.
 5              MS. LETZKUS:  Okay.  Thank you.
 6              WADE FROEHLICH, WITNESS, PREVIOUSLY SWORN
 7                        DIRECT EXAMINATION
 8    BY MS. LETZKUS:
 9    Q.   Mr. Froehlich, thank you so much for being here and for
10    waiting here all this time.
11         Could you tell us what your current role is with the
12    Federal Government.
13    A.   Yes, ma'am.  I work for the Army Sustainment Command.  My
14    official title is a logistics management specialist.  I work
15    in the services division under the food service section, and
16    that's my official title.
17    Q.   Okay.  What are the duties of your current --
18    A.   Duties.  I oversee the garrison food program for the
19    Army, budgeting for contracts, life cycle equipment
20    replacement and supplies, and I also provide analytics to the
21    command.
22    Q.   Okay.  What do you mean by providing analytics the
23    command?
24    A.   I look at headcount.  I look at staffing.  I look at
25    trends for dining facilities across the Army.
```

1    Q.   How long have you had this position?

2    A.   This particular position, I am 10 months in right now.

3    Q.   Okay.  And what position did you have prior?

4    A.   My prior position was CW5 in the United States Army.  922

5    Alpha food service technician.  I came in the Army as a E1.  I

6    rose all the way up to W5, and my last duty station was Army

7    Sustainment Command over the food program.

8    Q.   So how long have you been working in the field of food

9    services for the military?

10   A.   27 years, ma'am.

11   Q.   Can you give us your background over 27 years, just a

12   succinct summary of your experience with food services?

13   A.   I worked from a line cook to a shift leader, rations

14   administration.  I was a dining facility manager.  Upon

15   transition to a warrant officer, I oversaw a brigade,

16   division, corps, and then strategically at the Army

17   Sustainment Command.

18   Q.   Do you have any experience with food services at Fort

19   Huachuca in particular?

20   A.   In particular, I was a cook there from 2000-2002.

21   Q.   Would you consider yourself an expert in the field of

22   food services for the Army?

23   A.   Yes, ma'am.

24   Q.   Would you consider yourself an expert in the field of

25   food services at Fort Huachuca?

1    A.    Yes, ma'am.

2    Q.    Are you aware of how long soldiers generally get to eat a

3    meal at Fort Huachuca?

4    A.    I don't know specifically at Fort Huachuca, but usually

5    it's 90 minutes.  In training brigades, it can be less time

6    based on their point of instruction.  They could limit their

7    time to eat to an hour.

8    Q.    If a soldier can't eat his or her meal in the time

9    allotted because there's, for instance, a line out the door or

10   some other delay at the dining facility, what are the

11   consequences?

12   A.    For a permanent party soldier, or for any soldier,

13   really, they face UCMJ action for not being at the point of

14   their place of duty, but it can also cause issues with the

15   training brigade because it backs up their training and can

16   delay their time going into their permanent party duty

17   station.

18   Q.    Okay.  And the USMJC (sic)?

19   A.    United States Code of Military Justice.

20   Q.    As part of your job as logistics management specialist,

21   are you sometimes asked to review evaluations by Source

22   Selection Evaluation Boards regarding proposals submitted in

23   response to solicitations for Government contracts?

24   A.    Yes, ma'am.

25   Q.    How frequently have you been involved?

DIRECT EXAMINATION OF WADE FROEHLICH

1    A.   Probably one to two every month or two months, depending.

2    Q.   So when you are asked to review an SSEB evaluation, can

3    you just walk us through what you do, what your review is,

4    what the process is, what you look at, that stuff?

5    A.   Normally we look at the SSEB findings.  We review the

6    offeror staffing matrix.  We review the offeror's -- oh, my

7    goodness, that's a hard word -- offeror's tech II proposal.

8    We review the Government's staffing matrix and what the

9    requirements are, and then we go from there.

10   Q.   So when you -- when you're reviewing these SSEB

11   evaluations, do you review them with deference to the SSEB's

12   conclusions, or are you forming your own independent --

13   A.   No, we do it independently.  Normally we look at the SSEB

14   conclusions last because we don't want it to influence

15   anything we find, but then we compare them at the end.

16   Q.   So we're here today because of a proposal submitted by

17   ADES in response to a solicitation for a contract for dining

18   services at Fort Huachuca.

19        Do you recall seeing that proposal?

20   A.   Yes, ma'am.

21   Q.   Were you asked to take a look at that proposal?

22   A.   Yes, ma'am.

23   Q.   And who asked you?

24   A.   Mr. Mike Vicory.

25   Q.   What did he ask you to do?

1   A.    He asked us to look at ADES's proposal and see if there

2   was any issues with it, if it meant -- if it was acceptable or

3   unacceptable, and give him our results.

4   Q.    Did he provide you with any material to review?

5   A.    Yes.  He provided us with the IGE, which is independent

6   Government estimate of staffing, ADES's staffing matrix, their

7   tech II proposal, and the SSEB findings.

8   Q.    And the tech II proposal is?

9   A.    It's basically how they're going to conduct business.

10  Q.    So would that be the technical proposal part --

11  A.    It would be their technical proposal part, how they're

12  going to staff, what their staffing means, you know, what

13  their positions mean, what their definitions of the positions

14  are.

15  Q.    Did you review all the material you were provided?

16  A.    Yes, ma'am.

17  Q.    And did you, in fact, go on to form a conclusion about

18  ADES's proposal?

19  A.    We did.  We agreed that it was unacceptable.

20  Q.    Were you part of the SSEB that initially evaluated ADES's

21  proposal?

22  A.    No, ma'am.

23  Q.    And I believe there's been testimony that Mr. Schwartz

24  was also another subject matter expert who was asked to

25  evaluate ADES's proposal?

1  A.   Yes, ma'am.

2  Q.   Do you know if Mr. Schwartz was part of the initial SSEB

3  that evaluated ADES's proposal?

4  A.   He was not, ma'am.

5  Q.   Had you been involved in any way with the solicitation or

6  the proposals received in response prior to Mr. Vicory asking

7  you to take a look at ADES's proposal?

8  A.   No, ma'am.

9  Q.   So the blind vendor who's operating services under the

10  current contract at Fort Huachuca, his name is Mr. Weber.  Are

11  you -- have you ever met Mr. Weber?

12  A.   No, ma'am.

13  Q.   Have you ever talked to Mr. Weber?

14  A.   No, ma'am.

15  Q.   So you said you were provided with the SSEB's evaluation

16  of ADES's proposal, and you said you read that; right?

17  A.   Yes, ma'am.

18  Q.   Did you understand the SSEB's evaluation?

19  A.   Yes, ma'am.

20  Q.   Did you agree with the SSEB's conclusions?

21  A.   Yes, ma'am.

22  Q.   All of the conclusions or just some?

23  A.   All of them, ma'am.

24  Q.   Okay.  Could you turn to Exhibit 12 up there.  You should

25  have a book of Plaintiff's Exhibits, Defendant's Exhibits.

1    A.   Yes, ma'am.

2    Q.   Okay.  This is a letter from Mr. Vicory to Ms. Elliot at

3    ADES, and the first sentence says, "Please accept this letter

4    as the preaward debriefing."

5         Do you see that?

6    A.   Yes, ma'am.

7    Q.   So if you look up at the top, you'll see a blue "Case,"

8    and then numbers, and then "Document."  Do you see that?

9    A.   Yes, ma'am.

10   Q.   Can you turn to page 8 of 12 at the top?

11   A.   Yes, ma'am.

12   Q.   And in subsection 2, it says, "Subfactor 2.  Staffing

13   plan unacceptable.  The offeror did not clearly demonstrate

14   that their staffing is appropriate to successfully perform the

15   PWS requirements."

16        Do you see that?

17   A.   Yes, ma'am.

18   Q.   And just to refresh everyone's recollection, what is PWS?

19   A.   Performance work statement.

20   Q.   So what is the performance work statement?

21   A.   It outlines what the -- what the contractor has to do for

22   the Army, their basic duties and stuff like that.

23   Q.   If you look the next paragraph down, it says, "Below is

24   listed the specific areas of concern for each building or

25   task."

1       Do you see that?

2  A.   Yes, ma'am.

3  Q.   Okay.  And do you see in the next paragraph where it

4  says, "For Building 52107, cashiers are significantly

5  understaffed by 21 to 100 percent?"

6  A.   Yes, ma'am.

7  Q.   What is Building 52107?

8  A.   It's the Thunderbird Dining Facility, ma'am.

9  Q.   Do you understand what the reference to 21 percent to a

10 hundred percent understaffed means?

11 A.   It means that they weren't completely understaffed in

12 some areas, you know, in some instances, but could range to a

13 hundred percent in some instances.

14 Q.   So does that reference to a hundred percent mean that the

15 Army interpreted the proposal to include no staffing at all

16 for cashiers at 52107?

17 A.   The cashiers were not listed on the staffing matrix, but

18 if you look in the tech II proposal, it talks about admin

19 being the cashier.

20 Q.   Okay.  What are the implications for the admin being the

21 cashier?

22 A.   So you never do that because there's no safeguard of

23 funds.  Every instance in the Army, we have a admin and we

24 have a cashier or a headcount because that separates the

25 handling of cash.  You can't be the same person that handles

DIRECT EXAMINATION OF WADE FROEHLICH

1  -- that issues the cash, accepts the cash, goes and does

2  headcount, and then returns the cash.

3  Q.   Okay.  What -- so you're talking about that there is a

4  lack of accountability; right?

5  A.   Yes, ma'am.

6  Q.   What would happen if there was a discrepancy and some

7  money went missing?

8  A.   In every instance, it would initiate an investigation, we

9  call them IOs, but basically an investigation, which would

10 mean that the contractor -- the contractors that were pulling

11 headcount or acting as a cashier would stop having to do that.

12 There would be witness statements.  There would be basically a

13 full-blown investigation of everything that led up to that

14 missing cash.

15 Q.   Okay.  So if staffing was already lean and there was an

16 investigation, you said that the cashier would have to be

17 taken off that duty, not allowed to do that anymore while the

18 investigation's pending; correct?

19 A.   Yes, ma'am.

20 Q.   So if the staffing proposed is particularly lean and you

21 have to remove one of the workers from providing the services

22 that they're supposed to be providing, what would be the

23 consequence of that?

24 A.   It can take away from other areas.  It can slow up the

25 headcount.  It can impact -- basically impact soldier feeding.

DIRECT EXAMINATION OF WADE FROEHLICH

1   Q.   So could it cause longer lines?

2   A.   Oh, yes, ma'am.

3   Q.   Could it cause soldiers not to have enough time to eat

4   and return to their duty in the limited time frame that they

5   have to eat?

6   A.   Yes, ma'am.

7   Q.   Can you turn to Exhibit 14 for me.

8   A.   Yes, ma'am.

9   Q.   This appears to be a letter from Mr. Vicory to Ms. Mackey

10   at ADES.  Is that correct?

11   A.   Yes, ma'am.

12   Q.   Okay.  Do you see where it says, "Thank you for sharing

13   your concerns regarding the Army's decision to exclude ADES's

14   proposal from the competitive range?

15   A.   Yes, ma'am.

16   Q.   And it goes on to say, "In response, I," Mr. Vicory,

17   "requested that the requiring activity, Army Sustainment

18   Command (ASC), provide an independent review."

19        Do you see that?

20   A.   Yes, ma'am.

21   Q.   Okay.  Then it says, "ASC provided two subject matter

22   experts."  Were you one of those experts then?

23   A.   Yes, ma'am.

24   Q.   Does this letter appear to explain your reasoning why

25   ADES's proposal was not acceptable?

1           MR. LALCHANDANI:  Objection, Your Honor.  I don't

2    know if the foundation has been laid as to his knowledge of

3    this letter.

4           THE COURT:  Sustained.  If you want to lay some

5    foundation as to whether he's seen this letter before.

6    BY MS. LETZKUS:

7    Q.   Have you seen this letter before?

8    A.   I've never seen this exact letter.

9    Q.   All right.  So one of the SSEB's conclusions here was

10   that the staffing proposal was unacceptable because the

11   staffing proposed was too lean.

12        Do you understand that?

13   A.   Yes, ma'am.

14   Q.   Did you agree with that?

15   A.   Yes, ma'am.

16   Q.   So you said that one of the issues you flagged -- was one

17   of the issues you flagged the accountability with the cash

18   fund problem caused by the dual staffing of admin/cashier?

19   A.   Yes, ma'am.

20   Q.   And you said that you did agree with all of the SSEB's

21   conclusions as to why the proposal was unacceptable?

22   A.   Yes, ma'am.

23   Q.   So does that mean that, even setting aside the cash fund

24   accountability issue, that you determined ADES's proposal was

25   not acceptable?

1    A.    Yes, ma'am.

2    Q.    And did you determine that it was unacceptable because it

3    was understaffed?

4    A.    Yes, ma'am.

5    Q.    Not simply because of the cash fund accountability issue

6    but generally understaffed?

7    A.    Yes, ma'am.

8    Q.    So you testified that you did an independent review, and

9    you didn't just defer to the SSEB's findings; right?

10   A.    Yes, ma'am.

11   Q.    What was your independent conclusion as to whether the

12   proposal was technically acceptable?

13   A.    It was unacceptable, ma'am.

14   Q.    So in your own independent evaluation, what led you to

15   determine that the proposal was not technically acceptable?

16   A.    Well, as discussed, the first issue, of course, is the

17   cashiers doubling as -- or admin doubling as cashiers, so

18   that's a major one.  But besides that, there was two bands

19   that were not even proposed to, so there was no way to

20   evaluate them.  Therefore, we had to find them understaffed

21   because they had no staffing proposed.  And then the DFAs for

22   Weinstein were understaffed in band 2, I believe.

23   Q.    What are the DFAs?

24   A.    Dining facility attendants, ma'am.

25   Q.    And what do they do?

DIRECT EXAMINATION OF WADE FROEHLICH

 1  A.   They perform pot and pan washing, they run the clipper

 2  room, which is basically the dishwashing machine, clean the

 3  dining room.

 4  Q.   Okay.  Let me see if I can skip through some of this just

 5  in the interest of time.

 6       Okay.  Do admin clerks control the cash flow with the

 7  change fund?

 8  A.   Your admin clerk is normally the person that controls the

 9  cash in and out of the safe, yes, ma'am.

10  Q.   There was some discussion about an electronic system

11  that, you know, can track money coming in and going out.  I

12  think it was something like AFMA.  Are you aware of that?

13  A.   It's AFMIS, ma'am, Army Food Management Information

14  System.

15  Q.   Okay.  And are you familiar with that system?

16  A.   I am, ma'am.

17  Q.   Would the admin clerks have access to that system then?

18  A.   Yes, ma'am.

19  Q.   Would they have the ability to delete information from

20  the system?

21  A.   If so inclined to do so, yes, ma'am.

22  Q.   Have you, in your long experience with food service with

23  the military, ever encountered a situation where an admin

24  clerk did delete information from the system?

25  A.   Yes, ma'am.

1   Q.   And was the information deleted, did that have to do with

2   showing some sort of discrepancy?

3   A.   It had to do with a cash collection.  It's easy to cancel

4   a cash sale, which you can do.  It's also easy to change to

5   change fund if you have access, that level of access.  Or I

6   shouldn't say change fund.  That's not right.  The money

7   collected.  Change fund is just a change fund.

8   Q.   Okay.  So are you specifically familiar with any

9   scenarios where an admin clerk deleted information that would

10  implicate -- well, that would suggest that there was some

11  discrepancy in money coming in and out?

12          MR. LALCHANDANI:  Objection, Your Honor.  I don't

13  see the relevance to any possible scenario from any DFAC

14  across the military system when it's not specific --

15          THE COURT:  I'm going to overrule it.  I gave the

16  plaintiffs a lot of leeway on hypotheticals.

17          MR. LALCHANDANI:  Understood, Your Honor.

18          THE COURT:  Go ahead.

19  BY MS. LETZKUS:

20  Q.   Do you remember the question?

21  A.   Yes, ma'am.  Fort Cavazos, Fort Hood, about three years,

22  four years ago, had one of those situations, which caused an

23  investigation.  We've had others at Fort Leavenworth where

24  cash sheets were manipulated that caused an investigation.

25          So there's been a few.  That's just recently.  I mean,

1    I've experienced others.  We actually had one when I was a

2    cook at Fort Huachuca.  Of course the MPs were brought in, and

3    you know, the headcount at that time was dealt with.  Back

4    then we didn't use the computer system.  It was just plain

5    headcount on paper.

6    Q.   So would it be fair to say that the dual staffing of the

7    admin/cashier in that situation, that has caused problems in

8    the past for the Army?

9            MR. LALCHANDANI:  Objection, Your Honor.  I'm not

10   clear as to the term "dual staffing" in this context.

11           THE COURT:  Sustained.  If you want to maybe explain

12   what you mean by the dual staffing or if Mr. Froehlich

13   understands what you mean by dual staffing.

14           MS. LETZKUS:  Sure.

15   BY MS. LETZKUS:

16   Q.   So Mr. Froehlich, if an offeror proposed to cross-staff

17   the cashier position and the admin position, so have one

18   person be performing both of those tasks, would that cause any

19   problems?

20   A.   Yes, ma'am, with not only safeguarding of cash, of

21   course, because you're handling everything yourself, there's

22   no separation of, say, who signed for what, how much was

23   collected, how much was returned, but also, even if you were

24   pulling that cashier duty and you're the admin and you have

25   the access to the cash, if more change was needed, you would

 1  have to stop the line, go back, get more cash, come out, put

 2  it back in the system, you know, put it back in the cash

 3  register, and then continue headcounting.  So that would

 4  automatically slow up the line and the flow through the dining

 5  facility.

 6  Q.   So would you say that the cash fund accountability issue

 7  that you flagged with respect to ADES's proposal is a serious

 8  concern?

 9  A.   Yes, ma'am.

10  Q.   Are you familiar -- you said that you were familiar with

11  dining facilities at Fort Huachuca in particular; right?

12  A.   Yes, ma'am.

13  Q.   Are you aware of the number of people that dine at Fort

14  Huachuca, soldiers and visitors, versus -- sorry.  Let me just

15  start again.

16       So are you familiar with the fact that there are --

17  essentially you can pay in cash for dining services at Fort

18  Huachuca or you can pay by meal card?

19  A.   Yes, ma'am.  That's across the Army.  We are mandated to

20  take cash.

21  Q.   Okay.  There's been some testimony that hardly anyone

22  uses cash at the dining facilities at Fort Huachuca and most

23  soldiers use meal cards.  In your experience with dining

24  facilities at Fort Huachuca, is that accurate?

25  A.   No, ma'am.  I would say that the Weinstein Dining

1   Facility probably does more meal cards because it focuses on

2   the training audience, whereas Thunderbird dining facility

3   focuses on the permanent party.

4   Q.   And what is the -- what is the import of that distinction

5   that you just made?

6   A.   Well, you know, for FY '22, they fed about 4,500 cash

7   customers across the post, so to me, that's quite a

8   significant number.

9   Q.   Is there -- are there any limits that you're aware of on

10  who can use a cash card to pay for dining services at military

11  installations?

12  A.   A cash card?

13  Q.   Not a cash card.  I'm sorry.  I meant to say a meal card.

14  A.   Okay.  Yeah, so a meal card is issued to normally E1

15  through E4, junior soldiers, because we take their SEPRATS

16  away, so we owe them three meals and a place to live, which is

17  the barracks.  And then E5 through, you know, senior NCOs

18  through sergeant major pay cash.  Officers pay cash.  Any

19  visitors to the post that eat in the dining facilities pay

20  cash.  DoD civilians pay cash.

21  Q.   So going back to one of the things you said that made the

22  proposal unacceptable was the failure of staffing for certain

23  bands of meals at one of the dining facilities; correct?

24  A.   Yes, ma'am.

25  Q.   Okay.  So even if -- well, ADES says they've never had to

1    provide those meals in the past, so they didn't need to

2    address those meals.  What is your response to that?

3    A.   The Government sets the requirements for what they need,

4    not for now, but in the future.  Those two in particular

5    bands, one was in response to COVID.  We noticed that across

6    the Army, during COVID, that we were not prepared for, we had,

7    you know, modifications going on, people not knowing how to

8    staff.  So that was one of the things we addressed to make

9    sure that we had a hundred percent takeout band when we do

10   these proposals, that that is typical across the Army.

11        The other one is directly out of the Army regulation.

12   Senior commanders can opt for a brunch and supper meal.  In

13   particular, that was under Thunderbird, which makes sense to

14   me, because it is a permanent party dining facility, so if the

15   garrison commander wanted to do that, he has the option to do

16   that.

17   Q.   So does the Army currently anticipate that whatever

18   vendor gets the contract to operate services -- dining

19   services at Fort Huachuca for the next five years will need to

20   provide those bands of meals?

21   A.   Yes.  That's why we put them in there, ma'am.

22   Q.   So there's been some extensive discussion about whether

23   -- about how plaintiff is currently performing under its

24   existing contract to provide dining services at Fort Huachuca.

25        Are the Army's projected needs over the next five years

DIRECT EXAMINATION OF WADE FROEHLICH                    97

 1    the same as they were five years ago, when the contract was
 2    first ordered?
 3    A.   No, ma'am.  The world has changed.  I mean, COVID for one
 4    thing, but also the way we train, how we train, who we train.
 5    You know, the commander sets their expectations of what we are
 6    going to do in the next years.  Our Logistics Readiness
 7    Centers, they develop those requirements off of those, you
 8    know, needs of the Army.
 9    Q.   So with respect to COVID, did the Army anticipate COVID
10    happening when it awarded the contract to ADES, the one that
11    is set to expire?
12    A.   No, ma'am.
13    Q.   Is it important for the Army to think ahead and
14    anticipate potential challenges that might impact the level of
15    staffing that would be required to ensure that soldiers are
16    fed in a safe and timely manner?
17              MR. LALCHANDANI:  Objection, Your Honor.  I think
18    this point's been well-established.  Asked and answered.
19              THE COURT:  Overruled.  I'll allow it.
20    A.   We have to, ma'am.  We have to project and, you know,
21    project forward what we need because we know -- we know that
22    we're not done, so we have to project out to what we need, and
23    it could be, subtracting the COVID portion, it could be
24    strategic decisions way above us that come down through local
25    commands that drive those new requirements.

1              MS. LETZKUS:  Okay.  Let me just take five seconds,

2    Your Honor, and then hopefully I can wrap up.

3              THE COURT:  Okay.

4    BY MS. LETZKUS:

5    Q.   Mr. Froehlich, you testified that you agreed with the

6    SSEB's evaluation as to how the proposal was unacceptable in

7    every way that the SSEB concluded it was unacceptable;

8    correct?

9    A.   Yes, ma'am.

10   Q.   Do you believe that the SSEB misunderstood the proposed

11   staffing for -- by ADES for the bands of meals it was required

12   to staff?

13   A.   No, ma'am.

14   Q.   Did you misunderstand ADES's proposal as to how it was

15   going to staff those bands?

16   A.   No, ma'am.

17   Q.   So is it your current conclusion still today that ADES's

18   proposal is technically unacceptable?

19   A.   Yes, ma'am.

20             MS. LETZKUS:  That's all I have.

21             THE COURT:  Thank you.

22             The question is, how long do you think you'll have

23   for cross-examination?

24             MR. LALCHANDANI:  Your Honor, I can -- depends on if

25   we can stretch to 5:35, 5:37, if the Court will allow, and

1    then I do have an emergency bathroom situation --

2              THE COURT:  Okay.  Go ahead and take a break.

3              MR. LALCHANDANI:  -- that is now on the record.

4              THE COURT:  Okay.  Why don't we go ahead and we'll

5    take a brief break, and then, Ms. Letzkus, I don't know how

6    much redirect you would have.

7              Mr. Froehlich, you're from out of town; correct?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  So why don't you go ahead, take the

10   break.

11             (Off the record from 5:12 p.m. to 5:15 p.m.)

12             THE COURT:  Wherever you're ready.

13                       CROSS-EXAMINATION

14   BY MR. LALCHANDANI:

15   Q.   Good afternoon, Mr. Froehlich.

16   A.   Good afternoon, sir.

17   Q.   Mr. Froehlich, are you based in Illinois?  Is that

18   correct?

19   A.   My job is based in Illinois.  I work remotely from

20   Temple, Texas.

21   Q.   When was the last time you were at Fort Huachuca?

22   A.   2002, sir.

23   Q.   In 2002, was ADES administering the food services

24   contract at Fort Huachuca?

25   A.   I'm not -- I can't tell you if they were administering

1  the DFA portion, but I can tell you the Thunderbird Dining

2  Facility, it was soldier-ran, because that's where I worked.

3  Q.    And you mentioned that there was an issue with the cash

4  fund during your time at Fort Huachuca that you were aware of?

5  A.    Not exactly Fort Huachuca.  I mentioned Fort Cavazos.  I

6  mentioned Leavenworth.  Well, I take that back.  I did mention

7  that.  Yes, it was.  I was not admin at the time.  I was on

8  shift.

9  Q.    And that was when the facility was Army-run?

10  A.    Correct, sir.

11  Q.    Okay.  And can you say again your title?  Is it --

12  A.    My official title is logistics management specialist,

13  sir.

14  Q.    And Mr. Froehlich, you've held that role for

15  approximately 10 months?

16  A.    Yes, sir.

17  Q.    And part of your responsibilities in that role is to

18  train the Army's evaluators; is that correct?

19        I can be a little more specific.

20  A.    Yes, please.

21  Q.    Is part of your responsibility to train food quality

22  assurance evaluators who evaluate dining facilities across the

23  country?

24  A.    Not my particular one, no.  We're working towards that

25  point where it would become one of my responsibilities, yes.

CROSS-EXAMINATION OF WADE FROEHLICH

1  Q.   Okay.  You're familiar with the Army's evaluations of

2  dining facilities?

3  A.   Yes, sir.

4  Q.   And the Army, in your understanding, takes those

5  evaluations seriously?

6  A.   Yes, sir.

7  Q.   So you're familiar with the Contractor Performance

8  Assessment Report, for example?

9  A.   Yes, sir.

10 Q.   You're familiar with FMATs?

11 A.   No, sir.

12 Q.   Okay.  Why does the Army, in your understanding, inspect

13 its dining facilities?

14 A.   To ensure the contractor is performing in accordance with

15 the PWS.

16 Q.   So the evaluators, when they're inspecting the dining

17 facilities, they're looking to the PWS or the performance work

18 statement; is that correct?

19 A.   Along with the performance requirement services or

20 performance requirement statement, which basically lays out

21 the things we need to look at.

22 Q.   So the performance work statement is part of what the

23 Army evaluators are using to evaluate contractual compliance;

24 is that correct?

25 A.   It's what the contractor is supposed to do for the

CROSS-EXAMINATION OF WADE FROEHLICH

1    Government.

2    Q.   And the PWS or performance work statement is also part of

3    the solicitations; is that correct?  Is that your

4    understanding?

5    A.   Yes, sir.

6    Q.   Okay.  Now, I want to ask you a few questions.  You're

7    familiar with the term "cross-training"?

8    A.   That's correct, sir, I am.

9    Q.   And did you review the solicitation for this particular

10   contract at issue?

11   A.   Yes, sir.

12   Q.   And what is your understanding of whether the

13   solicitation allows or mandates cross-training or not?

14          MS. LETZKUS:  Objection, Your Honor.  Compound.

15          THE COURT:  Well, and do you want to direct him?

16   It's a 150-page solicitation.  It would be helpful to direct

17   him to where you are.

18          MR. LALCHANDANI:  Understood, Your Honor.  I will do

19   that.

20          THE COURT:  Okay.

21   BY MR. LALCHANDANI:

22   Q.   So Mr. Froehlich, you have in front of you a binder with

23   Exhibit 30 in it.  It might be different than the binder you

24   were looking at previously.

25          THE COURT:  Do you have a page number?

1          MR. LALCHANDANI:  Yes, Your Honor.

2   BY MR. LALCHANDANI:

3   Q.   And I'm going to direct your attention to page 106.  It's

4   at the bottom in bold.  And at the very top, Mr. Froehlich, it

5   will say page 107 of 119, but at the bottom it will say 106.

6   A.   107 of 119.  Yes, sir.

7   Q.   Are you there at the page?

8   A.   I am.

9   Q.   I want to direct your attention to "Subfactor 2:

10  Staffing Plan" that's roughly in the middle of the page.

11       Do you see that?

12  A.   Yes.  Yes, sir.

13  Q.   And do you see the last sentence that begins with the

14  word, "Additionally?"

15  A.   Yes, sir.

16  Q.   And I'm just going to read it.  "Additionally, the

17  offerer's staffing shall clearly demonstrate they can

18  accommodate fluctuating workloads within a band of meals,

19  minimize personnel turnover, and allow for cross-training and

20  cross-utilizing of personnel to perform the requirements of

21  the PWS."

22       Did I read that correctly?

23  A.   Yes.

24  Q.   Is it your understanding that the solicitation requires

25  offerors to provide cross-training?

 1  A.   It needs to demonstrate the ability to cross-train, yes,

 2  sir.

 3  Q.   Can the cashier position be cross-trained?

 4  A.   If it is outside of the admin duties.  You cannot have

 5  your admin be your cashier.  For example, if you had

 6  servers -- that's a bad example.  Ration personnel would be a

 7  better example.  So you put rations away in the morning.

 8  Rations can then go over and be cross-trained to be a cashier.

 9  You could do that because it separates those duties.

10  Q.   Okay.  And food sanitation specialists or FSSs can be

11  cross-trained to be cashiers?

12  A.   They could be, but it could impact their ability to serve

13  the meal if you had them as servers.  You can't have a FSS

14  which is supposed to be doing their duties doing the cashier

15  duties because then who is serving the meal?

16  Q.   I'm just asking in general.  Let's assume there's

17  sufficient FSSs.  Can an FSS be trained in the cashier role?

18  A.   They could.

19  Q.   And an FSS can be trained, cross-trained, in the admin

20  role; correct?

21  A.   They could but they could not perform both duties.  They

22  can't perform the cashier and the admin.  They could be --

23  they could be cross-trained in one or the other, but to cross-

24  train them both, again, you create a problem there because

25  you've got a cashier and an admin, the same person.

CROSS-EXAMINATION OF WADE FROEHLICH

1  Q.   I think -- so I'm just asking in general, is there any

2  limitation on the cross-training of an FSS to be a cashier?

3  Just that question first.

4  A.   No, sir, no.

5  Q.   Is there any limitation of an FSS being cross-trained to

6  be an admin?

7  A.   No, sir.

8  Q.   Okay.  Thank you.

9       When you were evaluating ADES's proposal, did ADES's

10  technical proposal include cross-training?

11  A.   It did, sir.

12  Q.   How did your evaluation take that into account?

13  A.   We looked at the -- we looked at the areas they were

14  cross-training too and whether that would be sufficient to

15  what they were going to do.

16  Q.   And you said you've conducted approximately one to two

17  reviews per month since you've been in this role; is that

18  correct?

19  A.   That's correct.

20  Q.   How many of those -- well, let me ask you, are you

21  familiar with the term "State licensing agency?"

22  A.   Yes, sir.

23  Q.   How many of those reviews that you've conducted other

24  than this one involved the State licensing agency?

25  A.   Maybe one to two, sir.

CROSS-EXAMINATION OF WADE FROEHLICH                106

1    Q.   And have you ever, for those, I guess, those one to two,

2    concluded -- well, let me lay a little more foundation.

3         So for those one to two, were you asked to evaluate

4    whether the State licensing agency had been improperly

5    excluded from the competitive range?

6    A.   No, sir.

7    Q.   So this Fort Huachuca situation is the only time you've

8    ever been asked to conduct such an evaluation?

9    A.   To whether they were acceptable or unacceptable by

10   themselves.  We have had situations where we had multiple, you

11   know, unacceptable offers, and they asked us to relook at a

12   lot of offers.

13   Q.   And just to be clear, were those cases involving the

14   State licensing agency or those one or two other cases with

15   the State licensing agency?

16   A.   One or two but not the majority, no, sir.

17   Q.   Okay.  Were you the one who raised the cash fund issue,

18   who noted it first?

19   A.   Myself and Mr. Schwartz both noticed it.  We conduct

20   independent, you know, reviews.

21   Q.   I want to ask you -- let me just -- so you and

22   Mr. Schwartz were the ones who raised that issue; is that

23   correct?

24   A.   Correct, sir.

25   Q.   Did you review the debriefing letter as part of your

CROSS−EXAMINATION OF WADE FROEHLICH

1  evaluation?

2  A.   I reviewed the findings of the SSEB.  I don't think I saw

3  the debriefing letter, no, sir.

4  Q.   Okay.  And the issue that you identified with the cash

5  fund was that you thought the same person would be taking the

6  cash out and bringing it back in; is that correct?

7  A.   Well, that's what the proposal actually said.

8  Q.   I want to look to the proposal then.  And you're talking

9  about the technical proposal; correct?

10  A.   I'm talking about the technical proposal.

11  Q.   Let's turn to Exhibit 9.  Do you have that in front of

12  you?

13  A.   I'm there, sir.

14  Q.   And this should be the technical proposal cover page,

15  some preliminary pages, and ends on page 9.  Is that what you

16  have?

17  A.   Page 9.

18  Q.   At the bottom there?

19  A.   Oh, yes.  Yes, sir.  I see Exhibit 9, and I see "Fort

20  Huachuca Food Service."

21  Q.   So I want to give you a moment, unless you know, but

22  where in the technical proposal does it say that the same

23  person would be issuing the cash fund to him or herself?

24  A.   I'd have to look, sir.

25  Q.   Take a moment, please, or as much time as you need.

1        MS. LETZKUS:  Your Honor, I just want to object for

2   the record that the Exhibit 9 does not include the entire

3   technical proposal because it's not containing the staffing

4   matrix.

5        THE COURT:  So it will be -- Mr. Froehlich, to the

6   extent you can, based on the information in Exhibit 9, if you

7   can answer the question.

8   A.   I used page -- page 8, at the bottom of the page, "Volume

9   II Technical, page 8."  It says, "Admin/Cashier: record

10  headcount."

11  Q.   And from that -- oh, you said at the bottom?  I'm seeing

12  that close to the top of page 8.

13  A.   Well, the page number's at the bottom I was referring to.

14  Q.   Okay.  But you're referring to the chart,

15  "Admin/Cashier?"

16  A.   Correct.  That's where -- and I based, looking at that

17  off of the staffing matrix, that did not have a cashier

18  proposed.

19  Q.   So based off this "record headcount," you're saying in

20  conjunction with the staffing matrix --

21  A.   Correct, and then I --

22        THE COURT:  Let him -- let him finish the question.

23  Go ahead.

24  A.   I looked down to the cross-utilization where it talks

25  about cross-utilizing people.

CROSS-EXAMINATION OF WADE FROEHLICH

 1   Q.   So what about the description of cross-utilization at the

 2   bottom of page 8 led you to conclude that one person would be

 3   issuing the cash fund to him or herself?

 4   A.   Well, at the bottom it doesn't, but there's no other

 5   person to do it, and you -- and the actual matrix says,

 6   "Admin/Cashier: record headcount."  Who else is -- who else is

 7   issuing the cash?

 8   Q.   So I want to direct your attention to the last paragraph

 9   of page 8 that begins with the word, "Currently."

10        Do you see that, Mr. Froehlich?

11   A.   "Currently?"

12   Q.   Yes.  Do you see that paragraph?

13   A.   Yes.

14   Q.   And the second sentence that says, "We have FSS personnel

15   that are cross-trained to be admin."  Do you see that?

16   A.   Correct, sir.

17   Q.   And why can't FSSs be admins?

18   A.   Why can't FSSs be admins?

19   Q.   Let me ask a better question.  You testified earlier that

20   FSSs can perform -- can be cross-trained as admins; right?

21   A.   Correct, sir.

22   Q.   So given that cross-training, couldn't an FSS do the

23   responsibilities of an admin?

24   A.   Based on the technical proposal in the staffing matrix,

25   who, if you took an FSS to do the cash, would be doing the FSS

CROSS-EXAMINATION OF WADE FROEHLICH

1  duties, which include serving, sir?

2  Q.   I want to ask you a little bit more about the cash fund.

3  Would you agree that the proper procedure is to have one

4  person sign the cash fund form out and another person to sign

5  it back in?

6  A.   To sign the cash, the actual cash box out, yes.

7  Q.   You're familiar with the DA Form 3546?

8  A.   Correct, sir.

9  Q.   And the person who signs that form on the left side

10 should be different than the person who signs it on the right

11 side?

12 A.   Correct, sir.

13 Q.   And do you know how much the cash fund was at issue in

14 this case?

15 A.   I don't know whether it was 25 or $50.  I mean, it can be

16 up to 250, depending on how big the facility is and how much

17 cash they take in and out.

18 Q.   But you agree, then, an appropriate safeguard is to have

19 those two signatures be separate; is that right?

20 A.   That's correct.

21 Q.   And another safeguard is part of the AFMIS system or the

22 -- is that correct?

23 A.   I would not say that's a safeguard.  That's an accounting

24 function.

25 Q.   Well, let me ask you in a better way.  So the AFMIS

CROSS-EXAMINATION OF WADE FROEHLICH

 1  system, when someone -- a soldier or someone pays in cash it's

 2  recorded in the AFMIS system; is that correct?

 3  A.   Correct, sir.

 4  Q.   And you can print out the information from that system;

 5  is that correct?

 6  A.   If so desired, yes, sir.

 7  Q.   And you can verify the cash that's in the cash fund

 8  against the printout from the AFMIS system?

 9  A.   You could, sir.

10  Q.   And that would be a second safeguard for the cash fund?

11  A.   Except that, if you have the same person doing it and

12  it's the admin, they could delete that function out of there.

13  They could delete that total sale.  That's why the Government,

14  even in our case, on military, we use a unit member to come in

15  and pull headcount, because they have -- they have very little

16  access to the AFMIS system, basically recording.  Admin have

17  additional powers, or I shouldn't say powers, but capabilities

18  under the AFMIS system.

19  Q.   So your testimony is somebody could possibly delete

20  entries from the AFMIS system?

21  A.   Yes, sir.

22  Q.   How can you ever guard against that?

23  A.   Well, number one, that's why you have two separate

24  people, because the cashier shouldn't have the same capability

25  under AFMIS that the admin does.

CROSS-EXAMINATION OF WADE FROEHLICH

1   Q.   Mr. Froehlich, do you agree that an office clerk can

2   issue or receive cash if appropriately trained?

3   A.   Are you referring to admin or office clerk?  Same

4   delineation?

5   Q.   Sure.  I'll ask you just the term office clerk as you

6   understand it.  Can that person issue or receive cash if

7   appropriately trained?

8   A.   If that's their job, yes.

9   Q.   And an FSS, if that's their job and is appropriately

10  trained, can issue or receive cash?

11  A.   Yes, sir.

12  Q.   Same with a shift leader?

13  A.   Yes, sir, but you're -- you're moving to take away from

14  your shift then.  I don't see how that would work.

15  Q.   Same with a manager?

16  A.   Correct, sir.  A manager's a little harder because he has

17  even more capability under AFMIS.

18  Q.   So you're saying a manager has more responsibility?

19  A.   Correct, sir.

20  Q.   Okay.  The cash fund, I want to ask about the timing of

21  the cash fund.  I don't know if this is the right terminology.

22  It's checked out at the beginning of mealtime; is that

23  correct?

24  A.   Correct, sir.

25  Q.   And it's checked back in at the end of the mealtime?

1  A.   Correct, sir.

2  Q.   How long does that process take at the beginning of the

3  mealtime?

4  A.   Depends on the size of the cash fund.  Depends on who's

5  issuing it.  Depends on how many headcounts you have.  It can

6  be anywhere from 15 to 30 minutes.

7  Q.   So during a course of a mealtime, an individual could

8  check out the cash fund, perform other duties, after handling

9  the cash fund; is that correct?  Let me ask it in a better

10 way.  I'm sorry.

11      Would you agree that checking out the cash fund does not

12 last the length of an entire meal period?

13 A.   Once that cash is checked out, yes, that cash is live for

14 the entire meal period.

15 Q.   Are you familiar with Army Regulation 3-27?

16 A.   No.  No, sir.

17          THE COURT:  And how many more questions do you have,

18 do you think?  I'm just -- if it's going to be a while, we

19 just need to stop and get a new date.  I'm not rushing you.  I

20 just --

21          MR. LALCHANDANI:  Yeah, I feel like we're making

22 progress, but Your Honor, I don't know.  There's no limit

23 of --

24          THE COURT:  Yeah, I think we better just stop.

25 We're already, by the time staff leaves, we're going to be

 1    close to six o'clock, so I just can't keep them any longer.

 2              So Mr. Froehlich, my hope had been that we would get

 3    you done today, but that doesn't look like it's going to

 4    happen.  So we'll go ahead and let you step down, and then the

 5    parties will discuss when we're going to reconvene and how

 6    we're going to do it.

 7              So thank you.  I apologize.  Please make sure that

 8    Ms. Letzkus and Mr. Hernandez know what your schedule is as

 9    far as any time that you're not available.

10              THE WITNESS:  Yes, Your Honor.

11              MR. FREEMAN:  Your Honor, could I ask the witness be

12    cautioned not to discuss the case?

13              THE COURT:  Yeah, Mr. Froehlich, you're still under

14    the admonition that I talked about not to discuss the case

15    with other individuals other than the lawyers in the case.

16              THE WITNESS:  Yes, Your Honor.

17              THE COURT:  All right.  Okay.  What are we going to

18    do?

19              MR. FREEMAN:  I'll make a proposal, Your Honor.

20    Would it be -- I don't think there is a lot more for

21    Mr. Froehlich.  To save him -- I think, Your Honor, obviously

22    we can't finish tonight.  Given that we've all had experiences

23    of putting on witnesses remotely, would it be possible to

24    reconvene by Zoom just to conclude the cross-examination?

25              THE COURT:  Our Court does not allow that anymore.

 1   That only was a situation under the CARES Act, so we cannot do

 2   testimony that way and under very limited circumstances.

 3              MR. FREEMAN:  So Your Honor --

 4              THE COURT:  Yes.

 5              MR. FREEMAN:  -- you mentioned possibly having some

 6   availability next -- is it -- you said Monday?  Was it --

 7              THE COURT:  Yeah.

 8              MR. FREEMAN:  I think that --

 9              THE COURT:  I've got -- well, I've got next Monday

10   and next Friday is very limited where we could start about

11   8:30 in the morning, but I would have to take a break at 10:00

12   to handle some criminal matters.  We could come back until

13   about noon.

14              But my issue is I have criminal matters that start

15   at 1 p.m. until 5 p.m., but then in the morning I've got to be

16   reviewing all the criminal complaints that come in over the

17   weekend and things like that.  So we can do it, but it's very

18   piecemeal, which --

19              MR. FREEMAN:  I appreciate that and I --

20              THE COURT:  -- isn't ideal but --

21              MR. FREEMAN:  So I apologize.

22              THE COURT:  That's okay.

23              MR. FREEMAN:  I'll throw out an idea.  So

24   Mr. Lalchandani could return on Monday.  I do believe that he

25   can finish this cross-examination in less than half an hour.

 1              THE COURT:  And then Ms. -- well, let me --
 2  Ms. Letzkus, would you be available Monday?
 3              MS. LETZKUS:  I don't have my calendar in front of
 4  me right now.  I believe --
 5              THE COURT:  Could you go downstairs and get it?
 6              MS. LETZKUS:  I believe I --
 7              THE COURT:  Can you have someone go downstairs and
 8  get it for you?
 9              MS. LETZKUS:  Okay.  Major Roan, who's the Army's
10  representative who's required to be in the courtroom whenever
11  anyone is -- cannot be here on Monday.
12              THE COURT:  Okay.  Can you be here Friday the 25th?
13              There is a lot of moving parts, people, so go ahead.
14              MR. LALCHANDANI:  One suggestion.
15              THE COURT:  Sure.
16              MR. LALCHANDANI:  So the reason Monday was
17  convenient is because I'm going to California.  If we're going
18  to come back, if I have to go all the way back to the East
19  Coast just to come back, then I think it would make sense for
20  me to come back with Mr. Freeman to do both the conclusion
21  with the closing in person.  I could fly 15 hours for 30
22  months, but just with the changes, the flight schedules, it's
23  a little bit difficult.
24              THE COURT:  What's everybody doing tomorrow morning,
25  like, at eight o'clock?  I have court at 9:30.  I could give

```
 1   you from 8:00 until 9:15 tomorrow.
 2            We don't have a clerk.
 3            THE CLERK:  Sorry.
 4            THE COURT:  That's okay.  Is there a way to just get
 5   somebody?
 6            MR. HERNANDEZ:  Your Honor, our other concern is
 7   that, if they take all the time and we have this limited
 8   time --
 9            THE COURT:  No, and I mean, I would definitely give
10   you guys time to -- I would give both sides the time to do
11   redirect.  What I'd like to do ideally is get testimony done,
12   and quite frankly, arguments, at this point, whether I even
13   need them or not I don't know, but that could be done
14   telephonically.  I'm more concerned about having the ability
15   to have Mr. Froehlich here.
16            THE CLERK:  Let me look at your DH/PHs.
17            MR. LALCHANDANI:  Your Honor, what time did you
18   start on Monday for your other matters?
19            THE COURT:  Well, I have -- I don't have morning
20   court, but I have to be available to review things, so we
21   could --
22            MR. FREEMAN:  Your Honor --
23            THE COURT:  But the Army's not available on Monday,
24   so that's why Monday doesn't work.
25            MR. FREEMAN:  Yep.
```

1           THE COURT:  The other option -- what's -- what do we

2    have?  The other option, I mean, my last criminal hearing

3    tomorrow is at 4:00.  We could start after that.

4           MR. FREEMAN:  We're available, Your Honor.

5           THE COURT:  So that would be tomorrow, like, at four

6    o'clock.  We might be able to get some of the criminal things

7    moved up a little bit.

8           MS. LETZKUS:  Your Honor, I'm just concerned with

9    doing this piecemeal.  I understand everyone's --

10          THE COURT:  Well, it's going to be piecemeal no

11   matter what at this point.  We're kind of -- the situation's

12   going to be piecemeal no matter what.

13          So tomorrow I could do -- I could also do it the --

14          (A discussion was had off the record between the

15          Court and the Clerk.)

16          THE COURT:  So here's what we could do tomorrow, and

17   we still have -- that way we have Mr. Froehlich still here.

18   We could do tomorrow, start at 8 a.m., go until -- from 8:00

19   until 9:30.  And I recognize, Ms. Letzkus, this is not ideal,

20   but I don't know what else to do based on everybody's time

21   constraints.  So we could go from about 8:00 to 9:30.

22          My criminal calendar is going to be from about 9:30

23   to 11:00.  If we have to come back, we can come back from

24   11:00 -- oh, you have your appointment.  Okay.  So we could

25   come back at -- later in the afternoon.  I mean, if I give you

1    an hour and a half, that should be plenty to get through one

2    witness.

3            I'm not talking about arguments.  Arguments we'll

4    deal with at a different time.  What I'm talking about is just

5    getting Mr. Froehlich done so we're not inconveniencing him

6    anymore.  So if we -- and Cindy, you can be here at 8:00?  And

7    everybody else can be here at eight?

8            MR. LALCHANDANI:  Yes, Your Honor.

9            MR. HERNANDEZ:  And I don't necessarily want to put

10   this on the record.

11           THE COURT:  Okay.  You have a conflict.

12           MR. HERNANDEZ:  I have a conflict.

13           THE COURT:  Okay.

14           MR. HERNANDEZ:  And it is a medical conflict.

15           THE COURT:  Okay.  Is -- can Ms. Letzkus take care

16   of this without you being here?

17           MR. HERNANDEZ:  May I talk to --

18           THE COURT:  Sure, sure.  Okay.  Ms. Kroeger, can you

19   fill in for Mr. Hernandez?

20           MS. KROEGER:  I'll enter an appearance.

21           THE COURT:  Okay.  All right.  And I will grant that

22   appearance.  How's that?  We can do it verbally on the record

23   right now.

24           All right.  So if everyone can be back at 8 a.m., at

25   least that way, hopefully, we can get done with Mr. Froehlich,

1    and then we can discuss the arguments, like I said.  The

2    arguments could be telephonic.  I don't have an issue or

3    concern with that.  It's the testimony of the witness that is

4    the concern.

5            MR. FREEMAN:  So I appreciate that.  That all works

6    for -- we will finish Mr. Froehlich between 8:00 and 9:30

7    tomorrow morning, Your Honor, 9:15.

8            THE COURT:  And just because -- that means --

9            MR. FREEMAN:  Finish and --

10           THE COURT:  Yes, that means cross and redirect.

11           MR. LALCHANDANI:  And Your Honor's questions.

12           MR. FREEMAN:  And Your Honor's questions, yes.

13           Just thinking forward with respect to telephonic

14   closing arguments, Your Honor --

15           THE COURT:  Yes.

16           MR. FREEMAN:  -- I am not available next week.

17           THE COURT:  Okay.  And neither am I, so we're good.

18           MR. FREEMAN:  Okay.

19           THE COURT:  Okay.  All right.  I will see you back

20   here at 8 a.m.

21           MR. FREEMAN:  Thank you.

22           MS. LETZKUS:  Thank you Your Honor.

23           MR. HERNANDEZ:  Thank you, Your Honor.

24           THE COURT:  Thank you.

25           (Proceedings concluded in this matter at 5:34 p.m.)

```
1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, do hereby certify that the

4   preceding pages of typewritten matter are a true, correct, and

5   complete transcription of the digital recording of proceedings

6   in the above-entitled matter.

7               Dated this 24th day of August, 2023.

8

9                         s/Erica R. McQuillen
                     Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```