1          IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3

4  Arizona Department of Economic                4:23-CV-00250-LCK
   Security, an Arizona State agency,

5
        Plaintiff,                               August 17, 2023
6                                                     8:05 a.m.
                                                 Tucson, Arizona
7  vs.

8  Christine Wormuth, Secretary of the
   Army, in her official capacity,

9

10       Defendant.
   _____

11

12

13

14

15           OFFICIAL TRANSCRIPT OF PROCEEDINGS

16            EVIDENTIARY HEARING (DAY THREE)

17       BEFORE THE HONORABLE LYNNETTE C. KIMMINS
                UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23           PROCEEDINGS WERE DIGITALLY RECORDED

24           TRANSCRIBED BY:  ERICA R. McQUILLEN
                405 West Congress, Suite 1500
25                  Tucson, Arizona 85701
                      (520) 205-4267

```
 1                  A P P E A R A N C E S

 2   For the Plaintiff:

 3        Andrew D. Freeman
          Neel K. Lalchandani
 4        Brown Goldstein & Levy LLP
          120 East Baltimore Street
 5        Suite 2500
          Baltimore, Maryland 21202
 6

 7   For the Defendant:

 8        Melissa Marcus Kroeger
          Sarah Suzanne Letzkus
 9        United States Attorney's Office
          405 West Congress Street
10        Tucson, Arizona 85701

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          EXAMINATION INDEX

2

3    WADE FROEHLICH

         CROSS BY MR. LALCHANDANI . . . . . . . . . . . . .   5
4        REDIRECT BY MS. LETZKUS . . . . . . . . . . . . .  29
         EXAM BY THE COURT  . . . . . . . . . . . . . . .  33

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  Calling Civil Matter 23-250, Arizona

3  Department of Economic Security vs. Christine Wormuth, on for

4  evidentiary hearing, day three.

5          Would counsel please state your appearances for the

6  record.

7          MR. FREEMAN:  Good morning, Your Honor.  Andrew

8  Freeman for the plaintiff, and with me Neel Lalchandani, who

9  will resume the questioning of Mr. Froehlich.

10          THE COURT:  Thank you.  Good morning, Mr. Freeman

11  and Mr. Lalchandani.

12          MR. LALCHANDANI:  Good morning.

13          MS. LETZKUS:  Good morning, Your Honor.  Sarah

14  Letzkus for the defendant, and with me is my co-counsel

15  Melissa Kroeger and the Army's representative Major Roan.

16          THE COURT:  Thank you.  Good morning.

17          Thank you all again for coming in early.  I

18  appreciate it.  Thank you, Mr. Froehlich, as well.

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  We'll go ahead and continue the

21  testimony, the cross-examination of Mr. Froehlich, so

22  Mr. Lalchandani, whenever you're ready.

23          MR. LALCHANDANI:  Yes, Your Honor.  And thank you,

24  Mr. Froehlich, and thank you to the Court and the Court's

25  chambers team as well for the accommodation during an

1    especially busy week.

2              WADE FROEHLICH, WITNESS, PREVIOUSLY SWORN

3                         CROSS-EXAMINATION

4    BY MR. LALCHANDANI:

5    Q.    Good morning, Mr. Froehlich.

6    A.    Good morning, sir.

7    Q.    So you left Fort Huachuca 21 years ago in 2002; is that

8    correct?

9    A.    Correct, sir.

10   Q.    And when you were there, you were a cook at Thunderbird;

11   is that right?

12   A.    Thunderbird.

13   Q.    At that time, in 2002, Weinstein hadn't been opened;

14   correct?

15   A.    Weinstein was opened.  It was a training -- it was

16   contracted for training.

17   Q.    And what about Black Tower?

18   A.    No, sir.

19   Q.    Okay.  Mr. Froehlich, who were -- you're familiar with

20   the Source Selection Evaluation Board that we've been

21   discussing; correct?

22   A.    That's correct.

23   Q.    Who are the members of the technical team of that Source

24   Selection Evaluation Board?

25   A.    I know who one of our ASC members were, Mr. Steven Green.

 1   I'm not sure who are the other two.  My assumption is one of

 2   the FPM or the FPM or the COR.  I'm not sure, to tell you the

 3   truth.

 4   Q.   And just so we're clear, FPM is food program manager?

 5   A.   Correct.

 6   Q.   And COR is contract officer representative?

 7   A.   Correct, sir.

 8   Q.   And those people would be based at Fort Huachuca;

 9   correct?

10   A.   Yes, sir.

11   Q.   Mr. Froehlich, did you prepare a written document

12   reflecting your findings?

13   A.   Myself and Mr. Schwartz together, yes, sir.

14   Q.   Okay.  And you supplied that to Mr. Vicory?

15   A.   Yes, sir.

16   Q.   Mr. Froehlich, you're familiar with the staffing matrices

17   that we've been discussing; correct?

18   A.   Yes, sir.

19   Q.   You would agree with me that those matrices do not

20   include delineated staffing for managerial positions; correct?

21   A.   What do you mean by delineated?

22   Q.   Sure, let me break that down.  So there's different

23   categories on the staffing matrices?

24   A.   Correct, sir.

25   Q.   So there might be cook I, for example, and cook II?

1    A.    Correct.

2    Q.    Is there a separate row for managers?

3    A.    Usually, yes, they show supervisory personnel.

4    Q.    So all the offerors, the staffing matrix, your testimony

5    is that the Army's -- sorry.  Let me start that over.

6          Is it your testimony that the Army's staffing matrices

7    that they provided to all offerors had a row for managers?

8    A.    Normally we ask them to put them on there so we can see

9    that management is present all day.

10   Q.    Okay.

11   A.    Underneath -- under ADES, it was not there.  It was

12   contained under PMO, so we couldn't see that either.  We could

13   see that they had managers.

14   Q.    Okay.  How many managers did they have?

15   A.    I believe it was -- I believe it was five managers, and

16   then I don't know how many assistant managers.

17   Q.    Okay.  Now, Mr. Froehlich, when you completed your

18   evaluation, is it accurate to say that you compared ADES's

19   proposed staffing with the Government's estimated staffing?

20   A.    Correct, sir.

21   Q.    How does the Army know how much staffing is sufficient

22   for the various scenarios in the staffing matrix?

23   A.    It's provided by -- it's a conglomeration between the

24   local command and the LRC, the Logistics Readiness Center, of

25   what the requirements will be in the future.

1  Q.   So did you personally come up with the Government's

2  estimated staffing?

3  A.   No, sir.

4  Q.   Okay.  So you took that at face value, and you just

5  applied their staffing to ADES's proposed staffing; correct?

6  A.   Correct, sir.

7  Q.   Okay.  How do you know that that staffing was accurate?

8  A.   That's why we have a team that comes up with that.  It's

9  not only -- you know, it's a team effort between Army

10  Sustainment Command and the LRC and the local command of what

11  the requirements will be in the future.

12  Q.   So do you know the rationale for why they came up with

13  the staffing at Fort Huachuca?

14  A.   No, sir.

15  Q.   You're not involved in that process?

16  A.   No, sir.

17  Q.   Okay.  Do you know if that team looks to the actual

18  staffing that's currently provided in coming up with its

19  estimates?

20  A.   I don't know.

21  Q.   Okay.  You would agree with me that those estimates are

22  just, that, estimates; correct?

23  A.   Estimates and requirements for what we will need in the

24  next five years, yes.

25  Q.   Okay.  But the like question is that they're just

1  predictions about what is needed; correct?

2  A.   Yes, sir.

3  Q.   In your experience, have you ever had a military dining

4  facility that was overstaffed?  Have you ever seen that in

5  your experience?

6  A.   No, sir.

7  Q.   You've never seen that in your --

8  A.   I've never seen overstaffed.

9  Q.   Okay.

10  A.   Possibly back in the '80s, before I came in, but since I

11  came in, we've just always been short cooks.

12  Q.   Okay.  So cooks has been the biggest shortfall, you'd

13  say?

14  A.   Yes, sir.

15  Q.   Okay.  You would agree with me that it's possible that --

16  to do the job more efficiently at Fort Huachuca than what the

17  Government has estimated?

18  A.   I'm not sure what you're asking me, sir.

19  Q.   Sure.  Let me rephrase.

20       So the Government has provided its estimates of the

21  number of staffing it believes is appropriate; correct?

22  A.   Yes, sir.

23  Q.   It is possible to provide those same services with less

24  staffing than what the Government predicts?

25            MS. LETZKUS:  Objection.  Speculation, Your Honor.

1        THE COURT:  Overruled.  I'll allow it if he can

2    answer it.

3    A.   The Government's estimate is the floor, so that's what we

4    predict, that's what we determine off of, is that floor.  If

5    it's less than that or if you cross-train somebody, you have

6    to specifically explain how you're going to utilize that

7    personnel.  But the bottom line is that that estimate is the

8    estimate.

9    Q.   And when you say "we," you're not involved with that

10   process?

11   A.   Come up with the estimate, you mean?

12   Q.   Yes.

13   A.   Correct, sir.

14   Q.   Okay.  So your testimony is that the Government's

15   estimate is, with certainty, is also correct, at least as a

16   minimum?

17        MS. LETZKUS:  Objection.  Misstates testimony.

18        MR. LALCHANDANI:  I'm asking if that's his testimony

19   to clarify.

20        THE COURT:  And why don't you ask him a question.

21        MR. LALCHANDANI:  Okay.

22        THE COURT:  And can you clarify between whether

23   you're asking him from the standpoint of a reviewer of a

24   proposal versus his experience in his various positions.

25        MR. LALCHANDANI:  Understood, Your Honor.

1    BY MR. LALCHANDANI:

2    Q.    In your experience as a reviewer, in the 10 months you've

3    been reviewing proposals, is it your testimony that the

4    Government's estimates as to the staffing required is always

5    accurate?

6    A.    It's their estimate.  It's not my -- it's not my job to

7    tell you whether it's right or not.  It's my job to review

8    whether that estimate meets the proposal.

9    Q.    So your job is to take the matrix that the Government has

10   provided and to just simply compare those numbers to the

11   numbers in the proposed staffing; is that correct?

12   A.    And also review the technical proposal to see if there's

13   explanations in there.

14   Q.    Okay.  So -- okay.  And as we established yesterday,

15   DES's proposal said that it would utilize cross-training;

16   correct?

17   A.    Correct, sir.

18   Q.    Okay.  Mr. Froehlich, you testified yesterday that you

19   agreed with the assessment of the Source Selection Evaluation

20   Board's technical team with respect to the understaffing of

21   the DFAs and FSS positions; correct?

22   A.    Correct, sir.

23   Q.    And as one example, that team found that the DFAs and

24   FSSs were understaffed for the Weinstein building in band 2;

25   correct?

 1   A.   Yes, sir.

 2   Q.   Okay.  I now want to direct your attention to Exhibit 22.

 3   It should be a loose-leaf page.  I believe it's in -- yeah,

 4   that one right there.  I'll give everyone a moment to make

 5   sure we have the right page.  And you should see the one with

 6   the exhibit sticker.  You want to look on the first page.

 7   A.   It says Exhibit 22 at the bottom?

 8   Q.   Yes, sir.  Thank you.

 9        You've reviewed this document as part of your evaluation;

10   correct?

11   A.   Correct, sir.

12   Q.   Okay.  And specifically, we were talking about band 2 for

13   Weinstein.  This reflects the staffing for Weinstein; correct?

14   A.   Correct.

15   Q.   And do you recall that there was concerns about the

16   staffing for breakfast for FSSs and DFAs?

17   A.   I would have to review to see what --

18   Q.   Sure.

19   A.   -- meals there were.  I don't remember.

20   Q.   Okay.  Well, we can look at Exhibit 12.  I was trying to

21   streamline it, but that's understandable.

22        So if you pull to Exhibit 12, and it will say page 8 of

23   12 in the top header in blue.

24   A.   I'm there, sir.

25   Q.   And if you go to the very last paragraph on the page, do

1   you see it says we're talking about building 85202, which is

2   Weinstein?

3   A.   Yes, sir.

4   Q.   And we're talking about band 2:  2,251 to 4,500 meals?

5   A.   Yes, sir.

6   Q.   And we're talking about FSSs and DFAs?

7   A.   Yes, sir.

8   Q.   And we're talking about -- let's start with between

9   5 a.m. and 8:30.  Okay?

10   A.   Okay.

11   Q.   All right.  Now I want to go back to Exhibit 22 so we can

12   just try to match this up.  So let's look, and you would agree

13   with me that's the second scenario that we're talking about,

14   that is band 2 for Weinstein; correct?

15   A.   Correct, sir.

16   Q.   Okay.  And between 5 a.m. and 8:30 a.m., there are FSSs,

17   there are six; is that correct?

18   A.   That's correct, sir.

19   Q.   Okay.  And it's your belief that those were understaffed;

20   correct?

21   A.   Between FSSs and DFAs, yes.

22   Q.   Okay.  So your testimony is they were understaffed

23   combined; is that correct?

24   A.   Correct sir.

25   Q.   Okay.  So let's look at DFAs.  So there were eight

```
 1  between 5:30 and eight o'clock; is that correct?
 2  A.   Correct, sir.
 3  Q.   So that would be a combined 14?
 4  A.   Correct, sir.
 5  Q.   How many combined FSSs and DFAs do you believe there
 6  should have been?
 7  A.   I can't remember what the Government estimate said, but I
 8  believe it was 16 or 17.  I'm not positive, to be honest.  I'd
 9  have to look again.
10  Q.   Because you were just applying the chart that was given
11  to you?
12  A.   I was applying rationale of looking at what the
13  Government's estimate was compared to what ADES's estimate
14  was.
15  Q.   But you were relying on your experience as well; correct?
16  A.   I was relying on my experience, but I also have to go
17  with the Government's estimate because that is the floor.
18  Q.   I guess what I'm trying to understand, I mean, anyone can
19  look at one chart and compare it to another chart, but were
20  you relying -- were you relying on your experience as well, I
21  just want to clarify, in making this determination for this
22  specific issue?
23  A.   I was relying on what the Government said it needed
24  versus what it was supplied by ADES.
25  Q.   Okay.  And you're not sure what the Government said was
```

 1  needed?

 2  A.   No.  No, sir.

 3  Q.   Okay.  And you think it was maybe 16 or 17?

 4  A.   I believe it was two or three off, yes, sir.

 5  Q.   Okay.  Okay.  And so you were applying the Government's

 6  chart.  Were you also considering -- well, let me back up.

 7       Does the Government's chart account for cross-training?

 8  A.   No, sir.

 9            MR. LALCHANDANI:  Court's indulgence.

10            THE COURT:  Sure.

11  BY MR. LALCHANDANI:

12  Q.   Now, Mr. Froehlich, you testified that you and

13  Mr. Schwartz documented your findings; correct?

14  A.   Yes, sir.

15  Q.   And you conveyed that to Mr. Vicory?

16  A.   Yes, sir.

17  Q.   Was that sent via email?

18  A.   Yes, sir.

19  Q.   And you're aware that Mr. Vicory then relied upon your

20  findings in rejecting the request for reconsideration;

21  correct?

22  A.   Yes, sir.

23  Q.   If Mr. Vicory wrote that hours are ample for managing the

24  headcount and admin functions for the total hours for the day,

25  do you have any reason to disagree with that?

1   A.   I can tell you exactly what that was, sir.  We said that

2   we were fair to the contractor that they had ample people to

3   pull the headcount, but at the same time, the issue still

4   existed of having the same person do two different -- you

5   know, it created the safeguard issue.

6   Q.   It was the issue with the cash fund; correct?

7   A.   Correct.

8   Q.   Okay.  And I believe, correct me if I'm wrong, the issue

9   was -- the concern was most acute at dinnertime; is that

10  correct?

11  A.   It got worse as the day went on.

12  Q.   Okay.  My understanding, and tell me if this is wrong, is

13  that, for breakfast and lunch, you just thought that the

14  evaluation or the proposal wasn't clear enough, is that

15  correct, as to the cash fund issue?

16  A.   It just did not have a cashier, and from what the

17  proposal said, it said "headcount."  That's what it said under

18  admin and cashier, so.

19  Q.   So I'm just trying to understand, so let me take it a

20  little slower.  So I thought I understood your testimony

21  yesterday to say, when Ms. Letzkus asked you, the issue was

22  not that ADES did not include personnel for the headcount.  It

23  was just that it wasn't enough.

24       Is that correct?

25  A.   There was no -- the issue was separation in that specific

1   case.

2   Q.   Okay.

3   A.   The ample personnel, we were fair to the contractor to

4   point out that they were pulling headcount, yes, but the issue

5   still remains.

6   Q.   It was a separation?

7   A.   Correct, sir.

8   Q.   Okay.  Well, maybe it's helpful, let's look back to the

9   Exhibit 22 here, and let's look at band 1.  Okay?

10  A.   Okay.

11  Q.   And you see terminology "office clerk;" correct?

12  A.   Yes.

13  Q.   As one of the positions?

14  A.   Correct, sir.

15  Q.   And we understand the terminology is different, but as

16  you said, the proposal said office clerk is -- can perform the

17  headcount duty as admin; correct?

18  A.   That's what the proposal says.

19  Q.   Okay.  And so at breakfast time, there were three people,

20  correct, for the actual mealtime?

21  A.   Correct.

22  Q.   Okay.  At lunchtime there were three people?

23  A.   I'm looking.  Yes.

24  Q.   You can see -- sorry.  I didn't mean to interrupt you.

25       Is that correct, Mr. Froehlich?

CROSS—EXAMINATION OF WADE FROEHLICH                    18

```
 1   A.   That's correct.

 2   Q.   Okay.  And for dinnertime there were two people?

 3   A.   Correct.

 4   Q.   Okay.  So the -- I just want to understand.  Your issue

 5   is that there were -- that's not -- that's not a sufficient

 6   number of people or that they're designated as the same

 7   category?  What's the issue with that?

 8   A.   If they're pulling headcount and if they're the cashier

 9   and the admin, that's a problem.

10   Q.   Even if it's two separate people?

11   A.   You're still pulling headcount at two stations, are you

12   not?

13   Q.   Mr. Froehlich, this is my opportunity to ask you

14   questions, please.

15              THE COURT:  I think he's asking for a clarification.

16              MR. LALCHANDANI:  Okay.  Well, it wasn't -- I

17   didn't --

18              THE COURT:  Okay.  Okay.  Go ahead.

19   BY MR. LALCHANDANI:

20   Q.   I'm just trying to understand the concern, so is the

21   concern that there's not sufficient number of staffing?  Is

22   that the issue?

23   A.   The concern I have is that there is -- there is no

24   separation.

25   Q.   Okay.  What if soldiers just pay for cash at one of the
```

UNITED STATES DISTRICT COURT

 1   headcount stations?
 2   A.   You still have that -- the admin pulling headcount,
 3   handling the cash, and the other one is also on headcount.  So
 4   who do you got -- who's issuing the cash?  The other one's
 5   issuing the cash.  What's stopping the other one from
 6   canceling -- it's still an admin pulling headcount.  What's
 7   stopping that admin who has the cash and the ability to cancel
 8   a cash transaction?
 9   Q.   Okay.  I'm not sure I'm understanding when you say "other
10   one."  Can you --
11   A.   So if you have two admins, and I'm understanding your
12   premise to be one issues cash to the other one, and then that
13   one has the cash; correct?  Is that what you're saying?
14   Q.   I'm saying that, if there's two headcount stations and
15   one station accepts cash, just at one of the two headcount
16   stations.
17   A.   Who issued the cash?  I don't know.
18   Q.   In this scenario, one person is checking in the cash at
19   the beginning of the meal, and then there is a separate person
20   who verifies on the back end.
21   A.   Who is that separate person?
22   Q.   It could be a manager.  It could be the other admin.
23   A.   Doesn't say in the proposal.
24   Q.   Doesn't it say in the proposal that FSSs are cross-
25   trained as admins?

1  A.   It does.

2  Q.   Doesn't it say in the proposal that managers can step in?

3  A.   No, it doesn't.

4  Q.   Didn't you testify yesterday that shift leaders can

5  handle cash?

6  A.   Yes, because they --

7  Q.   Didn't you testify -- sorry.  Please continue.

8  A.   Because they had no access to the AFMIS system to do

9  those things.

10  Q.   Did your evaluation take into account the cross-training?

11  A.   Yes.

12  Q.   I thought you testified a few moments ago that it didn't

13  take into account the cross-training.

14  A.   It takes into account any cross-training they put in

15  their proposal, but as far as the number of personnel, I have

16  to go by what the Government said the minimum is.

17  Q.   Okay.  So it takes it into account but not when you're

18  considering numbers; is that correct?

19  A.   You have to explain it, sir.

20  Q.   Okay.  And you didn't have the other technical proposals

21  here or as any part of your evaluation; correct?  Sorry.  You

22  didn't have the other offerors' technical proposals as part of

23  this evaluation?

24  A.   No, sir.

25  Q.   So you don't know how they've explained it, if at all?

1  A.   No, sir.

2  Q.   And you're familiar with Army Regulation 30-22?

3  A.   Yes, sir.

4  Q.   And you're aware that that regulation alone -- well,

5  you're aware that that regulation has to be complied with as

6  part of the solicitation; correct?

7  A.   Correct, sir.

8  Q.   You're aware that Army Regulation 30-22 is 255 pages

9  long?

10 A.   If you say so, sir, sure.  I'm not sure how long it is.

11 Q.   You're aware that it's lengthy and has numerous subparts;

12 correct?

13 A.   The Army regulation is shorter than the DA PAM, so I

14 don't know which one you're -- the AR seems shorter to me than

15 the DA PAM.

16 Q.   Okay.  But they have numerous subparts and many

17 requirements; correct?

18 A.   Correct.

19 Q.   All right.  Mr. Froehlich, just briefly on the cash fund,

20 I just want to understand the steps of the process.  It

21 happens before the meal; correct?

22 A.   Correct, sir.

23 Q.   Someone who's been trained can take the cash from the

24 Government-provided safe; correct?

25 A.   Correct.

```
 1   Q.   They count to verify the amount that's in there?
 2   A.   Correct.
 3   Q.   They sign the form, DA Form 3546; correct?
 4   A.   Correct.
 5   Q.   And they take the envelope to the headcount station;
 6   correct?
 7   A.   Not correct.
 8   Q.   Okay.  Why not?
 9   A.   Because that cashier has to be present to count the same
10   cash.
11   Q.   So they have to --
12   A.   You -- you cannot do that because then you are putting
13   the liability on that cashier.  You have to have that cashier
14   present.  Headcount -- admin counts it.  Cashier counts it.
15   They both agree, sign.  Then that cashier owns that cash to go
16   out to the headcount.
17   Q.   Okay.  And this takes place before the meal period?
18   A.   Correct, sir.
19   Q.   And that can take place in a few minutes, correct, that
20   process I just described?
21   A.   Depends on the number of headcounts, the cash fund.  It
22   just depends.
23   Q.   My question is --
24   A.   15 to an hour.  It depends on -- or half an hour.  I
25   shouldn't say an hour.  That's a little lengthy.  But half an
```

```
 1   hour.
 2   Q.    Is it possible that could take a few minutes?
 3   A.    No, sir.
 4   Q.    What if it's one cash fund and you're counting $25?
 5   A.    Probably 15 minutes between the two counting it.
 6   Q.    So if it's a -- how are the bills?  What --
 7   A.    So it depends on how you break them down, that's correct,
 8   but usually, normally, you have so many bills, so many -- so
 9   much loose cash or loose change, rolled change, of that sort.
10   Q.    Okay.  For a $25 cash fund, is there a standard, kind of
11   a $10 bill, a $5 bill?
12   A.    No, I don't know a standard of how you issue -- how you
13   issue -- I've never seen that.
14   Q.    Okay.  It's a combination of bills and change is what
15   you're saying?
16   A.    Correct, sir.
17   Q.    Okay.  And to count that, it could take 15 to 30 minutes?
18   A.    I would say 15 at the minimum because you got one person
19   counting it, a second person counts it.
20   Q.    Okay.  But this can take place before the meal period?
21   A.    Correct, sir.
22   Q.    And on the flip side, it takes place after the meal
23   period; correct?
24   A.    Correct, sir.
25   Q.    After the soldiers have left; correct?
```

1   A.   Correct, sir.

2   Q.   After the service is done; correct?

3   A.   At the end of the meal, yes, sir.

4   Q.   After the food service and the soldiers have eaten;

5   correct?

6   A.   Once the doors close -- you can still have soldiers

7   eating in there after the building closes.  You can't kick

8   soldiers out.  So soldiers can still be eating.  The service

9   can stop.  Soldiers still can be eating, and then yes, that

10  headcount, the admin has the headcount come back in, and the

11  admin does the headcount all over again.

12  Q.   Let me ask it this way.  So if the lunch period ends at

13  1 p.m. --

14  A.   Yes, sir.

15  Q.   -- can this process on the back end take place at

16  1:15 p.m.?

17  A.   It could.

18  Q.   It could take place at 1:30 p.m.?

19  A.   It could.

20  Q.   Okay.  I think I have just a few more questions.

21       Mr. Froehlich, are you aware of what is the busiest meal

22  of the day at Fort Huachuca?

23  A.   I would say the lunch meal probably is.

24  Q.   And why do you say that?

25  A.   Because that's when most soldiers visit.  Weinstein is

 1  probably busy all the time because of the training, but

 2  Thunderbird's probably the most busiest at lunch.

 3  Q.   And which one's most busy overall, just Weinstein or

 4  Thunderbird?

 5  A.   I would say Weinstein.

 6  Q.   Mr. Froehlich, I want to ask you about the two scenarios

 7  we've talked at length about, at Thunderbird, with the

 8  staffing matrix, the hundred percent takeout and the brunch

 9  and supper.  Are you familiar with those scenarios?

10  A.   Correct, sir.

11  Q.   And you reviewed Ms. Mackey's letter of March 6 as part

12  of your evaluation?

13  A.   No, sir.

14  Q.   Oh.  Okay.  Let me see.  Let's turn to Exhibit 14, first

15  page.

16  A.   I'm here, sir.

17         THE COURT:  14 or Exhibit 13?  Do you want the

18  letter she wrote or the letter that Mr. Vicory wrote?

19         MR. LALCHANDANI:  I was going to streamline and just

20  go to Exhibit 14 because Mr. Vicory describes what materials

21  he provided.

22         THE COURT:  All right.

23  BY MR. LALCHANDANI:

24  Q.   At the end of the first paragraph, do you see the

25  sentence -- well, it's a long sentence, but the last clause

 1    says, "I provided these SMEs," and it continues on with the

 2    list of documents provided.  It's last three lines of the

 3    first paragraph, four lines of the first paragraph.

 4    A.   I see -- are we talking as it relates to Weinstein?

 5    Q.   So we're at -- you're at Exhibit 14; is that correct?

 6    A.   Correct, sir.

 7    Q.   The first paragraph?

 8    A.   Oh, first paragraph.  I'm sorry.

 9    Q.   That's okay.  And there's a sentence -- okay.  I just

10    wanted to point to the end of that first paragraph.  It says,

11    "And I provided these SMEs your staffing matrix, technical

12    proposal, the Government's technical memorandum which

13    delineated the rationale for finding ADES technically

14    unacceptable, and a letter you provided me asking for the

15    reevaluation."

16         Do you see that?

17    A.   I do, sir.

18    Q.   Did you receive ADES's letter asking for the

19    reevaluation?

20    A.   I did not see it or review it.

21    Q.   Okay.  So that statement is inaccurate?

22    A.   I would say so, yes.

23    Q.   And you also were provided with additional documents that

24    are not listed in this list; correct?

25    A.   (Reading to self.)  The only thing I see is the staffing,

CROSS-EXAMINATION OF WADE FROEHLICH                    27

1    the Government's cost estimate.

2              MS. LETZKUS:  Your Honor, I just want to object on

3    the grounds of foundation.  He didn't author this letter.  He

4    hasn't shown that he understands what Mr. Vicory meant when he

5    was saying things in this letter.

6              THE COURT:  And I'll sustain the objection.  If you

7    want to ask questions related to what his review was, and I

8    guess you can have him read letter 14, Exhibit 14, to himself,

9    and you can ask him whether he agrees with certain portions,

10   but just to have him -- to just read what's in the letter and

11   then ask him questions about it is going to take a lot of

12   time, so --

13             MR. LALCHANDANI:  So I think -- I'm just

14   establishing a very simple proposition of which documents he

15   reviewed as part of his evaluation.

16             THE COURT:  Okay.  And I think you can ask him, ask

17   him that.

18   BY MR. LALCHANDANI:

19   Q.   Okay.  And I was just confirming that one document you

20   reviewed is the independent Government cost estimate; correct?

21   A.   Correct, sir.

22   Q.   The IGCE, by the way, it provides both a table of

23   staffing and a table of pricing; is that correct?

24   A.   It may.  I don't look at the pricing.  That is not my

25   purview, so I don't look at the staffing.  We have separate

CROSS-EXAMINATION OF WADE FROEHLICH

1   personnel that look at that.

2   Q.   Okay.  So just to be clear, you were not provided with

3   Ms. Mackey's letter?

4   A.   I did not see it, no, sir.

5   Q.   Okay.

6            THE COURT:  And for purposes of the record,

7   Mr. Froehlich, can you look at Exhibit Number 13, which is the

8   letter, and just see if it looks like you received that at

9   all?

10           THE WITNESS:  Yes, Your Honor.  Let me look.

11           MR. LALCHANDANI:  Just a few more questions,

12   Mr. Froehlich.

13           MR. FREEMAN:  He hasn't answered the judge's

14   question.

15           MR. LALCHANDANI:  Oh, sorry.

16           THE COURT:  Yeah, I just want him to take a look at

17   the letter to see if --

18           MR. LALCHANDANI:  My apologies.

19           THE COURT:  That's okay.

20           THE WITNESS:  I reviewed it, Your Honor.

21           THE COURT:  So this particular letter, do you recall

22   getting that letter with your packet of other items to review?

23           THE WITNESS:  I don't remember seeing this, no, Your

24   Honor.

25           THE COURT:  Okay.  Thank you.

1   BY MR. LALCHANDANI:

2   Q.   So just to be clear, you reviewed it right now in court

3   but not as part of your evaluation?

4   A.   I just looked at it, yes, sir.

5   Q.   Okay.  Just wanted to make that clear.

6        Were you made aware as part of your evaluation that ADES

7   offered to provide staffing for those two scenarios, the

8   staffing matrix for those two scenarios?

9   A.   No, no, sir.

10  Q.   Are you aware -- were you aware as part of your

11  evaluation that ADES provided pricing for those two scenarios?

12  A.   No, sir.  I didn't review that.

13            MR. LALCHANDANI:  No further questions.  Thank you,

14  Mr. Froehlich.

15            THE WITNESS:  Thank you, sir.

16            THE COURT:  And Ms. Letzkus?

17                      REDIRECT EXAMINATION

18  BY MS. LETZKUS:

19  Q.   Good morning, Mr. Froehlich.

20  A.   Good morning, ma'am.

21  Q.   You've been asked a lot of questions about staffing the

22  Weinstein Dining Facility.  Is Weinstein the only dining

23  facility that the solicitation required ADES to propose

24  staffing for?

25  A.   No, ma'am.  It was Thunderbird also and Black Tower.

1   Q.   Did the solicitation require ADES propose staffing for

2   several bands at Thunderbird?

3   A.   Thunderbird, yes, ma'am.

4   Q.   When you reviewed the proposal, did you see that they

5   proposed -- did you see whether ADES proposed staffing for all

6   four bands at Thunderbird?

7   A.   No.  They left out the 100 percent takeout and the -- 100

8   percent takeout and the brunch and supper band, ma'am.

9   Q.   So was the understaffing at Weinstein the only thing that

10  made ADES's proposal technically unacceptable?

11  A.   No, ma'am.

12  Q.   And you were asked some questions about ADES's proposal

13  saying they would cross-train their staff.  Could you go ahead

14  and take a look at Exhibit 30 for me, which is the

15  solicitation?  And if you could turn to page -- at the bottom

16  in bold where it says page 106.

17  A.   I'm there, ma'am.

18  Q.   Okay.  And if you look at where it says, "Subfactor 2:

19  Staffing Plan," do you see that?

20  A.   Yes, ma'am.

21  Q.   Okay.  And it says, "To be considered acceptable, the

22  offeror shall clearly demonstrate that their staffing is

23  appropriate to successfully perform the PWS requirements."

24       Did I read that right?

25  A.   Yes, ma'am.

1   Q.   And then skipping ahead to the third sentence, it says,

2   "The offeror's staffing and rationale shall clearly

3   demonstrate, one, that the number of staff and the associated

4   labor type outside of serving times is appropriate to clearly

5   demonstrate successful completion of the PWS requirements."

6        Did I read that --

7   A.   Yes, ma'am.

8   Q.   Are you able to evaluate whether the -- an offeror can

9   successfully perform the PWS requirements if they do not

10  propose staffing for required bands of meals?

11  A.   No.  There's no way to evaluate that.

12  Q.   Did ADES's proposal clearly demonstrate how its cross-

13  training of its staff would ensure successful completion of

14  the PWS performance work statement?

15  A.   Not really, ma'am.  It did talk about cross-training FSSs

16  and DFAs and I believe DFAs for admin duties, or the other way

17  around, FSSs for admin and I believe it was DFA for rations,

18  if I'm not mistaken.

19  Q.   Okay.  And did the proposal clearly explain how the

20  proposed cross-staffing would enable ADES to meet the minimum

21  requirements for performing the performance work statement?

22  A.   No, ma'am.

23  Q.   And we've had a lot of talk about the cash fund over the

24  past couple days.  Is the cash fund issue the only reason you

25  determined ADES's proposal to be unsuccessful?

1    A.    No, ma'am.

2    Q.    When it comes to staffing cashiers, what consequences if

3    any follow the utilization of administrative personnel as

4    cashiers?  What are the potential consequences?

5    A.    It creates a safety or safeguard issue or liability issue

6    with cash.

7    Q.    How about if managers are performing the cashier duties?

8    A.    Well, they have even more access to AFMIS, so I think

9    that creates even more liability.  Plus, if they're pulling

10   cashier, I'm not really sure who's watching over the building.

11   Q.    So you testified yesterday that in the past you have

12   evaluated for technical acceptability or capability technical

13   proposals that were made by State licensing agencies?

14   A.    Yes, ma'am.

15   Q.    Not just the -- to be clear, not just the proposal by

16   ADES but other State licensing agency proposals for other

17   solicitations?

18   A.    Yes, ma'am.

19   Q.    Did you evaluate those State licensing agencies'

20   technical proposals any different than how you would evaluate

21   any other offeror's proposal?

22   A.    No, ma'am.  I can't do that.  I evaluate everybody the

23   same.

24              MS. LETZKUS:  One second, Your Honor.

25              THE COURT:  Sure.

1          MS. LETZKUS:  Thank you, Mr. Froehlich.

2          That's all I have, Your Honor.

3          THE COURT:  Thank you.  And Mr. Froehlich, I have a

4   couple questions.

5                       EXAMINATION

6   BY THE COURT:

7   Q.   With respect to your review of the contract and the

8   technical aspect, is past performance considered when you're

9   reviewing the proposals?

10  A.   It is, Your Honor, but not by me.  I don't look at the

11  past performance.

12  Q.   Okay.  So in the technical aspect with respect to the

13  ADES contract, past performance would not be one of the items

14  that you would look at?

15  A.   Not me personally.  I'm just technical for, you know,

16  staffing and things like that.

17  Q.   Okay.  Was there someone else in the group, in your group

18  of SMEs, that were looking at this particular proposal that

19  would look at the past performance?

20  A.   I believe Mr. Steven Green, and don't quote me because

21  I'm not for sure, but I believe Mr. Steven Green who usually

22  chairs our SSEBs, gets to look at past performance.

23  Q.   And that past performance is only dealt with in the

24  category of past performance or in with technical?

25  A.   No, it's separate, Your Honor.

1   Q.   Okay.  And you answered part of my question, so there

2   is -- in the Government's solicitation, there was an actual

3   staffing matrix in the solicitation?

4   A.   It's a -- well, if there's -- the offers are not provided

5   with the Government estimate.  That's the Government's

6   estimate.

7   Q.   Okay.  I guess that was my question.  So the Government I

8   guess staffing matrix that you used to compare it to the DES

9   staffing matrix, do the potential vendors get a copy of the

10  Government's kind of proposed staffing?

11  A.   No, not to my knowledge, Your Honor.

12  Q.   And is the concern that an admin personnel should never

13  be trained as a cashier and vice versa, so you should never

14  have admin and cashier cross-trained?

15  A.   I believe it doesn't hurt to cross-train them, but you

16  would never do that.  Even me being on the military side, we

17  always had headcount from units because we always created that

18  separation, and if we had to use somebody, like I told

19  Mr. Neel, we would utilize a cook off the line because he has

20  no AFMIS access, so it keeps that separation there.

21              THE COURT:  I don't have any other questions.

22              Ms. Letzkus, do you have any questions based on the

23  Court's questions?

24              MS. LETZKUS:  No, Your Honor.

25              THE COURT:  And Mr. Lalchandani?

```
1            MR. LALCHANDANI:  No, Your Honor.  Thank you.

2            THE COURT:  Okay.  Thank you.

3        Thank you, Mr. Froehlich.

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  And I believe the Government has no

6  other witnesses; correct?

7            MS. LETZKUS:  Correct, Your Honor.

8            THE COURT:  Okay.  Great.  So we got done before

9  9:20, which is nice.

10        What I anticipate doing is taking the matter under

11 advisement and then setting a time for arguments, and as we

12 talked about yesterday evening, to accommodate the plaintiff's

13 counsel, I am willing to do that telephonically, if the

14 parties agree to that.

15        Is there any objection from the plaintiffs?

16            MR. FREEMAN:  No objection, and we would appreciate

17 that, Your Honor.

18            THE COURT:  And Ms. Letzkus, is there any objection

19 from the defense?

20            MS. LETZKUS:  No, Your Honor.

21            THE COURT:  Kind of working with everybody's

22 schedule and also with my staff's schedule, I think we were

23 thinking, if it works for all the parties, Tuesday, August

24 29th.  I think originally I said Monday, but then in speaking

25 with staff, Tuesday looks better in the afternoon.
```

UNITED STATES DISTRICT COURT

```
 1              I don't know if you want to talk with -- see if
 2   there is an issue or a problem.
 3              MS. LETZKUS:  The 29th would work for us, Your
 4   Honor.
 5              THE COURT:  Okay.  And Mr. Freeman?
 6              MR. FREEMAN:  Yes, that would work.  In the
 7   afternoon would work for us as well.
 8              THE COURT:  Right.  I was thinking, in trying to --
 9   you guys are two or three hours later than us?
10              MR. FREEMAN:  Three, three during the summer.
11              THE COURT:  Okay.  So if we started maybe at 1
12   p.m --
13              MR. FREEMAN:  Judge, we're glad to go late, even two
14   o'clock.  Did Your Honor have a sense of how long you're
15   available?
16              THE COURT:  I'm available all afternoon, so it will
17   depend on how much you guys want to talk.
18              MR. FREEMAN:  So --
19              THE COURT:  Okay.  What if we did it at -- would
20   1:30 work?
21              MR. FREEMAN:  1:30 would be fine.
22              THE COURT:  Does that work for you, Ms. Letzkus?
23              MS. LETZKUS:  Yes, 1:30 works for us.  Would Your
24   Honor like to set time limits on the --
25              THE COURT:  I probably will.  Let me think about
```

1   that.  The other thing that I know the parties discussed is

2   possibly doing some sort of posthearing memos.  I'm not

3   inclined to have the parties do that unless the parties want

4   to explain to me what they think they would provide the Court

5   that I don't already have.

6            MR. FREEMAN:  Your Honor, if there are any

7   particular issues that, as the Court turns to it, even in the

8   closing, if you had something that would benefit from

9   something in writing, we could get it to you in a couple days,

10   but we're fine with just submitting on the -- planning as of

11   now to submit solely on the closing.

12            I do, just as Your Honor thinks about time, it's my

13   understanding that, as plaintiffs, we get both an opening and

14   a rebuttal.

15            THE COURT:  Right, right.  You would get that.  You

16   would get that.  And then Ms. Letzkus, is there something in a

17   written posthearing memo that you think would be beneficial to

18   the Court?

19            MS. LETZKUS:  I tend to agree with plaintiff's

20   counsel, so unless something comes up at cross and you have a

21   specific question that you want us to address, I would be okay

22   submitting it on cross, or sorry, in closing.

23            THE COURT:  And I will tell the parties, I'm

24   debating on this.  I have a series of questions that I

25   anticipated asking both parties.  I want to kind of rereview

1    them in light of all the evidence, and I'm toying with the

2    idea, but I haven't decided whether or not I would actually

3    give the questions to everyone ahead of time so you had it.

4              But let me kind of mull that over, and if we do,

5    then we'll obviously be in contact with you.

6              MR. FREEMAN:  Thank you.

7              THE COURT:  Okay.

8              MR. FREEMAN:  And I would welcome that.

9              THE COURT:  Yeah.  I figured both parties would, and

10   my plan would be to give both parties questions that I would

11   ask each side, just so everybody's aware.  But let me kind of

12   go through my list of questions and see what's been answered,

13   what hasn't, and then we'll kind of go from there.

14             MR. FREEMAN:  Thank you.

15             THE COURT:  Okay.  So we will I guess see everyone

16   by telephone on the 29th.

17             MR. FREEMAN:  Thank you, Your Honor.

18             THE COURT:  All right.  Thank you.

19             MS. LETZKUS:  Thank you, Your Honor.

20             (Proceedings concluded in this matter at 8:49 a.m.)

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, Erica R. McQuillen, do hereby certify that the

4    preceding pages of typewritten matter are a true, correct, and

5    complete transcription of the digital recording of proceedings

6    in the above-entitled matter.

7               Dated this 24th day of August, 2023.

8

9                              s/Erica R. McQuillen
                           Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25