**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Arizona Department of Economic Security,

          Plaintiff,

v.

Christine Wormuth,

          Defendant.

No. CV-23-00250-TUC-LCK

**ORDER**

Pending before the Court is Plaintiff's Motion for Preliminary Injunction. (Doc. 22.) Defendant filed a response (Doc. 30), and Plaintiff replied (Doc. 32). The Court held an evidentiary hearing on August 15, 16, 17, and 29, 2023, and took the matter under advisement. (Docs. 34, 36, 38, 50.) The Court finds there are serious questions going to the merits and the balance of hardships tips sharply in Plaintiff's favor. Therefore, the Court grants Plaintiff's request for a preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff alleges that Defendant violated the Randolph Sheppard Act (RSA). Under the RSA, blind persons are given a priority for the operation of cafeterias on federal property. 20 U.S.C. §§ 107(b), 107e(7). The RSA is carried out through state licensing agencies (SLA) in cooperation with the Secretary of the United States Department of Education (DOE). 20 U.S.C. § 107b. In Arizona, the SLA is Plaintiff, Arizona Department of Economic Security (ADES). (Doc. 22, Ex. 1 ¶¶ 2, 3.) ADES, through a

licensed blind vendor, has operated the food services at the Army's Fort Huachuca since 2004. (*Id.* ¶ 4.) The current blind vendor, Scott Weber, has been operating those services since December 2013. (*Id.*)

The Army issued Solicitation Number W9124J21R0027, on March 25, 2022, seeking proposals to provide food services at Fort Huachuca. (Doc. 30, Ex. A, Attach. 1 at 3.) The Army stated that it would evaluate proposals on three factors, technical capability, past performance, and price, and it would employ a five-step process:

STEP 1. After initial evaluation of timely received proposals in accordance with (IAW) the evaluation criteria specified in this solicitation and based on those initial evaluations, to include the total evaluated price (TEP), a Competitive Range (CR) will be established from proposals evaluated as "Acceptable". If the contracting officer determines that a proposal should be excluded from the CR, the contracting officer will provide written notice of the exclusion to that offeror. If the SLA's proposal is excluded from the CR, the SLA may file a complaint with the Secretary of Education under the provisions of 34 CFR § 395.37.

STEP 2. In accordance with Army Regulation 210-25 (Vending Facility Program for the Blind on Federal Property), the Government shall enter into discussions/negotiations with all offerors whose proposals have been determined to be in the CR established in Step 1, above. If, after discussions have begun, the Government determines that an offeror's proposal should no longer be included in the CR, the proposal will be eliminated from consideration for award. Written notice of the exclusion from the CR will be provided to unsuccessful offerors. If the SLA is removed from the CR at this time, the SLA may file a complaint with the Secretary of Education under the provisions of 34 CFR § 395.37.

STEP 3. The Government will request Final Proposal Revisions (FPRs) at the conclusion of discussions with the offerors remaining within the CR. The FPRs will be evaluated IAW the evaluation criteria specified in this solicitation. The Government does not intend to conduct further discussions after receipt of the FPRs. As such, offerors in the CR are cautioned to submit their best offer for the FPRs. However, if the contracting officer determines it necessary, the Government may establish a revised CR, re-open and conduct discussions again after receipt of FPRs, and then call for new FPRs.

STEP 4. After evaluation of the FPRs has been completed, the offeror with a technically acceptable proposal with the lowest evaluated reasonable price and acceptable past performance will be the offer that represents the LPTA offer for the Government. The LPTA evaluation process stops at this point. Subject to a determination of contractor responsibility, that offeror will receive award unless preempted by application of the SLA priority in accordance with SLA Priority (STEP 5), below.

STEP 5. If the LPTA offer, as determined under STEP 4 above, is not the SLA, the Government will determine if award to the SLA shall preempt the LPTA offeror using the following criteria in accordance with the R-SA:

1
2
3
4
5
6

> (i) If the SLA's proposal was included in the CR, found to be technically acceptable with acceptable past performance and the SLA demonstrates through its proposal that it can provide such an operation at a fair and reasonable price as determined by the Government after applying the source selection criteria contained in the solicitation and provide food of high quality comparable to what is currently provided to service members, then priority/award will be given/made to the SLA subject to a determination of contractor responsibility and consultation with the Secretary of Education (IAW 34 CFR § 395.33(b).

7
8
9
10

> (ii) If the SLA proposal does not meet all criteria listed in the RFP and in paragraph (i) above, the SLA priority will not apply and award will be made to the LPTA offeror subject to a determination of contractor responsibility. If the SLA is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary of Education under the provisions of 34 CFR § 395.37.

11
12

(*Id.* at 104-08 ¶¶ a(3), c.) On May 13, 2022, ADES submitted a proposal in response to the Solicitation. (Doc. 22, Exs. 3, 7, 9.)

13
14
15
16
17
18

On January 20, 2023, the Army notified ADES that it had been excluded from the Competitive Range (CR) and was out of consideration for the contract because it had been rated unacceptable in its technical capability. (*Id.*, Ex. 10.) Upon request, the Army provided a debriefing letter to explain the basis for ADES's exclusion. (*Id.*, Ex. 12.) The Army rated ADES unacceptable solely as to its staffing plan, sub-factor 2 under the technical capability category, which required the following:

19
20
21
22
23
24
25
26

> To be considered acceptable, the Offeror shall clearly demonstrate that their staffing is appropriate to successfully perform the [performance work statement] PWS requirements. Appropriate staffing includes the number of personnel and the labor mix to successfully perform the PWS requirements. The offeror's staffing and rationale shall clearly demonstrate (1) that the number of staff and the associated labor type outside of serving times is appropriate to clearly demonstrate successful completion of the PWS requirements; and (2) the staffing will ensure successful continuous operations of all PWS tasks during the feeding times (to include as patrons/units rotate through the facility). Additionally, the offeror's staffing shall clearly demonstrate they can accommodate fluctuating workloads within a band of meals, minimize personnel turnover, and allow for cross-training and cross-utilizing of personnel to perform the requirements of the PWS.

27
28

(*Id.* at 3-4.) The letter went on to list several ways in which ADES's staffing plan had been deemed unacceptable to meet the Solicitation requirements. As to the Thunderbird dining facility (Building 52107): for 1-750 meals (3 times per day), cashiers were

understaffed 21-100%; and for the options of 1-250 meals (2 times per day) and 1-750 meals of 100% take-out (three times per day), no staffing was included. (*Id.* at 7.) As to the Weinstein dining facility (Building 85202): for 1-2250 meals (three times per day), cashiers were understaffed more than 101%; for 2251-4500 meals (three times per day) and 1-1500 meals (two times per day), food sanitation specialists (FSSs)/dining facility attendants (DFAs) were understaffed 1-21%; and for 2251-4500 meals of 100% take-out (three times per day), cashiers were understaffed 21-100%. (*Id.* at 7-8.)

ADES responded to the debrief letter and challenged the reasons it had been found technically unacceptable. (Doc. 22, Ex. 13.) ADES explained that it had included sufficient cashier staffing, but it had labeled them "admin/cashier" in the written technical proposal and "office clerk" in the staffing matrix. (*Id.* at 1.) With respect to the FSS/DFA positions, ADES argued that a discrepancy of up to 21% was not a sufficient basis to exclude its proposal, and ADES had used its experience to quantify the staffing numbers, which the Army had found adequate in the past. (*Id.* at 2.) It also noted that the FSS and DFA positions were cross-utilized to promote efficiency and savings, as it had explained in its proposal. (*Id.*) Finally, ADES stated that neither brunch/supper, nor take-out, were conducted at Thunderbird; however, ADES stated that it had included those scenarios in its pricing matrix. (*Id.*) Although not included in its staffing matrix, those numbers easily could have been provided upon request. (*Id.*)

After two specialists conducted a secondary review of ADES's staffing proposal, the Army still found it to be technically unacceptable. (Doc. 22, Ex. 14.) With respect to designating the cashier positions as "admin/cashier," the Army noted that the administrative person typically issued the change fund to the cashier and received it back to account for those funds. (*Id.* at 1.) By designating cashier and admin as the same position, it failed to provide a safeguard for those funds. (*Id.*) Also, the reviewers found there were enough hours designated for admin/cashier, but the hours needed to be rearranged and Plaintiff needed to provide an explanation to meet the requirements. (*Id.*) Next, the Army noted that the Solicitation included brunch/supper and take-out scenarios

for Thunderbird, regardless of whether currently offered, and ADES's failure to provide staffing for those scenarios was unacceptable. (*Id.* at 2.) The Army reiterated that FSS/DFA staffing for Weinstein was insufficient for breakfast and dinner. (*Id.*) The Army stated that, when evaluating technical capability, it looked solely at the proposal not at assumptions based on current or past performance. (*Id.*)

Because ADES believed it was wrongfully excluded from the CR, it filed a request for arbitration with the DOE in May 2023. On June 2, 2023, Plaintiff ADES sued the Secretary of the Army, Christine Wormuth. Plaintiff then filed the instant motion for a preliminary injunction to prevent the Army from awarding the food services contract at Fort Huachuca to a different provider while the arbitration is pending. ADES's current short-term contract was going to expire on August 31, 2023. Subsequently, the Army entered a bridge contract with ADES through September 30, 2023.[1]

### DISCUSSION

**Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v.*

---

[1] In response to this litigation, Defendant agreed not to award a new contract to a different provider until the Court issued a decision on Plaintiff's Motion for Preliminary Injunction. (Doc. 31.)

*Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under the serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. Regardless of which standard applies, the movant has the burden of proof on each element of the test. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).

Defendant contends that Plaintiff seeks a mandatory injunction, which comes with a heightened burden to show that "the facts and law clearly favor the plaintiff." *Comm'n. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986). A mandatory injunction is one that goes beyond maintaining the status quo, it requires more than a prohibition. *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979). Defendant cited one case in which the court found a heightened burden should apply to a preliminary injunction request sought while an RSA arbitration was pending. *Oklahoma ex rel. Okla. Dep't of Rehab. Servs. v. United States ex rel. Mattis*, No. CIV-18-1197-SLP, 2018 WL 10373342, at *3 (W.D. Okla. Dec. 17, 2018). That decision was based on a Tenth Circuit rule that a heightened burden applied because the injunctive relief requested was the same as the relief sought in the complaint. *Id.* ADES's complaint seeks relief under the Administrative Procedures Act, not solely a preliminary injunction, and that Tenth Circuit standard does not apply here. The Court finds that Plaintiff seeks maintenance of the status quo – for ADES to remain as the food service provider at Fort Huachuca – and a heightened standard is not applicable. *See State of Kansas v. United States*, 192 F. Supp. 3d 1184, 1209 (D. Kan. 2016) (rejecting a heightened standard and finding the status quo meant the SLA continuing to provide food services "regardless of whether it [was] legally entitled to priority for a new contract."), *aff'd in part sub nom. Kansas ex. rel. Kan. Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017); *Haw., Dep't of Hum. Servs., Div. of Vocational Rehab., Hoopono-Servs. for the Blind v. U.S. Marine Corps ex rel. Neller*, No. CV 18-00128-LEK-KJM, 2018 WL

2187977, at *4-5 (D. Haw. May 11, 2018) (granting the SLA a preliminary injunction to maintain the status quo by providing food services while RSA arbitration pending, even though contract had been awarded to new provider); *Johnson v. United States*, No. EP-14-CV-00317-DCG, 2014 WL 12540469, at *8 (W.D. Tex. Sept. 12, 2014).

### Randolph-Sheppard Act and Cafeteria Regulation

Congress passed the RSA "for the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). The Secretary of DOE is tasked with ensuring the purpose of the RSA is carried out by prescribing regulations and enforcing the statute and regulations. 20 U.S.C. §§ 107a(a), 107(b), 107d-1, 107d-3(e). If an SLA believes that a federal agency is not in compliance with the RSA and its regulations, the SLA may file a complaint with the Secretary of the DOE, who will set the matter for arbitration. 20 U.S.C. § 107d-1(b); 34 C.F.R. § 395.37.

A specific regulation governs the operation of cafeterias by blind vendors:

(a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

(b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section. If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of § 395.37.

1

2

3

4

5

6

7

8

9

(c) All contracts or other existing arrangements pertaining to the operation of cafeterias on Federal property not covered by contract with, or by permits issued to, State licensing agencies shall be renegotiated subsequent to the effective date of this part on or before the expiration of such contracts or other arrangements pursuant to the provisions of this section.

(d) Notwithstanding the requirements of paragraphs (a) and (b) of this section, Federal property managing departments, agencies, and instrumentalities may afford priority in the operation of cafeterias by blind vendors on Federal property through direct negotiations with State licensing agencies whenever such department, agency, or instrumentality determines, on an individual basis, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees: Provided, however, That the provisions of paragraphs (a) and (b) of this section shall apply in the event that the negotiations authorized by this paragraph do not result in a contract.

10

34 C.F.R. § 395.33.

11

**Likelihood of Succeeding on the Merits**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Plaintiff contends the Court must evaluate solely whether it is likely to succeed in the administrative arbitration. Defendant argues that the Court must evaluate Plaintiff's likelihood of succeeding at both the arbitration and any subsequent judicial review of that decision. Resolving that disagreement is relevant because, during review of an arbitration decision, a court owes deference to the agency. Pursuant to statute, 20 U.S.C. § 107d-2, the arbitration panel's decision operates as a final agency action subject to review under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq. See N.C. Div. of Servs. For Blind v. United States*, 53 Fed. Cl. 147, 159 (2002), *aff'd sub nom. N.C. Div. of Servs. for the Blind v. United States*, 60 F. App'x 826 (Fed. Cir. 2003) (citing 5 U.S.C. § 706(2)(A) and holding that an agency's final decision may be overturned only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). Plaintiff requests the Court issue a preliminary injunction only until the arbitration concludes. For that reason, the Court has determined it need only evaluate Plaintiff's likelihood of succeeding on the merits in the arbitration process, not any subsequent judicial review.

26

27

28

The review standard for an arbitration panel is not delineated by law. However, the deference a district court employs when conducting an Administrative Procedure Act (APA) review does not apply because the arbitration panel is issuing a final agency action

not reviewing one. (*See* Doc. 22, Ex. 25, *Okla. Dep't of Rehab. Servs. v. U.S. Dep't of the Army*, No. R-S/18-09, at 18, 43-44 (June 22, 2020) (finding arbitration panel's review is de novo); Doc. 22, Ex. 19, *Mo. Dep't of Soc. Servs. v. U.S. Dep't of the Army*, No. R-S/16-13, at 8 (May 1, 2019) (finding standard of review not delineated in statute or regulations and applying substantial evidence standard); Doc. 22, Ex. 18, No. R-S/16-09, *Texas v. U.S. Dep't of the Air Force*, at 21-22 (Feb. 28, 2017) (noting review not limited to determining if agency acted arbitrarily, although not necessarily de novo, and finding significant evidence of an RSA violation). This Court need not determine the exact standard the arbitration panel will employ, but concludes the panel will not offer significant deference to the Army's decision-making process.

ADES presented the following issues to the arbitration panel:

1. Did the Department of the Army violate the Randolph-Sheppard Act and regulations by judging ADES's bid to be technically unacceptable?

2. Did the Department of the Army violate the Randolph-Sheppard Act and regulations by excluding ADES's bid from the competitive range even though, to the extent there were any deficiencies with the proposal, the bid could have been made acceptable through meaningful discussions?

3. Did the Department of the Army violate the Randolph-Sheppard Act and regulations by failing to consult with the Secretary of Education to have the Secretary of Education determine whether ADES can operate the full food services contract at Fort Huachuca at a reasonable cost, with food of a high quality comparable to that currently provided employees?

4. Did the Department of the Army violate the Randolph-Sheppard Act and regulations by failing to consistently apply the criteria stated in the Solicitation to all bidders?

5. Did the Department of the Army violation the Randolph-Sheppard Act and regulations by relying on factors other than the criteria stated in the Solicitation when evaluating the proposals and setting the competitive range?

(Doc. 30, Ex. A, Attach. 2; Doc. 22, Ex. 17 at 8-9.) Plaintiff stated an intention to focus only on the first two issues in seeking a preliminary injunction.[2] (Doc. 22 at 15.) The

---

[2] Despite Plaintiff's representation, the parties addressed the third issue in their briefing. (Doc. 22 at 23-24; Doc. 30 at 18-19.) However, the Secretary of the DOE stated the arbitration panel would not address issue three because the facts as alleged by Plaintiff did not constitute a violation of the cited statutory and regulatory provisions. (Doc. 30, Ex. A, Attach. 2 at 2.) At the evidentiary hearing, Plaintiff indicated it had submitted additional briefing on issue three to DOE. However, it is proceeding before this Court solely on issues one and two.

Court finds this case is most expeditiously addressed by focusing solely on the second issue, whether the Army violated the RSA and its regulations when it excluded ADES from the CR.

The governing RSA regulation on this topic provides:

> Such solicitations for offers shall establish criteria under which all responses will be judged. . . . If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section.

34 C.F.R. § 395.33(b). The parties' dispute centers on the criteria the Army used to determine whether ADES's proposal should have been placed in the CR. Plaintiff relies on an original understanding of how to apply the CR to an SLA. Defendant rejects that interpretation, relying on the current Federal Acquisition Regulations (FAR) as set forth in the Solicitation.

<u>Plaintiff's Interpretation of Competitive Range</u>

Plaintiff contends that the Army was obligated to use the concept of CR that was understood at the time the RSA regulation was adopted in 1977. This argument relies upon arbitration panel decisions and a handbook published by the DOE. More than one arbitration panel has held that: "[a]t the time [RSA] regulations were promulgated, the term "competitive range meant that any proposal must be considered to be within a competitive range so as to require negotiations unless it is so technically inferior or out of line with regard to price that meaningful discussions are precluded." (Doc. 22, Ex. 22, *Colo. Bus. Enter. Prog. v. U.S. Dep't of the Air Force*, No. R-S/20-09, at 7 (Sept. 29, 2022); *see* Doc. 22, Ex. 24, *Utah Div. of Servs. for the Blind and Visually Impaired v. U.S. Dep't of the Air Force*, No. R-S/20-24, at 11 (Feb. 9, 2022) ("[w]hen there is doubt as to whether a proposal is in the competitive range, the proposal should be included . . . the competitive range includes all proposals that have a reasonable chance of being selected for award.").)[3]

---

[3] Plaintiff also relies on the arbitration decision in *S.C. Comm'n for the Blind v. U.S. Marine Corps*, No. R-S/19-01 (Aug. 11, 2022). (Doc. 22, Ex. 20.) The panel

1    Plaintiff also relies upon a DOE publication titled Administration of the Randolph-

2    Sheppard Vending Program by Federal Property Managing Agencies, which provides in

3    Chapter VII:

> Considering the clear intent of the Act, the determining factor for judging
> whether a proposal should be within the competitive range is if the offer
> can be made acceptable by conducting meaningful discussions. To be more
> specific, this should be interpreted as meaning whether the contracting
> officer is of the opinion that clarification, modification, or appropriate
> minor revision to the SLA proposal may result in the offer being fully
> acceptable. This judgment would be consistent with an action involving a
> commercial offerer [sic] under comparable circumstances. A proposal must
> be considered within the competitive range unless it is technically inferior
> or contains unduly high selling prices to patrons that the possibility of being
> made acceptable through meaningful negotiations is precluded. The group
> of proposals with the highest point scores should be considered to be in the
> competitive range.

11   (Doc. 22, Ex. 21 ¶ 3(b)(3).) The handbook was published in 1988 and retired in 2017.

12   (Doc. 22, Ex. 23.) In December 2021, a representative of DOE contrasted Chapter VII of

13   the retired handbook with other portions of the handbook that it deemed "outdated,"

14   noting that Chapter VII "provide[s] valuable guidance to our stakeholders and may

15   continue to be consulted." (*Id.*)

16   "When, as here, an agency, such as DOE, is charged with implementation of a

17   statute, its policy decisions are entitled to deference." *NISH v. Cohen*, 247 F.3d 197, 202

18   (4th Cir. 2001). Thus, an opinion letter from a Secretary is entitled to deference to the

19   extent it has "power to persuade." *Dep't of Hum. Servs., Div. of Vocational Rehab.,*

20   *Hoopono-Servs. for the Blind v. U.S. Dep't of Educ., Rehab. Servs. Admin.*, 46 F.4th

21   1148, 1157 (9th Cir. 2022) (reviewing a different letter from the Secretary of Education

22   regarding the applicability of the RSA) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134,

23   140 (1944)); *see also Miss. Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20, 27

24   (2004) ("An agency's interpretation merits a degree of deference commensurate with the

25   specialized experience of the agency and the value of uniformity in its administrative and

26

27   _____

28   concluded that it must interpret the RSA regulations based on how the term CR was used
     at the time the regulations were promulgated. (*Id.* at 11.) However, the panel ultimately
     declined to address the topic, finding it non-essential to resolution of the arbitration. (*Id.*
     at 12.)

judicial understandings of what national law requires.") (citing *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)). The quoted paragraph from the handbook is not necessarily internally consistent. For example, it provides that if an SLA's offer can be made acceptable through modifications, it should be included in the CR; but it also states that the CR should include only those proposals with the highest point scores (which would not necessarily include the SLA). Arbitration panels, however, have relied upon the handbook to find that federal agencies should generously interpret when an SLA qualifies to be placed in the CR. (*See* Doc. 22, Ex. 22, *Colo. Bus. Enter. Prog.*, No. R-S/20-09, at 7, 15 ("it is evident that DOE has long interpreted the regulation at 34 C.F.R. § 395.33(b) to require an SLA's bid to be included in the competitive range, except in very limited circumstances."); Doc. 22, Ex. 24, *Utah Div. of Servs. for the Blind and Visually Impaired*, No. R-S/20-24, at 12; Doc. 22, Ex. 25, *Okla. Dep't of Rehab. Servs.*, No. R-S/18-09, at 18, 43-44 (quoting the handbook, finding it persuasive, and determining the Army violated the RSA by not placing the SLA in the competitive range and initiating discussions).

Next, the Court applies Plaintiff's interpretation of CR and evaluates whether ADES's proposal could have been made acceptable through meaningful discussions. The Army identified three areas of deficiency in ADES's staffing plan: insufficient cashiers, understaffing of DFA/FSS positions, and the absence of staffing for two service options at Thunderbird. The Army did not contend that these deficiencies were of a caliber that they could not be remedied, and the proposal made acceptable, through modifications or minor revisions. ADES could add staff as a simple fix for the first two identified deficiencies. With respect to ADES's absence of staffing for the two Thunderbird service options, it could be easily resolved. ADES provided pricing for those two options; therefore, it appears the absence of staffing was simply a mistake. ADES offered, during the de-briefing process, to provide the staffing matrix. The Court finds that ADES's proposal could have been made acceptable through meaningful discussions.

<u>Defendant's Interpretation of Competitive Range</u>

Defendant contends the Court should defer to the Army's evaluation of its minimum needs at Fort Huachuca and whether each offeror could meet them. Defendant also argues that it was appropriate to use the interpretation of CR currently provided by the FAR and set forth in the Solicitation. In support, Defendant relies on a case that determined the Army was not required to use the 1977 interpretation of CR; rather, it found application of the current FAR provisions appropriate. *N.C. Div. of Servs. For Blind*, 53 Fed. Cl. at 167 (applying the APA and evaluating if the Army's actions were arbitrary, capricious, or an abuse of discretion).[4] Under FAR § 15.306(b), communications with an offeror prior to establishment of the CR may not be used to cure deficiencies or revise a proposal; they are allowed solely to improve the government's understanding of the proposal. Defendant argues that it followed the terms of the FAR and Solicitation by not engaging in meaningful discussions with any offerors prior to finding that they should be placed in the CR.

<u>Analysis</u>

No controlling law directs this Court's conclusion on whether the contracting officer was obligated to place ADES in the CR. The Court finds the arbitration panels' decisions persuasive because the Court is tasked with assessing how likely ADES is to succeed in that forum. Some arbitration panels have concluded that the FAR approach to establishing the CR conflicts with the purpose of the RSA and the more specific RSA statute and regulations govern. (Doc. 22, Ex. 22, *Colo. Bus. Enter. Prog.*, No. R-S/20-09, at 13-14 (looking to the intention of the regulations when adopted in 1977 and the 1988 DOE handbook); Doc. 22, Ex. 20, *S.C. Comm'n for the Blind*, No. R-S/19-01, at 5, 11. The government did not offer any arbitration panel decisions for the Court's consideration. Of the decisions submitted by Plaintiff that reached this issue, all concluded that the contracting officer should have used the broad interpretation of CR as

---

[4] Defendant also cites the case of *Okla. Dep't of Rehab. Servs.*, 2018 WL 10373342, at *4. That case did not touch on the second arbitration issue, it discussed the timing of when a contracting agency must consult with the DOE Secretary. *Id.* Because that issue is not before the Court, it is not relevant to the analysis. *See supra* at 9 & n.2.

understood in 1977 and as included in the DOE's 1988 handbook. In light of the arbitration panel decisions submitted by Plaintiff, the Court does not find Defendant's single out-of-circuit case, *N.C. Div. of Servs. For Blind*, persuasive. In particular, because that case applied the highly-deferential APA standard.

Next, the Army could have complied with both the understanding of CR at the time the regulations were adopted (and as set forth in DOE's handbook) and FAR § 15.306. Because ADES's proposal could have been made acceptable with meaningful discussions, it would have been found to be within the CR under the 1977 understanding of that term when the RSA regulations were promulgated. Then, as provided in FAR and the Solicitation, the Army could have engaged in meaningful conversations with the SLA as an offeror in the CR. This process would not preclude the Army from having its needs met, as Defendant suggests, because ADES would not be eligible for the contract unless its revised proposal ultimately was determined to be technically acceptable. (Doc. 30, Ex. A, Attach. 1 at 104-05, STEP 2-5.)

Defendant argues it could not treat Plaintiff different than other offerors. The purpose of the RSA, however, is to grant SLA's preferential treatment. 20 U.S.C. § 107 (granting priority to blind persons); *see Georgia ex rel. Ga. Vocational Rehab. Agency v. United States ex rel. Shanahan*, 398 F. Supp. 3d 1330, 1352 (S.D. Ga. 2019) ("Congress passed the RSA to change the normal government contracting procedures for the benefit of the blind, and as such, the RSA might require a different result than the general FAR regulations would otherwise with certain government contracts."). For example, a federal agency may choose to forego the standard competitive contracting process entirely and negotiate directly with an SLA. And the RSA affords SLAs a priority in the agency's final award of a contract. Thus, interpreting the RSA and its regulations as requiring that an SLA be treated differently with respect to placement in the CR, is not inconsistent with the other provisions of the RSA. It also aligns with the Court's obligation to interpret the RSA and its regulations broadly because federal agency cafeterias are "expected to provide maximum employment opportunities to blind vendors to the greatest extent

possible." *Hoopono-Servs. for the Blind*, 46 F.4th at 1156 (quoting 34 C.F.R. § 395.33(a)).

For all of these reasons, the Court finds there is, at a minimum, a serious question going to the merits on whether the arbitration panel will conclude the Army violated the RSA and its regulations by excluding ADES from the CR.

**Irreparable Harm**

The Court must evaluate whether Plaintiff is likely to suffer irreparable harm if an injunction is denied, and Defendant is allowed to award the Fort Huachuca food services contract to a different vendor before the arbitration is completed. *Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). The Army notified the Court that it is prepared to issue a contract to a new entity shortly after this Court's ruling if an injunction is denied. Scott Weber, the current ADES vendor operating the Fort Huachuca dining facilities, testified that his wife works with him and, if no injunction is issued, they will lose their entire income. Weber also stated that if an injunction is denied, he may have to leave the geographic area. That could preclude him from serving as the blind vendor for ADES if Plaintiff succeeds at arbitration.

ADES's RSA program is funded, in large part, by a percentage of net proceeds from contracts it enters with federal agencies under the RSA. (Doc. 1 ¶ 6.) Weber and Kristen Mackey, the administrator for Arizona's RSA program, testified that without an injunction the RSA program in Arizona would lose most of its funding. Mackey stated that funds from the Fort Huachuca contract provide 75-85% of the $5.4 million budget for Arizona's RSA program. As explained by Mackey, without an injunction the program would be gutted with respect to its ability to support current blind vendors and seek future contracts.

Defendant contends that monetary loss, the primary harm Plaintiff alleges, is usually not sufficient to establish irreparable harm. *See Am. Trucking Ass'ns., Inc. v. Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009) (holding that monetary harm "will not

usually support injunctive relief."). Plaintiff's Complaint before this Court is based on the APA. (Doc. 1 at 17-19.) That act waives the United States' sovereign immunity to be sued but does not allow money damages. 5 U.S.C. § 702; *Harger v. Dep't of Lab.*, 569 F.3d 898, 906 (9th Cir. 2009) (holding that the APA waives sovereign immunity only to the extent plaintiff seeks "relief other than money damages"). Thus, due to sovereign immunity, Plaintiff is unable to recover monetary damages after the fact, even if it wins at arbitration or a subsequent court proceeding. *See Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014) (finding irreparable harm and noting the Army's acknowledgement that neither an RSA arbitration panel nor a federal court may grant monetary damages to an SLA for a violation of the RSA); *Kan. Dep't for Child. & Fams.*, 874 F.3d at 1251 (finding irreparable harm because "sovereign immunity bars an arbitration panel or a federal court from awarding Kansas monetary damages even though the arbitration panel found that the Army violated the RSA."). Because Plaintiff cannot recover any monetary damages after the fact in this case, the Court will consider its monetary loss when evaluating the likelihood of irreparable harm.

Defendant argues Plaintiff will not suffer irreparable harm because it has no right to a contract extension or award of the new contract. Although the two scenarios are somewhat indistinguishable, the Court is not evaluating harm to Plaintiff because the Army did not award it the new contract. Instead, the Court looks at the likelihood of harm if the Army awards the contract to a different entity while the arbitration is pending. Courts facing similar facts have found irreparable harm as to the SLA and the blind vendor if the status quo is not maintained during the arbitration. *See Ga. Vocational Rehab. Agency*, 398 F. Supp. 3d at 1344-47, 1356; *Hoopono-Servs. for the Blind*, 2019 WL 3953950, at *7. Because ADES and Weber would be unable to recover any monetary losses incurred while the arbitration is pending, their imminent and substantial economic injury if an injunction is denied establishes a likelihood of irreparable harm. This factor weighs in favor of granting a preliminary injunction.

1

**Balance of Equities**

2          The third requirement – that the equities weigh in Plaintiff's favor – involves

3 weighing the possible harm that a preliminary injunction would cause Defendant against

4 the possible harm that would be caused to Plaintiff by the denial of a preliminary

5 injunction. *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir.

6 1999). The Court will compare the irreparable harm to established by Plaintiff with the

7 possible harm to the Army. Defendant argues that, if an injunction is granted, the Army's

8 mission may be compromised by Plaintiff not providing safe and timely food service to

9 the soldiers training at Fort Huachuca.

10          First, Defendant argues that ADES's proposal did not provide sufficient staff for

11 the Army's current and future requirements as set forth in the Solicitation. The food

12 service ADES is providing currently at Fort Huachuca has been rated satisfactory or

13 better in all categories. Weber testified that he has never received any deficiencies on his

14 annual Contract Performance Assessment Report (CPAR) reviews. From 2018 to 2019,

15 ADES received two Exceptional, one Very Good, and two Satisfactory ratings on the

16 CPAR. (Doc. 22, Ex. 4.) From 2019 to 2020, ADES received two Exceptional and two

17 Satisfactory ratings on the CPAR. (*Id.*, Ex. 5.) From 2021 to 2022, ADES received on the

18 CPAR two Very Good and three Satisfactory ratings. (*Id.*, Ex. 6.) On each of those

19 CPARs, the contracting officer representative at Fort Huachuca recommended ADES for

20 similar requirements in the future. (*Id.*, Exs. 4 at 3, 5 at 3, 6 at 3.) Weber testified that

21 96% of soldiers departing in October 2022 gave a satisfactory rating to their food

22 services. (*Id.* at 2.) In January 2023, departing soldiers categorized the overall quality as

23 satisfactory or excellent by a rate of 98% at Thunderbird and 94% at Weinstein. (*Id.*, Ex.

24 15 at 3-4.) For the period of December 1, 2022, to May 31, 2023, the contracting officer

25 representative rated Weber's quality of work as very good with no customer complaints.

26 (*Id.*, Ex. 16 at 6.) There is no evidence that the service ADES is providing now does not

27 meet the Army's current needs. Further, Weber testified that, if he continues to provide

28 the food service at Fort Huachuca during the arbitration period, he will deliver the same

quality service going forward. He stated that, if the Army determined it wanted additional staff, he would engage in discussions on that topic and increase staffing.

Second, Defendant argues it will be harmed by the inability to enter a long-term contract during the arbitration period. Michael Vicory, contracting officer for the recent Fort Huachuca Solicitation, testified that relying on short-term contracts creates uncertainty, which may cause employees to leave and degrade the quality of service provided. The Army's prior 5-year contract with ADES ended March 31, 2021. (Doc. 22, Ex. 2 ¶ 26.) Defendant presented no evidence that its short-term contracts with ADES, in effect over the past two years, diminished the service quality. (*Id.* ¶ 37.) ADES's reviews and ratings in that period, as discussed above, suggest the quality of service remained high. On a related topic, Victory stated that an injunction would force the Army into a sole-source contract with ADES, which reduces the Army's leverage and ability to make changes. The Court finds this argument very weak because the RSA allows agencies to negotiate a contract directly with an SLA; competitive bidding is not required under the statute. 34 C.F.R. § 395.33(d). As an illustration, the Army entered a five-year sole-source contract with ADES in 2016, and that agreement was expanded without competition to include full-service operations at Weinstein and Black Tower in 2019. (Doc. 22, Ex. 2 ¶¶ 26-27, 32.) Defendant has not demonstrated that it will suffer harm if it cannot enter a long-term contract based on a competitive bidding process.

An injunction will temporarily delay the Army from awarding a long-term contract based on a competitive bid process. However, Defendant's contention that it will be harmed by a lack of satisfactory food service in the interim is entirely speculative. If the Army determines it would benefit from a set contract period, it may negotiate such a contract with ADES to cover through and beyond the arbitration period. To the extent the Army believes changes to the current food service operations at Fort Huachuca are needed, it may negotiate directly with ADES for those modifications. Also, in the event ADES is unable to meet the Army's needs, and the preliminary injunction precludes the Army from providing timely and safe food services to its soldiers, Defendant may return

1  to the Court with that concern. Because Defendant has not established that it will suffer

2  any consequential harm if an injunction is granted, and Plaintiff has demonstrated a

3  likelihood of irreparable harm if an injunction is denied, the balance of equities tips

4  sharply in Plaintiff's favor.

5    **Public Interest**

6    As with the other elements, Plaintiff has the burden to demonstrate an injunction is

7  in the public interest. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)

8  (citing *Winter*, 555 U.S. at 26-27). This factor considers the impact on non-parties of

9  issuing or not issuing an injunction. *Id.* The Court must look at the "likely consequences

10  of the injunction," as supported by evidence, not consequences that are "too remote,

11  insubstantial, or speculative." *Id.*

12    Plaintiff contends that the public has an interest in the purposes behind the RSA,

13  providing employment and economic opportunities for blind individuals. Plaintiff also

14  states that an injunction is in the public interest because it will uphold the integrity of the

15  procurement process and allow time for enforcement of the RSA. Finally, Plaintiff argues

16  that it should not lose the protections of the RSA while it follows the established

17  arbitration process of the RSA regulations.

18    Congress already considered the public interest and determined it was served by

19  the requirements of the RSA, a weighty finding for this Court's analysis. *See Golden Gate*

20  *Rest. Ass'n v. San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) ("We are not sure

21  on what basis a court could conclude that the public interest is not served" by a

22  unanimously passed city ordinance) (citing 11A Charles Alan Wright, Arthur R. Miller &

23  Mary Kay Kane, *Federal Practice and Procedure* § 2948.4, at 207 (2d ed. 1995) ("The

24  public interest may be declared in the form of a statute.")); *Stormans, Inc.*, 586 F.3d at

25  1140 (directing the district court to give "due weight" to the state officials' consideration

26  of the public interest in passing the governing rules). These interests, as incorporated in

27  the RSA, are "providing blind persons with remunerative employment, enlarging the

28  economic opportunities of the blind, and stimulating the blind to greater efforts in striving

to make themselves self-supporting." 20 U.S.C. § 107(a). Absent an injunction, ADES's ability to support the blind vendor program statewide will be severely impaired. Plaintiff has carried its burden to establish that the granting of an injunction is in the public interest, because it preserves the status quo while Plaintiff pursues its rights under the RSA. *See Hoopono-Servs. for the Blind*, 2018 WL 2187977, at *9.

Defendant argues that injunctive relief is not in the public interest because it undermines the FAR procedures and the efficiencies attendant to a competitive contract award. While the public typically does have an interest in competitive government contracting and procurement, that interest is very weak in this case. By providing that government agencies may engage in direct negotiations with an SLA, 34 C.F.R. § 395.33(d), the federal government determined that the purposes underlying the RSA were more important than the general rules for competitive government contracting. Therefore, the public interest would not be meaningfully furthered by denying a preliminary injunction and allowing an award based on a competitive process, despite ADES pursuing relief under the RSA.

Defendant also argues that an injunction would leave ADES as the contractor, and it is not providing the necessary staffing and level of food service for the soldiers. The Army contends that modifications to rectify those issues may cost additional taxpayer funds. Defendant does not contend that the public has an interest in what provider operates the food services at Fort Huachuca, only that there is a public interest in the soldiers receiving satisfactory service. As discussed more thoroughly above, with respect to the balance of equities, Defendant failed to substantiate its contention that granting an injunction will impair the Army's ability to feed its soldiers in a timely and safe fashion. Also as discussed above, the Army has options for contract modification as needed. Further, there is no evidence that a necessary modification of the contract with ADES would cost more than the Army would pay under a new contract with a different entity.

Plaintiff established that the granting of a preliminary injunction is in the public interest. And Defendant failed to demonstrate that the public interest in the denial of a

preliminary injunction overrides the showing made by Plaintiff. This element favors granting a preliminary injunction.

### CONCLUSION

The Court has determined that there is a serious question on the merits of issue two, as presented to the arbitration panel, and that the balance of hardships tips sharply in ADES's favor. Additionally, Plaintiff has established that it will suffer irreparable harm if an injunction is not granted, and that a preliminary injunction is in the public interest. Because Plaintiff has satisfied the four requirements for a preliminary injunction, the Court will grant its motion.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 22) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant shall maintain Plaintiff as the food services vendor at Fort Huachuca until there is a final decision in the pending arbitration before the DOE or until further order of the Court.

**IT IS FURTHER ORDERED** that the parties shall file with the Court a joint report providing the status of the arbitration proceeding, beginning on **January 12, 2024**, and every four months thereafter.

Dated this 11th day of September, 2023.

Honorable Lynnette C. Kimmins
United States Magistrate Judge