1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    Arizona Department of Economic )
     Security, an Arizona State     )
4    agency,                        )
                                    )
5                    Plaintiff,     )    4:23-cv-00250-LCK
                                    )
6             vs.                   )
                                    )    Tucson, Arizona
7    Christine Wormuth; Secretary   )    August 29, 2023
     of the Army, in her official   )    1:38 p.m.
8    capacity,                      )
                                    )
9    _____Defendant.  __)

10

11

12                    TRANSCRIPT OF PROCEEDINGS
                          MOTION HEARING

13

14

15

         BEFORE THE HONORABLE LYNNETTE C. KIMMINS
16            UNITED STATES MAGISTRATE JUDGE
                405 WEST CONGRESS STREET
17               TUCSON, ARIZONA 85701

18

19

20

21   Transcribed by:
         Cindy J. Shearman
22       405 West Congress Street, Suite 1500
         Tucson, AZ 85701
23       520-205-4286

24            Proceedings were digitally recorded
           Transcript prepared by transcriptionist
25

1                    A P P E A R A N C E S

2  For the Plaintiff:

3      Andrew Freeman
       Neel Lalchandani
4      Brown Goldstein & Levi, LLP
       120 East Baltimore Street, Suite 2500
5      Baltimore, MD 21202-6701
       (Appearing telephonically)
6
   and
7
       Randy Aoyama
8      Hinshaw & Culbertson, LLP
       2375 East Camelback Road, Suite 410
9      Phoenix, AZ 85016
       (Appearing telephonically)
10

11  For the Defendant:

12      Sarah Letzkus
        Cole Hernandez
13      U.S. Attorney's Office
        405 West Congress Street, Suite 4800
14      Tucson, AZ 85701
        (Appearing telephonically)
15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    ARGUMENT                                           PAGE

3    By Mr. Freeman                                       5
     By Ms. Letzkus                                      31
4    By Mr. Freeman                                      48

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   P R O C E E D I N G S

 2              (Call to order of court, 1:38 p.m.)

 3              CLERK:  Court is now in session.  Calling civil matter

 4    23-250, Arizona Department of Economic Security versus

 5    Christine Wormuth on for an evidentiary hearing.

 6         Would counsel please state your appearances for the record?

 7              MR. FREEMAN:  Afternoon, Your Honor.  This is Andrew

 8    Freeman for Arizona Department of Economic Security.  With me

 9    today is Neel Lalchandani here in my office and also on the

10    line, Randy Aoyama, our local counsel.

11              THE COURT:  Thank you.  Good afternoon, everyone.

12              MS. LETZKUS:  Good afternoon, Your Honor.  This is

13    Sarah Letzkus for the defendant and with me in my office today

14    is my co-counsel, Cole Hernandez.

15              THE COURT:  Thank you.  Good afternoon, as well.

16         And so the parties are aware, we also have a separate

17    telephone line for members of the public that wanted to listen

18    in.  They'll be muted so we shouldn't hear any of them but they

19    do have the ability to go ahead and listen to the arguments.

20         This is the time set for closing arguments on the motion

21    for preliminary injunction and, Mr. Freeman, are you going to

22    be the one arguing for the plaintiff?

23              MR. FREEMAN:  I will, Your Honor.

24              THE COURT:  Okay.  So whenever you're ready to go, go

25    ahead.
```

1          MR. FREEMAN:   Thank you.

2      Good afternoon.   On behalf of the Arizona Department of

3  Economic Security, thank you for the opportunity to present our

4  closing argument and to address the court's questions.

5      I'd like to start by addressing the posture of this case

6  and some of the relevant legal issues.   I'll then address the

7  merits, why DES is likely to prevail in its Randolph-Sheppard

8  arbitration against the Army.   And, in the course of that

9  discussion, I'll discuss each of the court's questions.

10  Finally, I'll return to the irreparable harm to ADES and its

11  vendors, the lack of harm to the Army, and the public interest.

12  And of course at any time in the presentation, Your Honor, I'd

13  welcome any additional questions the court might have.

14          THE COURT:   Thank you.   I appreciate that.

15          MR. FREEMAN:   Let me start with the preliminary

16  injunction standard.   As the court knows, to obtain a

17  preliminary injunction, a plaintiff must establish, first, that

18  it is likely to succeed on the merits; second, that it will

19  suffer irreparable harm in the absence of preliminary relief;

20  third, that the balance of the equity supports an injunction;

21  and, fourth, that an injunction is in the public interest.

22      I'd like to direct the court's attention to a Ninth Circuit

23  decision from last year, *hiQ*, spelled lowercase h-i, upper case

24  Q, *Labs versus LinkedIn*, 31 F.4, 1180, which the Army cited on

25  the last page of its brief.   In that case, Your Honor, the

1    Ninth Circuit affirmed the district court, beginning its

2    analysis with the balance of the equities and instructed,

3    quote, when the balance of hardship tips sharply in the

4    plaintiff's favor, the plaintiff need demonstrate only serious

5    questions going to the merits, close quote, in order to obtain

6    that preliminary injunction.  Again, that's 31 F.4 at 1188 and

7    that same analysis is expanded upon at page 1191.

8        The posture of this case is the same as in the *hiQ Labs*.

9    The Fort Huachuca food services contract is the lifeblood of

10   the state's Randolph-Sheppard program.  Absent an injunction,

11   DES's blind vendor program will be decimated and Scott Weber,

12   its blind vendor, along with the program's other 20 blind

13   vendors and their families will suffer immediate, concrete, and

14   irreparable harm.  By contrast, granting an injunction will not

15   harm the Army at all.  It and its soldiers will continue to

16   receive the same high-quality service it has received for the

17   past two decades.

18       Because the balance of the harm tips so strongly in its

19   favor, DES need only raise serious questions going to the

20   merits of its claim to obtain a preliminary injunction.  It has

21   got at least that and has gone farther than necessary and

22   demonstrated that it's likely to succeed on the merits.

23       In a minute or two I will address why DES is likely to

24   succeed in the arbitration given that the Army refused to place

25   DES's proposal in the competitive range despite the fact that

1    it could have been made acceptable through meaningful

2    discussions.  That is all that is required, that is what is

3    required by the Randolph-Sheppard Act and its regulations for

4    placement in the competitive range.

5        First, I want to highlight the statutory and regulatory

6    scheme that applies here.  In 1974 Congress amended the

7    Randolph-Sheppard Act to require the Secretary of Education to,

8    quote, prescribe regulations to establish a priority for the

9    operation of cafeterias on federal properties by blind vendors

10   when such operation can be provided at a reasonable cost with

11   food of high-quality comparable to that currently provided to

12   employees.  That's 20 USC Section 107d-3(e), 107d-3(e).  Again,

13   the priority applies when the operation can be provided at a

14   reasonable cost with food of high-quality comparable to that

15   currently provided to employees.

16       That's precisely what we have here.  There's no real doubt

17   that DES and its blind vendor can provide food of high-quality

18   comparable to what they're currently providing.  And here price

19   is not an issue raised by the Army.

20       In 1977, the Department of Education promulgated the

21   regulations that Congress had charged it to promulgate at

22   34 CFR Section 395.33, colloquially referred to as the

23   cafeteria regulations.  In 395.33(a), the Department repeated

24   the Act's instruction as to when the priority should be

25   granted.  And it added that, quote, such operation shall be

1    expected to provide maximum employment opportunities to blind

2    vendors to the greatest extent possible, close quote.

3        In the next subsection, 395.33(b), the Department of

4    Education established a procedure that entitles the state

5    licensing agency to a priority to operate a cafeteria on

6    federal property if the SLA's proposal, quote, is judged to be

7    within a competitive range, close quote.  And, quote, has a

8    reasonable chance of being selected for final award, close

9    quote.

10       In 1977, when that regulation was adopted, federal property

11   managers, including the Army, were required to place the SLA's

12   proposal in the competitive range if it could then be made

13   acceptable through meaningful discussions.  That was the

14   meaning of the phrase "competitive range" in 1977.  We'll come

15   back to that in a minute.

16       With respect to the first preliminary injunction factor, a

17   likelihood of success, we submit that the most straightforward

18   way to resolve this motion is by ruling that DES is likely to

19   prevail or at the least has raised a serious question on the

20   second violation of the Randolph-Sheppard Act alleged in its

21   arbitration complaint.  I'm also going to discuss why DES

22   prevails on the first violation but the court need not even

23   reach that issue.  That's because, as to the second issue, even

24   assuming that DES's proposal was technically deficient, the

25   Randolph-Sheppard Act and regulations, still required the Army

1    to place that proposal in the competitive range since any

2    deficiencies could have been remedied through a meaningful

3    discussion.

4        The Army's main defense that it was precluded from

5    conducting meaningful discussions before the setting of the

6    competitive range simply misses the point.  DES is not saying

7    that the Army had to have discussions before setting the

8    competitive range.  Rather, the Randolph-Sheppard Act and

9    regulations require the Army to first place DES's proposal in

10   the competitive range, after which the parties could have

11   entered and should have entered into meaningful discussions.

12       At the outset, as we mentioned, the 1977 definition of

13   "competitive range" applies in this case.  Basic rules of

14   statutory interpretation mandate that the Department of

15   Education's 1977 regulation, which has not been revised since

16   then, be interpreted in light of what its terms meant at the

17   time it was adopted.  For example, after citing extensive case

18   law, the South Carolina arbitration panel, whose decision we

19   provided at ECF 22-20, held, quote, we must interpret the

20   Randolph-Sheppard regulations adopted in 1977 by reference to

21   how the term "competitive range" was used at the time the

22   regulation was drafted, close quote.  Again, that's ECF 22-20

23   at 11.

24       Similarly, in considering a slightly different issue, a

25   Georgia federal court looked to the understanding of the

1    cafeteria regulation at the time it was drafted, and that's

2    398 F.Supp 3d at 1349, and this issue is discussed in our reply

3    brief on ECF 32 at page 9.

4        Moreover, as we discussed at the hearing, the 1977

5    definition of "competitive range" is reflected in the

6    Department of Education's handbook.  Numerous arbitration

7    panels have relied on that handbook, including the Utah

8    decision, which is ECF 22-24 at 10, the Oklahoma decision,

9    ECF 22-25 at 44, and the Colorado decision, ECF 22-22 at 15.

10       Each of these discussions -- these decisions and all of

11   these decisions demonstrate that DES is likely to prevail

12   before its arbitration panel on the issue that the 1977

13   definition of "competitive range" and the interpretation of

14   that definition in the Department of Education's handbook apply

15   here and, therefore, entitle DES to be placed in the

16   competitive range and then conduct meaningful discussions with

17   the Army which would have led to a final decision that it was

18   appropriately in the competitive range.

19       Moreover, to the extent that the Army is arguing that the

20   Federal Acquisition Regulations somehow trump the

21   Randolph-Sheppard Act, it's simply mistaken.  Because the

22   Randolph-Sheppard cafeteria regulation is more specific in its

23   application to this case than the general FAR, numerous courts

24   and arbitration panels have held that the more specific

25   regulation governs over the more general one.  Among those

1    cases is the Michigan case we cited in -- and, again, we
2    discuss that issue at page 9 of our reply.
3        I'd like to turn now to the court's first question, which
4    was, quote, if the court were to utilize the interpretation of
5    "competitive range" from 1977 and/or the DOE handbook, should
6    that apply to all proposals in response to a solicitation or
7    only to a proposal by an SLA?
8        The answer is that as of now, in 2023, the 1977 definition
9    of "competitive range" does not apply to all proposals but
10   continues to apply to state licensing agencies' proposals.  And
11   that's true for several reasons.  First, the statutory priority
12   is granted to SLAs, and SLAs alone.  The requirement to place
13   the state licensing agency's bid in the competitive range if it
14   can be made acceptable is one application of that
15   Randolph-Sheppard priority which, again, applies just to the
16   SLA.
17       As the Colorado arbitration panel held last year, quote,
18   the use of the more restrictive definition of competition in
19   the current FAR does not implement the Randolph-Sheppard
20   priority.  That's ECF 22-22 at page 14.
21       The Department of Education's interpretation of its own
22   regulation, which is entitled to deference as we explain in our
23   motion, ECF 22 at page 21, footnote five, supports this
24   understanding.  Starting on page 35 of its handbook, the
25   Department of Education explains how the, quote, priority

1  applies before, during, and after the setting of the

2  competitive range.  It confirms that one way the priority

3  applies is by including the SLA's proposal in the competitive

4  range if it can be made acceptable through meaningful

5  discussions.

6      Another way the priority applies is when selecting the

7  contract.  As page 37 of the handbook explains, quote, the

8  SLA's proposal does not have to be the best overall proposal

9  for them to be awarded the contract, close quote.  That is not

10 true for other offerors.  I don't think the Army disputes that.

11 The SLA's proposal does not have to be the low bidder, so the

12 Army acknowledges that the SLA's proposal can be treated

13 differently than any other proposal.  What the Army misses is

14 that same difference also governs with respect to the initial

15 inclusion in the competitive range.

16     The 1977 definition is also consistent with the text and

17 purpose of the Randolph-Sheppard Act and regulations.  That act

18 is a broad remedial statute, as discussed in the Ninth

19 Circuit's decision last year in the *Hawaii* case, 46 F.4th at

20 1148 at page 1156.

21     When the 1977 definition of "competitive range" was first

22 adopted, it did apply to all offerors.  But in 1984, the

23 Department of Defense and other entities adopted the Federal

24 Acquisition Regulations, thus DOD chose to change the

25 definition of "competitive range".  It was entitled to do that

1    for all other offerors, it was not entitled to do that with

2    respect to state licensing agencies.  The Department of Defense

3    can change contracting rules generally but it does not have

4    authority to alter the Randolph-Sheppard Act or its 1977

5    regulation.  That power is reserved for Congress and explicitly

6    by Congress reserved to the Department of Education.

7        Thus, doubling back to the court's question, the 1977

8    definition currently applies solely to SLAs.  To be clear, a

9    federal agency can initially evaluate all proposals it receives

10   under the same criteria but after that evaluation, if an SLA's

11   proposal can be made acceptable through meaningful discussions,

12   then that proposal must be included in the competitive range.

13   And then the federal property manager, the Army in this case,

14   moves on to step two, where even it acknowledges it can then

15   conduct discussions with the offeror.

16       So, let me turn -- I want to apply this 1977 definition of

17   "competitive range" to the facts of this case and I'm going to

18   skip to the court's fourth question and then come back to

19   questions two and three, if that's okay.

20           THE COURT:  That's fine.

21           MR. FREEMAN:  So the court's fourth question is the

22   appropriate one when applying the 1977 definition.  Was ADES's

23   technical proposal so technically inferior that it could not

24   have been made acceptable through meaningful discussions?  And

25   the answer to that question is a resounding no.

1    In 1977, the term "competitive range" meant that a

2    proposal, quote, must be considered to be within a competitive

3    range so as to -- so as to require negotiation unless it is so

4    technically inferior or out of line with regard to price that

5    meaningful discussions are precluded, close quote.  That's

6    again from the South Carolina arbitration decision which is

7    ECF 22-20 at page 11.

8    As the Department of Education handbook puts it, there

9    needs only be, quote, a possibility, close quote, that a

10   proposal can be made acceptable through meaningful discussions.

11   And that's the DOE handbook, it was Plaintiff's Exhibit 18 to

12   our initial motion and then was Exhibit -- ECF 22-21 at

13   page 36.  That possibility standard is a low bar to meet and

14   one that ADES easily crossed.

15   Here, it is evident that this possibility existed.  Indeed,

16   there was a high probability that any of the supposed

17   deficiencies in DES's proposal could have been easily fixed.

18   First, the Army complained that the DFAs, dining facility

19   attendants, and FSSs, were understaffed.  And Mr. Froehlich

20   testified the Army believed that DES's proposal was short by

21   just two to three people.

22   The easy remedy would have been to provide those two to

23   three people which DES and Mr. Weber would have been glad to

24   do, in -- yeah, it would have been short of meaningful

25   discussions.  If the Army had simply said, "We want two or

1    three more DFAs or FSSs," they would have been provided.

2    Alternatively, those discussions might have convinced the Army

3    that the current staffing which does not include those two or

4    three people but instead covers their tasks by cross-training,

5    that that might have sufficed and saved the Army money.  Either

6    one of those would have, through meaningful discussions, led to

7    the satisfaction -- to the provision of staffing that satisfied

8    the Army.

9         Second, the Army complained that there were not enough

10   cashiers.  Again, that issue could have been remedied by DES

11   providing more cashiers if that was what the Army wanted or

12   again by convincing the Army that the current staffing

13   suffices.

14        On the same sort of the subissue that was raised later by

15   the Army about the cash boxes and whether they were adequately

16   secured, I submit, first of all, that wasn't even part of the

17   initial disqualification.

18        Secondly, to the extent that it applies, and we submit that

19   it doesn't, again, that could have been remedied either by

20   providing additional cashiers or other people to check out the

21   cash boxes or, again, by convincing the Army that the current

22   staffing provided.  Again, that was the sort of difference that

23   could have easily been remedied by meaningful discussions.

24        Third, and finally, with respect to the Army's complaints,

25   the Army alleged or the Army pointed out that while DES

1   provided the pricing for two scenarios at Thunderbird, these

2   scenarios that don't currently occur, DES did not fill out the

3   staffing matrix for those two scenarios.  That, too, Your

4   Honor, could have been easily fixed during meaningful

5   discussions.  The Army could have asked for the staffing of

6   those two matrices.  DES had already determined that staffing

7   to come up with the pricing, and DES would have said:  Sure.

8   Here's the staffing.

9       Indeed, Ms. Mackey, in her March 6th letter offered to do

10  exactly that.  That's Exhibit 22-13 at page 2.  She offered it.

11  That offer was not even communicated to Mr. Froehlich and, in

12  any case, the Army simply declined to take her up on that

13  offer.  But, again, the Randolph-Sheppard Act required the Army

14  to take her up on that offer.

15      The Randolph-Sheppard Act and its regulations required the

16  Army to place DES's proposal in the competitive range, and then

17  engage -- because it could then have been made acceptable

18  through meaningful discussions.  Once it was in the competitive

19  range, again, the Army admits it could have asked for

20  clarification and could have, could have asked DES for that

21  staffing and Ms. Mackey would have, as she had offered,

22  provided that staffing.

23      Arbitration panels have found violations of the

24  Randolph-Sheppard Act under similar circumstances.  Like this

25  case, in the South Carolina arbitration, SLA's proposal was

1   allegedly, quote, missing certain components.  As noted in the

2   dissent in that case, the proposal did not include staffing for

3   the fourth meal of the day necessary for Marines in training,

4   did not include a menu for required events, or a nutritional

5   content as required by that solicitation.  So those specifics

6   are included at ECF 22-20 at pages 25 and 33.

7       The majority of that panel, however, found that any items,

8   quote, missing from the South Carolina proposal could have been

9   easily resolved in meaningful discussions and, further, that,

10  quote, minor mistakes in the proposal and questions regarding

11  staffing levels could have been easily rectified had the Marine

12  Corps engaged in meaningful discussions with the South Carolina

13  SLA.  Again, that's ECF 22-20 at page 4.  We discussed that in

14  our initial brief, ECF 22 at page 23.

15      The evidence that DES's proposal could have been made

16  acceptable, let alone could possibly have been made acceptable

17  is overwhelming.  As Mr. Weber expressly testified, if the Army

18  had wanted more staff, he would have gladly supplied that

19  additional staff.  He testified at the hearing that if the Army

20  asked for more staffing, he would, quote, do what they asked.

21  It's their facility and their soldiers; we take care of them,

22  close quote.  That's the transcript from day one at page 84,

23  lines 16 through 25.

24      Additionally, the history of cooperation and -- between DES

25  and the Army is additional evidence that meaningful discussions

1    could have made DES's proposal acceptable and, again, DES in

2    Ms. Mackey's March letter offered to provide the staffing for

3    the two scenarios at Thunderbird.  Again, any deficiencies here

4    were easily fixable.

5        In Mr. Vicory's exalted (phonetic) knowledge, the Army has

6    sometimes engaged in, quote, extensive discussions with

7    offerors at step two.  That was the testimony in the day two

8    transcript at page 62, lines 12 to 15.  Here the discussions

9    and negotiations between DES and the Army would not have needed

10   to be extensive.  The Army could have simply said, "We want

11   this additional staffing information" and DES would have

12   obliged.

13       The Army, Your Honor, has not rebutted or even attempted to

14   rebut this evidence.  In its response and at the hearing, the

15   Army refused to argue under the proper 1977 standard.  The Army

16   has not disputed that it was possible for DES's proposal to be

17   made acceptable through meaningful discussions.  Thus, the

18   court should find that the Army violated the Randolph-Sheppard

19   Act by failing to include DES's proposal in the competitive

20   range given that any deficiencies in that proposal could have

21   been remedied through meaningful discussions.

22       Turning to the court's third question, that is, as Your

23   Honor wrote, the Army engaged in written discussions with ADES

24   after excluding it from the competitive range, and the

25   contracting officer testified that he would have included the

1  SLA in the competitive range if the Army determined its

2  technical evaluation had been inaccurate.  Could these

3  interactions qualify as, quote, meaningful discussions?  And

4  the answer to that is simply no.

5      The question merges two distinct issues together.  I want

6  to tease those issues apart.  The first allegation, the first

7  violation that DES has alleged is that the Army improperly

8  evaluated DES's proposal in the first instance.  The second

9  alleged violation, the one that concerns meaningful

10  discussions, is distinct from that first violation.  For the

11  second violation, the question is:  Excepting those

12  deficiencies, could the proposal have been made acceptable and

13  those deficiencies remedied through meaningful discussions?

14  But the Army, Your Honor, in it's quote, unquote, reevaluation

15  of DES's proposal, limited itself to the first issue, whether

16  DES's proposal was technically acceptable.  The Army never

17  considered whether the proposal could be made acceptable

18  through meaningful discussions.

19      Again, for example, Mr. Vicory never even communicated to

20  Mr. Froehlich Ms. Mackey's offer to clarify the cross-training

21  nor her offer to provide the staffing matrices for the two

22  scenarios at Thunderbird.  There simply were no meaningful

23  discussions between the parties.

24      The Army did not engage in any discussions with DES or

25  allow any revisions to DES's proposal.  The parties simply

1    exchanged two letters.  The Army did not take DES up on its

2    offer to provide staffing for the two -- for those two

3    scenarios, the Army did not in any way allow DES to clarify its

4    proposal or to engage in a discussion, a back and forth with

5    the Army in which DES either could have explained why its

6    proposed staffing was satisfactory or listened to the Army and

7    made slight modifications to its proposal to add additional

8    staff to meet the Army's, what the Army thought were its

9    requirements.

10        Regardless, the proper inquiry here is not whether the Army

11   in fact engaged in meaningful discussions with DES in April

12   2023 at the end of that process.  The Army violated the

13   Randolph-Sheppard Act months before that in January 2023 when

14   it excluded DES's proposal from the competitive range.  The

15   subsequent exchange of letters after DES's proposal had already

16   been kicked out of the competitive range cannot somehow rectify

17   the Army's failure to start off by placing DES in the

18   competitive range, again conducting meaningful discussions.

19        Turning to the court's second question, which was, quote,

20   do, quote, meaningful discussions, close quote, necessarily

21   include the right for an SLA to revise its proposal one or more

22   times?  The answer to that question is yes.

23        The Department of Education handbook provides guidance on

24   this point.  It explicitly refers to clarification,

25   modification, or minor revision of the SLA's proposal.  That's

1   Exhibit 18 at page 36.  Indeed, revisions are even expressly

2   contemplated even under the FAR.  FAR 15.306(d)(3), quote,

3   encourages, close quote, discussions of, quote, aspects of the

4   offeror's proposal, close quote, that could be, quote, altered.

5   In other words, the FAR says that there should be discussions

6   of aspects of the offeror's proposal which could be altered

7   which is simply another word for revised.  It is difficult to

8   understand how discussions could be meaningful if they did not

9   allow revisions to the proposal.

10      As already noted, the South Carolina arbitration panel

11  envisioned meaningful discussions to include the SLA revising

12  its staffing level and addressing additional items missing from

13  its original proposal.  Likewise, the Utah arbitration panel

14  found that the Utah SLA could have lowered its price and

15  otherwise revised its proposal if the Air Force had properly

16  conducted meaningful discussions.  That's ECF 22-24 at 10.

17      While speaking of the FAR, I wanted to briefly address the

18  fact that FAR 15.306 and the arguments regarding the Army's

19  step two, I wanted to address that step two, that the Army's

20  main and really its only response on the second violation

21  alleged by DES in its complaint is that the Army was -- claims

22  that it was precluded from having discussions before setting

23  the competitive range.

24      Again, as I mentioned earlier, that misses the point.  DES

25  is not saying that the Army had to have discussions before

1    setting the competitive range.  Rather, the 1977 definition of

2    "competitive range", and the language in the Department of

3    Education's handbook requires the Army to first place DES's

4    proposal in the competitive range if it can be made acceptable

5    by discussions and then to hold those discussions.  So

6    FAR 15.306 is simply no defense at all.

7        For the same reason, there's no conflict between the

8    Randolph-Sheppard Act and the five-step process outlined in the

9    solicitation.  Step two of that process acknowledges that the

10   Army, quote, shall enter into discussion slash negotiations

11   with all offerors if proposals have been determined to be in

12   the competitive range, close quote.  The entire point is that

13   the Army was required to place DES's proposal in the

14   competitive range in step one, at which point it could have

15   conducted the discussions with DES at step two as required by

16   -- as required by the Randolph-Sheppard Act and regulations.

17       The bottom line is simply that the Randolph-Sheppard Act

18   and the FAR are reconcilable.  That said, if there were

19   conflicts between specific Randolph-Sheppard regulations and

20   the general FAR, the former would govern.  There's extensive

21   case law and panel decisions on that point.  Among other

22   authorities, that includes the Georgia federal court decision,

23   398 F. Supp. 3d at 1351, note seven, and Oklahoma arbitration

24   decision ECF 22-25 at 18.

25       I'd like to turn then to the court's fifth and final

1  question, which was, when examining the Army's findings with

2  respect to ADES's proposal, what level of review should the

3  court employ?  And that question goes to the first preliminary

4  injunction factor, the likelihood of success on the first

5  alleged violation.  But, again, the question, when examining

6  the Army's findings with respect to ADES's proposal, what level

7  of review should the court apply -- employ?  Is it closer to de

8  novo or is there (unintelligible) owed to the Army's decision?

9  And the answer to that question is that no special deference is

10  owed to the Army's findings.  Multiple arbitration panels have

11  recognized this, Oklahoma, 22-25 at 33; Missouri, 22-19 at 8;

12  Texas, 22-18 at 22 all make this specific point that given the

13  remedial purposes of the Randolph-Sheppard Act and given that

14  the arbitration panel is the trier of fact as opposed to

15  appellate tribunal, the standard closer to de novo is the

16  appropriate one.

17      The arbitration panel is set up by the Department of

18  Education and it acts as the alter ego of the Secretary of

19  Education.  As the Oklahoma panel put it, quote, a statutory

20  interpretation that limits the panel's review and requires

21  deference to the contracting officer's determination under the

22  Randolph-Sheppard Act would be wholly inconsistent with the

23  statutory mandate requiring the Secretary of Education to

24  assure compliance with the Randolph-Sheppard Act's purposes and

25  objectives.  That's 22-25 at 33.

1        In any event, under any standard of review, the Army's

2    decision was unreasonable.  In the Army's response brief at 10,

3    it acknowledged that procurement decisions cannot stand if it

4    violates a regulation.  And as we've explained, the Army's

5    decision did just that.

6        Moreover, at a minimum, the agency's decision must be

7    coherently explained and supported by substantial evidence and

8    the Army has failed to do either here.  The Army has failed to

9    provide the most basic evidentiary support for its conclusions.

10   It hasn't provided any documents from the underlying

11   evaluation.  It hasn't provided the source selection board doc

12   -- evaluation -- the source selection evaluation board

13   documents, including its technical evaluation.  It hasn't

14   provided the independent government cost estimate of it which

15   outlines the Army's estimated staffing levels.  It hasn't

16   provided an explanation of how the Army came up with those

17   staffing levels.  It hasn't provided Mr. Froehlich's written

18   evaluation that he testified he had emailed to Mr. Vicory.

19   That's the day three transcript, page 15, lines 12 to 18.  Nor

20   has it provided the other bidders' proposals, let alone the

21   Army's evaluation of those proposals.

22       Without any of those documents, essentially the Army's just

23   asking the court to take its word that DES's proposal was

24   understaffed and has provided no evidence of that

25   understaffing.  That's the sort of evidence that the

1    arbitration panel will look at when making a more fulsome

2    determination.  All the Army has provided the court is a series

3    of shifting --

4         Let me skip ahead, Your Honor, to save a little bit of

5    time.

6         The Army confuses the issue here by saying, that, quote,

7    past performance is a separate inquiry from technical capacity.

8    But here it's not quite that simple.  Here, well, in the

9    typical case, past performance is at a different location, but

10   here DES was the incumbent.  It provides services at the exact

11   same site, the exact same cafeterias.  So its past performance

12   is the same as its current performance, it's the same as its

13   proposed future performance.  There's a direct link between the

14   staffing that DES currently proposes -- that DES currently

15   provides and the staffing it proposed.  In its technical

16   proposal --

17        THE COURT:  Mr. Freeman, let me stop you for a minute.

18   Didn't the new solicitation actually require additional staff

19   than what was indicated in the past performance staff?

20        MR. FREEMAN:  I don't believe so, Your Honor.  The new

21   solicitation required staffing for exactly the same services

22   that are currently being provided.  I think what Your Honor is

23   referring to is the two new possibilities that the solicitation

24   addressed or requested DES address, the one is all take-out

25   scenario and the other was brunch at Thunderbird.  Each of

1    those actually requires less staffing than the proposal.  The

2    idea of the all take-out is simply that you'd have a few, you

3    might have a few fewer staff if you don't have the same

4    clean-up, you simply prepare the food and it's taken out in

5    to-go boxes.  Again, DES has done that before.  DES provided

6    the pricing for that.

7         There's never been brunch at Thunderbird, but brunch is

8    simply instead of having three meals a day, you have two meals

9    a day so there's less staffing not more staffing.

10        So if I understand Your Honor's question, it's not that the

11   solicitation required additional staffing, the solicitation

12   asked for two hypothetical scenarios in which less staffing

13   would be required.

14        Again, the Army -- was within its right to ask for staffing

15   for those hypothetical scenarios.  DES provided pricing that

16   was based on its staffing.  It failed to provide those two

17   staffing matrices.  I submit, Your Honor, that that is, you

18   know, if anything could have been, could have been clarified by

19   meaningful discussions, it was simply providing the two

20   staffing matrices that Ms. Mackey offered to provide in her

21   letter that provided the basis for the pricing in the -- that

22   was provided.

23        And one other point I want to make in relation to that is

24   that at least with regards to the take-out, the Army knew that

25   DES had provided during COVID, the Army had actual knowledge of

1    DES's actual staffing during COVID when DES did provide 100

2    percent take-out.  So, again, the Army knew that even under the

3    current, the current proposal, the current staffing, DES was

4    capable of providing 100 percent take-out.

5        Remember, Your Honor, the Army also, Mr. Fuller testified,

6    as I recall, that among the evaluators that the Army had were

7    people who were actually from Fort Huachuca so they had

8    personal knowledge of that.

9        In addition, the Army claims that it was not permitted to

10   look at the current staffing in evaluating the proposed

11   staffing is simply wrong.  That would have -- that point was

12   addressed by the Missouri arbitration panel which expressly

13   found that the Army had violated the Act by not considering a

14   company's history of performance in evaluating its technical

15   component.  The Missouri panel stated, quote, the Army was well

16   aware of the facts of the Missouri SLA's subcontractor's

17   management approach and organization because the organization

18   had been the incumbent contractor at Fort Leonard Wood.  That's

19   the location of (unintelligible) fifty years.  That's ECF 22-10

20   at page 10.

21       Again, the Army's own evaluation documents, like the CeTARS

22   that were discussed at the hearing, armed (phonetic) the

23   adequacy of the DES's staffing.  Even if those documents were

24   part of the past performance factor, they should have been

25   considered for the technical factor as well.  Again, that's

```
1    simply a second -- all of this, Your Honor, goes to the DES's
2    first complaint.  All of it goes to why we believe that DES's
3    proposal should have been, even under the Army's, proper
4    application of the Army standard, should have been included in
5    the competitive range.  All of this is beside the point or a
6    supplement to the point that DES's proposal could have been
7    made to be within the competitive range through meaningful
8    discussions.
9          THE COURT:  Mr. Freeman, I think the 45 minutes are
10   up.  So unless there's something else that you need to say, I'm
11   going to let the government have their say.
12         MR. FREEMAN:  I appreciate it, Your Honor.  I've
13   actually, I've been running a clock and I'm not quite at
14   41 minutes if I could just have a few more minutes to address
15   irreparable harm, the second preliminary injunction.
16         THE COURT:  Sure.  Go ahead.
17         MR. FREEMAN:  So there's undisputed testimony that
18   losing the Fort Huachuca contract would be catastrophic for
19   DES, for Mr. Weber, and for the other blind members of the
20   program.
21         THE COURT:  And, Mr. Freeman, I'm going to have you
22   start over.  For some reason, you're fading in and out.  I
23   don't know why but --
24         MR. FREEMAN:  Okay.  Let me try to get a little bit
25   closer.  Is that better, Your Honor?
```

Case 4:23-cv-00250-LCK Document 55 Filed 10/12/23 Page 29 of 58

29

```
1          THE COURT:  Okay, yeah, that's better.
2          MR. FREEMAN:  Thank you.
3      So with respect to the second preliminary injunction
4  factor, irreparable harm, the undisputed testimony is that
5  losing the Fort Huachuca contract will be catastrophic for DES,
6  for Mr. Weber, and for the other blind vendors in the program.
7  DES will lose roughly $4 million out of its $5.4 million
8  budget, almost 75 percent, just slightly over 75 percent.
9  Mr. Weber will lose his employment, his wife will lose hers.
10  Ms. Mackey testified eight members of the DES staff who
11  administer the program will be affected, and without adequate
12  funding and staffing, DES will not be able to support its 20
13  blind vendors throughout the state, won't be able to provide it
14  with the same training, equipment, or assistance with applying
15  for contracting opportunities, won't be able to provide them
16  with the same payments and benefits, including health insurance
17  and retirement benefits.
18      DES also currently provides supplemental cash payments up
19  to a fair minimum wage for blind vendors.  Again, it will not
20  have the funds to do any of that which will have a
21  life-altering impact for vendors who operate small or blind
22  vending facilities like the cafeteria outside the Tucson
23  federal courthouse.
24      Again, monetary damages are not available due to sovereign
25  immunity.  So losing the Fort Huachuca contract will be
```

UNITED STATES DISTRICT COURT

1    devastating, the impact will be immediate, and will be

2    irreparable.

3        Finally, with respect to the balance of the harms, there's

4    simply no comparison between the evisceration of the State of

5    Arizona's Randolph-Sheppard program on the one hand and on the

6    other hand the Army continuing to receive high-quality service

7    at the current price which it has not claimed to be

8    unreasonable.  Therefore, the balance tips overwhelmingly in

9    favor of DES and, given that, as I noted earlier, even though

10   DES meets the likelihood of success standard, it need only

11   show, quote, serious questions going to the merits under *hiQ*

12   *Labs*.

13       Finally, with respect to the public interest, that factor,

14   too, favors DES.  The public interest is promoted by respecting

15   the Randolph-Sheppard Act and its blind vendors and by allowing

16   the Randolph-Sheppard arbitration process to play out.  The

17   stakes in the case are extremely significant for DES.  If DES

18   is permitted -- if the Army is permitted to kick DES out of

19   Fort Huachuca, even for a six-month period, it would be

20   disastrous.

21       We, therefore, respectfully ask that the court enter an

22   injunction, preserve the status quo until a panel renders its

23   decision on the merits, and avoid that disaster for DES.  Thank

24   you.

25           THE COURT:  Thank you, Mr. Freeman.

1      And for the government, Ms. Letzkus, are you arguing?

2             MS. LETZKUS:  Yes, Your Honor.

3             THE COURT:  Okay.  Whenever you're ready.

4             MS. LETZKUS:  Thank you, Your Honor.

5      It's plaintiff's burden here to prove all the elements that

6  are required to obtain an injunction, including likelihood of

7  success on the merits, likelihood of irreparable harm to

8  plaintiff, that the balance the equities tilts in favor of the

9  injunction, and that public interest would be served by the

10 issuance of the injunction.  Plaintiffs have failed to meet its

11 burden here.  Therefore, the court must deny the motion for

12 preliminary injunction.

13     As defendant has said from the beginning, this is a simple

14 case both from the law and the facts.  And both the law and the

15 facts are in defendant's favor here.

16     First, the Randolph-Sheppard Act priority is not absolute.

17 Multiple federal courts have affirmed that proposition and

18 that's set out in defendant's briefing.  The Randolph-Sheppard

19 Act gives the state licensing agency a priority over other

20 offerors only after the competitive range has been set and the

21 state licensing agency's acceptable proposal is included in the

22 competitive range.  The regulation, 34 CFC 395.33, makes it

23 very clear in subsection (b) that the priority applies only if

24 the state licensing agency is first judged to be in the

25 competitive range.

In order to be included in the competitive range, the state licensing agency's proposal must clearly demonstrate that it meets the minimum requirements of the agency and of the solicitation.  The Randolph-Sheppard Act priority does not mean that a state licensing agency can submit an unacceptable proposal that does not meet the agency's minimum needs and does not comply with the requirements of the solicitation and still automatically be included in the competitive range.

Now, once the state licensing agency's proposal is included in the competitive range, because it has submitted an acceptable proposal, then the priority would apply, meaning it almost certainly would get the contract.  But under the plaintiff's interpretation of the Randolph-Sheppard Act, the agency would be required to in every instance include the state licensing agency's proposal in a competitive range even if it's unacceptable.  Therefore, the state licensing agency would always be entitled to the contract, no matter how unacceptable its proposal may be.  But again, Your Honor, federal courts have said the Randolph-Sheppard Act priority is not absolute.

To try and get around this, plaintiff says that the agency is required to engage in meaningful discussions with the state licensing agency to enable it to make its proposal acceptable. And when plaintiff references "meaningful discussions", it clearly does not mean discussions for clarifications about how its proposal as submitted can work to satisfy the Army's

1    minimum requirements.  Plaintiff clearly interprets "meaningful

2    discussions" to mean that the contracting officer has to let

3    the state licensing agency heavily revise the proposal it

4    submits or even submit a completely new proposal.

5        It's important for the court to remember that there is no

6    meaningful discussion requirement in the Randolph-Sheppard Act

7    itself or in the (unintelligible) evaluation.  The meaningful

8    discussion idea comes from the Department of Education handbook

9    that has guidelines for interpreting the Randolph-Sheppard Act

10   priority.  Guidelines are simply that, guidelines.  They

11   provide guidance.  They do not provide requirements nor do they

12   have the effect of federal law.  At any rate, the handbook's

13   guidance must be read as a whole and not just as selectively

14   quoted by plaintiffs.

15       In talking about how contracting officers evaluate state

16   licensing agency proposals, the handbook specifies, quote, a

17   proposal received from an SLA will be evaluated in the same

18   manner as for other offerors, close quote.  The handbook also

19   provides that the meaningful discussion contemplated, quote,

20   would be consistent with an action involving a commercial

21   offeror under comparable circumstances, close quote.

22       So the handbook itself makes it clear that it's not

23   establishing special treatment for state licensing agencies

24   over all other offerors when it comes to the establishment of

25   the competitive range.  Whatever the handbook means by

1    "meaningful discussions", it can't mean what plaintiff contends

2    it does, otherwise, it would not say to treat offerors equally.

3        Plaintiff's interpretation of the meaningful discussion

4    issue would create a two-tier system for offerors when it comes

5    to the competitive range.  The Department of Education is only

6    authorized to promulgate regulations and guidance regarding the

7    implementation of the RSA.  It does not have the right to

8    change or override the Federal Acquisition Regulation, FAR.  As

9    such, in the plaintiff's interpretation, all nonstate licensing

10   agency offerors would be subject to requirements of FAR but

11   state licensing agencies would not.

12       You heard from the contracting officer, Mr. Vicory, that

13   FAR strictly limits discussion with offerors after they submit

14   their proposal but before the contracting officer sets the

15   competitive range.  Per FAR, the contracting officer can talk

16   to the offerors and have them provide clarifications and answer

17   questions about the terms of their proposal after it's been

18   submitted.  But the contracting officer is prohibited from

19   allowing offerors to revise or correct or change their

20   proposals.  48 CFR 15.306 when talking about exchanges between

21   offerors after receipt of proposals but before the setting of

22   the competitive range specifically says, quote, such

23   communications shall not be used to cure proposal deficiencies

24   or material omissions, materially alter the technical or craft

25   elements of the proposal, and/or otherwise revise the proposal,

1     close quote.

2          Under plaintiff's interpretation, state licensing agencies

3     would be permitted to revise the proposals as much as they want

4     or even scrap their proposals entirely and start all over again

5     with an entirely new proposal.  But any other offeror would not

6     be permitted to revise or change its proposal.  That would

7     directly contradict the handbook's instruction that state

8     licensing agency proposals should be evaluated in the same

9     manner as all other offerors.

10         And as Mr. Vicory testified, if the contracting officer

11    were to permit SLAs to submit revised, corrected, or new

12    proposals but not other offerors, he would be -- the

13    contracting officer would be opening himself or herself up to

14    litigation or to General Accountability Office protest from the

15    other vendors that submitted bids and were excluded from the

16    competitive range because he would not be treating all offerors

17    equally in evaluating the proposal.  And Mr. Vicory also

18    testified that, based on his experience, he believed any such

19    protest would be upheld and the Army would be required to take

20    corrective action, eventually start the process over again.  As

21    the contracting officer, Mr. Vicory was required by FAR and by

22    the solicitation to evaluate each offeror's proposal in the

23    same manner and that would be consistent with the handbook

24    citing as well.

25         Mr. Vicory gave plaintiff the opportunity to explain and

1    clarify how it believes its proposal as submitted met the

2    requirements of the solicitation and the Army's minimum

3    requirements.  But he did not give plaintiffs a chance to

4    revise its proposal or come up with some new proposal.  He did

5    not do so because that would violate FAR and, again, it

6    actually would be inconsistent with the handbook's repeated

7    guidance to treat all offerors the same and to treat state

8    licensing agencies just like any other commercial offeror.

9        Plaintiff here has never actually attempted to provide a

10   new or revised proposal.  It clearly stands by its contention

11   that its proposal as submitted met the minimum requirements of

12   the Army and the solicitation.  And even if it had attempted to

13   provide a new proposal, the contracting officer, Mr. Vicory,

14   would have violated the terms of the solicitation if he

15   considered a revised or new proposal from plaintiffs.

16       The solicitation clearly set out the five-step process that

17   explains the first step would be to determine if the proposal

18   submitted met the minimum needs of the Army and satisfied the

19   requirements of the solicitation and set the competitive range

20   based off proposals that were acceptable.

21       Mr. Freeman referenced testimony from Mr. Vicory that the

22   Army has sometimes had extensive discussions with offerors in

23   step two but plaintiff did not get to step two.  Plaintiff

24   failed at step one.  The second step was -- the second step did

25   provide that the contracting officer would engage in

1    discussions and negotiations but only with those offerors whose

2    proposals were acceptable and included in the competitive

3    range.  The proposal plaintiff submitted was not acceptable,

4    therefore, it could not be included in the competitive range

5    and the contracting officer could not engage in discussions and

6    negotiations with plaintiff for relief past terms of the

7    solicitation.  The handbook does not say that the state

8    licensing agency proposal must be considered within the

9    competitive range if it is technically inferior or deficient.

10        Here, the court heard from Mr. Vicory, the contracting

11   officer, and Mr. Froehlich, the Army's subject matter expert.

12   Both testified that there were multiple, serious deficiencies

13   with plaintiff's technical proposal.  For example, the staffing

14   for cashiers was too lean to meet the Army's projected minimum

15   needs and posed too much of a risk of a back-up in getting

16   soldiers fed in a timely fashion so that they could get back to

17   their training and their mission.

18        There were also too few food sanitation workers to ensure

19   that the dining facilities and equipment were clean and the

20   food service was safe for the soldiers to eat.  And there was

21   the trash can issue.  Mr. Froehlich explained how plaintiff's

22   cross-training proposal would cause a serious problem with

23   accountability as well as other problems if, for instance, flow

24   rate.

25        Most egregiously, plaintiff's proposal did not even propose

1    any staffing at all for two bands of meals at the Thunderbird

2    facility which the solicitation clearly required them to

3    include in their proposal.  When Mr. Freeman says, well, the

4    Army could have easily asked plaintiff to propose staffing for

5    the two bands of meals.  The Army did ask all offerors,

6    including plaintiffs, to propose staffing for those bands of

7    meals as a required part of the solicitation.

8        Mr. Vicory, the contracting officer, went out of his way

9    here to get a second opinion from two Army subject matter

10   experts after the SSEB determined that plaintiff's proposal was

11   simply unacceptable.  He didn't have to do that  but he did so

12   because he wanted to make sure that the Army had made the right

13   decision.

14       The subject matter experts determined that plaintiff's

15   proposal was technically unacceptable and did not meet the

16   Army's minimum requirements.  If it couldn't meet the Army's

17   minimum requirements, then it could never be technically

18   acceptable.  As such, it could not be included in the

19   competitive range.  It's important to remember than the Army's

20   minimum requirements were the bare minimum of what the Army

21   believes it needs from a national security standpoint.  If a

22   vendor cannot satisfy the Army's minimum requirements, that may

23   negatively impact national security.

24       Plaintiff essentially argued here that the Army was

25   required to instruct plaintiff and is required to instruct

1    other SLAs, state licensing agencies, how to fix their

2    proposal, tell them exactly how many staff to propose and

3    exactly how to respond to the solicitation.  And plaintiff

4    argues that state licensing agencies have to be included in the

5    competitive range no matter how many deficiencies and they

6    should always get the contract.  That flies in the face of a

7    competitive selection process.  Why even have other entities

8    submit offers if the SLA doesn't have to comply with the

9    solicitation?

10        Mr. Vicory testified the solicitation here was very clear

11   that unacceptable proposals would not be included in the

12   competitive range.  He testified that if he had included

13   plaintiff's unacceptable proposal in the competitive range, he

14   would have violated the terms of the solicitation and been

15   subject to a General Accountability Office protest which would

16   have been sustained because he would not have treated all

17   offerors the same in evaluating proposals.

18        One of Your Honor's questions was what the standard of

19   review should be with respect to Mr. Vicory's conclusion backed

20   up by the SSEB and the subject matter experts that plaintiff's

21   proposal was unacceptable and therefore could not be included

22   in the competitive range.

23        Contracting office decisions are entitled to deference by

24   this court.  By virtue of that deference, the court may

25   overturn the government's procurement decision only if the

1    procurement officer's decision lacked a rational basis.  In

2    conducting the rational basis analysis, the court looks to

3    whether the contracting agency provided a coherent and

4    reasonable explanation of its exercise of discretion.  And,

5    Your Honor, this deference discussion is found in annotated

6    *Impresa Consturzioni Domenico Garufi v United States* -- sorry

7    for my terrible Italian.  That is 238 F.3d 1324.  It's from the

8    Federal Circuit in 2001.

9        To overcome the deference that is afforded the contracting

10   officer's decision, plaintiff here bears the burden of showing

11   that the award decision has no rational basis but Mr. Vicory

12   and Mr. Froehlich clearly established several rational bases

13   for finding plaintiff's proposal to be technically unacceptable

14   and therefore not included in the competitive range.

15       Plaintiff cites multiple arbitration panel decisions, which

16   arbitration panel failed to apply the required deferential

17   level of review.  As explained in our opening, Your Honor, the

18   -- all of the arbitration panel decisions on which plaintiff

19   relied are factually distinguishable.  Moreover, the court is

20   not bound by the arbitration panels' decisions.  They are not

21   binding nor are they persuasive.

22           THE COURT:  Ms. Letzkus, let me ask you, I may not be

23   bound by them but in determining whether or not ADES has a

24   likelihood of success before the arbitration panel, aren't

25   those decisions meaningful for the court to consider and

1    shouldn't the court consider those decisions?

2         MS. LETZKUS:  Well, they're not meaningful or

3    persuasive, Your Honor, because as explained, they're all

4    factually distinct.  Only one of them involves a SLA being not

5    included in the competitive range due to technical deficiencies

6    of the proposal and in that case there was direct evidence that

7    the contracting officer had a personal bias against the blind

8    vendor.  So defendant would suggest, Your Honor, that these

9    arbitration panel decisions are not entitled to any persuasive

10   value.

11        THE COURT:  Has the government provided specific

12   arbitration panels' decisions that would be on point for the

13   issues that we have here?

14        MS. LETZKUS:  No, Your Honor.  What we relied on was

15   plaintiff's extensive discussion of arbitration panel decisions

16   and how they were distinguishable from our situation.

17        THE COURT:  Okay.  Go ahead.

18        MS. LETZKUS:  Well, the arbitration panel decisions

19   are not persuasive and their failure to apply the deferential

20   standard should be rejected here.  Federal courts have made it

21   clear that the traditional deference does apply in

22   Randolph-Sheppard Act disputes and those cases are cited in

23   defendant's brief.

24      Even arbitration panels who (unintelligible) the

25   traditional deference standards have never said that de novo

1   review applies unless there's substantial weight afforded the

2   contracting officer's decision.  The Army knows its projected

3   future needs better than anybody and Mr. Vicory went out of his

4   way to choose subject matter experts to take an independent

5   second look at plaintiff's proposal after the SSEB had already

6   determined that it didn't satisfy the Army's minimum needs.

7        The court must afford discretion to the Army's decision as

8   to what its minimum needs are and whether plaintiff has or can

9   meet them.  Otherwise, the state licensing agency would get to

10  dictate to the Army what the Army's needs are.  That would be

11  an absurd result with far-reaching consequences for national

12  security.

13       The only person from plaintiff's side who was involved with

14  a proposal and testified about it was Mr. Weber.  Even

15  Mr. Weber conceded that he does not believe he knows better

16  than the Army what the Army's needs are over the next five

17  years.  So the court should defer to Mr. Vicory who has the

18  benefit of not only the SSEB evaluation but also the

19  independent SMEs' evaluation.

20       Plaintiff has (unintelligible) a significant time and

21  opportunity of establishing that it had satisfactorily under

22  the existing contract.  The past performance issue is simply a

23  red herring.  Past performance is just one independent factor

24  to be considered, not the sole factor.  And there's no dispute

25  that plaintiff's past performance was considered by the Army

and was deemed acceptable.  Nor in the solicitation does it require the Army to count past performance twice by using it to evaluate the technical capability factor or the fact and subfactor in addition to the separate past performance factor. Your Honor asked Mr. Weber where in the solicitation it provides that past performance is to be taken into account when evaluating the technical capability factor and he was unable to point the court to any such provision.

Mr. Vicory testified the solicitation did contemplate the sort of double counting of past performance.  And Mr. Froehlich testified the Army has decided that its projected needs over the next five years are different from five years ago when plaintiff was awarded the contract.

As (unintelligible) the world has changed recently, especially with the war in Ukraine, the Army has to anticipate and adjust potential changes to the number and types of soldiers that will need to be sent.  It's key (unintelligible) to remember that the RSA priority is not absolute and does not require that the government contracts with a vendor whose proposal is technically inferior and does not meet the minimum requirements of the solicitation.  And several courts have acknowledged this fact, including the Tenth Circuit in *Kansas versus North America*, which is 874 F.3d 1226, the Federal Circuit in *Kentucky versus United States*, 424 F.3d 1222, the Fourth Circuit in *NISH versus Cohen*, 274 (sic) F.3d 197, and

the Court of Federal Claims in *Commonwealth of Kentucky*

*Education Cabinet, Department for the Blind versus United*

*States*, which is 62 Fed. Cl 445, and *Mississippi Department of*

*Rehabilitation Services versus the United States* which is

61 Fed. Cl 20.

And this technical proposal was deficient for multiple

reasons.  Therefore, it could not be considered in the

competitive range and the RSA priority does not kick in here.

As such, plaintiff has not established that the defendant

violated the RSA in not including it in the competitive range

and plaintiff has not then satisfied its burden to prove it's

likely to succeed on the merits.

And with regards to the irreparable harm factor, courts

have repeatedly said that money losses are not generally

considered irreparable harm.  Mr. Weber testified he will lose

his (unintelligible) if he's not awarded the contract, despite

the proposal being unacceptable.  But ADES's witness,

Ms. Mackey, testified that ADES has over 30 locations in

Arizona so it stands to reason that ADES could find Mr. Weber a

job at one of those other facilities.

Mr. Freeman here has repeatedly pointed out that ADES

relies heavily on its cut of the proceeds from the Fort

Huachuca contract to fund its operation.  It's unfortunate then

that ADES did not given Mr. Weber more assistance in crafting

the proposal or did not itself craft the proposal in such a way

1  as to meet the minimum requirements of the Army and the terms

2  of the solicitation.

3      Federal courts have made it clear that the

4  Randolph-Sheppard Act does not give state licensing agencies or

5  blind vendors an unqualified right to a contract.

6      Plaintiff has also not met its burden to prove that the

7  balance of the equities tilts in favor of an injunction here.

8  Again, what -- under the plaintiff's interpretation of the

9  Randolph-Sheppard Act, the competitive selection process for

10  contracting would be completely ignored and discarded.

11      The court has heard testimony it took a long time to get a

12  final decision in an RSA arbitration and then there are the

13  appeals.  And during that time, the Army will be forced to

14  continue the contract with plaintiff by a series of bridge

15  contracts even though the Army has decided plaintiff can't

16  satisfy its minimum requirements.  And the court heard from

17  Mr. Vicory that such bridge contracts are disfavored for

18  multiple reasons.

19      It would be inequitable to allow plaintiffs to use the

20  preliminary injunction process to force the Army to continue to

21  contract with plaintiff indefinitely even though it can't meet

22  the Army's minimum needs.  We are talking here about soldiers

23  who have volunteered to serve their country.  They deserve to

24  be fed in a safe and timely fashion so they can continue their

25  training and serve their mission.

1          THE COURT:  Hasn't Mr. Weber done that, though, for

2     the last 10 years?

3          MS. LETZKUS:  Well, as Mr. Froehlich testified, the

4     Army has determined that its needs are projected to be

5     different over the next five years so plaintiff's current

6     performance does not necessarily impact or demonstrate that it

7     will be able to meet the Army's projected requirements over the

8     next several years.

9          THE COURT:  And if I remember correctly, didn't

10    Mr. Vicory also indicate that under a current contract, if

11    additional staffing or meals needed to be done, there was a

12    mechanism to do that within an existing contract; is that

13    correct?

14         MS. LETZKUS:  Yes, Your Honor, he did testify to that.

15    I believe he also testified that depending on the changes

16    required that could be considered a new solici -- something

17    that required a new solicitation that would be subject to

18    protest by other potential vendors.

19         THE COURT:  Let me ask one other question and then

20    I'll let you continue with your other arguments.  But one of

21    the questions I have is should the court find not necessarily

22    that the plaintiff is likely to succeed on the merits but at

23    least serious questions going to the merits, what's the Army's

24    argument with respect to the balancing of the hardships and how

25    that does not tip sharply in the plaintiff's favor?

1       MS. LETZKUS:  Well, then, the balance doesn't shift

2  sharply in plaintiff's favor here because what plaintiff wants

3  the court to do by using the preliminary injunction process is

4  to do an end run around the competitive selection process which

5  is -- has been put in place to conserve taxpayers' money and to

6  get efficient, effective services.  If -- it's not the Army's

7  obligation to prove that it will be harmed but the Army has,

8  Mr. Vicory has testified that the -- excuse me.  Mr. Froehlich

9  has testified that the Army's needs are projected to change

10  over the next few years and therefore -- and that plaintiff's

11  proposal does not meet those minimum needs so the Army should

12  not be forced to continue the contract with plaintiff

13  indefinitely pending the results of an arbitration panel and

14  any appeals of that decision because it would simply be -- it

15  would simply enable the plaintiff to do an end run around the

16  competitive selection process.

17       And that also goes to the public interest factor, Your

18  Honor.  The public interest is served by enforcing the

19  competitive selection process, not by rewarding offerors who

20  are trying to use the preliminary injunction process to force

21  the Army to continue to accept services that it has determined

22  don't meet the minimum needs.

23       So, Your Honor, the FAR was created in order to conduct

24  government procurement that (unintelligible) by taxpayers with

25  integrity, fairness, and openness and ensure a fair contracting

1    process where all offerors are treated with fairness and equity

2    based on their ability to meet the minimum requirements of the

3    agency, and the contracting officer here correctly applied FAR

4    in finding that plaintiff's proposal didn't meet the Army's

5    minimum requirements and was therefore unacceptable and could

6    not be included in the competitive range.  Allowing plaintiffs

7    to disregard the Army's minimum requirements would set a bad

8    precedent, would not serve the needs of our soldiers, and would

9    negatively affect the Army's mission.

10        So, in conclusion, Your Honor, plaintiff has simply not met

11   its burden to demonstrate that it's entitled to the

12   extraordinary remedy of a preliminary injunction here and,

13   therefore, defendant respectfully requests that the court deny

14   plaintiff's motion.  And I'd be happy to answer any additional

15   questions that Your Honor might have.

16            THE COURT:  I don't have any other questions.  Thank

17   you, Ms. Letzkus.

18            MS. LETZKUS:  Thank you, Your Honor.

19            THE COURT:  And, Mr. Freeman, any rebuttal?

20            MR. FREEMAN:  Yes, Your Honor.

21        Several points, I'll try to address them basically in the

22   order that the Army raised them.  I'd like to start with

23   something the Army failed entirely to address which is the fact

24   that the requirement to place a proposal in the competitive

25   range if it might be made acceptable through meaningful

discussions doesn't come from the DOE handbook, it comes from

the meaning of "competitive range" the way competitive range

was applied in 1977 when the Randolph-Sheppard Act and its

regulations were adopted.  So that's as a matter of statutory

interpretation by the Randolph-Sheppard Act and its regulations

require that -- excuse me.  I'm sorry.

THE COURT:  That's okay.

MR. FREEMAN:  -- require the SLA's proposal to be

placed into a competitive range if it can be made acceptable

from meaningful discussions.

It's the Army, not the Department of Education, that

changed, that tried to change that.  The -- again, the Army has

the right to change it for other offerors but not for state

licensing agencies.  The Army's counsel referred to the

handbook's reference to evaluating in the same manner other

offerors.  Again, that's because that's in 1977, when the

regulations were adopted, everybody was evaluated that way.

And the SLA's proposal was therefore evaluated in the same

manner.

Now that the Department of Education has changed -- I'm

sorry, now that the Department of Defense has changed the way

it sets the competitive range, it can still evaluate everyone

in the same manner but the Randolph-Sheppard Act and its

regulations require one additional step with respect to the

SLA, which is to continue considering the SLA's -- whether the

1    SLA's proposal can be made to be acceptable through meaningful

2    discussions.  That was the requirement in 1977 under the

3    Randolph-Sheppard Act and regulations, that's still the

4    requirement today.

5        And the Army argues that the Department of Education can't

6    create a two-tier system and can't override FAR.  But, in fact,

7    there is a -- there's a like two-tier system that is required

8    by the Randolph-Sheppard Act.  That's the purpose of the

9    Randolph-Sheppard Act.  That, as I said before, and I don't

10   think the Army disputes if the SLA is in the competitive range

11   and its proposal can be made acceptable, then it is supposed

12   to, Congress directed that it receive its award.

13       There are certainly some situations where the SLA's

14   proposal cannot be made acceptable and it won't get it.  But

15   the priority, as Congress instructed and the Department of

16   Education implemented, is a priority for the SLA to get this

17   because Congress wants blind vendors to have this

18   entrepreneurial opportunity.

19       That point, Your Honor, I want to again fly was directly

20   addressed by the Georgia District Court, not by an arbitration

21   panel, at 398 F.Supp. 3d at 1351, note seven, which recognized

22   that the Randolph-Sheppard Act, quote, might require a

23   different result than the general FAR regulations would

24   otherwise with certain government contracts.  And then again

25   the Oklahoma arbitration decision found the same thing at

1   page 18.

2      With respect, by the way, to the import of the arbitration

3   decisions, we're not claiming that every one of them has

4   exactly the same facts, but each and every one of the

5   propositions that we cite those arbitrations for is fully

6   appropriate and fully applicable here.  I do think that the

7   government, the Army slightly mischaracterized some of those.

8      First of all, the personal bias case that counsel referred

9   to is the Oklahoma case.  There are, in fact, two of the

10  arbitration panels that we reference which were addressing

11  situations in which the federal property manager had found the

12  SLA's bid to be technically unacceptable.  That's both the

13  South Carolina decision and the Missouri decision are, I would

14  submit, are very close on the facts as well as on the law

15  that's applicable here.

16     On the other hand, some of the cases that the Army is

17  citing are simply not Randolph-Sheppard cases but the

18  (unintelligible) not a Randolph-Sheppard case.  The cases sort

19  of generally alludes to where money losses are not considered

20  irreparable harm don't apply here because in those cases

21  monetary damages are available, whereas, here it's undisputed

22  that because of sovereign immunity, monetary damages would not

23  be available to ADES or Mr. Weber at the end of this case.  So,

24  again, we cite that both in our brief and again in our reply.

25     With respect again, to -- so I find that the Georgia

1   District Court case, there's also the Fourth Circuit's decision

2   in *US versus Cohen,* 427 F.3d at 202, which specifically

3   addressed the fact that, quote, the Department of Defense was

4   wrong in implementation of the Randolph-Sheppard Act.  It was

5   primarily to follow the decisions of the Department of

6   Education.  It is the Department of Education's administration

7   of the Randolph-Sheppard Act that is authorized by statute that

8   is entitled to deference.  Again, the deference goes to the

9   Department of Education, not to the Army, certainly not to the

10  contracting officer.  It's not -- Mr. Vicory doesn't get to

11  interpret the Randolph-Sheppard Act, only the Department of

12  Education does.

13      Again, despite Mr. Vicory's, what I submit are overblown

14  fears, if the -- when the Randolph-Sheppard arbitration panel

15  says that he should have included that SLA's proposal in the

16  competitive range and he complies with that direction, there is

17  simply no risk of some sort of GAO or other challenge or

18  nobody's going to jail.  That is simply the law.  The law is

19  that the Randolph-Sheppard Act does in this particular instance

20  override the -- override the FAR.

21      With respect to the cash fund which the government

22  mentioned, that was not a ground for exclusion.  I submit that

23  that wasn't actually a real concern.  The cash fund has never

24  been an issue in 20 years of operation and, again, to the

25  extent that there was desire for some sort of different

1   approach, that's precisely the sort of meaningful discussion

2   that could be held.

3       Mr. Vicory agreed in day two transcript, page 50, at lines

4   9 through 16, that a debriefing letter, quote, set out all the

5   grounds for the Army's disqualification of DES's proposal, and

6   he conceded that the debriefing letter did not mention the cash

7   fund and really that should end the inquiry.

8       With respect to the alleged impact on national security, we

9   submit that there is simply no effect on national security for

10  Mr. Weber continuing providing food service for the next six

11  months or even longer if there might be an appeal.  Again, we

12  could come back to the court if there is some concern about the

13  length of time.

14      But Mr. Weber has, is, and will continue to provide

15  high-quality service to the Army and its soldiers during the

16  pendency of any preliminary injunction while the arbitration

17  panel is playing out.  Again, we cited to the court the length

18  of time of the recent arbitration panel which has been less

19  than six months.  So we anticipate that the hearing in this

20  case will be sometime early next year.

21      Again, the Army has simply not identified any appreciable

22  harm that it will suffer, let alone harm that comes close to

23  what DES will suffer.  We're not talking about over the next

24  five years, we're talking about over the next six months, maybe

25  a little bit longer, but the -- for the panel to decide,

1   hopefully, for the Army then to implement the panel's decision.

2   That, that's the time period where the harm is being balanced,

3   that's the time period where, in the absence of a preliminary

4   injunction, ADES will completely lose this income, be

5   devastated, Mr. Weber will lose his income.  Moving him to

6   another facility is not an adequate substitute for that, and

7   the Army has, I believe, conceded, certainly has not disputed,

8   that there is no opportunity to recover that income and

9   therefore that this harm is indeed irreparable.

10       If I might just have one moment to consult with co-counsel,

11  Your Honor, I think I'm almost finished.

12           THE COURT:  Yes, go ahead.

13           MR. FREEMAN:  Just a couple of last points, Your

14  Honor.  Again, where I left off that the Army will continue to

15  receive the same level of staffing tomorrow under preliminary

16  injunction that it's receiving today under the prior contract

17  and on which the Army has consistently given high, favorable

18  evaluations to.

19       With respect to the court's question regarding if

20  additional staffing is needed, could that be done, the answer

21  is absolutely yes.  The Army simply does a contract

22  modification.  A contract modification would be totally in line

23  with the current contract.  There's no scenario that the Army

24  has offered that would technically require a new solicitation

25  while the arbitration is pending.

1        With respect, finally, to the -- the underlying question is

2   simply, contrary to the Army's argument, the Army does override

3   FAR to the extent that the two are in conflict.  I'm sorry, the

4   Randolph-Sheppard Act and the Randolph-Sheppard regulations

5   override FAR to the extent they are in conflict.  Again, we

6   submit that they can be reconciled.  We submit that if the

7   Army, by following the Randolph-Sheppard Act, can place this

8   into the competitive range and then conduct meaningful

9   discussions in step two, and that the FAR allows that, but to

10  the extent that it does not or, again, it is the

11  Randolph-Sheppard Act that specifically applies to this

12  specific situation and it is the Department of Education and

13  its regulations that governs here.

14       At the least, there are serious questions with respect to

15  whether the arbitration panel will reach that conclusion.

16  Again, in light of the overwhelming balance of the hardships,

17  and the overwhelming hardship that DES will suffer compared to

18  the simple continuation of the satisfactory status quo that the

19  Army will, I don't want to say suffer, but that the Army will

20  enjoy, all that the court need find is that there's a serious

21  question as to whether the SLA's bid should have been placed in

22  the competitive range because it could be -- because it could

23  then have been made acceptable through meaningful discussions.

24       Finally, Your Honor, under the preliminary injunction

25  rules, if there is some sort of changed circumstance while the

1   preliminary injunction is pending, we could always return to

2   the court.  I highly doubt that that would be the case but the

3   preliminary injunction is just that, and, again, if there are

4   changed circumstances, we could return.  Thank you.

5          THE COURT:  Thank you.  The court will take the matter

6   under advisement.  I do have a question, I guess, for either of

7   the parties regarding this.  Is there any additional

8   information regarding the status of the arbitration compared to

9   a couple of weeks ago?

10          MR. FREEMAN:  A slight one, Your Honor.  So I think

11  when we first informed the court, both sides had appointed

12  their arbitrators and the way the process works, the -- those

13  two arbitrators then choose a chairperson.

14      Actually, while we were all in Tucson, the Department of

15  Education provided the parties two choices with a list of

16  potential chairpeople.  Unfortunately, the Army's arbitrator

17  has left the country until September 8th.  But I am assured

18  that promptly upon his return the two arbitrators will consult

19  and choose a chairperson and the arbitration will move forward.

20  Again, that will still be on a more expedited schedule that

21  resulted in the six-month, a hearing at the end of six months

22  in what was Fort Lee, is now Fort Gregg-Adams arbitration in

23  Virginia.

24          THE COURT:  Okay.  And, Ms. Letzkus, any additional

25  information regarding the status of the arbitration?

1          MS. LETZKUS:  No, Your Honor.

2          THE COURT:  Okay.  At this time, I'll go ahead and

3     take it under advisement and a written order will follow.

4     Thank you all very much.  I appreciate it.

5          MR. FREEMAN:  Thank you, Your Honor.

6          MS. LETZKUS:  Thank you, Your Honor.

7       (The matter was concluded at 3:09 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1              C E R T I F I C A T E

2

3

4         I, Cindy J. Shearman, court-approved transcriber,

5    certify that the foregoing is a correct transcript from the

6    official digital sound recording of the proceedings in the

7    above-entitled matter to the best of my ability.

8

9

10    _s/Cindy J. Shearman_____        October 12, 2023_
      Cindy J. Shearman, RDR, CRR, CRC       Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25